UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ELMER WILLIAMS,

      Plaintiff,

v.

RICKY DIXON, in his official capacity as
Secretary of the Florida Department of
Corrections, CENTURION OF FLORIDA,
LLC, MHM HEALTH PROFESSIONALS,
LLC, ALEXIS FIGUEROA, M.D., KALEM
SANTIAGO, JASON HOWELL,
ELIZABETH HOLMES, TONY ABBOTT,
GERALD KNAUS, JESSEE MORRIS,
ADELE JOHNS, WENDY MILLETTE, and
SGT. SAVONIA RICHARDSON-GRAHAM,

      Defendants.

Case No.

**DEMAND FOR JURY TRIAL**

## COMPLAINT FOR DAMAGES

Plaintiff Elmer Williams asserts the following claims against Defendants Ricky D. Dixon, in his official capacity as Secretary of the Florida Department of Corrections (FDC), Centurion of Florida, LLC, MHM Health Professionals, LLC, Alexis Figueroa, M.D., Kalem Santiago, M.D. (ACN), Jason Howell, Elizabeth Holmes, Tony Abbott, Gerald Knaus, Jessee Morris, Adele Johns, Wendy Millette, and Sergeant Savonia Richardson-Graham.

## INTRODUCTION

**"Doing nothing for others is the undoing of ourselves." – Horace Mann**

Plaintiff Elmer Williams has a history of diagnosed prostate cancer. One year ago—then a prisoner in the custody of the Florida Department of Corrections—Plaintiff was transferred to Suwannee Correction Institution and by all accounts something was wrong. He complained about numbness in his legs and back pain, he had trouble walking, and ultimately, he fell hurting himself. His dorm guard, Sergeant Richardson-Graham, violated protocol in responding to his injuries and used discipline to retaliate against him for grieving her misconduct. His doctors and nurses ignored his medical complaints, causing him to have to scrape his body against the dirty cell floor in confinement for a month resulting in wounds that became so infected and untreated that bone was visible. FDC's Central Office staff also ignored Plaintiff's medical concerns, summarily dismissing his increasingly urgent emergency requests for help. The medical staff has also retaliated against Plaintiff for his grievances about their lack of care, denying him a needed wheelchair.

In the end, everyone has ignored the obvious—since he was moved to Suwannee C.I., Plaintiff became increasingly ill, and the retaliatory conduct and lack of constitutionally adequate care were only making it worse. His condition became so bad that Plaintiff is now terminal and days ago he was awarded compassionate medical release, where he is now thankfully in the care of his family and qualified medical professionals.

Defendants did nothing for Plaintiff. Some were so absorbed in their pettiness and inhumanity that they punished him; others ignored reality because accepting it meant adding losses to their employers' balance sheets or having to undertake additional work. Regardless of the reason, Defendants must be taken to account for their gross and flagrant violations of the law.

### JURISDICTION AND VENUE

1. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

2. Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of civil rights under the Eighth Amendment to the U.S. Constitution.

3. Plaintiff's claim is also predicated upon the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131 and 12133, and § 504 of the Rehabilitation Act.

4. Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367, to consider the state law claims alleged herein.

5. Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391(b), being the district where the claims arose and Defendants conduct business.

6. All conditions precedent to this lawsuit, including exhaustion of administrative remedies, have occurred, been performed, or been waived.

### PARTIES

7. At all times material hereto, Plaintiff Elmer Williams was an inmate in the custody and care of FDC at Suwannee Correctional Institution. On October 31, 2022, Plaintiff was released from the custody of FDC to the care of his family due to his worsening medical condition. He is no longer a prisoner for purposes of the Prison

Litigation Reform Act, 42 U.S.C. § 1997e.

8.      Defendant Ricky Dixon is the Secretary of the Florida Department of Corrections and is sued in his official capacity. References to the FDC herein also refer to Defendant Dixon. Dixon is responsible for the operation of Florida's prison system, including compliance with the Constitution and federal laws.

9.      Defendant Centurion of Florida, LLC is a subsidiary of Centene Corporation, principally located in Missouri and registered as a foreign limited liability company with the State of Florida. Centurion has contracted with FDC to provide medical care to prisoners. When providing medical care for prisoners in FDC custody, Centurion stands in the shoes of FDC. At all relevant times during the events at issue in this case, Centurion was acting under color of law by and through its agents, employees, and contractors identified herein and, on information and belief, other presently unknown individuals.

10.      Defendant MHM Health Professionals, LLC is a wholly owned subsidiary of MHM Services, Inc., which itself is a wholly owned subsidiary of Centene Corporation. MHM Health is responsible for the provision of staffing services related to Centurion's contract with FDC. At all relevant times during the events at issue in this case, MHM Health was acting under color of law by and through its agents, employees, and contractors identified herein and, on information and belief, other unknown individuals.

11.      Alexis Figueroa, M.D. was at all relevant times Centurion's Medical Director/Chief Health Officer at Suwannee C.I. Annex and is otherwise *sui juris*.

4

Figueroa was at all relevant times employed by MHM Health to fulfill this role for Centurion. Dr. Figueroa approved the contours of Plaintiff's medical treatment. Dr. Figueroa is being sued in his individual capacity. At all relevant times during the events at issue in this case, Dr. Figueroa was acting under color of law.

12.    Kalem Linette Santiago, M.D. (ACN) was at all relevant times the FDC Clinical Advisor and is otherwise *sui juris*. Santiago is employed by the Florida Department of Corrections to review care decisions. Dr. Santiago approved the contours of Plaintiff's medical treatment. Dr. Santiago is being sued in her individual capacity. At all relevant times during the events at issue in this case, Dr. Santiago was acting under color of law.

13.    Jason Howell was at all relevant times a registered nurse employed by MHM to provide nursing care to inmates. Howell was involved in Plaintiff's medical treatment. Howell is being sued in his individual capacity. At all relevant times during events at issue in this case, Howell was acting under color of law.

14.    Elizabeth Holmes was at all relevant times a registered nurse employed by MHM to provide nursing care to inmates. Holmes was involved in Plaintiff's medical treatment. Holmes is being sued in her individual capacity. At all relevant times during events at issue in this case, Holmes was acting under color of law.

15.    Tony Abbott was at all relevant times an advanced practice registered nurse employed by MHM to provide nursing care to inmates. Abbott was involved in Plaintiff's medical treatment. Abbott is being sued in his individual capacity. At all relevant times during events at issue in this case, Abbott was acting under color of law.

16.    Gerald Knaus was at all relevant times a registered nurse employed by MHM to provide nursing care to inmates. Knauss was involved in Plaintiff's medical treatment. Knauss is being sued in his individual capacity. At all relevant times during events at issue in this case, Knauss was acting under color of law.

17.    Jessee Morris was at all relevant times a licensed practical nurse employed by MHM to provide nursing care to inmates. Morris was involved in Plaintiff's medical treatment. Morris is being sued in his individual capacity. At all relevant times during events at issue in this case, Morris was acting under color of law.

18.    Adele Johns was at all relevant times an FDC employee staffed in its Central Office. Johns was tasked with responding to Plaintiff's grievances to FDC. Johns is being sued in her individual capacity. At all relevant times during the events at issue in this case, Johns was acting under color of law.

19.    Wendy Millette was at all relevant times an FDC employee staffed in its Central Office. Millette was tasked with responding to Plaintiff's grievances issued to FDC. Millette is being sued in her individual capacity. At all relevant times during the events at issue in this case, Millette was acting under color of law.

20.    Sergeant Savonia Richardson-Graham was at all relevant times a corrections officer employed by FDC to work at Suwannee Correctional Institution. Sgt. Richardson-Graham was in charge of Plaintiff's housing at Suwannee Annex. Sgt. Richardson is being sued in her individual capacity. At all relevant times during the events at issue in this case, Sgt. Richardson-Graham was acting under color of law.

21.     At all relevant times, the actions of Dixon, Centurion, MHM Health and their respective agents were state action and were taken under color of state law.

## COMMON ALLEGATIONS OF FACT

22.     Plaintiff has a history of prostate cancer.

23.     His prostate-specific antigen (PSA) levels, indicating recurrent prostate cancer, were increasing in September 2021.

24.     In November 2021, while in the custody of FDC, Plaintiff was transferred to Suwannee Correction Institution (Suwannee C.I.).

25.     On or about November 18, 2021, Plaintiff reported that walking was painful. Plaintiff was examined by Defendants Howell and Abbott that day, who reported in an FDC Back Pain Protocol report that Plaintiff had severe back pain and numbness in his legs. The report referenced findings of severe back pain that would require immediate clinician notification. However, there appear to be no records in Plaintiff's medical file that would suggest that either defendant made any attempt to report Plaintiff's difficulty walking to any clinicians at Suwannee C.I.

26.     That same day, Plaintiff fell out of his bunk and injured his hip, neck, and back. Defendant Richardson-Graham was the sergeant assigned to Plaintiff's dorm at the time. She refused to call for a stretcher and instead ordered two prisoners to pick Plaintiff up and put him in another prisoner's wheelchair, further injuring him.

27.     Richardson-Graham's above-referenced actions violated FDC policy.

28.     On or about November 19, 2021, Abbott noted in Plaintiff's records that he received an urgent urology referral from October 4, 2021 at his previous institution.

Abbott questioned in his notes whether the referral was ever submitted to urology.

29.  Plaintiff then began experiencing chest pain, breathing problems, numbness in his legs, and difficulty walking. On or about November 23, 2021, Plaintiff told Howell that he been in pain all morning and his legs were locking up.

30.  The next day, on or about November 24, 2021, Howell completed a pre-special housing form stating Plaintiff complained that his legs were numb and he marked "yes" to completing a DC4-529 Mental Health Referral for mental health grade S-3, because Plaintiff declared a mental health emergency.

31.  Despite these symptoms, Plaintiff's fall, the fact Howell had just marked "yes" on the pre-special housing form noting Plaintiff's leg numbness, and the fact that Howell (and Abbott) previously made findings that Plaintiff was experiencing severe back pain and numbness, Howell refused to accommodate Plaintiff's mobility limitations with a wheelchair and simply told him to "walk."

32.  Howell told Plaintiff to "hold on to the medical wall for support to make it back to the lobby."

33.  That same day, Plaintiff wrote an informal grievance concerning Howell's refusal to provide constitutionally adequate care to Plaintiff.  Specifically, Plaintiff wrote to the warden that Howell was *purposely* denying Plaintiff a wheelchair.

34.  On or about December 2, 2021, Plaintiff wrote an informal grievance complaining that he could not get his blood work done because he could not walk to the medical unit and staff still had not provided him with a wheelchair. He had also put in sick call requests concerning these and other health issues.

35.    Graham-Richardson then issued a disciplinary report (DR) against Plaintiff for not going to an Institutional Classification Team (ICT) call-out even though the reason he did not go was because he could not walk. As a result of the DR, Plaintiff was placed in confinement.

36.    While in confinement, Plaintiff attempted to declare a medical emergency because he had passed out, become paralyzed, was in excruciating pain, and needed medication. Nurse Morris told Plaintiff that he could not declare a medical emergency to get any help or medication because the doctor was not there. He then laughed at Plaintiff—who was huddled up in pain—and left without permitting a medical emergency, calling any clinician, or taking any other action.  Plaintiff spent the night in excruciating pain with muscle spasms that robbed him of sleep.

37.    On or about December 4, 2021, Plaintiff issued a grievance regarding Morris' above-referenced refusals.

38.    Upon information and belief, it is Centurion's practice, custom, and policy not to permit prisoners in confinement to declare a medical emergency when their doctors are not on prison grounds.

39.    Plaintiff continued to grieve Howell's, Morris's, and Richardson-Graham's failure to provide adequate care and treatment and retaliatory measures.

40.    Upon release from confinement on or about December 20, 2021, Plaintiff was seen by medical staff. He maintained his complaints—primarily that his legs were numb, swelling, and that he could not use them. For more than a month, Plaintiff had complained but neither FDC nor MHM employees and staff contracted by Centurion

were doing anything about those complaints. Instead, they were punishing Plaintiff by denying him access to a wheelchair, locking him up in confinement, laughing at him, and denying him prompt and adequate care.

41.    Plaintiff was also told that he had to sign a refusal for treatment upon leaving confinement. He refused to sign that document because he was adamant that he was *not* refusing treatment.

42.    On or about December 22, 2021, Plaintiff's sister and daughter both called Suwannee C.I. expressing alarm about what Plaintiff reported to them—not being able to walk, having back pain, a hernia, constipation, and not being treated.

43.    On or about December 24, 2021, Plaintiff was evaluated in the Emergency Room and told Figueroa, Abbott, and nursing staff that he could not walk.

44.    Despite this, Plaintiff was sent back to his dorm. His discharge instructions—completed by nurse Knaus—explained that he had full use of his upper extremities and had to manage his daily living activities as best as he could.

45.    Instead of undertaking any further steps or procedures to alleviate Plaintiff's concerning lack of ability to use his lower limbs, Figueroa, Morris, Abbott, and Holmes did nothing.

46.    Several days later, on or about December 27, 2021, Plaintiff was seen again by nurse Knaus in connection with sick call he requested because he had not had a bowel movement in five days. Even though Plaintiff was continuing to have problems with bowel movements, pain in his back, and an inability to use his lower extremities, Knaus failed to render any treatment to Plaintiff. Instead, Knauss

reminded Plaintiff that this was the third time he had been to medical in three days. He also put a note in Plaintiff's records that he was "abusing" the sick call system and referred him for a mental health assessment.

47.    On or about December 31, 2021, Plaintiff put in another sick call request reporting that his ankles were badly infected and swollen and that they need to be cleaned, sanitized, and bandaged and to report an injury on his shoulder.

48.    On or about January 5, 2022, Plaintiff had an evaluation done by Howell regarding shortness of breath. Howell found that Plaintiff had diminished lung sounds in his lower left lung and that his pulse was irregular.

49.    Then, on or about January 7, 2022, Howell undertook an evaluation of Plaintiff's lower extremities. Howell noted that Plaintiff's lower limbs were warm to the touch, that the swelling extended above the knee, and that he had a new onset of bilateral ankle edema. Plaintiff was finally admitted to the infirmary after almost two months of complaints.

50.    While in the infirmary, on or about January 12, 2022, nurse Wilson noted that there was a foul odor coming from Plaintiff's left ankle wound. Plaintiff told Wilson and Dr. Figueroa that he had not gotten any wound care in several days.

51.    At this time Plaintiff also finally had his PSA levels tested. His PSA levels jumped off the charts from 5.21 (as of September 2021) to 21.00 ng/mL.

52.    A PSA value of greater than or equal to 4.0 ng/mL is the consensus standard at which further evaluation for prostate cancer should occur. Dr. Figueroa was apparently unconcerned and failed to order a full clinical evaluation of Plaintiff's

prostate cancer to see whether Plaintiff's pain and extremity numbness were related to the rising PSA.

53.     Dr. Figueroa noted that Plaintiff had an October 2021 referral to a urologist, but he never took any effort to actualize that referral or make sure that Plaintiff received any care for the spread of his prostate cancer—those tests and any related treatment would have been a significant financial burden for Centurion and MHM Health, to whom Dr. Figueroa would have to answer.

54.     Further, despite requests and grievances for a wheelchair on several occasions (and being chastised by Howell for asking for one), Plaintiff still did not have a pass for a wheelchair or permitted use of one—from time to time he was able to borrow other prisoners' wheelchairs.

55.     Graham-Richardson and Howell never sought to secure a wheelchair for Plaintiff as a direct response to the grievances he had issued concerning them.

56.     On or about January 16, 2022, Plaintiff issued another grievance requesting a wheelchair.

57.     Ultimately, Plaintiff grieved his medical condition directly to FDC—in an emergency medical grievance received by Johns and an appeal received by Millette. Both grievances were received by FDC on or about January 11, 2022.

58.     Plaintiff sought to bypass the Inmate Grievance Procedure based on his continued steep decline in health with his emergency medical grievance that was to be considered and responded to by Johns.

59.     By the time these grievances were received by Johns and Millette and before they were signed by Johns and Millette, medical staff at Suwannee C.I. knew that Plaintiff's PSA had spiked, his ankle wounds were foul-smelling and infecting, he was not able to use his lower extremities. Despite this, Johns and Millette summarily denied Plaintiff's emergency request and appeal—just days after receiving them.

60.     Millette informed Plaintiff in her response denying his appeal that he should contact the Suwannee C.I. medical department for assistance and that his appeal did not merit emergency consideration.

61.     Johns informed Plaintiff in her response denying his emergency medical grievance that the grievance was not accepted as a "grievance of an emergency nature" by the FDC Central Office.

62.     Neither Johns nor Millette provided adequate review of Plaintiff's serious and urgent medical claims.

63.     Still in the infirmary and without a wheelchair to get around, on or about February 2, 2022, Plaintiff was seen by a nurse for wound treatment where it was noted that the wound was the result of necrotizing fasciitis, a rare bacterial infection that spreads quickly in the body and can cause death.

64.     Those wounds were caused by the failures of Richardson-Graham, Howell, Holmes, Figueroa, Abbott, Knaus, and Morris to provide adequate care to Plaintiff and provide him with a wheelchair. Without a wheelchair, Plaintiff had no choice other than to crawl across filthy cement floors to use the toilet or even get his food. Other times he would urinate in a bottle because he could not access the toilet

without use of his lower extremities.

65.    On or about February 8, 2022, during an infirmary checkup, Plaintiff asked why he hadn't been seen by a urologist for the rising PSA levels. Despite Abbott questioning in November 2021 whether Plaintiff's then-urgent urology referral was transmitted and Dr. Figueroa's notation in January 2022 that Plaintiff needed to immediately see a urologist based on the sudden rise in Plaintiff's PSA levels, no one bothered to ensure that the referral was still in place or was otherwise received by the urologist. Instead, Centurion staff had to resubmit the referral to urology *one month* after Dr. Figueroa, his staff, and Centurion knew that Plaintiff's PSA levels were alarmingly high, and that Plaintiff was having complaints regarding his lower back and legs—all complaints that more likely than not were related to his prostate cancer.

66.    On or about February 9, 2022, Plaintiff received wound treatment on two stage 2 wounds on his ankles—wounds caused by Plaintiff crawling on the floor to access his basic needs. Stage 2 means the wounds require 14 to 45 days of treatment.

67.    On or about February 14, 2022—well before the time required to allow Plaintiff's wounds to heal and despite the concerning spike in Plaintiff's PSA and accompanied back pain and lower extremity numbness—Figueroa and Holmes started Plaintiff's discharge process from the prison infirmary.

68.    Figueroa and Holmes both stated that Plaintiff was "clinically stable" in their discharge forms and that he would be able to continue his wound and other treatment in his dorm.

14

69.     Just two days after his discharge from the infirmary, lab reports showed that Plaintiff's PSA level doubled to 43.40 ng/mL in just a month's time, now around nine times the level from September 2021.

70.     On or about February 18, 2022, Plaintiff reported having a urinary tract infection in a sick call because there is blood and pus coming from his catheter and it was marked as urgent by a nurse. Plaintiff grieved and grieved this issue without any immediate medical attention to the issue from Dr. Figueroa, nurse Abbott, or Centurion, despite the noted urgency.

71.     The next day, Plaintiff issued another sick call request, asking for a pass for more Pampers because he was numb from the chest down and could not tell when he would have a bowel movement.

72.     Despite festering wounds, severe bloating, his inability to move or feel his lower extremities, and his escalating PSA levels, on or about February 23, 2022, Dr. Figueroa tells Plaintiff that he is doing much better and that his symptoms are resolved. That same day, Plaintiff had around 30 lbs. of fluids drained from his body.

73.     On or about April 1, 2022, Plaintiff issued an informal grievance reporting that he had to sit on the floor when he showers because he could not walk. He requested help because of the unsanitary nature of having to shower this way, particularly because Plaintiff had open wounds on his buttocks.

74.     Even though Defendants knew that Plaintiff was not able to move his lower extremities and was suffering from sores due to his inability to walk.

75.    In retaliation for filing these grievances, Graham-Richardson threatened filing baseless disciplinary reports against Plaintiff for not cleaning up after himself even though he could not move his lower extremities or change diapers without assistance, all of which Richardson-Graham knew well.

76.    Plaintiff's family also called FDC to alert staff that Richardson-Graham was threatening Plaintiff with retaliatory confinement.

77.    Twenty-one days later, on or about April 21, 2022, Plaintiff issued a formal grievance on this issue. He also reported missing meals and having to pay other prisoners to help him because of his inability to move around the prison.

78.    On or about April 24, 2022, Plaintiff issued a second formal grievance, again explaining his paralysis, lack of independence and accessibility, and that he must rely on others to shower, change diapers, and move around because Centurion, MHM Health, and their staff members have refused to treat or accommodate Plaintiff.

79.    In May 2022, Plaintiff was still grieving his lack of treatment and asking for help with his daily needs.

80.    In June 2022, Plaintiff was still grieving lack of treatment and accommodation and seeking any help.

81.    In July 2022, Plaintiff complained in an affidavit about the sores on his buttocks. They were getting bigger and deeper—to the point where you could see the bone—and Plaintiff was concerned they were infected and that he would need reconstructive surgery.

82.     Plaintiff's ankle sores were also growing with bone visible.

83.     The wounds were caused by Plaintiff being forced to drag his body along the cement floors in confinement and otherwise to use the bathroom or get food.

84.     Plaintiff has now had these wounds for several months emanating a foul odor without any relief from Defendants.

85.     In July, Dr. Figueroa dug out masses of necrotic tissue from Plaintiff's heels but did nothing to deal with the growing and infected deep sores on Plaintiff's ankles and buttocks.

86.     On July 29, 2022, Plaintiff's counsel wrote to Dr. Figueroa:

> Dear Dr. Figueroa: Last week I visited your patient Mr. Elmer Williams, DC# 086916, and I understood from him that he was going to be sent to RMC for hospital care. I see that as of today, he is still at Suwannee Annex. I did observe the deep wounds to his feet and ankle and I understand that the wounds on his buttocks are similar. I want to very sincerely request that Mr. Williams be sent to an acute care hospital, such as Memorial Hospital in Jacksonville. I am especially concerned about surgical care. I understand you removed a mass of necrotic tissue from his heels and that the infection has gone right down to the bone. I have a medical release which I will attach to this e-mail. Please feel free to contact me if you want to discuss this case.

87.     On August 4, 2022, not having heard back from Dr. Figueroa, counsel sent another email explaining the urgency of the request and the rules that govern treatment of infections that do not heal, enclosing a copy of the rules with the e-mail. That email to Dr. Figueroa reads in pertinent part:

> Dear Dr. Figueroa, I just wanted to add to my earlier email that Mr. Williams apparently fits into the category of patients that "wounds that fail to heal within two months" so that the CHO must notify the Regional Medical Director for approval to send the patient to a wound specialty facility. I don't believe Suwannee C.I. qualifies. Please feel free to call me on my cell phone at [redacted].

88.   Dr. Figueroa responded that same day:

> Good afternoon Mr. Cook. I have addressed all your questions to the legal department and they should be contacting you momentarily. I can assure you as I have explained to Mr. William, We are doing everything possible to help him cope with this terrible and terminal condition. Unfortunately, this is as far I can help you with your concern. If you have any further questions or concern please reach out to our administration.  Thank you and have a great afternoon.

89.   On the next day, August 5, 2022, counsel received an email from the office of FDC's Chief Clinical Advisor, Dr. Kalem Linette Santiago:

> Dr. Santiago, Chief Clinical Advisor, has reviewed this case and determined he is receiving adequate care.

90.   It should be noted that Dr. Santiago is the highest-ranking doctor in the Florida Department of Corrections, the nation's third largest corrections agency, yet she holds only a temporary medical license, called an Area of Critical Need (ACN) license that would not permit her to practice medicine in most Florida communities.

91.   In mid-August 2022, Plaintiff was transferred to Reception and Medical Center (RMC) for medical treatment. Staff there told Plaintiff that the medical defendants and Dr. Figueroa should be embarrassed for the condition of his wounds.

92.   While at RMC, Plaintiff finally received some results regarding his elevated PSA levels. His prostate cancer had metastasized and spread to L-1 through

-5 vertebrae, both sides of his prostate, both hips, and his lymph nodes—areas where Plaintiff complained of pain and numbness since November 2021, which Defendants ignored and covered up—both as retaliation for Plaintiff's complaints, and as a cost-saving mechanism for Centurion and MHM Health.

93.    In fact, despite knowing that Plaintiff's serious infections continued to worsen by the day, medical staff contracted by MHM Health and Centurion followed a policy, practice, and custom of ignoring serious and immediate medical needs for gain.

94.    Specifically, Dr. Figueroa, MHM Health, Centurion, and their staff, including Abbott, Howell, Holmes, Knaus, and Morris, failed to provide timely accommodation for Plaintiff's loss of motor control, despite being authorized to provide such accommodation, and provided inadequate treatment, tantamount to no treatment at all, for his growing infections.

95.    In his e-mail, Dr. Figueroa mentioned the fact that Plaintiff's cancer prognosis is now "terminal." Dr. Figueroa, MHM Health, and Centurion were waiting for Plaintiff to die to prioritize their profits, basing their medical judgments on cost of treatment and not on serious medical needs.

96.    Even though RMC staff told Plaintiff that Dr. Figueroa and the other medical defendants should be embarrassed for the condition of Plaintiff when he was transferred to RMC from Suwannee C.I. in August 2022, staff at RMC under the control of Centurion and MHM Health, and overseen by FDC, continued to deprive Plaintiff of constitutionally adequate care for his serious medical conditions—both his

spreading cancer and his horrific wounds.

97.    For example, medical staff at RMC employed by MHM Health and contracted by Centurion, failed to consistently provide timely wound care for Plaintiff's deep wounds on his legs and buttocks, even though such delays allowed infection to continue to spread; blood and green pus were removed from his wounds when vacuumed due to the low frequency of wound care.

98.    Despite Plaintiff's deep and obviously infected wounds, RMC medical staff failed to consistently provide Plaintiff with new dressings on his legs and buttocks every day or more frequently when the wound conditions demand it.

99.    Plaintiff also complained to RMC medical staff that he had lost the ability to write using his dominant right hand due to muscle weakness, but Centurion, MHM Health, and FDC ignored Plaintiff's requests for therapy—preventing him from properly retaining the ability to use his right arm in the future and preventing him from detailing his medical complaints and filing grievances.

100.    Further, despite knowing that Plaintiff was experiencing symptoms consistent with the spread of his prostate cancer, Dr. Montoya, a Centurion contractor employed by MHM Health, only recently—in October 2022—provided Plaintiff with any form of treatment to stop the spread of his cancer, despite Plaintiff languishing at RMC for more than two months.

101.    Dr. Montoya ordered Plaintiff to take chemotherapy pills and shots; however, but he never evaluated Plaintiff for any other options that could prevent his untimely death.

102.   Instead, the Defendants were betting Plaintiff would simply die of his spreading prostate cancer before dying of septic shock or losing a limb to the growing infections in his feet and buttocks. The lack of timely action or concern or plans to take steps—possibly costly steps—to save Plaintiff's life was purposeful. It is all part of an unwritten policy, practice, and custom to save money at Plaintiff's and other seriously ill prisoners' expense.

103.   Today, despite the persistent failure to treat by Defendants, Plaintiff is now in a normal acute care hospital where efforts are being made to undo their long-term failures to treat, thanks to having been awarded compassionate medical release by a state panel set up to review cases like his.

104.   Although not necessary because Plaintiff is no longer a prisoner for the purposes of the PLRA, Plaintiff has appropriately and repeatedly grieved to FDC to obtain immediate and necessary treatment to no avail.

<u>Causes of Action</u>

I.   **Violation of 42 U.S.C. § 1983 – First Amendment Retaliation (against Figueroa, Richardson-Graham, and Howell)**

Plaintiff repeats and re-alleges the Common Allegations of Fact, as if fully set forth herein and further alleges:

105.   As a prisoner, Plaintiff had a right to protected speech and redress of grievances under the First Amendment to the U.S. Constitution.

106.   Plaintiff wrote grievances complaining of abusive treatment by Dr. Figueroa, Sgt. Richardson-Graham, and Howell and they responded with retaliatory

and life-endangering measures to punish him.

107.    The retaliatory life-threatening measures are such as would deter a person of ordinary firmness from exercising protected speech and seeking redress.

108.    Moreover, responses to the grievances were almost uniformly hostile and accusatory and show little or no actual review of records or information.

109.    Plaintiff has been required to engage the services of the undersigned counsel. As such, Plaintiff is entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE, Plaintiff demands: (a) judgment for compensatory and punitive damages against Defendants Figueroa, Richardson-Graham, and Howell; and (b) an order awarding Plaintiffs reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988 and any other applicable law.

## II.    Violation of 42 U.S.C. § 1983 – Eighth Amendment (Centurion and MHM Health)

Plaintiff repeats and re-alleges the Common Allegations of Fact, as if fully set forth herein and further alleges:

110.    As a prisoner, Plaintiff had an Eighth Amendment right to receive timely and adequate medical treatment for a serious medical condition.

111.    Centurion and MHM Health were deliberately indifferent or purposefully ignoring Plaintiff's serious medical needs in violation of the Eighth Amendment right to be free from cruel and unusual punishment.

112.    Plaintiff's injuries were proximately caused by the policies and practices

of Centurion and MHM Health.

113.    Prior to and during the events giving rise to Plaintiff's Complaint, Centurion and MHM Health maintained policies and practices pursuant to which prisoners like Plaintiff with serious medical needs were routinely denied medical care and access to medical care.

114.    Specifically, there exist policies and widespread practices at FDC pursuant to which prisoners receive unconstitutionally inadequate healthcare, including policies and practices in which healthcare staff contracted by Centurion and MHM Health: (a) commonly disregard reports by patients of objectively serious symptoms; (b) refuse to provide adequate treatment to patients; (c) refuse to conduct or obtain diagnostic tests and bloodwork for patients; (d) fail to create sensible treatment plans for patients whose health status requires the same; (e) fail to ensure continuity of care; (f) prioritize profits at the expense of constitutionally adequate care; (g) fail or refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper; and (h) refuse and/or fail to provide any medical care whatsoever for defined medical problems.

115.    These policies and practices were allowed to flourish because Centurion and MHM Health, which respectively direct and staff the provision of healthcare services at Suwannee Correction Institution (including its Annex), Reception and Medical Center, and FDC, directly encouraged the very type of misconduct at issue here and failed to provide adequate training and supervision of healthcare and correctional employees.

116.    Centurion and MHM Health violated Plaintiff's rights by maintaining practices and policies that were the moving force of these constitutional violations.

117.    These policies and practices were able to exist and thrive within FDC because Centurion (as the contractor to oversee health services at FDC) and MHM Health (as the employer of medical staff under the Centurion contract) were both deliberately indifferent to the problem, thereby effectively ratifying it.

118.    Centurion and MHM Health also acted to violate Plaintiff's constitutional rights through the actions and failures to act by individuals with final policymaking authority for them.

119.    Plaintiff's injuries were caused by persons who acted pursuant to the foregoing policies and practices in engaging in the misconduct described herein.

120.    Plaintiff has been required to engage the services of the undersigned counsel. As such, Plaintiff is entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE, Plaintiff demands: (a) judgment for compensatory and punitive damages against Centurion and MHM Health; and (b) an order awarding Plaintiff's reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988 and any other applicable law.

## III.    Violation of ADA/RA (against Secretary Dixon)

Plaintiff repeats and re-alleges the Common Allegations of Fact, as if fully set forth herein and further alleges:

121.    Plaintiff is entitled to relief for disability discrimination against Ricky Dixon, or his successor, in his official capacity, for violating Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, (the "ADA") which provides in pertinent part:

> No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity.

> 42 U.S.C. § 12132

122.    Title II of the Act prohibits, among other things:

> limiting a qualified individual's enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service of an agency; and

> subjecting a qualified individual to discrimination under any program or activity conducted by an agency.

> 28 C.F.R. § 39.130.

123.    As a result of the spread of his cancer, Plaintiff became disabled as defined at 42 U.S.C. § 12102(2), as he suffered a physical impairment that substantially limited one or more of his major life activities, including, but not limited to, the ability to walk normally and to perform normal bathroom functions.

124.    Plaintiff is a "qualified individual" as defined at 42 U.S.C. § 12131(2): "Qualified Individual" means a person with a disability who meets the essential eligibility requirements for receipt of services or participation in programs or activities provided by the entity (with or without regard to any auxiliary aids or modifications).

125.    FDC is a public entity that has violated Title II of the ADA.

126.    FDC is an entity that receives federal funding.

127.    Suwannee C.I. Annex and RMC are state facilities and their operation comprises a program and service for purposes of Title II of the ADA.

128.    Defendant Ricky D. Dixon, or his predecessor, in his official capacity, authorized his agents and employees to act for Defendants when they committed the ADA violations alleged herein. Defendants' agents and employees accepted the undertaking of acting on behalf of Defendant Dixon when they committed the ADA violations alleged herein.

129.    Defendant Dixon, or his predecessor, had control over its agents and employees when they committed the ADA violations alleged herein.

130.    The ADA violations alleged herein and committed by FDC's agents or contractors, and employees were done while acting within the course and scope of their employ and/or agency with Defendant FDC. Thus, Defendant is vicariously liable for the actions of the agents and employees when they committed the ADA violations alleged herein.

131.    Plaintiff's need for accommodation was known and obvious.

132.    Defendant FDC, its employees, contractors, and agents knew and/or should have known of Plaintiff's need for a reasonable accommodation, were authorized to provide the accommodation and were able to do so in the normal course of their employment, and knew the risks of failure to do so.

133.    Defendant, its contractors, agents, and employees, acted intentionally or with deliberate indifference to Plaintiff's need for reasonable accommodation by, among other things:

      a)  failure to accommodate his lower extremity numbness;

      b)  failure to accommodate his incontinence of bladder and bowel;

      c)  failing and intentionally refusing to train FDC employees regarding the humane management of physically disabled inmates;

      d)  permitting sadistic officers to physically abuse Plaintiff; and

      e)  fabricating records to hide Plaintiff's disability needs.

134.    As a proximate result of Defendant's, its contractors', employees' and agents' failure and intentional refusal to provide Plaintiff with a reasonable accommodation for his disability, despite being authorized to do so and knowing the stakes, he suffered physical harm, severe pain, and the threat of imminent death.

WHEREFORE, Plaintiff demands: (a) judgment for compensatory damages against FDC; and (b) an order awarding Plaintiff's reasonable attorneys' fees, litigation expenses, and costs pursuant to applicable law.

## IV.    Violation of 42 U.S.C. § 1983 – Eighth Amendment Failure to Treat (against Santiago, Figueroa, Howell, Holmes, Abbott, Knaus, Morris, Millette, and Johns)

Plaintiff repeats and re-alleges the Common Allegations of Fact, as if fully set forth herein and further alleges:

135.    Dr. Figueroa, Dr. Santiago, nurses Howell, Holmes, Abbott, Knaus, and Morris, and Central Office staff Millette and Johns know, and have known, that

Plaintiff suffers from serious medical needs, yet they failed and intentionally refused to provide the necessary aid and treatment that would alleviate numerous serious medical needs.

136.   They disregarded the risks and harms by failing and intentionally refusing to do anything that would remedy Plaintiff's serious medical needs.

137.   They have been deliberately indifferent to the serious medical needs of Plaintiff.

138.   Specifically, as the medical providers and staff working for FDC or Centurion as staffed employees by MHM Health, these defendants were required to evaluate the appropriate level of care for Plaintiff in his deteriorating condition.

139.   In the face of obvious lower extremity numbness, infected sores, elevated PSA levels, and other related issues, these defendants refused to permit Plaintiff to receive care and medical supplies to treat or mitigate his serious medical conditions to avoid the risk of serious harm.

140.   As a direct and proximate cause of this deliberate indifference, Plaintiff has suffered and will continue to suffer from harm in violation of his Eighth Amendment rights.

141.   Plaintiff has been required to engage the services of the undersigned counsel. As such, Plaintiff is entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE, Plaintiff demands: (a) judgment for compensatory and punitive damages against Santiago, Figueroa, Howell, Holmes, Abbott, Knaus,

Morris, Millette, and Johns; and (b) an order awarding Plaintiffs reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988 and any other applicable law.

## V. Conspiracy under 42 U.S.C. § 1983 to Violate the Eighth Amendment (Figueroa, Richardson-Graham, Howell, Abbott, Knaus, Holmes, and Morris)

Plaintiff repeats and re-alleges the Common Allegations of Fact, as if fully set forth herein and further alleges:

142.   Plaintiff is entitled to relief against Defendants Figueroa, Richardson-Graham, Howell, Abbott, Knaus, Holmes, and Morris for violation of the Eighth Amendment, in creating circumstances that increased the risk of serious harm, including denial of access to bathroom and shower, a wheelchair, and also denying care to remedy the risk of harm, such as sufficient adult diapers, sanitation needs, and an impaired inmate assistant to help with self-care.

143.   Defendant employees of FDC and employees of Centurion/MHM Health, acted under color of law to further the conspiracy.

144.   Each of the co-conspirators committed overt acts and was an otherwise a knowing and willing participant in joint activity.

145.   As a direct result of Defendants' conspiracy to deprive Plaintiff of his constitutional rights, he suffered severe physical injuries and pain.

146.   Defendants conspired to do an unlawful act by unlawful means and each Defendant engaged in overt acts in furtherance of the conspiracy.

147.   As Plaintiff has been obliged to retain counsel for redress, pursuant to 42

U.S.C. § 1988, Plaintiff is entitled to reasonable attorney fees, as well as costs.

WHEREFORE, Plaintiff demands: (a) judgment for compensatory and punitive damages against Figueroa, Richardson-Graham, Howell, Abbott, Knaus, Holmes, and Morris; and (b) an order awarding Plaintiffs reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988 and other applicable law.

## VI.    Abuse or Neglect of a Vulnerable Adult § 415.1111, Fla. Stat. (Figueroa, Richardson-Graham, Howell, Abbott, Knaus, Holmes, and Morris)

Plaintiff repeats and re-alleges the Common Allegations of Fact, as if fully set forth herein and further alleges:

148.    Plaintiff is entitled to relief against Defendants Figueroa, Richardson-Graham, Howell, Abbott, Knaus, Holmes, and Morris under the Adult Protective Services Act.

149.     Plaintiff met the definition of a "vulnerable adult" in that he was an adult whose ability to perform the normal activities of daily living or to provide for his own care was impaired due to a physical infirmity.

150.    Figueroa, Richardson-Graham, Howell, Abbott, Knaus, Holmes, and Morris assumed the responsibility for a caregiver relationship, involving the regular and frequent care of Plaintiff.

151.    Defendants had a duty to avoid acts or omissions that caused significant impairment to Plaintiff's health.

152.    Defendants had a duty to provide care, supervision, and services necessary to Plaintiff.

153.   Defendants breached that duty of care by abusive and neglectful acts that could reasonably be expected to cause serious physical and mental injury.

154.   Defendants breached their duties to Plaintiff as follows:

a) Acting in a way that caused or was likely to cause significant impairment to Plaintiff's physical, mental, and emotional health;

b) Failing to follow normal and accepted humane corrections practices and procedures relating to the safe care of vulnerable prisoners; and

c) Failing to provide care, supervision, and services necessary to maintain the physical and mental health of Plaintiff, including necessary treatment, supervision, monitoring, and medical services, that a prudent person would consider essential for the well-being of a vulnerable adult.

155.   As a direct and proximate result of Defendants' breach of duty to the Plaintiff, Plaintiff suffered severe physical injuries and emotional distress.

156.   Defendants' acts and omissions as stated above constitute "abuse" as that term is defined in section 415.102(1), Florida Statutes, as well as "neglect" as that term is defined in section 415.102(15), Florida Statutes.

157.   Pursuant to section 415.1111, Florida Statutes, Plaintiff is entitled to actual damages from Defendants, as well as attorneys' fees and costs.

158.   Plaintiff will seek punitive damages provided for in Chapter 415, Florida Statutes.

WHEREFORE, Plaintiff demands: (a) judgment for compensatory and punitive damages against Figueroa, Richardson-Graham, Howell, Abbott, Knaus, Holmes, and Morris; and (b) an order awarding Plaintiffs reasonable attorneys' fees,

litigation expenses, and costs pursuant to section 415.1111, Florida Statutes.

**DEMAND FOR A JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

Dated: November 4, 2022.

Respectfully submitted,

LAW OFFICE OF JAMES COOK

By: */s/ James V. Cook*
     James V. Cook (FBN 0966843)
     314 W. Jefferson Street
     Tallahassee, Florida 32301
     Tel. (850) 222-8080
     Fax (850) 561-0836
     cookjv@gmail.com

-and-

SLATER LEGAL PLLC

By: */s/ James M. Slater*
     James M. Slater (FBN 111779)
     113 S. Monroe Street
     Tallahassee, Florida 32302
     Tel. (305) 523-9023
     james@slater.legal

*Attorneys for Plaintiff Elmer Williams*