UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ELMER WILLIAMS,

      Plaintiff,

v.

RICKY DIXON, in his official capacity
as Secretary of the Florida Department of
Corrections, CENTURION OF
FLORIDA, LLC, MHM HEALTH
PROFESSIONALS, LLC, ALEXIS
FIGUEROA, M.D., KALEM
SANTIAGO, JASON HOWELL,
ELIZABETH HOLMES, TONY
ABBOTT, GERALD KNAUS, ADELE
JOHNS, WENDY MILLETTE, and
SGT. SAVONIA RICHARDSON-
GRAHAM,

      Defendants.

Case No. 3:22-cv-01221-MMH-MCR

**DEMAND FOR JURY TRIAL**

**SECOND AMENDED COMPLAINT**

Plaintiff Elmer Williams asserts the following claims against Defendants Ricky

D. Dixon, in his official capacity as Secretary of the Florida Department of Corrections

(FDC), Centurion of Florida, LLC, MHM Health Professionals, LLC, Alexis

Figueroa, M.D. (ACN), Kalem Santiago, M.D. (ACN), Jason Howell, Elizabeth

Holmes, Tony Abbott, Gerald Knaus, Adele Johns, Wendy Millette, and Sergeant

Savonia Richardson-Graham. This amendment is filed with the written consent of all

opposing parties pursuant to Rule 15(a)(2).

## INTRODUCTION

**"Doing nothing for others is the undoing of ourselves." – Horace Mann**

Plaintiff Elmer Williams has a history of diagnosed prostate cancer. Around a year ago—then a prisoner in the custody of the Florida Department of Corrections—Plaintiff was transferred to Suwannee Correction Institution and by all accounts something was wrong. He complained about numbness in his legs and back pain, he had trouble walking, and ultimately, he fell hurting himself. His dorm guard, Sergeant Richardson-Graham, violated protocol in responding to his injuries and used discipline to retaliate against him for grieving her misconduct. His doctors and nurses ignored his medical complaints, causing him to have to scrape his body against the dirty cell floor in confinement for a month resulting in wounds that became so infected and untreated that bone was visible. FDC's Central Office staff also ignored Plaintiff's medical concerns, summarily dismissing his increasingly urgent emergency requests for help. The medical staff has also retaliated against Plaintiff for his grievances about their lack of care, denying him a needed wheelchair. FDC also denied Plaintiff any reasonable accommodations for his requested and obvious mobility limitations.

In the end, everyone has ignored the obvious—since he was moved to Suwannee C.I., Plaintiff became increasingly ill, and the retaliatory conduct and lack of constitutionally adequate care were only making it worse. His condition became so bad that Plaintiff is now terminal and was awarded compassionate medical release.

Defendants did nothing for Plaintiff. Some were so absorbed in their pettiness and inhumanity that they punished him; others ignored reality because accepting it meant adding losses to their employers' balance sheets or having to undertake additional work. Regardless of the reason, Defendants must be taken to account for their gross and flagrant violations of the law.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

2.      Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of civil rights under the Eighth Amendment to the U.S. Constitution.

3.      Plaintiff's claim is also predicated upon the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131 and 12133, and § 504 of the Rehabilitation Act.

4.      Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367, to consider the state law claims alleged herein.

5.      Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391(b), being the district where the claims arose and Defendants conduct business.

6.      All conditions precedent to this lawsuit, including exhaustion of administrative remedies, have occurred, been performed, or been waived.

## PARTIES

7.      At all times material hereto, Plaintiff Elmer Williams was an inmate in the custody and care of FDC at Suwannee Correctional Institution. On October 31, 2022, Plaintiff was released from the custody of FDC to the care of his family due to his worsening medical condition. He is no longer a prisoner for purposes of the Prison

Litigation Reform Act (PLRA), 42 U.S.C. § 1997e.

8.      Defendant Ricky Dixon is the Secretary of the Florida Department of Corrections and is sued in his official capacity. References to the FDC herein also refer to Defendant Dixon. Dixon is responsible for the operation of Florida's prison system, including compliance with the Constitution and federal laws.

9.      Defendant Centurion of Florida, LLC is a subsidiary of Centene Corporation, principally located in Missouri and registered as a foreign limited liability company with the State of Florida. Centurion has contracted with FDC to provide medical care to prisoners. When providing medical care for prisoners in FDC custody, Centurion stands in the shoes of FDC. At all relevant times during the events at issue in this case, Centurion was acting under color of law by and through its agents, employees, and contractors identified herein and, on information and belief, other presently unknown individuals.

10.      Defendant MHM Health Professionals, LLC is a wholly owned subsidiary of MHM Services, Inc., which itself is a wholly owned subsidiary of Centene Corporation. MHM Health is responsible for the provision of staffing services related to Centurion's contract with FDC. At all relevant times during the events at issue in this case, MHM Health was acting under color of law by and through its agents, employees, and contractors identified herein and, on information and belief, other unknown individuals.

11.    Alexis Figueroa, M.D. (ACN) was at all relevant times Centurion's Medical Director/Chief Health Officer at Suwannee C.I. Annex and is otherwise *sui juris*. Figueroa was at all relevant times employed by MHM Health to fulfill this role for Centurion.  Dr. Figueroa approved the contours of Plaintiff's medical treatment. Dr. Figueroa is being sued in his individual capacity. At all relevant times during the events at issue in this case, Dr. Figueroa was acting under color of law.

12.    Kalem Linette Santiago, M.D. (ACN) was at all relevant times the FDC Clinical Advisor and is otherwise *sui juris*. Santiago is employed by the Florida Department of Corrections to review care decisions. Dr. Santiago approved the contours of Plaintiff's medical treatment. Dr. Santiago is being sued in her individual capacity. At all relevant times during the events at issue in this case, Dr. Santiago was acting under color of law.

13.    Jason Howell was at all relevant times a registered nurse employed by MHM to provide nursing care to inmates. Howell was involved in Plaintiff's medical treatment. Howell is being sued in his individual capacity. At all relevant times during events at issue in this case, Howell was acting under color of law.

14.    Elizabeth Holmes was at all relevant times a registered nurse employed by MHM to provide nursing care to inmates. Holmes was involved in Plaintiff's medical treatment. Holmes is being sued in her individual capacity. At all relevant times during events at issue in this case, Holmes was acting under color of law.

15.     Tony Abbott was at all relevant times an advanced practice registered nurse employed by MHM to provide nursing care to inmates. Abbott was involved in Plaintiff's medical treatment. Abbott is being sued in his individual capacity. At all relevant times during events at issue in this case, Abbott was acting under color of law.

16.     Gerald Knaus was at all relevant times a registered nurse employed by MHM to provide nursing care to inmates. Knaus was involved in Plaintiff's medical treatment. Knaus is being sued in his individual capacity. At all relevant times during events at issue in this case, Knaus was acting under color of law.

17.     Adele Johns was at all relevant times an FDC employee staffed in its Central Office. Johns was tasked with responding to Plaintiff's grievances to FDC. Johns is being sued in her individual capacity. At all relevant times during the events at issue in this case, Johns was acting under color of law.

18.     Wendy Millette was at all relevant times an FDC employee staffed in its Central Office. Millette was tasked with responding to Plaintiff's grievances issued to FDC. Millette is being sued in her individual capacity. At all relevant times during the events at issue in this case, Millette was acting under color of law.

19.     Sergeant Savonia Richardson-Graham was at all relevant times a corrections officer employed by FDC to work at Suwannee Correctional Institution. Sgt. Richardson-Graham was in charge of Plaintiff's housing at Suwannee Annex. Sgt. Richardson is being sued in her individual capacity. At all relevant times during the events at issue in this case, Sgt. Richardson-Graham was acting under color of law.

6

20.     At all relevant times, the actions of Dixon, Centurion, MHM Health and their respective agents were state action and were taken under color of state law.

## COMMON ALLEGATIONS OF FACT

21.     Plaintiff has a known, documented history of prostate cancer, which FDC, Centurion, and MHM Health staff contracted by Centurion were aware of at all times material to this lawsuit.

22.     After diagnosis and treatment by his urologist, Plaintiff's prostate-specific antigen (PSA) levels—indicating recurrent prostate cancer—had fallen to 0.2 ng/ML in 2020. According to a urinalysis report signed by Nurse Abbott in February 2022, at that PSA level, Plaintiff would only need testing every two to four years.

23.     Because Plaintiff's prostate cancer was under control, his urologist—an independent doctor unaffiliated with FDC, Centurion, or MHM Health— discontinued Plaintiff's medication in late 2020 with instructions that he be seen again in June 2021 to assess Plaintiff's cancer and determine whether to change the course of action or restart medication.

24.     Plaintiff was never taken by FDC or Centurion staff to see his urologist in June 2021.

25.     On September 30, 2021, Plaintiff had a urinalysis that conveyed a drastic change in his PSA levels—it had gone from 0.2 ng/ML—requiring testing ever few years—to 5.21 ng/ML—well over the 4 ng/ML threshold used to determine whether prostate cancer is active, spreading, and whether further testing is necessary.

26.     According to the urinalysis report generated by Nurse Abbott in February 2022, "[a] PSA value of 1.00 ng/ML selects for the upper range of PSA values. Men who have a PSA above the median for their age group are at a higher risk for prostate cancer and for the aggressive form of the disease. The higher above the median, the greater the risk."

27.     According to FDC and Centurion records, medical staff had apparently made or intended to make an "urgent" urology referral for Plaintiff to be seen regarding the spike in his PSA levels, which was never submitted. Plaintiff was also not told at this time that his PSA level had risen or that he was referred for an "urgent" visit to the urologist.

28.     And it was around the time that FDC and Centurion knew of Plaintiff's high PSA level that Plaintiff—who previously had no mobility limitations—started to experience difficulties walking and ultimately fell, hitting his head, requiring dental work to fix broken teeth.

29.     Then, in mid-November 2021, while in the custody of FDC, Plaintiff was transferred to Suwannee Correction Institution (Suwannee C.I.).

30.     Just after his arrival to Suwannee C.I.—and having already experienced increasing difficulties in walking—on or about November 18, 2021, Plaintiff fell out of his bunk and injured his hip, neck, and back.

31.     Plaintiff declared a medical emergency and Sgt. Richardson-Graham was called out of the officer station to Plaintiff's area. Upon approaching Plaintiff, she stated "I'm not calling a stretcher for you, you can forget that!" She instead ordered

two prisoners to pick Plaintiff up and put him in another prisoner's wheelchair.

32.   Sgt. Richardson-Graham's above-referenced actions violated FDC policy.

33.   Plaintiff was taken to medical in a wheelchair where he was examined by Nurse Howell. Nurse Howell reported in an FDC Back Pain Protocol report that Plaintiff had severe back pain and numbness in his legs. Plaintiff informed Nurse Howell that he had hurt his neck and back, that he was experiencing numbness in his body and extremities and was concerned about paralysis, and that his PSA levels had risen from 0.2 to 5.2 in an alarmingly short period of time. At this time Plaintiff had not been seen by a urologist since December 2020.

34.    Plaintiff was given a muscle relaxer shot but no further action was taken to address Plaintiff's concerns, including his concern about his PSA levels.

35.   Plaintiff asked Nurse Howell if he could approve a wheelchair, to which Nurse Howell told Plaintiff: "hell no." When he asked how he would get around, Nurse Howell told Plaintiff "I don't know, hold on to the wall, or you can go to confinement." Threats of confinement were a standard response to medical complaints at Suwannee C.I.

36.   Nurse Howell refused to accommodate Plaintiff's mobility limitations with a wheelchair and simply told him to walk.  At this point, Plaintiff was, at the very least, an extreme fall risk and had a history of a severe injury from a fall.

37.   The next day, Nurse Abbott noted in Plaintiff's records that an *urgent* urology referral from October 4, 2021 at his previous institution. Nurse Abbott

questioned in his notes whether the referral was ever submitted to Utilization Management—the internal Centurion review team, which approved referrals, but which could also overrule clinician recommendations. As explained below, even though Nurse Abbott, Dr. Figueroa, and Centurion and MHM Health staff knew that Plaintiff was due for a referral to urology to test his PSA, they deliberately delayed testing Plaintiff's antigen levels and blood and callously disregarded his deteriorating condition.

38.     Plaintiff then began experiencing chest pain, breathing problems, and continued numbness in his legs, and even more difficulty walking, which prevented him from performing his normal activities of daily life, such as arriving to the chow hall on time to eat, or moving around the facility. He relayed this information to Nurse Howell again.

39.     On or about November 24, 2021, Plaintiff had a callout to go to the Institutional Classification Team (ICT) for a job assignment. Plaintiff was unable to go to callout without a wheelchair and no wheelchair had been assigned to him despite a request to Nurse Howell days earlier. Plaintiff asked Sgt. Richardson-Graham if he could borrow a wheelchair to get to ICT callout because he did not want to arrive in a borrowed wheelchair without staff approval. Sgt. Richardson-Graham would not let Plaintiff use a borrowed wheelchair even though she knew that Plaintiff could not safely walk to the ICT callout.

40.     Sgt. Richardson-Graham later observed Plaintiff writing an informal grievance about her earlier failure to call for a stretcher for Plaintiff after he fell out of his bunk. She waited until ICT callout had ended and then borrowed the same wheelchair Plaintiff had asked for approval earlier to take Plaintiff to disciplinary confinement in retaliation for Plaintiff writing an informal grievance. In addition to retaliating against Plaintiff by placing him in confinement, Sgt. Richardson-Graham also gave Plaintiff's electronic tablet communications device to another inmate as punishment for his attempt to exercise his First Amendment rights.[1]

41.     During Plaintiff's pre-confinement physical, Nurse Howell completed a pre-special housing form stating Plaintiff complained that his legs were numb, and he marked "yes" to completing a DC4-529 Mental Health Referral for mental health grade S-3, because Plaintiff declared a mental health emergency.

42.     That same day, Plaintiff wrote an informal grievance concerning Nurse Howell's refusal to provide constitutionally adequate care to Plaintiff.  Specifically, Plaintiff wrote to the warden that Howell was *purposely* denying Plaintiff a wheelchair.

43.     In response to the informal grievance about Nurse Howell, FDC staff wrote that Plaintiff's allegations were "unfounded" and that a wheelchair is ordered "per a clinician." It was only many months later that Plaintiff was assigned his own wheelchair, despite the obvious and apparent need for one demonstrated over the next

---

[1] Inmates are allowed to have tablets to send emails to loved ones with the messages monitored by prison staff. Prison officials sometimes block messages complaining about care or treatment or confiscate tablets or refuse to allow them to be charged.

several months as Plaintiff became completely paralyzed from the chest down.

44.    Plaintiff was taken to confinement in a wheelchair and placed in a cell for disabled prisoners with two beds—despite being a specialized cell for disabled inmates, staff took the wheelchair from Plaintiff and left him alone in the cell without any impaired inmate assistant or bunkmate.

45.    Confinement was hell for Plaintiff.

46.    He repeatedly put in sick call requests about his medical issues and needs, and sometimes the sick calls were not picked up by staff or processed. He also grieved not being able to get his blood work done or laboratory tests. Plaintiff specifically noted that his "life and health" were in "jeopardy" and that he was being denied a wheelchair, even though he could not walk, preventing him from getting his tests done "to determine where [his] PSA level is at and what's wrong with [him.]" At this point in time, no one had told Plaintiff that his PSA level had rapidly risen. All he knew was that he was never taken back to the urologist in June 2021, nor any time thereafter, for a follow-up appointment.

47.    In confinement, Plaintiff was not allowed to be on the floor, but he lacked the strength to pull himself up and down from his bunk and was having trouble moving around to get his food, which was placed in the food slot and never delivered to him personally. Plaintiff ultimately had to spend most of his confinement on the filthy cement floor after falling out of his bunk several times and further injuring himself. Because he was not allowed to be on the floor, he would pretend to be making up his bed when guards patrolled. He would pee in cups and on the floor. The few times he

had to defecate he had to use all of his energy through horrific spasms and pain to crawl to the toilet, though he could not pull himself up to sit on it and had to use his hands and toilet paper to clean up his feces and put them in the toilet.

48.     Plaintiff told Cpt. Lindblade that he was not able to get up and make it to the toilet and had to urinate in a cup. His response was that Plaintiff needed to get rid of the cups or face discipline for misuse of property.[2]

49.     On December 1, 2021, staff had an orderly clean Plaintiff's confinement cell and take all the cups used for urination and Plaintiff's soiled clothing. No one had taken any steps at this time to provide Plaintiff with a wheelchair, an impaired inmate assistant, or any other assistance.

50.     The next day, Plaintiff fell trying to get to the toilet and hit the concrete floor. He had to use all his strength to pull himself back onto his bunk.

51.     According to an affidavit from January 5, 2022, Plaintiff wrote that on December 2, 2021: "I'm stink more than ever now because my cell floor is pissy from me peeing on it all day when I don't have the strength to make it to the toilet."

52.     Plaintiff was unable to shower in confinement because he could not walk and was not given a wheelchair. Eventually after more than a week, he was given a wheelchair to shower and then returned to his cell and the wheelchair was taken back.

53.     According to the affidavit, on December 3, 2021, Plaintiff noted "my cell is so stink, it smells like a public port-o-pot." He also wrote that he thought the warden

---

[2] The penalty for misuse of property was to be placed in a cell in his boxers with no mattress, sheets, blanket, or pillow, or bedding of any kind, despite the winter cold.

would have intervened to do something for Plaintiff given the large number of grievances he had filed about his conditions in confinement.

54.     Plaintiff was also concerned that medical staff were not helping him, he noted that "a lot of this neglect is coming from 'retaliation' for me writing Jason Howell up, the nurse."

55.     Plaintiff continued to get worse in confinement. On December 4, 2021, Plaintiff attempted to declare a medical emergency because he was in excruciating pain, injured, and needed medication. Nurse Jessee Morris told Plaintiff that he could not declare a medical emergency to get any help or medication because no doctor was there. He then laughed at Plaintiff—who was huddled up in pain—and left without permitting a medical emergency, calling any clinician, or taking any other action. Plaintiff spent the night in excruciating pain with muscle spasms that robbed him of sleep.

56.     Upon information and belief, it is Centurion's practice, custom, and policy not to permit prisoners in confinement to declare a medical emergency when their doctors are not on prison grounds.

57.     That same day, Plaintiff wrote "I have cried and cried and cried tear of pain and frustration over the cruel and inhumane way I've been treated here at Suwannee C.I. Annex by the nurses and security. If I didn't have God on my side and the strong will to survive, I would have committed suicide, that's just how much pain and anguish I feel inside."

58.     Plaintiff also wondered in confinement why Dr. Figueroa and the nursing staff were not sending him to see his cancer providers or a neurologist. He wrote on December 5, 2021 that "the more these people delay marking my file emergency and taking my sudden paralysis seriously, the more my life and health will be in jeopardy because my strength has depleted, the numbness in my body has worsened, the pain in my back and neck has increased, my PSA numbers are up, I've reached the stage where I'm completely numb and paralyzed from the bottom of my chest to my toes. I mean what is an emergency stage?"

59.     The next day, December 6, Plaintiff wrote "I can hardly wait to get all my medical needs taken care of; surgeries or whatever so the healing process can start." That day would not come for nearly another year.

60.     That day Plaintiff urinated in his pants because he couldn't hold it. Cpt. Lindblade did his rounds and asked Plaintiff "why does it smell like piss in here? Where are you pissing?" Plaintiff explained that he was not able to walk and had to drag himself along the filthy floor. Cpt. Lindblade threatened to place Plaintiff in his underwear in a cold strip/property restriction (meaning no bedding) cell as punishment.

61.     As a result of having to drag himself along the dirty floor in confinement to go to the toilet or collect his food from the food tray, Plaintiff's skin was abraded resulting in terrible wounds on his ankles that would become infected to the bone.

62.     Despite being repeatedly alerted to their failure to ensure that Plaintiff received adequate care and treatment, Centurion and MHM Health failed to provide Plaintiff with adequate care for his then-present, well-known serious medical needs. On or about December 20, 2021, Plaintiff was released from confinement in a borrowed wheelchair. He was told that he had to sign a refusal for treatment upon leaving confinement, which he refused to sign because he was adamant that he was *not* refusing treatment. He immediately declared a medical emergency.

63.     Plaintiff was finally examined by medical staff. He maintained his complaints—primarily that his legs were numb, swelling, and that he could not use them. But despite being *seen* by medical staff, he was not *treated* by them. No, for more than a month, Plaintiff had continued to voice his complaints but neither FDC nor MHM employees and staff contracted by Centurion were doing anything about those complaints. Instead, they were punishing Plaintiff for his grievances by denying him access to a wheelchair, locking him up in confinement, laughing at him, and denying him prompt and adequate care. Designated FDC grievance reviewers denied his grievances and the Clinical Advisor approved the non-treatment although the abuses were clearly substantiated by the medical records.

64.     Defendants Figueroa and Abbott were final policymakers for purposes of implementing medical policies at Suwannee C.I. They received Plaintiff's complaints about numbness, swelling, and lack of use of his extremities; they knew that Plaintiff had a history of prostate cancer and had not gotten a new PSA test or renewed referral since he was transferred to Suwannee C.I. on November 15, 2021—despite knowing

16

in mid-November 2021 that Plaintiff's previous institution requested an "urgent" referral to a urologist on October 4, 2021.

65.   Their deliberate and purposeful failure to have Plaintiff's PSA checked or have him urgently seen by his urologist is part and parcel of Centurion and MHM Health's unwritten practice and custom of delaying testing of known diseases to deny prisoners their adequate medical care. Basically, a twist on the proverbial three wise monkeys—see no evil, hear no evil, *treat* no evil. This practice is pervasive in FDC facilities where Centurion and MHM Health manage the delivery of health services. For example, other prisoners at FDC and Suwannee C.I. were not regularly tested for known cancer despite being required to provide regular testing under the FDC medical grading system. Centurion and MHM Health failed to provide prisoners with cancer like Plaintiff routine bloodwork or urinalysis to test their condition as part of their unconstitutional policy, practice, and custom.

66.   Centurion and MHM Health made the conscious choice to implement a policy of delayed testing for cancer treatment, aware that they were violating prisoners' constitutional rights. By not having those prisoners' blood or urine tested to determine the spread of cancer, Centurion and MHM Health could continue to treat the prisoners perfunctorily without having to expend resources and costs on more acute treatment, such as surgery, radiation therapy, and other life-saving measures.

67.   Centurion, MHM Health, and FDC were on notice of Plaintiff's worsening condition not just from Plaintiff's complaints and grievances, but also from calls from Plaintiff's family. For example, on or about December 22, 2021, Plaintiff's

family called Suwannee C.I. expressing alarm about what Plaintiff reported to them—not being able to walk, having back pain, a hernia, constipation, and not being treated. FDC staff confronted the medical staff after these calls and voiced what they had noticed concerning Plaintiff's mobility issues. Despite being told that Plaintiff was in worsening condition, Centurion and MHM Health failed to have Plaintiff adequately treated and FDC ignored Plaintiff's and his family's pleas for help to accommodate his disability.

68.     On or about December 24, 2021, Plaintiff was evaluated in the Emergency Room and told Dr. Figueroa, Nurse Abbott, and nursing staff that he could not walk.

69.     Despite this, Plaintiff was sent back to his dorm. His discharge instructions—completed by Nurse Knaus—explained that he had full use of his upper extremities and had to manage his daily living activities as best as he could. It would be obvious by a lay standard, however, that Plaintiff could not manage his daily living activities due to his worsening health condition and mobility limitations and the refusal to provide him a wheelchair or impaired inmate assistant.

70.     Instead of undertaking any further steps or procedures to alleviate Plaintiff's concerning lack of ability to use his lower limbs, Dr. Figueroa and Nurse Abbott—as the final policymakers for Centurion and MHM Health—did not provide Plaintiff with a wheelchair or other mobility devices while ignoring Plaintiff's obvious and serious medical needs. Again, these failures were not by accident; they were part of Centurion and MHM Health's practice, policy, and custom of delaying testing or

rendering any changes to the medical status of a prisoner so that they would not need to expend resources on expensive life-saving treatments.

71.    Several days after Plaintiff was evaluated and told he would not be given any access to devices or treatment for his worsening condition, on or about December 27, 2021, Plaintiff was seen again by Nurse Knaus in connection with sick call he requested because he had not had a bowel movement in five days. Even though Plaintiff was continuing to have problems with bowel movements, pain in his back, and demonstrated the inability to use his lower extremities, Nurse Knaus failed to render or propose any treatment to Plaintiff. Instead, Nurse Knaus reminded Plaintiff that this was the third time he had been to medical in three days. He also put a note in Plaintiff's records that he was "abusing" the sick call system and referred him for a mental health assessment.

72.    On or about December 31, 2021, Plaintiff put in sick call requests reporting that: his ankles were badly infected and swollen and that they need to be cleaned, sanitized, and bandaged and to report an injury on his shoulder; and that he was "paralyzed and suffering from severe nerve damage."

73.    According to Douglas Sexton, an Operations and Management Consultant for FDC, "[i]n order to receive any accommodation, including an impaired inmate assistant, [a plaintiff] had to have a valid pass in effect or request an accommodation from medical staff either in sick call or in chronic clinic. At that point he would have been evaluated with regard to each accommodation he requested, . . ."

74.     Plaintiff continually voiced his needs to medical staff during visits and in sick call requests, like the ones submitted on December 31. Yet, despite his pleas and his obvious and apparent need for an accommodation, medical staff refused to provide Plaintiff with a wheelchair, an inmate assistant, or any other accommodation for his mobility impairment.

75.     On or about January 5, 2022, Plaintiff had an evaluation done by Nurse Howell regarding shortness of breath. Plaintiff complained that he had to sleep in a borrowed wheelchair for days because he could not lie on his back without struggling to breathe. Nurse Howell found that Plaintiff had diminished lung sounds in his lower left lung and that his pulse was irregular.

76.     Then, on or about January 7, 2022, Nurse Howell undertook an evaluation of Plaintiff's lower extremities. Nurse Howell noted that Plaintiff's lower limbs were warm to the touch, that the swelling extended above the knee, and that he had a new onset of bilateral ankle edema. Plaintiff was finally admitted to the infirmary after almost two months of complaints—the delays intended to prevent Plaintiff from receiving a timely diagnosis.

77.     While in the infirmary, on or about January 12, 2022, Nurse Wilson noted there was a foul odor coming from Plaintiff's left ankle wound. Plaintiff told her and Dr. Figueroa that he had not gotten any wound care in several days. Plaintiff's ankle was visibly infected as can be seen in the below photograph taken days later:

 

78.     Around this time Plaintiff also finally had his PSA levels tested, months after he should have been tested based on his medical grade and his visible and known worsening medical condition. His PSA levels jumped off the charts from 5.21 (as of September 2021) to 21.00 ng/mL, 100 times higher than in June 2022.

79.     A PSA value of greater than or equal to 4.0 ng/mL is the consensus standard at which further evaluation for prostate cancer should occur. Dr. Figueroa was apparently unconcerned and failed to order a full clinical evaluation of Plaintiff's prostate cancer to see whether Plaintiff's pain and extremity numbness were related to the rising PSA.

80.     Dr. Figueroa noted in the record that Plaintiff had an intended October 2021 referral to a urologist, but he never took any effort to actualize that referral or

make sure that Plaintiff received any care for the spread of his prostate cancer—those tests and any related treatment would have been a significant financial burden for Centurion and MHM Health, to whom Dr. Figueroa would have to answer. Instead, Dr. Figueroa's lack of concern to Plaintiff was all part of furthering his employers' policy, as their final policymaker. As noted in a December 2021 impression diagnosis from a sick call referral, Dr. Figueroa was merely "[c]ontinu[ing] monitoring Prostate issues" even though he was not a urologist or cancer specialist and knew that Plaintiff's previous institution had requested an urgent urology referral months earlier.

81.    Despite knowing that Plaintiff's PSA level had gone from 0.2 to 5.2 to 21 in a matter of months, Dr. Figueroa failed to immediately inform Plaintiff. Instead, Plaintiff noted in sworn affidavit dated February 2, 2022—written contemporaneously while he was in the infirmary—"1-27-2022. I am stressed to the 'MAX' right now because Dr. Figueroa has finally told me that my PSA level is up to '22,' 'shocking,' because it was only '14' back in 2018 when I was diagnosed with prostate cancer. So my PSA level went from 0.2 to 5.2 to now it's 22. So had my bloodwork been done sooner as scheduled, this problem would and could and should have been detected sooner, . . ."

82.    On January 30, 2022, Plaintiff noted in his affidavit that it was clear that the medical staff were delaying his urology referral because he had not "even signed the consent form yet that I normally sign a week or so before I see my primary oncologist […] so I know what games are being played with my life."

22

83.     FDC uses forms titled "Consultation Request/Consultant's Report" for referrals to outside medical providers, like to Plaintiff's urologist. The form indicates the type of service, date of request, reasons for consultation, and acuity of the consultation (such as "urgent" in the case of Plaintiff's October 4, 2021 "urgent" referral to urology). These forms are completed by medical staff and then sent to Centurion's Utilization Management coordinators for approval and scheduling. On the lower portion of the form, there is a section titled "Authorization for Specialty Evaluation," which the inmate signs to authorize transport to the specialist outside of FDC. Plaintiff had not been provided with a consent form—or Consultation Request/Consultant's Report form—to date at Suwannee C.I. for his "urgent" urology referral.

84.     Although Centurion and FDC switched to digital medical records at some point while Plaintiff was at Suwannee C.I., Plaintiff was provided paper medical consent forms when he ultimately was seen by specialists much later.

85.     While languishing in confinement and not being properly attended to—to the point where Plaintiff developed horrific wounds on his buttocks—Plaintiff continued to request accommodations—in addition to being seen by a specialist to address his medical needs. Despite requests and grievances for a wheelchair on several occasions (and being chastised by Nurse Howell for asking for one), Plaintiff still did not have a pass for a wheelchair or permitted use of one—from time to time he was able to borrow other prisoners' wheelchairs. Plaintiff noted in his affidavit that he was the only inmate in the infirmary who did not have a wheelchair pass.

86.    Sgt. Graham-Richardson and Nurse Howell never sought to secure a wheelchair for Plaintiff as a direct response to the grievances he had issued concerning them. The other medical staff also retaliated against Plaintiff and refused his necessary accommodations due to Plaintiff's complaints against Nurse Howell and Dr. Figueroa. Without a wheelchair, Plaintiff continued to grieve while in the infirmary: on or about January 16, 2022, he issued another grievance requesting a wheelchair.

87.    Ultimately, Plaintiff grieved his medical condition and lack of mobility devices (a wheelchair) directly to Secretary Dixon in an emergency medical grievance received by Defendant Adele Johns and an appeal received by Defendant Wendy Millette. Both grievances were received by FDC on or about January 11, 2022. Recognizing that time was of the essence, Plaintiff sought to bypass the Inmate Grievance Procedure, as permitted by the rules, based on his continued steep decline in health with his emergency medical grievance that was to be considered and responded to by Johns.

88.    At the time Plaintiff grieved these issues at the institutional level and directly to Secretary Dixon, FDC was subject to a monitored settlement agreement in the matter of *Disability Rights Florida, Inc.*, Case No. 2019-CA-2825, Second Judicial Circuit in and for Leon County, Florida, dated November 8, 2021. Pursuant to that agreement, FDC was and is required to provide certain accommodations to mobility impaired prisoners to ensure that they have reasonable access to medical equipment and accommodations absent any security concerns, and access to inmate assistants to help them, among other things.

89.     By the time these grievances were received by Johns and Millette and before they were signed by Johns and Millette, medical staff at Suwannee C.I. knew that Plaintiff's PSA had spiked, his ankle wounds were foul-smelling and infecting, he was not able to use his lower extremities. The implications of these facts would have been obvious by a lay standard. Despite this, Johns and Millette summarily denied Plaintiff's emergency request and appeal—just days after receiving them, and despite FDC's agreement to provide accommodations and services to prisoners like Plaintiff to ensure their access to services and benefits at FDC.

90.     Millette informed Plaintiff in her response denying his appeal that he should contact the Suwannee C.I. medical department for assistance and that his appeal did not merit emergency consideration.

91.     Johns informed Plaintiff in her response denying his emergency medical grievance that the grievance was not accepted as a "grievance of an emergency nature" by the FDC Central Office.

92.     Johns and Millette, after reading Plaintiff's grievance and appeal and reviewing the corresponding medical records, had to know that Plaintiff was at imminent risk of serious harm but chose to ignore the urgency.

93.     Still in the infirmary and without a wheelchair to get around, on or about February 2, 2022, Plaintiff was seen by a nurse for wound treatment where it was noted that the foul-smelling wounds were the result of necrotizing fasciitis, a rare bacterial infection that spreads quickly in the body and can cause death.

94.     Those wounds were caused by the failures of Richardson-Graham, Howell, Holmes, Figueroa, Abbott, and Knaus to provide timely adequate care to Plaintiff and FDC's failure to provide him with a wheelchair and impaired inmate assistant as a reasonable accommodation for his known mobility impairment. Without a wheelchair, Plaintiff had no choice other than to crawl across filthy cement floors to try to use the toilet or even get his food. Other times he would urinate in a bottle or cup because he could not access the toilet without use of his lower extremities. And for that he was threatened with even harsher conditions.

95.     On or about February 8, 2022, during an infirmary checkup, Plaintiff asked why he hadn't been seen by a urologist for the rising PSA levels. Despite Nurse Abbott questioning in November 2021 whether Plaintiff's then-urgent urology referral was actually made and Dr. Figueroa's notation in January 2022 that Plaintiff needed to immediately see a urologist based on the sudden rise in Plaintiff's PSA levels, no one bothered to ensure that the referral was still in place or was otherwise received or acted on by the urologist. Instead, Centurion staff had to resubmit the referral to urology *one month* after Dr. Figueroa, his staff, and Centurion knew that Plaintiff's PSA levels were alarmingly high, and that Plaintiff was having complaints regarding his lower back and legs—all complaints that more likely than not were related to his prostate cancer.

96.     On or about February 9, 2022, Plaintiff received wound treatment on his ankles, which had been categorized as stage 2 wounds. Stage 2 means the wounds require 14 to 45 days of treatment.

26

97.    On or about February 14, 2022—well before the time required to allow Plaintiff's wounds to heal and despite the concerning spike in Plaintiff's PSA and accompanied back pain and lower extremity numbness—Dr. Figueroa and Nurse Holmes started Plaintiff's discharge process from the prison infirmary.

98.    Dr. Figueroa and Nurse Holmes both stated that Plaintiff was "clinically stable" in their discharge forms and that he would be able to continue his wound and other treatment in his dorm. Centurion and MHM Health staff routinely tell prisoners they are in stable condition to delay testing and treatment—a calculated policy to ensure that Centurion and MHM Health are not required to provide costly care.

99.    Although some of the medical records reflect that Dr. Figueroa or his staff spoke with Plaintiff about "treatment" or plans, Plaintiff was routinely left in the dark as to what medical was going to do for his worsening condition.

100.    Not only was Plaintiff left in the dark, but medical staff also deliberately misrepresented Plaintiff's condition in his medical records. For example, the "Fall Risk" scale for Plaintiff was marked as "low risk" for falling each month, despite known or observed falls, reported falls through grievances and medical encounters, and Plaintiff's obvious inability to walk without mobility aids—and later at all.

101.    Just two days after his discharge from the infirmary to the dorm, lab reports showed that Plaintiff's PSA level doubled to 43.40 ng/mL in just a month's time, now around nine times the level from September 2021 and about 200 times the level in June 2022. Yet at this time Plaintiff had not been given a consent form to sign, nor was he taken to see his urologist. Plaintiff was also not referred to see any other

oncologist or neurologist at this time. Instead, he was sent back to the dorms and the custody of Sgt. Richardson-Graham, who had previously retaliated against him for drafting an informal grievance against her. He did not have a pass for an inmate assistant or wheelchair and was taken to the dorm in a borrowed wheelchair and dropped off to fend for himself.

102.    In the dorm and without any accommodations, Plaintiff would have to beg and pay prisoners to borrow their wheelchairs. Other inmates would help Plaintiff get in and out of his wheelchair when they were able. But often, no one was available to help Plaintiff get out of bed for breakfast. So, he would miss breakfast.

103.    Sometimes, other inmates were able to help Plaintiff get into a borrowed wheelchair and to the shower, where he would shower sitting on the floor. Unable to get to the toilet, Plaintiff on occasion would defecate in the shower area and then use a glove to push his feces down the drain. Plaintiff could not shower every day.

104.    Plaintiff also could only put mail, sick call requests, and grievances in their boxes when other inmates would hoist him from his bed into a wheelchair, if one was available. There were days that Plaintiff had an issue but could not voice it because he was physically unable to get out of his bed to go to medical or to the drop box.

105.    Plaintiff would soil himself in bed either because he did not have diapers or because he did not have anyone to help him get the diapers on and off.

106.    FDC staff and Sgt. Richardson-Graham knew that Plaintiff was unable to walk and care for himself, but rather than take steps to accommodate Plaintiff's disability, they simply let Plaintiff lie in his bed during master count rather than getting

up.

107.    Fending for himself in the dorm, Plaintiff continued to voice his medical needs—when he was physically able to with the assistance of gracious dormmates. For example, on or about February 18, 2022—four days after being released from the infirmary—Plaintiff reported having a urinary tract infection in a sick call request because there was blood and pus coming from his catheter. It was marked urgent. Plaintiff grieved and grieved this issue without any timely medical attention to the issue from Dr. Figueroa, Nurse Abbott, or Centurion, despite the noted urgency.

108.    The next day, on February 19, 2022, Plaintiff issued another sick call request, asking for a pass for more Pampers because he was numb from the chest down and could not tell when he would have a bowel movement. Fecal bacteria was especially dangerous because of the deep necrotizing wounds on his buttocks.

109.    Despite open and obvious festering wounds, severe bloating, his inability to move or feel his lower extremities, and his escalating PSA levels, on or about February 23, 2022, Dr. Figueroa told Plaintiff that he was doing much better and that his symptoms were resolved. That same day, Plaintiff had around 30 lbs. of fluids drained from his body.

110.    Plaintiff continued to struggle in the dorm without a wheelchair, inmate assistant, or any other accommodations to ensure that he could eat every meal, shower regularly, and go to medical when needed, among other things.

111.    On or about April 1, 2022, Plaintiff issued an informal grievance reporting that he still had to sit on the floor when he showered because he could not

walk. He requested help because of the unsanitary nature of having to shower this way, particularly because Plaintiff had deep open wounds on his buttocks. Medical staff knew that Plaintiff was at risk for developing pressure sores on his body, which they noted in January and February 2022.

112.    Despite knowing the increased risk for developing wounds and observing them, medical staff failed to timely treat the wounds or provide consistent treatment for this serious medical need. The wounds grew and are still present on Plaintiff's body, almost a year later. The below image depicts what Plaintiff's buttocks wounds looked like in October 2022, after Plaintiff was finally transferred to RMC:



113.    Even though Defendants knew that Plaintiff was not able to move his lower extremities and was suffering from sores due to his inability to walk, FDC still refused to provide him with a wheelchair or inmate assistant to aid in his mobility needs. Despite Plaintiff's continued grievances to Suwannee C.I. staff and Secretary Dixon for reasonable accommodations for his visible and apparent disability, FDC

refused to provide him with the accommodations they agreed to provide mobility-impaired prisoners pursuant to federal law and their monitored settlement agreement with Disability Rights Florida.

114.   In retaliation for filing grievances about having to crawl around on a filthy floor, among other things, Sgt. Graham-Richardson threatened filing baseless disciplinary reports against Plaintiff for not cleaning up after himself even though he could not move his lower extremities or change diapers without assistance, all which Sgt. Richardson-Graham knew well.

115.   Plaintiff's family also called FDC at this time to alert staff that Sgt. Richardson-Graham was threatening Plaintiff with retaliatory confinement for his complaint that he could not get around without assistance.

116.   Plaintiff ultimately issued a formal grievance on this issue. He also reported missing meals and having to pay other prisoners to help him because of his inability to move around the prison.

117.   On or about April 24, 2022, Plaintiff issued a second formal grievance, again explaining his paralysis, lack of independence and accessibility, and that he must rely on others to shower, change diapers, and move around because Centurion, MHM Health, and their staff members have refused to treat or accommodate Plaintiff.

118.   In May 2022, Plaintiff was still grieving his lack of treatment and asking for help with his daily needs. Around this time, on or about May 24, 2022, Dr. Figueroa finally diagnosed Plaintiff with osteomyelitis—bone infection, despite it being obvious for months that Plaintiff's buttocks and legs were infected down to the

visible bone. But Dr. Figueroa again delayed any treatment for Plaintiff's serious and obvious infection.

119.   In May 2022, Dr. Figueroa also finally ordered Plaintiff's urology referral, which had been noted as "urgent" in October 2021 and ignored by Centurion and MHM Health staff, including Dr. Figueroa, Abbott, Howell, and Knaus.

120.   The determination to delay treating Plaintiff's bone infection and urology referral was not a mistaken medical judgment, but rather a callous plan to disregard Plaintiff's urgent and life-threatening medical needs.

121.   According to FDC records, Plaintiff was seen by his urologist on May 16, 2022 with recommendations to start various medications.

122.   In June 2022, Plaintiff was still grieving lack of treatment and accommodation and seeking any help with his worsening wounds, lack of mobility, and lack of reasonable accommodation for his known and obvious mobility impairment.

123.   According to FDC medical records, Plaintiff was seen by an oncologist on June 10, 2022 and had a follow-up visit with his urologist on June 16. Plaintiff's PSA level had decreased to 7.2 from greater than 40 several months earlier after the administration of Eligard by Plaintiff's urologist. However, Plaintiff's physical findings indicated that his prostate cancer was metastatic with spinal cord malignancy—meaning the cancer had spread to other parts of Plaintiff's body by this time. As Plaintiff learned much later after he was transferred from Suwannee C.I. to RMC, the untreated cancer had metastasized and spread to L-1 through -5 vertebrae,

32

both sides of his prostate, both hips, and his lymph nodes. After a year of delays, Plaintiff was told his cancer had become terminal.

124.  In July 2022, Plaintiff complained in an affidavit about the sores on his buttocks. They were getting bigger and deeper—to the point where you could see the bone—and Plaintiff was concerned they were infected and that he would need reconstructive surgery. Plaintiff's ankle sores were also growing with bone visible.

125.  By this time, Plaintiff had these wounds for several months emanating a foul odor without any relief from Defendants. The wounds were caused by Plaintiff sedentary condition, lack of sensation and being forced to drag his body along the cement floors in confinement and otherwise to use the bathroom or get food—a problem Plaintiff had been complaining to medical staff and FDC about for months without any intervention to treat his condition or to provide a wheelchair, inmate assistant, or any other mobility access device or intervention.

126.  Around this time, Dr. Figueroa dug out masses of necrotic tissue from Plaintiff's heels but did nothing to deal with the growing and infected deep sores on Plaintiff's ankles and buttocks or take any other action to treat Plaintiff's visible and apparent medical conditions. Per Centurion and MHM Health's custom, policy and practice, Dr. Figueroa did the least possible work as a stopgap to ensure that his employer would not have to pay for expensive treatment.

127.  On July 29, 2022, Plaintiff's counsel wrote to Dr. Figueroa:

> Dear Dr. Figueroa: Last week I visited your patient Mr. Elmer Williams, DC# 086916, and I understood from him that he was going to be sent to RMC for hospital care. I see that as of today,

33

he is still at Suwannee Annex. I did observe the deep wounds to his feet and ankle and I understand that the wounds on his buttocks are similar. I want to very sincerely request that Mr. Williams be sent to an acute care hospital, such as Memorial Hospital in Jacksonville. I am especially concerned about surgical care. I understand you removed a mass of necrotic tissue from his heels and that the infection has gone right down to the bone. I have a medical release which I will attach to this e-mail. Please feel free to contact me if you want to discuss this case.

128.   On August 4, 2022, not having heard back from Dr. Figueroa, counsel sent another email explaining the urgency of the request and the rules that govern treatment of infections that do not heal, enclosing a copy of the rules with the e-mail. That email to Dr. Figueroa reads in pertinent part:

> Dear Dr. Figueroa, I just wanted to add to my earlier email that Mr. Williams apparently fits into the category of patients with "wounds that fail to heal within two months" so that the CHO must notify the Regional Medical Director for approval to send the patient to a wound specialty facility. I don't believe Suwannee C.I. qualifies. Please feel free to call me on my cell phone at [redacted].

129.   Dr. Figueroa responded that same day:

> Good afternoon Mr. Cook. I have addressed all your questions to the legal department and they should be contacting you momentarily. I can assure you as I have explained to Mr. Williams, we are doing everything possible to help him cope with this terrible and terminal condition. Unfortunately, this is as far I can help you with your concern. If you have any further questions or concern please reach out to our administration.  Thank you and have a great afternoon.

130.   On the next day, August 5, 2022, counsel received an email from the office of FDC's Chief Clinical Advisor, Dr. Kalem Linette Santiago:

> Dr. Santiago, Chief Clinical Advisor, has reviewed this case and determined he is receiving adequate care.

131.   It should be noted that Dr. Santiago is the highest-ranking doctor in the Florida Department of Corrections, the nation's third largest corrections agency, yet she, like Dr. Figueroa, holds only a temporary medical license, called an Area of Critical Need (ACN) license that would not permit her to practice medicine in most Florida communities.

132.   In mid-August 2022, Plaintiff was transferred to Reception and Medical Center (RMC) for medical treatment. Staff there told Plaintiff that the medical defendants and Dr. Figueroa should be embarrassed for the condition of his wounds.

133.   While at RMC, Plaintiff finally learned that his cancer had metastasized and spread through his body, even though Dr. Figueroa knew his cancer had metastasized back in June. His prostate cancer had metastasized and spread to areas where Plaintiff complained of pain and numbness since November 2021, which Defendants ignored and covered up—both as retaliation for Plaintiff's complaints, and as a cost-saving mechanism for Centurion and MHM Health.

134.   In fact, despite knowing that Plaintiff's serious conditions and infections continued to worsen by the day, medical staff contracted by MHM Health and Centurion followed a policy, practice, and custom of ignoring serious and immediate medical needs for gain. Their final policymakers, such as Dr. Figueroa, delayed testing Plaintiff's PSA or otherwise referring Plaintiff to a urologist so that by the time he finally received a diagnosis it was too late to provide Plaintiff with expensive, possibly life-saving medication and treatment.

135.   Further, Dr. Figueroa, MHM Health, Centurion, and their staff, including Abbott, Howell, Holmes, and Knaus failed to provide timely accommodation for Plaintiff's loss of motor control, despite being authorized to provide such accommodation, and provided inadequate treatment, tantamount to no treatment at all, for his growing infections. FDC also failed to provide any such accommodations despite its knowledge through Plaintiff's grievances and complaints, and his family's pleas.

136.   In his email, Dr. Figueroa mentioned the fact that Plaintiff's cancer prognosis is now "terminal," raising an inference that Dr. Figueroa, MHM Health, and Centurion were waiting for Plaintiff to die to prioritize their profits, basing their medical priorities on cost of treatment and not on serious medical needs.

137.   Even though RMC staff told Plaintiff that Dr. Figueroa and the other medical defendants should be embarrassed for the condition of Plaintiff when he was transferred to RMC from Suwannee C.I. in August 2022, staff at RMC under the control of Centurion and MHM Health, and overseen by FDC, continued to deprive Plaintiff of constitutionally adequate care for his serious medical conditions—both his spreading cancer and his horrific wounds.

138.   For example, medical staff at RMC employed by MHM Health and contracted by Centurion, failed to consistently provide timely wound care for Plaintiff's deep wounds on his legs and buttocks, even though such delays allowed infection to continue to spread; blood and green pus were removed from his wounds when vacuumed due to the low frequency of wound care.

139.    Despite Plaintiff's deep and obviously infected wounds, RMC medical staff failed to consistently provide Plaintiff with new dressings on his legs and buttocks every day or more frequently when the wound conditions demand it.

140.    Plaintiff also complained to RMC medical staff that he had lost the ability to write using his dominant right hand due to muscle weakness, but Centurion, MHM Health, and FDC ignored Plaintiff's requests for therapy—preventing him from properly retaining the ability to use his right arm in the future and preventing him from further detailing his medical complaints and filing grievances.

141.    Instead, Defendants were betting Plaintiff would simply die of spreading prostate cancer before dying of septic shock or losing a limb to the growing infections on his body. The lack of timely action, concern or plans to take steps, possibly costly steps, to save Plaintiff's life was purposeful—all part of an unwritten policy, practice, and custom to save money at Plaintiff's and other seriously ill prisoners' expense.

142.    Today, despite the persistent failure to treat by Defendants, Plaintiff is now in a normal acute care hospital where efforts are being made to undo their long-term failures to treat, having been awarded compassionate medical release by a state panel set up to review cases like his. Notwithstanding, due to Centurion and MHM Health's policy, custom, and practice of delayed testing and treatment, Plaintiff's cancer is terminal.

143.    Although not necessary because Plaintiff is no longer a prisoner for the purposes of the PLRA, Plaintiff has appropriately and repeatedly given notice through grievances to FDC to obtain immediate and necessary treatment to no avail.

## Causes of Action

**I.     Violation of 42 U.S.C. § 1983 – First Amendment Retaliation (against Figueroa, Richardson-Graham, and Howell)**

Plaintiff repeats and re-alleges the Common Allegations of Fact, as if fully set forth herein and further alleges:

144.    As a prisoner, Plaintiff had a right to protected speech and redress of grievances under the First Amendment to the U.S. Constitution.

145.    Plaintiff wrote grievances complaining of abusive treatment by Dr. Figueroa, Sgt. Richardson-Graham, and Howell and they responded with retaliatory and life-endangering measures to punish him.

146.    The retaliatory life-threatening measures are such as would deter a person of ordinary firmness from exercising protected speech and seeking redress.

147.    Moreover, responses to the grievances were almost uniformly hostile and accusatory and show little or no actual review of records or information.

148.    Plaintiff has been required to engage the services of the undersigned counsel. As such, Plaintiff is entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE, Plaintiff demands: (a) judgment for compensatory and punitive damages against Defendants Figueroa, Richardson-Graham, and Howell; and (b) an order awarding Plaintiffs reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988 and any other applicable law.

II.     **Violation of 42 U.S.C. § 1983 – Eighth Amendment (Centurion and MHM Health)**

Plaintiff repeats and re-alleges the Common Allegations of Fact, as if fully set forth herein and further alleges:

149.   As a prisoner, Plaintiff had an Eighth Amendment right to receive timely and adequate medical treatment for a serious medical condition.

150.   Centurion and MHM Health were deliberately indifferent or purposefully ignoring Plaintiff's serious medical needs in violation of the Eighth Amendment right to be free from cruel and unusual punishment.

151.   Plaintiff's injuries were proximately caused by the policies and practices of Centurion and MHM Health.

152.   Prior to and during the events giving rise to Plaintiff's Complaint, Centurion and MHM Health maintained policies and practices pursuant to which prisoners like Plaintiff with serious medical needs were routinely denied medical care and access to medical care.

153.   Specifically, there exist policies and widespread practices at FDC—through Centurion and MHM Health's management of healthcare delivery—pursuant to which prisoners receive unconstitutionally inadequate healthcare, including policies and practices in which healthcare staff contracted by Centurion and MHM Health: (a) commonly disregard reports by patients of objectively serious symptoms; (b) refuse to provide adequate treatment to patients; (c) refuse to timely conduct or obtain diagnostic tests and bloodwork for patients; (d) fail to create sensible

treatment plans for patients whose health status requires the same; (e) fail to ensure continuity of care; (f) prioritize profits at the expense of constitutionally adequate care; (g) fail or refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper; and (h) refuse and/or fail to provide any medical care whatsoever for defined medical problems.

154.   These policies and practices were allowed to flourish because Centurion and MHM Health, which respectively direct and staff the provision of healthcare services at Suwannee Correction Institution (including its Annex), Reception and Medical Center, and FDC, directly encouraged the very type of misconduct at issue here and failed to provide adequate training and supervision of healthcare and correctional employees.

155.   Centurion and MHM Health violated Plaintiff's rights by maintaining practices and policies that were the moving force of these constitutional violations.

156.   These policies and practices were able to exist and thrive within FDC because Centurion (as the contractor to oversee health services at FDC) and MHM Health (as the employer of medical staff under the Centurion contract) were both deliberately indifferent to the problem, thereby effectively ratifying it.

157.   Centurion and MHM Health also acted to violate Plaintiff's constitutional rights through the actions and failures to act by individuals with final policymaking authority for them.

158.   Plaintiff's injuries were caused by persons who acted pursuant to the foregoing policies and practices in engaging in the misconduct described herein.

159.    Plaintiff has been required to engage the services of the undersigned counsel. As such, Plaintiff is entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE, Plaintiff demands: (a) judgment for compensatory and punitive damages against Centurion and MHM Health; and (b) an order awarding Plaintiff's reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988 and any other applicable law.

## III.    Violation of ADA/RA (against Secretary Dixon)

Plaintiff repeats and re-alleges the Common Allegations of Fact, as if fully set forth herein and further alleges:

160.    Plaintiff is entitled to relief for disability discrimination against Ricky Dixon, or his successor, in his official capacity, for violating Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, (the "ADA") which provides in pertinent part:

> No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity.

> 42 U.S.C. § 12132

161.    Title II of the Act prohibits, among other things:

> limiting a qualified individual's enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service of an agency; and

> subjecting a qualified individual to discrimination under any program or activity conducted by an agency.

41

28 C.F.R. § 39.130.

162.    As a result of the spread of his cancer, Plaintiff became disabled as defined at 42 U.S.C. § 12102(2), as he suffered a physical impairment that substantially limited one or more of his major life activities, including, but not limited to, the ability to walk normally and to perform normal bathroom functions.

163.    Plaintiff is a "qualified individual" as defined at 42 U.S.C. § 12131(2): "Qualified Individual" means a person with a disability who meets the essential eligibility requirements for receipt of services or participation in programs or activities provided by the entity (with or without regard to any auxiliary aids or modifications).

164.    FDC is a public entity that has violated Title II of the ADA.

165.    FDC is an entity that receives federal funding.

166.    Suwannee C.I. Annex and RMC are state facilities, and their operation comprises a program and service for purposes of Title II of the ADA.

167.    The widespread abuse in FDC and at Suwannee C.I. was obvious, flagrant, rampant and of a continued duration such that to put Dixon and/or his predecessor on notice.

168.    At all times material, Defendant Dixon was an official who at a minimum has authority to address the discrimination and to institute corrective measures on FDC's behalf and had actual knowledge of discrimination in the entity's programs and failed adequately to respond.

169.    Specifically, Defendant Ricky Dixon, or his predecessor, in his official capacity, had knowledge of the widespread history of abuse to Plaintiff and other

prisoners who suffer from disabilities and are retaliated against for their exercise of the First Amendment right to grieve. He or his predecessor also had knowledge of the widespread history of abuse to Plaintiff and other prisoners who were otherwise denied reasonable accommodations for their disabilities. Defendant had actual knowledge of Plaintiff's allegations of abuse and understanding of the systemic issues and discrimination from its lawsuit with Disability Rights Florida in Leon County, under which Dixon and FDC agreed to court-implemented monitoring and promised better accommodations for disabled prisoners with mobility limitations, like Plaintiff. Dixon further had actual knowledge of the discrimination from Plaintiff's grievances to the Secretary raising these issues at Suwannee C.I., such as the failure to accommodate his mobility limitations to assist him in receiving access to benefits at FDC.

170.    Dixon and/or his predecessor turned a blind eye to his subordinates who retaliated against disabled prisoners, including Plaintiff, for exercising their First Amendment rights, or empowered and rewarded or failed to correct them. Dixon knew that his subordinates would act unlawfully, and he failed to stop them from doing so.

171.    Dixon and/or his predecessor also turned a blind eye to his subordinates who would deny reasonable accommodations to inmates despite known and obvious need for such accommodations, such as denying wheelchairs, inmate assistants, and diapers to inmates suffering from mobility impairments and incontinence.

172.    Plaintiff's need for accommodation was known and obvious.

173.    Plaintiff requested reasonable accommodations to FDC and Dixon.

174.   Dixon acted intentionally and/or with deliberate indifference to Plaintiff's need for reasonable accommodation by, among other things:

    a)  failure to accommodate his lower extremity numbness;

    b)  failure to accommodate his incontinence of bladder and bowel; and

    c)  failing and intentionally refusing to train FDC employees regarding the humane management of physically disabled inmates.

175.   As a proximate result of Defendant's failure and intentional refusal to provide Plaintiff with a reasonable accommodation for his disability, he suffered physical harm and severe pain.

WHEREFORE, Plaintiff demands: (a) judgment for compensatory damages against FDC; and (b) an order awarding Plaintiff's reasonable attorneys' fees, litigation expenses, and costs pursuant to applicable law.

## IV.  Violation of 42 U.S.C. § 1983 – Eighth Amendment Failure to Treat (against Santiago, Figueroa, Howell, Holmes, Abbott, Knaus, Millette, and Johns)

Plaintiff repeats and re-alleges the Common Allegations of Fact, as if fully set forth herein and further alleges:

176.   Dr. Figueroa, Dr. Santiago, nurses Howell, Holmes, Abbott, Knaus, and Central Office staff Millette and Johns know, and have known, that Plaintiff suffers from serious medical needs, yet they failed and intentionally refused to provide the necessary aid and treatment that would alleviate numerous serious medical needs.

177.   They disregarded the risks and harms by failing and intentionally refusing to do anything that would remedy Plaintiff's serious medical needs.

178.   They have been deliberately indifferent to the serious medical needs of Plaintiff.

179.   Specifically, as the medical providers and staff working for FDC or Centurion as staffed employees by MHM Health, these defendants were required to evaluate the appropriate level of care for Plaintiff in his deteriorating condition.

180.   In the face of obvious lower extremity numbness, infected sores, elevated PSA levels, and other related issues, these defendants refused to permit Plaintiff to receive care and medical supplies to treat or mitigate his serious medical conditions to avoid the risk of serious harm.

181.   As a direct and proximate cause of this deliberate indifference, Plaintiff has suffered and will continue to suffer from harm in violation of his Eighth Amendment rights.

182.   Plaintiff has been required to engage the services of the undersigned counsel. As such, Plaintiff is entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE, Plaintiff demands: (a) judgment for compensatory and punitive damages against Santiago, Figueroa, Howell, Holmes, Abbott, Knaus, Millette, and Johns; and (b) an order awarding Plaintiffs reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988 and any other applicable law.

**V.    Abuse or Neglect of a Vulnerable Adult § 415.1111, Fla. Stat. (Figueroa, Richardson-Graham, Howell, Abbott, Knaus, and Holmes)**

Plaintiff repeats and re-alleges the Common Allegations of Fact, as if fully set forth herein and further alleges:

183.   Plaintiff is entitled to relief against Defendants Figueroa, Richardson-Graham, Howell, Abbott, Knaus, and Holmes under the Adult Protective Services Act.

184.    Plaintiff met the definition of a "vulnerable adult" in that he was an adult whose ability to perform the normal activities of daily living or to provide for his own care was impaired due to a physical infirmity.

185.   Figueroa, Richardson-Graham, Howell, Abbott, Knaus, and Holmes assumed the responsibility for a caregiver relationship, involving the regular and frequent care of Plaintiff by virtue of their status as employees or agents of FDC.

186.   Defendants had a duty to avoid acts or omissions that caused significant impairment to Plaintiff's health.

187.   Defendants had a duty to provide care, supervision, and services necessary to Plaintiff.

188.   Defendants breached that duty of care by abusive and neglectful acts that could reasonably be expected to cause serious physical and mental injury.

189.   Defendants breached their duties to Plaintiff as follows:

    a)  Acting in a way that caused or was likely to cause significant impairment to Plaintiff's physical, mental, and emotional health;

    b)  Failing to follow normal and accepted humane corrections practices and procedures relating to the safe care of vulnerable prisoners; and

c) Failing to provide care, supervision, and services necessary to maintain the physical and mental health of Plaintiff, including necessary treatment, supervision, monitoring, and medical services, that a prudent person would consider essential for the well-being of a vulnerable adult.

190.   As a direct and proximate result of Defendants' breach of duty to the Plaintiff, Plaintiff suffered severe physical injuries and emotional distress.

191.   Defendants' acts and omissions as stated above constitute "abuse" as that term is defined in section 415.102(1), Florida Statutes, as well as "neglect" as that term is defined in section 415.102(15), Florida Statutes.

192.   Defendants acted in bad faith or for a malicious purpose in committing neglect and/or abuse.

193.   Defendants' conduct rises to this level because they sadistically withheld necessities (i.e., food, clothing, shelter and medicine) essential to Plaintiff's well-being through their abuse and neglect in connection with Plaintiff's disabilities.

194.   Pursuant to section 415.1111, Florida Statutes, Plaintiff is entitled to actual damages from Defendants, as well as attorneys' fees and costs.

195.   Plaintiff will seek punitive damages provided for in Chapter 415, Florida Statutes.

WHEREFORE, Plaintiff demands: (a) judgment for compensatory and punitive damages against Figueroa, Richardson-Graham, Howell, Abbott, Knaus, and Holmes; and (b) an order awarding Plaintiffs reasonable attorneys' fees, litigation expenses, and costs pursuant to section 415.1111, Florida Statutes.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

Dated: January 17, 2023.

Respectfully submitted,

LAW OFFICE OF JAMES COOK

By: */s/ James V. Cook*
        James V. Cook (FBN 0966843)
        314 W. Jefferson Street
        Tallahassee, Florida 32301
        Tel. (850) 222-8080
        Fax (850) 561-0836
        cookjv@gmail.com

        -and-

SLATER LEGAL PLLC

By: */s/ James M. Slater*
        James M. Slater (FBN 111779)
        113 S. Monroe Street
        Tallahassee, Florida 32302
        Tel. (305) 523-9023
        james@slater.legal

        *Attorneys for Plaintiff Elmer Williams*

### Certificate of Service

I hereby certify that on January 17, 2023, I electronically filed the foregoing document with the Clerk by using the CM/ECF system, which will serve a copy on all counsel of record.

By: */s/ James M. Slater*
        James M. Slater