## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

ELMER WILLIAMS, )
)
    Plaintiff, )
)
v. )
)   Case No.: 3:22-cv-01221-MMH-MCR
RICKY DIXON, in his official )
capacity as Secretary of the Florida )
Department of Corrections, et al., )
)
    Defendants. )

## <u>DEFENDANT ALEXIS FIGUEROA'S MOTION TO DISMISS SAC</u>

Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Rule 3.01, Defendant Alexis Figueroa moves to dismiss Plaintiff Elmer Williams's Second Amended Complaint for failure to state a claim.

## <u>INTRODUCTION</u>

Mr. Williams, a former Florida Department of Corrections ("FDC") inmate, suffers from recurrent prostate cancer that metastasized and spread. Despite medical intervention both inside and outside of custody, Mr. Williams's condition is terminal.

In his Second Amended Complaint ("SAC"), Mr. Williams claims Alexis Figueroa, M.D. ("Dr. Figueroa") (1) violated his First Amendment rights by retaliating against him, (2) violated his Eighth Amendment rights by being deliberately indifferent to his serious medical needs, and (3) abused or neglected him, in violation of Florida's Adult Protective Services Act ("APSA"). Each of these claims fail.

*First*, as to retaliation, Mr. Williams fails to identify any alleged retaliatory action by Dr. Figueroa in response to Mr. Williams's formal and informal grievances—his only alleged protected speech. *Second*, Mr. Williams's allegations and the records central to his claim demonstrate Dr. Figueroa provided constitutionally adequate care, including evaluating Mr. Williams, prescribing medications, ordering numerous diagnostic tests, and referring him to multiple specialists. And *third*, the same allegations and records show Dr. Figueroa did not abuse or neglect Mr. Williams. Regardless, though, his claim fails as a matter of law because Mr. Williams cannot substitute an APSA claim for a medical malpractice claim. Accordingly, the claims against Dr. Figueroa should be dismissed.

## **ALLEGATIONS FROM SAC**[1]

At all relevant times, Mr. Williams was an inmate in FDC's custody. ECF No. 42 at ¶ 7. Mr. Williams suffers from recurrent prostate cancer, which was previously and successfully treated during his incarceration prior to 2020. *Id.* at ¶¶ 22–23.

---

[1] As explained in the Centurion Defendants' motion to dismiss (ECF No. 58), Mr. Williams filed the SAC after his deposition was taken. Prior to his deposition, Mr. Williams provided an incomplete set of records to the Centurion Defendants, many of which were used during his deposition. After the deposition, Mr. Williams filed the SAC to correct inaccurate allegations in the First Amended Complaint.

Because Mr. Williams relied on the medical records in forming the SAC, the records are central to his claim and may be considered on Dr. Figueroa's motion. *Day v. Taylor*, 400 F.3d 1272, 1275–76 (11th Cir. 2005) (citing *Horsley v. Feldt*, 304 F.3d 1125 (11th Cir. 2002)); *accord Estrada v. Stewart*, No. 5:12-CV-149-OC-10PRL, 2016 WL 11717280, at *2 (M.D. Fla. Apr. 18, 2016) (considering records of prisoner asserting deliberate indifference claim), *aff'd in part, rev'd in part on other grounds,* 703 F. App'x 755 (11th Cir. 2017); *Baker v. Corizon Health*, No. 3:19CV561/TKW/EMT, 2019 WL 3642579, at *2 (N.D. Fla. July 26, 2019) (considering records of inmate as "central to the complaint").

In September 2021, while at Moore Haven Correctional Rehabilitation Facility[2] ("MHCRF") Mr. Williams's prostate-specific antigen ("PSA") levels were tested and a urologist consult was made—but Mr. Williams alleges it was not submitted. ECF No. 42 at ¶¶ 25–27. Mr. Williams alleges he began to experience mobility issues around this time, which he attributes to his cancer's recurrence and spread. *Id.* at ¶¶ 28, 133. Mr. Williams does not allege he was unable to walk while at MHCRF.

In mid-November 2021, Mr. Williams was transferred to Suwannee Correctional Institution ("SCI"), where Dr. Figueroa worked. *Id.* at ¶ 29.

Mr. Williams alleges a "lack of constitutionally adequate care" on the part of SCI medical staff, including Dr. Figueroa. But his medical records tell another story.

With respect to specific encounters with Dr. Figueroa, Mr. Williams first alleges Dr. Figueroa "received [his] complaints about numbness, swelling, and lack of use of his extremities" on or about December 20, 2021. *Id.* at ¶¶ 62–64. Mr. Williams alleges he was "*seen* by medical staff, [but] was not *treated* by them." *Id.* at ¶ 63.

But, according to Mr. Williams's medical records, he was seen *and treated* by Dr. Figueroa on December 20. ECF No. 58-1 at PLMEDICAL 5–14. Dr. Figueroa assessed Mr. Williams, ordered back x-rays to determine the cause of Mr. Williams's back pain and mobility complaints, provided pain medication, and submitted a referral to a neurologist. *Id.* The back x-rays were taken the next day. *Id.* at PLMEDICAL 15. Based on his assessment, Dr. Figueroa did "not recommend wheelchair at this time."

---

[2] MHCRF is a private prison run by GEO Group at which co-Defendant Centurion of Florida, LLC is not responsible for providing healthcare services.

*Id.* at PLMEDICAL 13. Dr. Figueroa also started Mr. Williams on a laxative for complaints of constipation. *Id.*

The next encounter with Dr. Figueroa alleged in the SAC occurred on December 24, 2021—just four days later—when Dr. Figueroa was notified Mr. Williams had returned for the same complaints. ECF No. 42 at ¶¶ 62–64, 68–69; ECF No. 58-1 at PLMEDICAL 49.

Mr. Williams was admitted into the SCI infirmary on January 7, 2022. ECF No. 42 at ¶ 76. Although not pleaded in the SAC, medical records show Dr. Figueroa assessed Mr. Williams on January 11, 2022, in the infirmary, and that he had ordered wound care, made an urgent urology referral, and started Mr. Williams on "cipro," an antibiotic. ECF No. 58-1 at PLMEDICAL 18–20.

Mr. Williams next alleges that on or around January 12, 2022, while staying the infirmary, he informed medical staff (including Dr. Figueroa) that he had not received any wound care in several days, ECF No. 42 at ¶ 77; even though records from the day before indicated Dr. Figueroa observed Mr. Williams "moving lower extremity *when wound care is performed*." ECF No. 58-1 at PLMEDICAL 18.

Mr. Williams alleges that on or around February 14, 2022, he was prematurely discharged from the prison infirmary. ECF No. 42 at ¶ 97. Mr. Williams's records from that day indicate he was evaluated, was clinically stable, was educated about his medical condition, was given a prescription for an antibiotic, was referred for a follow-up with a urologist, and was discharged with a wheelchair. ECF No. 58-1 at PLMEDICAL 21–22.

After his discharge, Mr. Williams had his PSA levels checked again after his release from the infirmary, and he was again seen by medical providers less than a week after his discharge for complaints of a urinary tract infection. ECF No. 42 at ¶¶ 101, 107; ECF No. 58-1 at PLMEDICAL 24–27. Mr. Williams was seen February 23, 2022, by Dr. Figueroa, who noted Mr. Williams's urology consult was pending, his catheter would be changed, and that he would continue receiving doxycycline, an antibiotic prescribed upon discharge from the infirmary. *Id.*

Although Mr. Williams fails to discuss the care he received in March or April, records show he was seen by his urologist on March 24, 2022. *Id.* at PLMEDICAL 28–30 (noting under "Specialty Service" that he was "seen last on 3/24/2022," and noting under "Other Pertinent Info/supporting documentation needed: Urologist Notes from 3/24/2022"). Additional diagnostic testing was ordered, including a whole body bone scan and an abdominal pelvic CT with contrast. *Id.* Dr. Figueroa also requested a follow-up urology consult for Mr. Williams. *Id.*

Mr. Williams alleges that on May 24, 2022, Dr. Figueroa diagnosed him with osteomyelitis (i.e. a bone infection) but that Dr. Figueroa "again delayed any treatment[.]" ECF No. 42 at ¶ 118. Despite alleging treatment was delayed, records show Dr. Figueroa admitted him to the infirmary on May 24, 2022, and ordered wound care. ECF No. 58-1 at PLMEDICAL 34–36. The records also show Mr. Williams had again been put on the antibiotic doxycycline. *Id.* at PLMEDICAL 35. And Mr. Williams's Medication Report shows he was prescribed numerous medications and treatments in May 2022, including Eligard, Bicalutamide (brand

name Casodex), and Tamsulosin for his prostate cancer and furosemide for edema, and had orders for his catheter to be changed monthly. *Id.* at PLMEDICAL 39–40.

Mr. Williams alleges that in or around July 2022 Dr. Figueroa ". . . did nothing to deal with the growing and infected deep sores on [Mr. Williams's] ankles and buttocks . . ." ECF No. 42 at ¶ 126. Contrary to these allegations, records show Dr. Figueroa ordered a PICC line be inserted and that Mr. Williams be started on IV antibiotics, which occurred July 16. ECF No. 58-1 at PLMEDICAL 43–44. Further, records show Mr. Williams was prescribed wound care and the antibiotic cephalexin on June 10, and that course of antibiotics was due to be stopped on July 1, 2022. *Id.* at PLMEDICAL 39–48.

Throughout the SAC, Mr. Williams repeatedly alleges Dr. Figueroa delayed having his PSA levels tested, delayed referring him to a urologist, and refused to provide him a wheelchair. ECF No. 42 at ¶¶ 64, 70, 79–81, 94–95, 107, 109, 119, 133, 134, and 135. Despite his claims of "delay," Mr. Williams admits he had PSA and other lab tests ordered within weeks of his November transfer to SCI, but he alleges he missed the tests because he could not walk to the appointment. *Id.* at ¶ 46. He does not attribute his missed appointment to any conduct by Dr. Figueroa, who he does not allege to have seen at that time.

Moreover, Mr. Williams's allegations and records show he was urgently referred to urology in January 2022, ECF No. 58-1 at PLMEDICAL 18–23; he had his PSA levels tested multiple times, *id.* at PLMEDICAL 19; ECF No. 42 at ¶ 101; and he saw a urologist in March, May, June, and July, ECF No. 58-1 at PLMEDICAL

18–30, 37–38, 45. Records also indicate Mr. Williams was admitted in the infirmary on January 7, 2022, until he was discharged with a wheelchair on February 14, 2022. ECF No. 42 at ¶ 76; ECF No. 58-1 at PLMEDICAL 21–23.

## ARGUMENT

Mr. Williams's claims against Dr. Figueroa must be dismissed. *First*, Mr. Williams has not adequately alleged Dr. Figueroa retaliated against him. *Second*, Mr. Williams's allegations and records show Dr. Figueroa provided constitutionally adequate care. And *third*, Mr. Williams cannot state an APSA claim.

## I.  Mr. Williams fails to state First Amendment retaliation claim (Count I).

The First Amendment retaliation claim alleges Dr. Figueroa responded to Mr. Williams's grievances "with retaliatory and life-endangering measures to punish him." ECF No. 42 at ¶ 145. But the SAC fails to adequately allege any retaliation.

To state a First Amendment retaliation claim, Mr. Williams must allege: "(1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the administrator's allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech." *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008); *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). Allegations of verbal abuse or threats alone are insufficient to state a retaliation claim. *Hernandez v. Florida Dept. of Corr.*, 281 Fed. Appx. 862, 866 (11th Cir. 2008).

To satisfy the causation element, "a plaintiff is required to do more than make 'general attacks' upon a defendant's motivations and must articulate 'affirmative evidence' of retaliation to prove the requisite motive." *Hurst v. Flesher*, 2020 WL 1929460, at *6 (M.D. Fla. Apr. 21, 2020) (citing *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998)). "In other words, the prisoner must show that, as a subjective matter, a motivation for the defendant's adverse action was the prisoner's grievance or lawsuit." *Jemison v. Wise*, 386 F. App'x 961, 965 (11th Cir. 2010).

Mr. Williams failed to plausibly allege Dr. Figueroa retaliated against him for filing grievances—protected speech—for at least two reasons. *First*, there are no allegations Dr. Figueroa was *aware* Mr. Williams filed grievances, which means Mr. Williams has not alleged a causal connection between his grievance writing and any alleged adverse action. *Allen v. Bedard*, No. 2:13-CV-787-FTM-29, 2013 WL 6231233, at *5 (M.D. Fla. Dec. 2, 2013) (dismissing conclusory retaliation claim because "there are no facts in Plaintiff's amended complaint alleging that any defendant was aware of the grievances."); *Brazill v. Cowart*, No. 2:10-CV-458-FTM-29DN, 2011 WL 900721, at *4 (M.D. Fla. Mar. 14, 2011) (concluding retaliation claim was implausible when there was no allegation inmate grievances were reviewed by the defendants).

*Second*, Mr. Williams has not alleged any specific adverse action by Dr. Figueroa. There is not even a conclusory allegation of what Dr. Figueroa did or did not do. *See* ECF No. 42. Without identifying an allegedly adverse action taken by Dr. Figueroa, Mr. Williams has not pleaded a *prima facie* case of retaliation.

To the extent Mr. Williams attempts to rely on his allegations of delayed or inadequate medical treatment, such allegations are insufficient. Even if these allegations are taken as true at this stage—an inference to which they are not entitled given that the allegations are refuted by the contemporaneously created medical records that are central to his claim, *Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010) ("[s]elf-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records")—those allegations are "general attacks" and not "affirmative evidence" of retaliation. *Hurst*, 2020 WL 1929460, at *6. As such, Mr. Williams does not plausibly plead retaliation by Dr. Figueroa for any First Amendment-protected activities by Mr. Williams.

## II. Mr. Williams fails to state a claim for deliberate indifference (Count IV).

Mr. Williams has not stated a claim against Dr. Figueroa for deliberate indifference to a serious medical need for two reasons. *First*, Dr. Figueroa provided constitutional care to Mr. Williams, and there are no plausible allegations that Dr. Figueroa deliberately disregarded a serious risk of harm about which he had knowledge. And *second*, Mr. Williams has not plausibly pleaded Dr. Figueroa's actions caused Mr. Williams's injuries.

### A. Deliberate indifference to serious medical need standard.

The Eighth Amendment protects inmates from "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). But a "prisoner

bringing a deliberate-indifference claim has a steep hill to climb." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020). As the Eleventh Circuit explained,

> "[D]eliberate indifference is *not* a constitutionalized version of common-law negligence." "To the contrary, we (echoing the Supreme Court) have been at pains to emphasize that 'the deliberate indifference standard . . . is far more onerous than normal tort-based standards of conduct sounding in negligence,' and is in fact akin to 'subjective recklessness as used in the criminal law.'" With respect to prisoners' medical care, in particular, we have held that the Eighth Amendment doesn't require it to be "perfect, the best obtainable, or even very good." Rather, we have emphasized, "[m]edical treatment violates the [E]ighth [A]mendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."

*Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1271 (11th Cir. 2020)[3] (internal citations omitted) (emphasis in original).

Indeed, the Eleventh Circuit has cautioned courts against employing a "'perhaps they could be doing more' standard" when considering claims of deliberate indifference to a serious medical need. *Hammonds v. Theakston*, 833 F. App'x 295, 301 (11th Cir. 2020) (quoting *Hoffer*, 973 F.3d at 1271). Instead, courts should first consider the care provided to an inmate and, if such care satisfies the constitutional minimum, then there is no need to consider whether a defendant could have done more. *Hoffer*, 973 F.3d at 1277 (concluding it did not need to reach the question of whether less efficacious care was provided pursuant to a cost defense "because we have held that the Eighth Amendment's 'minimally adequate care'" was provided).

A deliberate indifference claim involves both an objective and subjective component. *Keohane*, 952 F.3d at 1266. After a prisoner demonstrates an objectively

---

[3] In the constitutional context, "[O]nly the most egregious official conduct" shocks the conscience. *Waddell v. Hendry Cty. Sheriff's Off.*, 329 F.3d 1300, 1305 (11th Cir. 2003).

serious medical need, the inmate must prove prison officials acted with deliberate indifference to that need by showing: "(1) the official was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, (2) the official actually drew that inference, (3) the official disregarded the risk of serious harm, and (4) the official's conduct amounted to more than gross negligence." *Ireland*, 53 F.4th at 1287 (11th Cir. 2022) (quotations omitted).

"With regard to the subjective component of the Eighth Amendment claim, the Court in *Farmer* [*v. Brennan,* 511 U.S. 825, 837 (1994),] held that the prison 'official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference*.'" *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617 (11th Cir. 2007) (emphasis added). "Each individual Defendant must be judged separately and on the basis of what that person knows, because 'imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference.'" *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008).

Because medical care must shock the conscience to constitute deliberate indifference, proof of medical malpractice is not enough. *Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Indeed, "mere evidence of negligence 'in diagnosing or treating a medical condition' or a showing of medical malpractice does not establish deliberate indifference." *Monteleone v. Corizon*, 686 F. App'x 655, 658 (11th Cir. 2017).

And "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second

guess medical judgments and to constitutionalize claims which sound in state tort law." *Hoffer*, 973 F.3d at 1272. "[T]he question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) (quoting *Estelle*, 429 U.S. at 10). That's because "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment [fails to] support a claim of cruel and unusual punishment." *Keohane*, 952 F.3d at 1266.

**B. Mr. Williams has not pled Dr. Figueroa's care was deliberately indifferent.**

Mr. Williams's allegations against Dr. Figueroa fail to establish deliberate indifference. As detailed *supra*, throughout the SAC Mr. Williams alleges his complaints of pain and mobility impairment were "ignored"; his wound care was neglected; and his urologist referral, PSA level tests, and various medical treatments were "delayed."

These allegations simply do not state a plausible claim for deliberate indifference. Taken together, the details included in the SAC and in Mr. Williams's records show the care provided to Mr. Williams was nowhere near the sort that would be so "grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Hoffer*, 973 F.3d at 1271 (11th Cir. 2020).

In fact, as detailed *supra*, the details gleaned from the SAC and Mr. Williams's records demonstrate Dr. Figueroa provided Mr. Williams constitutional care. Mr.

Williams was thoroughly evaluated each time he interacted with Dr. Figueroa: and numerous tests, treatment plans, and medications were prescribed and implemented for Mr. Williams's medical benefit. As detailed *supra*, Mr. Williams's allegations and records show he was urgently referred to urology in January 2022, ECF No. 58-1 at PLMEDICAL 18–23; he had his PSA levels tested multiple times, *id.* at PLMEDICAL 19; ECF No. 42 at ¶ 101; and he saw a urologist in March, May, June, and July, ECF No. 58-1 at PLMEDICAL 18–30, 37–38, 45; and he was admitted into the infirmary on January 7, 2022, where he was kept until February 14, 2022 (when he was discharged with a wheelchair). ECF No. 42 at ¶ 76; ECF No. 58-1 at PLMEDICAL 21–23.

Though Mr. Williams may have desired additional treatment or testing, that "isn't grist for a constitutional claim." *Mann v. Sec'y, Dep't of Corr.*, No. 21-11445, 2021 WL 5112647, *4 (11th Cir. Nov. 3, 2021); *accord Hoffer*, 973 F.3d at 1272 (explaining courts are reluctant to second guess medical judgments); *Adams*, 61 F.3d at 1545 (explaining whether to order additional tests is classic question of medical judgment). This is true even if the treatment Mr. Williams received was subpar. *Hoffer*, 973 F.3d at 1273 (citing *Lamb v. Norwood*, 899 F.3d 1159, 1162 (10th Cir. 2018) for the holding: "We have consistently held that prison officials do not act with deliberate indifference when they provide medical treatment even if it is subpar or different from what the inmate wants.")

Lastly, Mr. Williams's generalized complaints that Dr. Figueroa did not refer him to a urologist or test his PSA levels sooner also do not state a claim for deliberate

indifference.[4] Rather, the records central to Mr. Williams's claims show he was scheduled to have his PSA levels tested within weeks of his transfer to SCI; he had a pending urology referral when he came to SCI that was renewed in January and February; he saw a urologist in March, May, June, and July; and he was provided medication to treat his prostate cancer, which caused his PSA levels to decrease. So Mr. Williams has not plausibly alleged any facts that Dr. Figueroa was deliberately indifferent to getting Mr. Williams treatment for his prostate cancer.

Instead, as the Eleventh Circuit has explained, Dr. Figueroa would not be liable for deliberate indifference even if he should have done something more to ensure Mr. Williams was seen by a urologist sooner. *Mann*, 2021 WL 5112647 at *3 ("We assume that [the doctor's] failure to refer [Plaintiff] to a specialist or order a colonoscopy violated the applicable standard of care and could support a negligence claim. But … '[m]ere incidents of negligence or malpractice do not rise to the level of constitutional violations.'" (quoting *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991))). Accordingly, none of the allegations against Dr. Figueroa are sufficient to state a claim for deliberate indifference, and the claim should, therefore, be dismissed.

---

[4] Again, these allegations appear to be against Dr. Figueroa in his official capacity as a final policymaker. If that is the case, they cannot be a basis to hold Dr. Figueroa liable in his individual capacity because the allegations are against co-Defendants Centurion of Florida, LLC and MHM Health Professionals, LLC. *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (holding, "when an officer is sued under Section 1983 in his or her official capacity, the suit is simply another way of pleading an action against an entity of which an officer is an agent." (cleaned up)). If the Court concludes the SAC's remaining allegations are official capacity allegations instead of individual capacity allegations, then no analysis of those allegations is necessary to resolve this motion.

**C. Mr. Williams fails to plead causation.**

Even if Mr. Williams pleaded Dr. Figueroa was deliberately indifferent, his claim is deficient nonetheless for failing to plausibly allege causation. Proof of causation is required to prevail on a deliberate indifference claim. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009); *accord Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) (requiring "causal link" between indifference and injury). In cases involving a delay in treatment, a prisoner must also demonstrate the delay seriously exacerbated the medical condition. *Goebert v. Lee Cty.*, 510 F.3d 1312, 1327 (11th Cir. 2007).

Here, there is no plausible allegation Dr. Figueroa injured Mr. Williams. Before he ever transferred to SCI, Mr. Williams alleges his PSA levels had risen and that he was experiencing mobility issues he attributes to his prostate cancer spreading. As detailed *supra*, records show that Mr. Williams was thoroughly evaluated each time he saw with Dr. Figueroa as a patient: and numerous tests, treatment plans, and medications were prescribed and implemented to treat Mr. Williams's various medical conditions. In fact, Mr. Williams was admitted into the infirmary shortly after his initial encounters with Dr. Figueroa, where he remained for more than a month. *See* ECF No. 42 at ¶¶ 76–97 (alleging Mr. Williams was placed in the infirmary on or about January 7 until his release on Feb. 14, 2022). Mr. Williams then alleges he continued to receive care from other providers at SCI and then at Reception and Medical Center until his release from custody in October 2022. *See generally id.* His records also show he was placed on medications to treat his prostate cancer, and that he was seen by both

15

a urologist and oncologist who dictated the treatment he should receive. Given the care that Dr. Figueroa provided, it is implausible that he injured Mr. Williams. *Peterson v. Willie*, 81 F.3d 1033, 1039 (11th Cir. 1996) (concluding defendants were not proximate cause of prisoner's injury); *Tuten v. Nocco*, No. 8:20-CV-1838-WFJ-AEP, 2021 WL 1238408, at *2 (M.D. Fla. Apr. 2, 2021) (explaining, "The unconstitutional act must be the proximate cause of the injury.")

As such, Mr. Williams has not sufficiently pleaded any alleged delay in treatment by Dr. Figueroa seriously exacerbated any of Mr. Williams's medical conditions.

## III.   Mr. Williams cannot state a claim under the APSA (Count V).

Even assuming Mr. Williams met the definition of a vulnerable adult during his interactions with Dr. Figueroa, his claim under § 415.1111, Florida Statutes, for abuse or neglect of a vulnerable adult fails for three reasons. *First*, Dr. Figueroa was not a statutory caregiver who can be held liable under the APSA. *Second*, Mr. Williams's claim depends on proving a violation of the medical standard of care, rendering Chapter 415 inapplicable since the APSA is not a substitute for medical negligence claims. And *third*, to the extent Mr. Williams argues Dr. Figueroa is liable for neglect, the claim is barred by sovereign immunity.

### A. Dr. Figueroa was not a 'caregiver.'

Mr. Williams's claim fails as a matter of law because Dr. Figueroa was not a "caregiver" under the APSA. The APSA "was enacted to protect 'vulnerable adults'

from 'abuse, neglect, and exploitation' by 'caregivers,' as those terms are defined in the Act … [and] provides for protective services, including protective supervision, placement, and in-home and community-based services, as well as for protective services interventions when the vulnerable adult lacks the capacity to consent[.]" *See Bohannon v. Shands Teaching Hosp. & Clinics, Inc.*, 983 So. 2d 717, 718 (Fla. Dist. Ct. App. 2008). As this Court previously opined,

> "To state a cause of action under section 415.1111, a complaint must set forth factual allegations which demonstrate that the plaintiff or the plaintiff's decedent was a 'vulnerable adult' as defined by section 415.102(27), that the defendant was a 'caregiver' as defined by section 415.102(4), and that the defendant committed 'abuse' as defined by section 415.102(1), or 'neglect' as defined by section 415.102(15), or 'exploitation' as defined by section 415.102(7) with respect to the vulnerable adult."

*Grasso v. Grasso*, 131 F. Supp. 3d 1303, 1312–13 (M.D. Fla. 2015) (quoting *Bohannon*, 983 So. 2d 717 at 721).

Under the APSA, a "'[c]aregiver'" means a person who has been entrusted with or has assumed the responsibility for frequent and regular care of or services to a vulnerable adult on a temporary or permanent basis and who has a commitment, agreement, or understanding with that person or that person's guardian that a caregiver role exists." § 415.102, Fla. Stat.

Based on the plain language of the statute, Dr. Figueroa was not a "caregiver" to Mr. Williams. While records show that Dr. Figueroa evaluated and treated Mr. Williams on multiple occasions during the nearly 10 months he was at SCI, there is no evidence Dr. Figueroa provided Mr. Williams with "frequent" or "regular" care—which is a plain statutory requirement. *Cf. Bobbin v. Corizon Health, Inc.*, 2014 WL

5474126 at *5 (M.D. Fla. Oct. 29, 2014) (finding the plaintiff had plausibly alleged three defendant healthcare providers were "caregivers" to the injured person due to their assuming responsibility for the "frequent and regular care of [the injured person] during his incarceration . . . and [their] commitment or understanding . . . that a caregiver role existed [between the injured person and themselves,]").

Mr. Williams also does not allege Dr. Figueroa assumed responsibility for his frequent and regular care **other than a single, conclusory recitation of the elements of the cause of action.** ECF No. 42 at ¶ 185. This conclusory statement, unsupported by any facts, need not be considered. *Ziyadat v. Diamondrock Hosp. Co.*, 3 F.4th 1291, 1295–96 (11th Cir. 2021) (holding courts "must ignore '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 129 S. Ct. 1937, 1940, 173 L. Ed. 2d 868 (2009))).

So because Mr. Williams has not adequately alleged Dr. Figueroa was a caregiver under the APSA, his claim must be dismissed.

**B. Mr. Williams cannot bring claim as a substitute to medical negligence.**

In *Bohannon*, the Florida First District Court of Appeal held that "[the APSA] was not intended by the Florida Legislature to provide an alternate cause of action for medical negligence." *Bohannon*, 983 So. 2d at 721. Per the Florida Supreme Court, the "[Florida] Legislature chose to define medical malpractice as a claim arising out of the rendering of, or failure to render, medical care or services[,] … [a]ccordingly … claims that arise out of an action or inaction directly related to medical care or services, which

require the use of professional judgment or skill, sound in medical malpractice." *See Nat'l Deaf Acad., LLC v. Townes*, 242 So. 3d 303, 313 (Fla. 2018) (citing § 766.106(1)(a), Fla. Stat.) (internal quotation marks omitted).

In *Specialty Hosp.-Gainesville, Inc. v. Barth*, the First District further clarified that "an allegation of medical negligence subject to the statutory requirements of [Fla. Stat.] chapter 766 [which governs medical negligence suits] . . . cannot form the basis of a claim under section 415.1111, Florida Statutes[,]" and that "[t]he holding in *Bohannon* excluded any medical-malpractice or medical-negligence claims from the orbit of chapter 415 … [t]he entire legislative scheme of chapter 415 is to protect vulnerable adults, not to provide a duplicative remedy for medical malpractice." *See Specialty Hosp.-Gainesville, Inc. v. Barth*, 277 So. 3d 201, 204–209 (Fla. Dist. Ct. App. 2019).[5]

When a question arises about whether a claim sounds in negligence or medical malpractice, "a court must look beyond [the] label proffered and 'must[] apply the law to the well-pleaded factual allegations.'" *Univ. of Miami v. Bloomer*, 337 So. 3d 838, 840 (Fla. Dist. Ct. App. 2022); *accord Buck v. Columbia Hosp. Corp. of S. Broward*, 147 So. 3d 604, 606 (Fla. Dist. Ct. App. 2014) ("When determining whether a complaint alleges a cause of action in medical negligence versus simple negligence, '[t]he key inquiry is whether the action arises out of medical diagnosis, treatment, or care.'").

---

[5] The *Barth* Court also noted that "since our decision in *Bohannon*, rendered more than a decade ago, the legislature has not abrogated that decision, indicating legislative approval.'" 277 So. 3d at 207 (quoting *Goldenberg v. Sawczak*, 791 So. 2d 1078, 1081 (Fla. 2001)).

Here, Mr. Williams's allegations against Dr. Figueroa relate to the rendering (or the alleged delay in rendering) of medical treatment. *Townes*, 242 So. 3d at 313. In short, in the SAC Mr. Williams complains about Dr. Figueroa's alleged failure to provide adequate medical treatment, additional medical treatment (or medical devices) or effectuate timely referrals to medical specialists. Because all the allegations pertain to Dr. Figueroa's alleged rendering (or alleged failure to render) medical care, Mr. Williams's claim is really one of medical malpractice—not for a violation of the APSA. As stated in *Barth*, "Chapter 766, Florida Statutes, provides the exclusive remedy for claims 'arising out of the rendering of, or the failure to render, medical care or services.'" 277 So. 3d at 208 (quoting § 766.106(1)(a), Fla. Stat. (2018)). Because Mr. Williams has brought a claim under the APSA when the law required him to bring his claim under Florida's Medical malpractice Act, the APSA claim should be dismissed with prejudice.[6]

## C. Dr. Figueroa has sovereign immunity from claims of neglect.

Lastly, to the extent Mr. Williams seeks to hold Dr. Figueroa liable for neglect, the claim must be dismissed because Dr. Figueroa is immune under § 768.28, Florida Statutes. Subsection (10) of the statute provides as follows:

> (10)(a) **Health care providers or vendors, or any of their employees or agents, that have contractually agreed to act as agents of the Department of Corrections to provide health care services to inmates of the state correctional system shall be considered agents of the State of Florida, Department of Corrections, for the purposes of this section**, while acting

---

[6] It is worth noting that Mr. Williams did not comply with the strict presuit requirements for bringing a medical malpractice claim under § 766.106(2) and § 766.203(2), Florida Statutes, so Mr. Williams also cannot bring a medical malpractice claim.

> within the scope of and pursuant to guidelines established in said contract or
> by rule. The contracts shall provide for the indemnification of the state by the
> agent for any liabilities incurred up to the limits set out in this chapter.

§ 768.28(10)(a), Fla. Stat. (emphasis added). Plaintiff alleged Centurion "contracted

with FDC to provide medical care to prisoners." ECF No. 42 at ¶ 9. And it is

undisputed that Dr. Figueroa was working pursuant to Centurion's contract. Thus,

Dr. Figueroa is an agent of FDC under § 768.28.

Because Dr. Figueroa is an *agent* of FDC, he falls squarely within the protections

of § 768.28(9)(a) for acts in the scope of his employment, including acts constituting

negligence. *Jaar v. Univ. of Miami*, 474 So. 2d 239, 244 (Fla. Dist. Ct. App. 1985)

(explaining sovereign immunity applies "to a physician who, within the scope of his

governmental employment, negligently caused injury to another.") Section

768.28(9)(a) provides in pertinent part:

> (9)(a) **No** officer, employee, or **agent of the state or of any of its subdivisions
> shall be held personally liable in tort** or named as a party defendant in any
> action **for any injury or damage suffered as a result of any act, event, or
> omission of action in the scope of her or his employment or function, unless
> such** officer, employee, or **agent acted in bad faith or with malicious purpose
> or in a manner exhibiting wanton and willful disregard of human rights,
> safety, or property.** …

(emphasis added); s*ee Bean v. Univ. of Miami*, 252 So. 3d 810, 816 (Fla. Dist. Ct. App.

2018) (collecting cases applying immunity under § 768.28 to private companies).

This application of the sovereign immunity statute to Dr. Figueroa is supported

by rulings from federal district courts that have addressed the issue. *See Ferrell v. Florida*

*Dep't of Corr.*, 4:21CV397-WS-MAF, 2022 WL 329985, at *5 (N.D. Fla. Jan. 13,

2022), *report and recommendation adopted,* 4:21CV397-WS/MAF, 2022 WL 327203

(N.D. Fla. Feb. 3, 2022) (concluding Centurion was entitled to sovereign immunity for wrongful death claim where no bad faith was alleged); *King v. Fla. Dep't of Corr. et al.*, Case No. 4:19-cv-488-RH-MJF at ECF Nos. 57, 66 (N.D. Fla. Oct. 13, 2020 and Nov. 5, 2020) (concluding Centurion had sovereign immunity for prisoner's state law claims); *accord Biddle v. Prison Health Servs., Inc.*, No. 09-20391-CV, 2010 WL 11553188, at *1 (S.D. Fla. Mar. 18, 2010) (dismissing negligence claim under § 768.28(10)(a) against FDC healthcare provider because "Plaintiff has not alleged [the contractor] acted outside the scope and guidelines of its contract with [FDC].").

The analysis is also supported by the Florida courts:

> The Florida Statutes, the clearest expression of legislative intent, give the Department [of Corrections] broad authority to contract with private entities, including for inmate health services, where it is advantageous to the state. *See* § 20.315(12). **They further facilitate, and arguably encourage, these arrangements by** exempting certain health services contracts from competitive-bidding requirements and **extending sovereign immunity to providers and vendors who provide contracted healthcare services to inmates**. *See* §§ 945.025(4), **768.28(10)(a)**.

*Crews v. Fla. Pub. Employers Council 79, AFSCME*, 113 So. 3d 1063, 1072 (Fla. Dist. Ct. App. 2013) (emphasis added).

To avoid Dr. Figueroa's entitlement to sovereign immunity, Mr. Williams alleges "Defendants acted in bad faith or for a malicious purpose in committing neglect and/or abuse." ECF No. 42 at ¶ 192. But this conclusory allegation is insufficient.

Rather, to overcome Dr. Figueroa's entitlement to sovereign immunity, Mr. Williams must plead plausible facts demonstrating his conduct amounts to "bad faith," "malicious purpose," or "wanton and willful disregard of human rights [or] safety."

*Peterson v. Pollack*, 290 So. 3d 102, 109–10 (Fla. Dist. Ct. App. 2020). "Bad faith" is equated with the actual malice standard, and "malicious purpose" means "the subjective intent to do wrong." *Id.* at 109.

As explained in the deliberate indifference section above, none of the allegations against Dr. Figueroa evidence a subjective intent to harm Mr. Williams. Rather, Dr. Figueroa provided medical care to Mr. Williams whenever he saw him for a medical encounter, and he referred Mr. Williams to other clinicians where appropriate. So the allegations of the SAC and the records central to Mr. Williams's claims belie any hint of bad faith or malicious purpose that would prevent the Court from dismissing the APSA claim against Dr. Figueroa based on sovereign immunity.

## CONCLUSION

The claims against Dr. Figueroa should be dismissed. Mr. Williams's allegations and the records central to his claim demonstrate Dr. Figueroa did not violate his constitutional rights in providing medical care. Because Dr. Figueroa did not violate Mr. Williams's rights—and because Mr. Williams cannot state a claim under the APSA— Dr. Figueroa should be dismissed from this suit.

Respectfully Submitted,

/s/ *Jacob Hanson*
Brian A. Wahl (FBN 95777)
**BRADLEY ARANT BOULT CUMMINGS LLP**
1819 5th Avenue North
One Federal Place
Birmingham, AL 35203
Tel: (205) 521-8800
Primary Email: bwahl@bradley.com
Secondary Email: tramsay@bradley.com

R. Craig Mayfield (FBN 429643)
Jacob B. Hanson (FBN 91453)
**BRADLEY ARANT BOULT CUMMINGS LLP**
100 North Tampa Street, Suite 2200
Tampa, Florida 33602
Tel: (813) 559-5500
Primary Email:      cmayfield@bradley.com
Primary Email:      jhanson@bradley.com
Secondary Email:  tabennett@bradley.com
Secondary Email:  sdhayes@bradley.com

*Counsel for Defendants Centurion of Florida, LLC;*
*MHM Health Professionals, LLC; Jason Howell;*
*Alexis Figueroa; Tony Abbott; and Elizabeth Holmes*

## LOCAL RULE 3.01(G) CERTIFICATION

Undersigned counsel certifies that, pursuant to Local Rule 3.01(g), he conferred with counsel for Plaintiff regarding the relief sought in this motion via e-mail on February 22, 2023. Plaintiff opposes the motion in all respects.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 3, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification to counsel of record:

*/s/ Jacob B. Hanson*
Jacob B. Hanson
*Counsel for Defendants Centurion of Florida, LLC,*
*MHM Health Professionals, LLC, Dr. Alexis Figueroa,*
*Jason Howell, Tony Abbott, and Elizabeth Holmes*