## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

ELMER WILLIAMS,     )
             )
   Plaintiff,      )
             )
v.            )
             ) Case No.: 3:22-cv-01221-MMH-MCR
RICKY DIXON, in his official   )
capacity as Secretary of the Florida )
Department of Corrections, et al.,  )
             )
   Defendants.

## DEFENDANT CENTURION OF FLORIDA, LLC'S MOTION TO DISMISS

Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Rule 3.01, Defendant Centurion of Florida, LLC ("Centurion") moves to dismiss Plaintiff Elmer Williams's Third Amended Complaint for failure to state a claim.

## INTRODUCTION

Mr. Williams, a former Florida Department of Corrections ("FDC") inmate, suffers from recurrent prostate cancer that metastasized and spread. Despite medical intervention both inside and outside of custody, Mr. Williams's condition is terminal.

In his Third Amended Complaint ("TAC"), Mr. Williams claims his constitutional rights were violated by Centurion despite admitting (1) he was provided diagnostic testing, (2) he was provided medications and treatment, (3) he was seen by specialists, and (4) he was transferred to FDC's prison hospital for treatment. As such, the TAC is nothing more than a house of cards that should fall even at the pleading stage of litigation because Mr. Williams cannot state a claim.

## ALLEGATIONS FROM TAC

As a threshold matter, the TAC was filed not only after Mr. Williams was deposed to preserve his testimony, but also after he served more than 1,000 discovery requests on Defendants. Indeed, Mr. Williams sought leave to file the TAC based on information he learned through discovery. *See* ECF No. 88. So Mr. Williams drafted the TAC not only with the benefit of his deposition and discovery responses, but based on them. Even so, Mr. Williams make misleading allegations and intentionally omits allegations of documented treatment in an attempt to satisfy the pleading standard.

As such, Centurion submits it is appropriate to consider the medical and grievance records on which Mr. Williams relied when drafting the TAC. *Day v. Taylor*, 400 F.3d 1272, 1275–76 (11th Cir. 2005) (citing *Horsley v. Feldt*, 304 F.3d 1125 (11th Cir. 2002)). Indeed, courts frequently consider medical records in deliberate indifference cases even when such discovery has not been conducted. *Estrada v. Stewart*, No. 5:12-CV-149-OC-10PRL, 2016 WL 11717280, at *2 (M.D. Fla. Apr. 18, 2016) (considering medical records of prisoner asserting deliberate indifference claim), *rev'd in part on other grounds,* 703 F. App'x 755 (11th Cir. 2017); *Baker v. Corizon Health*, No. 3:19CV561/TKW/EMT, 2019 WL 3642579, at *2 (N.D. Fla. July 26, 2019) (considering medical records of inmate as "central to the complaint").

So Centurion will refer both to the allegations of the TAC, as well as the records attached to this motion, which are central to Mr. Williams's claim, and the authenticity of which is undisputed as they were relied upon by him during his deposition and to draft the TAC. *Horsley*, 304 F.3d at 1134.

2

## I. Allegations regarding medical care.

At all relevant times, Mr. Williams was an inmate in FDC's custody. ECF No. 93 at ¶ 6. Mr. Williams suffers from recurrent prostate cancer, which was previously and successfully treated during his incarceration prior to 2020. *Id.* at ¶¶ 19–21.

After his cancer went into remission, Mr. Williams's urologist requested he be seen again in June 2021. *Id.* at ¶ 21. Mr. Williams alleges he did not see his urologist in June 2021, insinuating Centurion was to blame. *Id.* at ¶ 22. But Mr. Williams's medical records show he was housed at Moore Haven Correctional Rehabilitation Facility[1] ("MHCRF") prior to his November 17, 2021 transfer to Suwanee Correctional Institution ("SCI"). Ex. A at PLMEDICAL 1–2.

In September 2021, while at MHCRF, Mr. Williams's prostate-specific antigen ("PSA") levels were tested and a urologist consult was made—but Mr. Williams alleges it was not submitted. ECF No. 93 at ¶¶ 23–25. Mr. Williams alleges he began to experience mobility issues around this time, which he attributes to his cancer's recurrence and spread. *Id.* at ¶¶ 26, 132. Mr. Williams alleges Centurion was aware of his mobility issues, *id.* at ¶ 26; but he does not allege facts supporting this conclusion since he was not at a facility where Centurion provided care or treatment to inmates.[2]

---

[1] MHCRF is a private prison run by GEO Group at which the Centurion Defendants do not provide healthcare services. Florida Accountability Contract Tracking System, facts.fldfs.com/Search/ContractDetail.aspx?AgencyId=700000&ContractId=PF153&Tab=1 (contract showing GEO Group was responsible for inmate healthcare at MHCRF).

[2] Mr. Williams also alleges Dr. Figueroa never told him his PSA level had risen or that he was referred to a urologist. ECF No. 93 at ¶ 25. That is true—Dr. Figueroa did not work at MHCRF, had not yet met Mr. Williams, and was not treating him in September 2021, so he did not tell Mr. Williams anything. Thus, this allegation is technically true, but is misleading since it implies Dr. Figueroa was treating Mr. Williams at MHCRF, which Plaintiff and his counsel know is untrue.

In mid-November 2021, Mr. Williams was transferred to SCI, where Centurion provided healthcare services to inmates. *Id.* at ¶ 27.

The day after he arrived, Mr. Williams alleges he fell from his bunk, injuring his back. *Id.* at ¶¶ 28–29. He was examined by a nurse and referred to a clinician. *Id.* at ¶¶ 31–32. Mr. Williams was provided Toradol and Solumedrol for his acute back complaints and released back to his dorm. *Id.* at ¶ 32; Ex. A at PLMEDICAL 4.

Within weeks of his transfer to SCI, Mr. Williams admits he was scheduled to have blood and lab tests conducted, even though he alleges he missed the appointment while he was in confinement.[3] ECF No. 93 at ¶ 44.

After release from confinement, Mr. Williams alleges he saw medical providers *four times* between December 20, 2021, and January 5, 2022. *Id.* at ¶¶ 60–61, 66, 69, and 73.

Although Mr. Williams alleges he was "not *treated*" on December 20, 2021, *id.* at ¶ 61; his medical records show he was seen by Dr. Alexis Figueroa, who assessed Mr. Williams, ordered back x-rays to determine the cause of Mr. Williams's back pain and mobility complaints, provided pain medication, and submitted a referral to a neurologist. Ex. A at PLMEDICAL 5–15. The back x-rays were taken the next day. *Id.* at PLMEDICAL 15. Based on his assessment, Dr. Figueroa did "not recommend wheelchair at this time." *Id.* at PLMEDICAL 13. Dr. Figueroa also started Mr. Williams on a laxative for complaints of constipation. *Id.*

---

[3] Mr. Williams alleges he put in multiple sick call requests while he was in confinement, but no such sick call requests are in the medical records he provided before his deposition.

Mr. Williams was seen again on January 7, 2022, at which point he was admitted into the SCI infirmary. ECF No. 93 at ¶ 74. While in the infirmary, he was provided wound care, had his PSA levels checked, was started on the antibiotic "cipro," and was urgently referred to a urologist. *Id.* at ¶¶ 75–78, 95, 97–98; Ex. A. at PLMEDICAL 18–23. Mr. Williams was in the infirmary for more than a month before being released with a wheelchair[4] on February 14, 2022, when he was clinically stable. ECF No. 93 at ¶¶ 99–100; Ex. A. at PLMEDICAL 21–23.

Mr. Williams had his PSA levels checked again after his release from the infirmary, and he was again seen by medical providers less than a week after his discharge for complaints of a urinary tract infection. ECF No. 93 at ¶¶ 103, 109; Ex. A at PLMEDICAL 24–27. Despite alleging he "grieved and grieved this issue without any timely medical attention," ECF No. 93 at ¶ 109; records indicate he was seen by a provider, who noted Mr. Williams's urology consult was pending, his catheter would be changed, and that he would continue receiving doxycycline, an antibiotic prescribed upon discharge from the infirmary. Ex. A at PLMEDICAL 24–27.

Mr. Williams now admits he was seen by his urologist on March 24, 2022,[5] which he says is four months after complaining of mobility concerns. *Id.* at PLMEDICAL 28–30 (noting under "Specialty Service" that he was "seen last on

---

[4] Mr. Williams alleges he was discharged without a wheelchair, ECF No. 93 at ¶ 103; but medical records note he was discharged with a wheelchair, Ex. A at PLMEDICAL 21 ("Patient will be discharge[d] with a wheelchair ...."). Mr. Williams also admitted during his deposition he was given "a loaner wheelchair" when he was discharged.

[5] Mr. Williams previously denied seeing a urologist in March 2022, going so far as to argue the medical records did not mean what they say. ECF No 76 at 13.

3/24/2022," and noting under "Other Pertinent Info/supporting documentation needed: Urologist Notes from 3/24/2022"); ECF No. 93 at ¶ 122. Additional diagnostic testing was ordered, including a whole body bone scan and an abdominal pelvic CT with contrast. *Id.* Dr. Figueroa also requested a follow-up urology consult for Mr. Williams. Ex. A at PLMEDICAL 28–30.

Mr. Williams alleges he was seen in medical in May for an infection. ECF No. 93 at ¶¶ 120–21. Despite alleging treatment was delayed, records show Dr. Figueroa admitted him to the infirmary on May 24, 2022, and ordered wound care. Ex. A at PLMEDICAL 34–36. The records also show Mr. Williams had again been put on the antibiotic doxycycline. *Id.* at PLMEDICAL 35. And Mr. Williams's Medication Report shows he was prescribed numerous medications and treatments in May 2022, including Eligard, Bicalutamide (brand name Casodex), and Tamsulosin for his prostate cancer; furosemide for edema; and had orders for his catheter to be changed monthly. *Id.* at PLMEDICAL 39–40.

Mr. Williams was again seen by the urologist on May 16 and June 16, 2022, and, by June 10, 2022—when he saw an oncologist—his PSA levels had decreased dramatically. ECF No. 93 at ¶ 122; Ex. A at 37–38, 45.

In July 2022, Mr. Williams had necrotic tissue removed from his heels. ECF No. 93 at ¶ 125. Though Mr. Williams alleges Dr. Figueroa "did nothing to deal with the growing and infected deep sores," *id.*; records show Dr. Figueroa ordered a PICC line be inserted and ordered Mr. Williams be started on IV antibiotics, which occurred July 16. Ex. A at PLMEDICAL 43–44. Further, records show Mr. Williams was

prescribed wound care and the antibiotic cephalexin on June 10, and that course of antibiotics was due to be stopped on July 1, 2022. *Id.* at PLMEDICAL 42.

Mr. Williams was seen by the urologist again on July 18, 2022. *Id.* at PLMEDICAL 45. On July 23, 2022, Dr. Figueroa reviewed the urology notes, made another urology referral, and ordered additional diagnostic tests (PSA test, CBC, and CMP). *Id.* at PLMEDICAL 45–48.

In August 2022, Mr. Williams was transferred to Reception and Medical Center ("RMC") for further treatment, where he alleges he learned his prostate cancer had spread and metastasized. ECF No. 93 at ¶¶ 131–32.

## II. Policy and custom, and final policymaker allegations.

Mr. Williams' allegations against Centurion includes both policy and custom allegations, and final policymaker allegations.

Mr. Williams generally alleges the following four policies and customs. First, he alleges Centurion has a policy or custom of failing to provide diagnostic testing to prisoners with known diseases. *Id.* at ¶¶ 63, 141. Mr. Williams relies only on his own experience—which is contradicted by the multiple diagnostic tests he admits he received. *Id.* at ¶ 44 (acknowledging bloodwork and lab tests were to occur within weeks of arrival to SCI); ¶¶ 77, 103, 122 (PSA levels tested). The incomplete medical records Mr. Williams' counsel produced in this case further contradict his allegations, showing he had his PSA levels tested multiple times, was given x-rays, had blood work performed, and other diagnostic tests ordered. *See generally* Ex. A.

Second, he alleges Centurion has a policy or custom of ignoring serious medical needs for financial gain. ECF No. 93 at ¶¶ 64, 79, 100, 125, 132–35. Mr. Williams cites no facts to support his contention Centurion prioritizes costs over treatment, and he does not cite to any examples of the supposed policy affecting the treatment of other patients. That is to say nothing of the medical records refuting his conclusory allegations. *See generally* Ex. A.

Third, Mr. Williams alleges the following eight policies and customs exist:

(a) commonly disregard reports by patients of objectively serious symptoms;
(b) refuse to provide adequate treatment to patients;
(c) refuse to timely conduct or obtain diagnostic tests and bloodwork for patients or comply with referrals to specialists;
(d) fail to create sensible treatment plans for patients whose health status requires the same;
(e) fail to ensure continuity of care;
(f) prioritize profits at the expense of constitutionally adequate care;
(g) fail or refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper; and
(h) refuse and/or fail to provide any medical care whatsoever for defined medical problems.

ECF No. 93 at ¶ 153. Mr. Williams also alleges Centurion "failed to provide adequate training and supervision" of healthcare providers. *Id.* at ¶ 154. Mr. Williams cites no facts supporting the existence of these policies or his conclusory claim that Centurion fails to train and supervise. *Id.*

Mr. Williams also does not allege how any of these 10 supposed policies and customs, or the alleged failure to train and supervise, caused alleged violations of his Eighth Amendment rights. *See generally id.*

Lastly, Mr. Williams alleges Centurion violated his constitutional rights "through the actions and failures to act by individuals with final policymaking

8

authority for it." *Id.* at ¶ 156. Mr. Williams alleges in a conclusory fashion that Centurion's unidentified utilization management ("UM") staff members and Defendant Dr. Alexis Figueroa were final policymakers. *Id.* at ¶¶ 8, 79. Mr. Williams does not allege any facts supporting these conclusions. Mr. Williams also does not allege what actions of Dr. Figueroa and unidentified UM staff constituted a policy decision of Centurion, as opposed to merely constituting the medical judgment of the supposed final policymakers.

## ARGUMENT

As the medical records central to Mr. Williams's claim and his own allegations demonstrate, Mr. Williams's constitutional rights were not violated. Absent a violation of his rights, Centurion cannot be held liable.

But even if the Court declines to consider the medical records, the claim against Centurion should nonetheless be dismissed for three reasons. *First*, Mr. Williams's allegations of policies and customs are conclusory. *Second*, Mr. Williams's allegations are based solely on his own experiences, so he fails to allege a widespread custom about which Centurion consciously disregarded known risks. And *third*, Mr. Williams fails to plead how any of the alleged policies or customs were the moving force behind Eighth Amendment violations.

## I.  Mr. Williams cannot demonstrate his rights were violated.

The Court should conclude Mr. Williams's claim against Centurion (Count II) fails because he cannot show a constitutional violation. The Eighth Amendment

protects inmates from "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). But a "prisoner bringing a deliberate-indifference claim has a steep hill to climb." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020). As the Eleventh Circuit explained,

> Deliberate indifference is *not* a constitutionalized version of common-law negligence. To the contrary, we (echoing the Supreme Court) have been at pains to emphasize that the deliberate indifference standard is far more onerous than normal tort-based standards of conduct sounding in negligence, and is in fact akin to subjective recklessness as used in the criminal law. With respect to prisoners' medical care, in particular, we have held that the Eighth Amendment doesn't require it to be perfect, the best obtainable, or even very good. Rather, we have emphasized, medical treatment violates the Eighth Amendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.

*Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1271 (11th Cir. 2020) (cleaned up).

Indeed, the Eleventh Circuit has cautioned courts against employing a "'perhaps they could be doing more' standard" when considering claims of deliberate indifference to a serious medical need. *Hammonds v. Theakston*, 833 F. App'x 295, 301 (11th Cir. 2020) (quoting *Hoffer*, 973 F.3d at 1271). Instead, courts should first consider the care provided to an inmate and, if such care satisfies the constitutional minimum, then there is no need to consider whether a defendant could have done more. *Hoffer*, 973 F.3d 1277 (concluding it did not need to reach the question of whether less efficacious care was provided pursuant to a cost defense "because we have held that the Eighth Amendment's 'minimally adequate care'" was provided).

A deliberate indifference claim involves both an objective and subjective component. *Keohane*, 952 F.3d at 1266. After a prisoner demonstrates an objectively

serious medical need, the inmate must prove prison officials acted with deliberate indifference to that need by showing: "(1) the official was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, (2) the official actually drew that inference, (3) the official disregarded the risk of serious harm, and (4) the official's conduct amounted to more than gross negligence." *Ireland v. Prummell*, 53 F.4th 1274, 1287 (11th Cir. 2022) (quotations omitted).

Because medical care must shock the conscience to constitute deliberate indifference, proof of medical malpractice is not enough. *Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Indeed, "mere evidence of negligence 'in diagnosing or treating a medical condition' or a showing of medical malpractice does not establish deliberate indifference." *Monteleone v. Corizon*, 686 F. App'x 655, 658 (11th Cir. 2017).

And "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Hoffer*, 973 F.3d at 1272. "[T]he question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) (quoting *Estelle,* 429 U.S. at 10). That's because "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's

diagnosis or course of treatment [fails to] support a claim of cruel and unusual punishment." *Keohane*, 952 F.3d at 1266.

Applying this jurisprudence to Mr. Williams's care, the Court should conclude his rights were not violated. Mr. Williams was provided continuous care, including (1) doctors prescribing medications, ordering diagnostic testing and specialist consults, and providing a wheelchair for Mr. Williams's complaints about back pain and mobility issues; and (2) scheduling a PSA test within weeks of his arrival and having his PSA levels tested multiple times between January and August, admitting him to the infirmary for around-the-clock care in January and May, prescribing multiple courses and types of antibiotics and wound care, referring Mr. Williams to a urologist and oncologist multiple times, ordering various types of diagnostic testing, and starting Mr. Williams on various medications, including Eligard, Bicalutamide, and Tamsulosin to treat his prostate cancer. That Mr. Williams received this care disproves his claims that his constitutional rights were violated.

In an unpublished[6] case, the Eleventh Circuit concluded an inmate suffering from colon cancer had not established a deliberate indifference claim against a prison doctor. *Mann v. Sec'y, Dep't of Corr.*, No. 21-11445, 2021 WL 5112647 (11th Cir. Nov. 3, 2021). The inmate complained of "having abdominal discomfort for two months and diarrhea, blood in his stool, and pain in his upper stomach that was worse when he ate." *Id.* at *2. The doctor diagnosed GERD, prescribed over-the-counter

---

[6] Although unpublished cases are not precedential, this Court may consider them as persuasive authority. *United States v. Brown*, 599 F. Supp. 3d 1178, 1183 n.5 (M.D. Fla. 2022).

12

gastrointestinal medications, and ordered diagnostic tests. *Id.* After reviewing the lab results, the doctor did nothing for more than a year. *Id.* at *1. When the inmate again complained, additional testing was performed, and it was determined the inmate had Stage IV colon cancer. *Id.* The inmate sued, complaining the doctor should have referred him to a specialist sooner and ordered other tests. *Id.* at *3. But the Eleventh Circuit affirmed the trial court's conclusion that the inmate's constitutional rights were not violated, concluding: "Mann's claim is essentially one of missed diagnosis or the failure to do additional testing, which isn't grist for a constitutional claim." *Id.* at *4.

Like in *Mann*, Mr. Williams cannot show his rights were violated. While the doctor in *Mann* took a year to consult a specialist, Mr. Williams was referred to multiple specialists within weeks, and he was provided treatment and medications for acute issues. At best, Mr. Williams complains about the quality of care he received, which "isn't grist for a constitutional claim." *Mann*, 2021 WL 5112647, at *4.

Because Mr. Williams's constitutional rights were not violated, the claim against Centurion should be dismissed. *Knight through Kerr v. Miami-Dade Cty.*, 856 F.3d 795, 821 (11th Cir. 2017) ("There can be no policy-based liability or supervisory liability when there is no underlying constitutional violation.").

## II. Mr. Williams cannot establish *Monell* liability against Centurion.

Regardless of whether the Court considers Mr. Williams's medical records, the claim against Centurion should be dismissed because the TAC's allegations are insufficient to impose liability on Centurion.

13

**A. Deliberate indifference to serious medical need standard against entity.**

Private contractors who provide medical care for prisons act under the color of law for purposes of § 1983. *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985). But a medical contractor like Centurion cannot be liable under theories of *respondeat superior* or vicarious liability. *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978) ("Congress did not intend to create liability under § 1983 unless action pursuant to an official policy or custom caused a constitutional tort."); *accord Grech v. Clayton Cnty, Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003) ("Liability under § 1983 may not be based on the doctrine of *respondeat superior*.").

Instead, a plaintiff may successfully state a § 1983 claim and show liability of a government entity "only where the [government entity] itself causes the constitutional violation" through implementation of an official policy or custom. *Cook ex. rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1116 (11th Cir. 2005) (citations omitted). Moreover, a plaintiff must show the entity's action was "taken with the requisite degree of culpability ... with deliberate indifference to its known or obvious consequences." *McDowell v. Brown*, 392 F.3d 1283, 1291 (11th Cir. 2004).

To establish that an official policy or custom of the government entity causes the constitutional violation, a plaintiff must show it was the "moving force" behind the alleged constitutional deprivation. *See Monell* 436 U.S. at 693–94; *accord Snow ex rel. Snow v. City of Citronelle*, 420 F.3d 1262, 1271 (11th Cir. 2005).

14

As the Eleventh Circuit explained, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability on a governmental entity as part of either a policy or custom unless the challenged policy itself is unconstitutional." *Ireland v. Prummell*, 53 F.4th 1274, 1289 (11th Cir. 2022) (quotations omitted). In other words, "a single instance of allegedly wrongful conduct cannot establish an unconstitutional policy or custom." *Id.* at 1290. Further, "random acts or isolated incidents are insufficient to establish a custom or policy." *Id.* at 1291. "Rather, a plaintiff must establish the existence of a pattern of similar violations." *Id.* (citing *Craig v. Floyd Cnty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011)).

The existence of a policy or custom must be established "before satisfying the discrete requisites of [a plaintiff's] deliberate indifference claims." *Id.* at 1290.

**B. Policy and custom allegations are not factually supported.**

Mr. Williams's policy and custom allegations are not supported by factual allegations, but instead are conclusory allegations of generalized policies. *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1262 (11th Cir. 2004) ("[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal."). Mr. Williams's conclusory allegations are improper.

This is precisely the pleading issue the Supreme Court discussed in *Iqbal*. 556 U.S. at 681 (discussing requirements for pleading a governmental policy and concluding "the allegations are conclusory and not entitled to be assumed true."); *accord Grider v. Cook*, 522 Fed. App'x 544, 548 (11th Cir. 2013) (affirming dismissal of

complaint because the plaintiff "did not provide any specific facts about any policy or custom that resulted in his alleged constitutional deprivation."); *Campbell v. City of Jacksonville*, No. 3:17-CV-914-J-34JRK, 2018 WL 1463352, at *16 (M.D. Fla. Mar. 23, 2018) (Howard, J.) (holding *Monell* liability was inadequately pled because there were "no facts suggesting how these broad alleged failures actually constitute municipal policy, custom or practice."); *Morgan v. Tucker*, No. 3:13-CV-81-J-34PDB, 2016 WL 1089994, at *6 (M.D. Fla. Mar. 21, 2016) (Howard, J.) ("The Court concludes that Morgan's boilerplate and conclusory allegations of Corizon's policy or custom—devoid of any factual development—are insufficient to state a § 1983 claim."). Absent support, Mr. Williams has not plausibly pled a *Monell* claim against Centurion.

For example, Mr. Williams's allegation that Centurion had a policy of not providing treatment to maximize profits is unsupported. This Court has previously rejected nearly identical conclusory allegations. *Scayles v. Inch*, No. 3:19-CV-1311-MMH-PDB, 2022 WL 35991, at *9 (M.D. Fla. Jan. 4, 2022) (Howard, J.) ("As it relates to Plaintiffs' assertion that Centurion has a policy to deliberately delay diagnosis and treatment … in order to save money, Plaintiffs present only legal conclusions devoid of any well pled allegations of fact in support of that conclusion."). And Mr. Williams fails to allege how any policy that considers cost-saving measures constitutes deliberate indifference. *See Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1277 (11th Cir. 2020) (explaining that prison officials are not prohibited from considering cost because "[h]ealthcare can be expensive . . . [w]hat a topsy-turvy world it would be if incarcerated inmates were somehow immune from that cold—and

sometimes cruel-reality"). Moreover, despite alleging Centurion has a policy of not treating patients to maximize profits, Mr. Williams goes on to allege extensive treatment he received from a urologist and oncologist, undermining his conclusory allegation that Centurion withholds such care. So the Court should dismiss Mr. Williams's allegations about a policy of denying or delaying treatment based on financial motives.

Mr. Williams also has not established liability for failure to train or supervise. "[T]o hold a supervisor liable a plaintiff must show that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation." *O'Kelley v. Craig*, 781 F. App'x 888, 898 (11th Cir. 2019). The causal connection can be satisfied by showing a "supervisor's policy or custom results in deliberate indifference to constitutional rights." *Id.* But, again, conclusory allegations are not enough. *Id.* at 899 (affirming dismissal because plaintiff did not "offer any specifics of current training or whether the Sheriff was aware of any similar prior incidents, so we cannot infer that he was on notice that current training was inadequate."); *accord Roy v. Ivy*, 53 F.4th 1338, 1352 (11th Cir. 2022) (affirming dismissal of supervisory liability claim); *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1329 (11th Cir. 2015) (affirming dismissal of failure to train claim where plaintiff alleged "the Sheriff's Office was 'on notice' of the need" to train, but "no facts [we]re alleged to support that conclusion."). Because Mr. Williams makes no factual allegations about how the Centurion Defendants failed to train or supervise, his conclusory allegations are insufficient to state a claim.

17

Lastly, the Court should reject Mr. Williams's conclusory final policymaker allegations. When considering whether someone is a final policymaker, which is a question of law, the court must "examine not only the relevant positive law, including ordinances, rules and regulations, but also the relevant customs and practices having the force of law." *Mandel v. Doe*, 888 F.2d 783, 792 (11th Cir. 1989) (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986)). "Discretion in the exercise of a particular function—without more—is not sufficient to make a municipal official a final policymaker." *Mogel v. John W. Renfrow*, 07-20616-CIV, 2008 WL 4735173, at *2 (S.D. Fla. Aug. 29, 2008). Instead, "[t]he official must []be responsible for establishing final government policy respecting such activity before the municipality can be held liable." *Pembaur*, 475 U.S. at 482–83. If an official's "decisions are subject to meaningful administrative review," they are not a final policymaker. *Maschmeier v. Scott*, 269 Fed. Appx. 941, 943 (11th Cir. 2008) (citing *Scala v. City of Winter Park*, 116 F.3d 1396, 1401 (11th Cir. 1997)).

Mr. Williams has not alleged any facts plausibly alleging Dr. Figueroa or unidentified UM staff were acting as policymakers for Centurion when treating him. He references no positive law establishing policymaking authority lies with either Dr. Figueroa or UM staff, nor any policy or procedure granting them such authority.

Regardless, Mr. Williams's allegations that individual treatment decisions amount to Centurion's policy or custom would subject Centurion to *respondeat superior* liability, which undoubtedly is not permitted. *Monell*, 436 U.S. at 691. Treatment decisions of healthcare providers regarding individual patients simply is not the sort of

decision that can constitute a policy or custom. *Engelleiter v. Brevard County Sheriff's Dept.*, 290 F. Supp. 2d 1300, 1314 (M.D. Fla. 2003) (holding, "it would be a severe stretch of the term 'policy or custom' to find that each nurse establishes a 'policy or custom' for the Brevard County Sheriff's Office every time she administers insulin to a detainee.").

### C. Mr. Williams's own alleged experiences are insufficient to plead existence of policies and customs of Centurion.

To the extent Mr. Williams points to any facts to support the existence of a policy or custom of Centurion, Mr. Williams relies solely on his own experience, which is insufficient to state a claim.

Mr. Williams's TAC focuses exclusively on the alleged medical treatment *he* received from September 2021 until his release. *See generally* ECF No. 93. Mr. Williams does not make any non-conclusory allegations about medical treatment provided to any other inmate. *Id.* So his policy and custom allegations are based on his own care.

As the Eleventh Circuit has repeatedly explained, "[t]hat is not enough." *Floyd v. City of Miami Beach*, 730 F. App'x 838, 842 (11th Cir. 2018) (holding plaintiff's "own experience is inadequate by itself because '[a] single incident of a constitutional violation is insufficient to prove a policy or custom even when the incident involves several employees of the municipality.'" (citing *Craig*, 643 F.3d at 1312)); *accord Piazza v. Jefferson Cnty., Alabama*, 923 F.3d 947, 957 (11th Cir. 2019) (same). Rather, "it is established law that proof of a single incident of unconstitutional activity is not sufficient to demonstrate a policy or custom for purposes of § 1983 liability." *Ireland*,

53 F.4th at 1290; *accord Gurrera v. Palm Beach Cnty. Sheriff's Off.*, 657 F. App'x 886, 893 (11th Cir. 2016) ("A pattern of similar constitutional violations is ordinarily necessary because a single violation is not so pervasive as to amount to a custom." (cleaned up)). Nor are multiple delays experienced by Mr. Williams sufficient to establish a policy or custom. *Roy*, 53 F.4th at 1351 ("To the extent that Roy contends he can show an unconstitutional custom or practice by Wexford based solely on the multiple delays that he experienced, this contention is meritless.").

Further, Mr. Williams's failure to plead anything beyond his own experiences means he also has not alleged Centurion was aware of a serious risk of harm due to the alleged policies or customs. *Calvin v. Jones*, No. 3:19-CV-916-J-34MCR, 2020 WL 4428468, at *9 (M.D. Fla. July 31, 2020) (Howard, J.) ("Calvin's factual allegations relating solely to alleged individual failures in his medical care are simply insufficient to sustain a claim that there is either a policy to deny medical care to inmates or a practice or custom of denying adequate medical care, much less that the practice was so widespread that Corizon had notice of violations and made a 'conscious choice' to disregard them."); *see also Davis v. Sec'y, Dep't of Corr.*, No. 3:15-CV-649-J-34JRK, 2017 WL 1885366, at *11 (M.D. Fla. May 9, 2017) (Howard, J.) (same). So the scant allegations of the TAC fail to establish the existence of a policy or custom, and fail to establish Centurion deliberately or consciously disregarded their known consequences.

**D. Mr. Williams has not pleaded alleged policies, practices, and customs were moving force behind alleged violations of Eighth Amendment.**

Mr. Williams also has not adequately alleged any of the policies were the moving force behind a constitutional deprivation. *Id.* at *8. To prevent *Monell* liability from collapsing into *respondeat superior*, "a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410, 117 S. Ct. 1382, 1391, 137 L. Ed. 2d 626 (1997); *Davis*, 2017 WL 1885366, at *11 (holding a prisoner "must plead that an official policy or a custom or practice of [FDC's healthcare contractor] was the moving force behind the alleged federal constitutional violation.").

"At the motion to dismiss stage, a plaintiff must allege facts showing that the municipality caused the constitutional violation." *Ford v. Gualtieri*, No. 8:17-CV-2957-T-17TBM, 2018 WL 11216671, at *4 (M.D. Fla. June 12, 2018). Failure to plead facts plausibly supporting an allegation that a specific policy or custom was the moving force behind a constitutional violation is grounds for dismissal. *Davis*, 2017 WL 1885366, at *11; *Ratley v. Inch*, No. 3:21-CV-598-MMH-LLL, 2022 WL 2209897, at *11 (M.D. Fla. June 21, 2022) (Howard, J.) (dismissing claim against Centurion where prisoner "asserted no facts showing that a policy, custom, or practice of Centurion was the moving force behind any violation of his federal constitutional rights.").

Here, Mr. Williams fails to plausibly allege how any policy or custom of Centurion caused a violation of his constitutional rights. This failure requires dismissal. *See Scayles*, 2022 WL 35991, at *9 (granting motion to dismiss where

21

complaint failed to allege the purported unconstitutional policies were the "impetus" for the alleged deficiencies in his medical treatment).

For instance, Mr. Williams has not pled how Centurion's consideration of costs when making policies led to the specific constitutional violations complained of in the TAC. *McDowell*, 392 F.3d at 1292 ("The County's liability cannot be dependent on the scant likelihood that its budget decisions would trickle down the administrative facets and deprive a person of his constitutional rights. Instead, liability must be premised on a finding that '*this*' budget decision was 'highly likely to inflict the *particular* injury' McDowell suffered."). Indeed, the Eleventh Circuit and this Court have recognized it is not unconstitutional to consider cost when it comes to prisoner healthcare. *See Hoffer*, 973 F.3d at 1277; *Scayles*, 2022 WL 35991, at *9. So Mr. Williams has not pleaded how any alleged policy led to a violation of his constitutional rights—nor can he since his rights were not violated.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Count II of the TAC.

## LOCAL RULE 3.01(G) CERTIFICATION

Undersigned counsel certifies that, pursuant to Local Rule 3.01(g), he conferred with counsel for Plaintiff regarding the relief sought in this motion via e-mail on October 24, 2023. Plaintiff opposes the motion in all respects.

Respectfully Submitted,

/s/ *Jacob Hanson*

R. Craig Mayfield (FBN 429643)
Jacob B. Hanson (FBN 91453)
**BRADLEY ARANT BOULT CUMMINGS LLP**
100 North Tampa Street, Suite 2200
Tampa, Florida 33602
Tel: (813) 559-5500
Primary Email:   cmayfield@bradley.com
Primary Email:   jhanson@bradley.com
Secondary Email: tabennett@bradley.com

Brian A. Wahl (FBN 95777)
**BRADLEY ARANT BOULT CUMMINGS LLP**
1819 5th Avenue North
One Federal Place
Birmingham, AL 35203
Tel: (205) 521-8000
Primary Email: bwahl@bradley.com
Secondary Email: tramsay@bradley.com

*Counsel for Defendants Centurion of Florida, LLC;*
*Jason Howell; Alexis Figueroa; Tony Abbott; and*
*Elizabeth Holmes*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 25, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification to counsel of record.

/s/ *Jacob B. Hanson*

Jacob B. Hanson
*Counsel for Defendants Centurion of Florida, LLC;*
*Jason Howell; Alexis Figueroa; Tony Abbott; and*
*Elizabeth Holmes*