## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

ELMER WILLIAMS,                         )
                                        )
     Plaintiff,                       )
                                        )
v.                                      )
                                        )   Case No.: 3:22-cv-01221-MMH-MCR
RICKY DIXON, in his official            )
capacity as Secretary of the Florida    )
Department of Corrections, et al.,      )
                                        )
     Defendants.

## <u>DEFENDANT ALEXIS FIGUEROA'S MOTION TO DISMISS TAC</u>

Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Rule 3.01, Defendant Alexis Figueroa moves to dismiss Plaintiff Elmer Williams's Third Amended Complaint for failure to state a claim.

## <u>INTRODUCTION</u>

Mr. Williams, a former Florida Department of Corrections ("FDC") inmate, suffers from recurrent prostate cancer that metastasized and spread. Despite medical intervention both inside and outside of custody, Mr. Williams's condition is terminal.

In his Third Amended Complaint ("TAC"), Mr. Williams claims Dr. Alexis Figueroa retaliated against him and was deliberately indifferent to his serious medical needs. Mr. Williams's claims fail because he fails to identify any alleged retaliatory action by Dr. Figueroa, who provided constitutionally adequate care to Mr. Williams as shown by the TAC's allegations and the medical records central to his claim.

## **ALLEGATIONS FROM TAC[1]**

At all relevant times, Mr. Williams was an inmate in FDC's custody. ECF No. 93 at ¶ 6. Mr. Williams suffers from recurrent prostate cancer, which was previously and successfully treated during his incarceration prior to 2020. *Id.* at ¶¶ 19–21.

In September 2021, while at Moore Haven Correctional Rehabilitation Facility[2] ("MHCRF"), Mr. Williams's prostate-specific antigen ("PSA") levels were tested and a urologist consult was made—but Mr. Williams alleges it was not submitted.[3] ECF No. 93 at ¶¶ 23–25. Mr. Williams alleges he began to experience mobility issues around this time, which he attributes to his cancer's recurrence and spread. *Id.* at ¶¶ 26, 132. Mr. Williams, however, does not allege he was unable to walk while at MHCRF.

In mid-November 2021, Mr. Williams was transferred to Suwannee Correctional Institution ("SCI"), where Dr. Figueroa worked. *Id.* at ¶ 27.

---

[1] As explained in Centurion's motion to dismiss (ECF No. 96), Mr. Williams filed the TAC after his deposition and extensive discovery was taken. Because Mr. Williams relied on the medical records in forming the TAC, the records are central to his claim and may be considered on Dr. Figueroa's motion to dismiss. *Day v. Taylor*, 400 F.3d 1272, 1275–76 (11th Cir. 2005) (citing *Horsley v. Feldt*, 304 F.3d 1125 (11th Cir. 2002)); *accord Estrada v. Stewart*, No. 5:12-CV-149-OC-10PRL, 2016 WL 11717280, at *2 (M.D. Fla. Apr. 18, 2016) (considering medical records of prisoner asserting deliberate indifference claim), *aff'd in part, rev'd in part on other grounds,* 703 F. App'x 755 (11th Cir. 2017); *Baker v. Corizon Health*, No. 3:19CV561/TKW/EMT, 2019 WL 3642579, at *2 (N.D. Fla. July 26, 2019) (considering medical records of inmate as "central to the complaint").

[2] MHCRF is a private prison run by GEO Group at which the Centurion Defendants do not provide healthcare services. Florida Accountability Contract Tracking System, facts.fldfs.com/Search/ContractDetail.aspx?AgencyId=700000&ContractId=PF153&Tab=1 (contract showing GEO Group was responsible for inmate healthcare at MHCRF).

[3] Mr. Williams also alleges Dr. Figueroa never told him his PSA level had risen or that he was referred to a urologist. ECF No. 93 at ¶ 25. That is true—Dr. Figueroa did not work at MHCRF, had not yet met Mr. Williams, and was not treating him in September 2021, so he did not tell Mr. Williams anything. Thus, this allegation is technically true, but is severely misleading since it implies Dr. Figueroa was treating Mr. Williams at MHCRF, which Plaintiff and his counsel know is untrue.

Mr. Williams alleges a "lack of constitutionally adequate care" on the part of SCI medical staff, including Dr. Figueroa. But his medical records tell another story.

With respect to specific encounters with Dr. Figueroa, Mr. Williams first alleges Dr. Figueroa "received [his] complaints about numbness, swelling, and lack of use of his extremities" on or about December 20, 2021. *Id.* at ¶¶ 60–62. Mr. Williams alleges he was "seen by medical staff, [but] was not treated by them." *Id.* at ¶ 61.

But, according to Mr. Williams's medical records, he was seen *and treated* by Dr. Figueroa on December 20. ECF No. 96-1 at PLMEDICAL 5–14. Dr. Figueroa assessed Mr. Williams, ordered back x-rays to determine the cause of Mr. Williams's back pain and mobility complaints, provided pain medication, and submitted a referral to a neurologist. *Id.* The back x-rays were taken the next day. *Id.* at PLMEDICAL 15. Based on his assessment, Dr. Figueroa did "not recommend wheelchair at this time." *Id.* at PLMEDICAL 13. Dr. Figueroa also started Mr. Williams on a laxative for complaints of constipation. *Id.*

The next encounter with Dr. Figueroa alleged in the TAC occurred on December 24, 2021—just four days later—when Dr. Figueroa was notified Mr. Williams had returned for the same complaints. ECF No. 93 at ¶¶ 66–68; ECF No. 96-1 at PLMEDICAL 49.

Mr. Williams was admitted into the SCI infirmary on January 7, 2022. ECF No. 93 at ¶ 74. Although not pleaded in the TAC, medical records show Dr. Figueroa assessed Mr. Williams on January 11, 2022, in the infirmary, and that he had ordered

3

wound care, made an urgent urology referral, and started Mr. Williams on "cipro," an antibiotic. ECF No. 96-1 at PLMEDICAL 18–20.

Mr. Williams next alleges that on or around January 12, 2022, while staying in the infirmary, he informed medical staff (including Dr. Figueroa) that he had not received any wound care in several days, ECF No. 93 at ¶ 76; even though records from the day before indicated Dr. Figueroa observed Mr. Williams "moving lower extremity when wound care is performed." ECF No. 96-1 at PLMEDICAL 18. Mr. Williams also alleges Dr. Figueroa was "unconcerned" with his PSA levels and "never took any effort to actualize" a urology referral, ECF No. 93 at ¶¶ 78–79; even though Dr. Figueroa had urgently referred him to a urologist the day before. ECF No. 96-1 at PLMEDICAL 18–20.

Mr. Williams alleges that on or around February 14, 2022, he was prematurely discharged from the prison infirmary. ECF No. 93 at ¶ 99. Mr. Williams's records from that day indicate he was evaluated, was clinically stable, was educated about his medical condition, was given a prescription for an antibiotic, was referred for a follow-up with a urologist, and was discharged with a wheelchair. ECF No. 96-1 at PLMEDICAL 21–22.

Mr. Williams had his PSA levels checked again after his release from the infirmary, and he was again seen by medical providers less than a week after his discharge for complaints of a urinary tract infection. ECF No. 93 at ¶¶ 103, 109–10; ECF No. 96-1 at PLMEDICAL 24–27.

Mr. Williams was seen February 23, 2022, by Dr. Figueroa, who noted Mr. Williams's urology consult was pending, his catheter would be changed, and that he would continue receiving doxycycline, an antibiotic prescribed upon discharge from the infirmary. ECF No. 93 at ¶ 111; ECF No. 96-1 at PLMEDICAL 24–27.

Mr. Williams now admits he was seen by his urologist on March 24, 2022, which he says is four months after complaining of mobility concerns. ECF No. 96-1 at PLMEDICAL 28–30 (noting under "Specialty Service" that he was "seen last on 3/24/2022," and noting under "Other Pertinent Info/supporting documentation needed: Urologist Notes from 3/24/2022"); ECF No. 93 at ¶ 122. Additional diagnostic testing was ordered, including a whole body bone scan and an abdominal pelvic CT with contrast. *Id.* Dr. Figueroa also requested a follow-up urology consult for Mr. Williams. ECF No. 96-1 at PLMEDICAL 28–30.

Mr. Williams alleges that on May 24, 2022, Dr. Figueroa diagnosed him with osteomyelitis (i.e. a bone infection) but that Dr. Figueroa "again delayed any treatment[.]" ECF No. 93 at ¶ 120. Despite alleging treatment was delayed, records show Dr. Figueroa admitted him to the infirmary on May 24, 2022, and ordered wound care. ECF No. 96-1 at PLMEDICAL 34–36. The records also show Mr. Williams had again been put on the antibiotic doxycycline. *Id.* at PLMEDICAL 35. And Mr. Williams's Medication Report shows he was prescribed numerous medications and treatments in May 2022, including Eligard, Bicalutamide (brand name Casodex), and Tamsulosin for his prostate cancer and furosemide for edema, and had orders for his catheter to be changed monthly. *Id.* at PLMEDICAL 39–40.

Mr. Williams alleges that in or around July 2022 Dr. Figueroa ". . . did nothing to deal with the growing and infected deep sores on [Mr. Williams's] ankles and buttocks . . ." ECF No. 93 at ¶ 125. Contrary to these allegations, records show Dr. Figueroa ordered a PICC line be inserted and that Mr. Williams be started on IV antibiotics, which occurred July 16. ECF No. 96-1 at PLMEDICAL 43–44. Further, records show Mr. Williams was prescribed wound care and the antibiotic cephalexin on June 10, and show that course of antibiotics was due to be stopped on July 1, 2022. *Id.* at PLMEDICAL 39–48.

Throughout the TAC, Mr. Williams repeatedly alleges Dr. Figueroa delayed having his PSA levels tested, delayed referring him to a urologist, and refused to provide him a wheelchair. *See generally* ECF No. 93. Despite his claims of "delay," Mr. Williams admits he had PSA and other lab tests ordered within weeks of his November transfer to SCI, but he alleges he missed the tests because he could not walk to the appointment. *Id.* at ¶ 44. He does not attribute his missed appointment to any conduct by Dr. Figueroa, who he does not allege to have seen at that time.

Moreover, Mr. Williams's allegations and records show he was urgently referred to urology in January 2022, ECF No. 96-1 at PLMEDICAL 18–23; he had his PSA levels tested multiple times, *id.* at PLMEDICAL 19; and he saw a urologist in March, May, June, and July, *id.* at PLMEDICAL 18–30, 37–38, 45. Records also indicate Mr. Williams was admitted in the infirmary on January 7, 2022, until he was discharged with a wheelchair on February 14, 2022. ECF No. 93 at ¶ 99; ECF No. 96-1 at PLMEDICAL 21–23.

**ARGUMENT**

Mr. Williams's claims against Dr. Figueroa for retaliation (Count I) and deliberate indifference (Count IV) must be dismissed. *First*, Mr. Williams has not adequately alleged Dr. Figueroa retaliated against him. *Second*, Mr. Williams's allegations and records show Dr. Figueroa provided constitutionally adequate care.

**I.      Mr. Williams fails to state First Amendment retaliation claim (Count I).**

Mr. Williams's First Amendment retaliation claim alleges Dr. Figueroa responded to his grievances "with retaliatory and life-endangering measures to punish him." ECF No. 93 at ¶ 144. More specifically, Mr. Williams alleges Dr. Figueroa retaliated against him by not securing a wheelchair for him and by ignoring his cancer. *Id.* at ¶¶ 85, 132. These scant allegations fail to state a claim for retaliation.

To state a First Amendment retaliation claim, Mr. Williams must allege: "(1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the administrator's allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech." *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008); *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). Allegations of verbal abuse or threats alone are insufficient to state a retaliation claim. *Hernandez v. Florida Dept. of Corr.*, 281 Fed. Appx. 862, 866 (11th Cir. 2008).

Mr. Williams failed to plausibly allege Dr. Figueroa retaliated against him because he cannot establish causation. To satisfy the causation element, "a plaintiff is

required to do more than make 'general attacks' upon a defendant's motivations and must articulate 'affirmative evidence' of retaliation to prove the requisite motive." *Hurst v. Flesher*, 2020 WL 1929460, at *6 (M.D. Fla. Apr. 21, 2020) (citing *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998)). "In other words, the prisoner must show that, as a subjective matter, a motivation for the defendant's adverse action was the prisoner's grievance or lawsuit." *Jemison v. Wise*, 386 F. App'x 961, 965 (11th Cir. 2010).

Here, Mr. Williams alleged Dr. Figueroa retaliated against him by not providing a wheelchair and by ignoring his cancer. As to the wheelchair, Mr. Williams alleges Dr. Figueroa retaliated by not providing him a wheelchair while in the infirmary in January 2022. ECF No. 93 at ¶ 85. But as the records central to his claims show, Dr. Figueroa evaluated Mr. Williams in December 2021 for mobility complaints and determined then that Mr. Williams would not receive a wheelchair. ECF No. 96-1 at PLMEDICAL013 ("I do not recommend wheelchair at this time."). So the evidence shows Dr. Figueora had already determined, in his medical judgment, that Mr. Williams did not need a wheelchair prior to the alleged retaliation. Because that explanation is plausible and there are no facts alleging it is pretextual, Mr. Williams cannot state a First Amendment retaliation claim related to the denial of the wheelchair in January 2022.[4] *Christmas v. Nabors*, 76 F.4th 1320, 1334 (11th Cir. 2023)

---

[4] Further, Mr. Williams appears to concede he was provided a wheelchair in February 2022 when discharged from the infirmary—though he classifies it as unassigned—further rebuffing any insinuation that the denial of the wheelchair in January 2022 was pretextual. ECF No. 93 at 103; ECF No. 96-1 at PLMEDICAL 21–23 ("Patient will be discharge with a wheelchair so he can get around while is is [sic] been workout.").

(affirming dismissal of claim where evidence showed cane was taken for security reasons even though prisoner alleged it was retaliation for filing grievances).

Mr. Williams's conclusory allegation that Dr. Figueroa ignored his cancer is similarly refuted by the TAC's allegations and the records central to his claim. While under Dr. Figueroa's care, Mr. Williams had his PSA levels tested multiple times, *id.* at PLMEDICAL 19; and he saw a urologist in March, May, June, and July, *id.* at PLMEDICAL 18–30, 37–38, 45. He was also started on medication which caused his PSA levels to drop while under Dr. Figueroa's care. ECF No. 93 at ¶ 122. In short, the TAC and records central to Mr. Williams's claim refutes conclusory allegations that Dr. Figueroa ignored Mr. Williams's cancer.

But even if the Court did not consider the medical records, his conclusory allegation is still insufficient. At most, Mr. Williams has made only "general attacks" and has not alleged "affirmative evidence" of retaliation. *Hurst*, 2020 WL 1929460, at *6. Because his general attacks are insufficient to state a First Amendment retaliation claim, Count I should be dismissed against Dr. Figueroa.

## II. Mr. Williams fails to state a claim for deliberate indifference (Count IV).

Mr. Williams has not stated a claim against Dr. Figueroa for deliberate indifference to a serious medical need since Dr. Figueroa provided constitutional care to Mr. Williams, and there are no plausible allegations that Dr. Figueroa deliberately disregarded a serious risk of harm about which he had knowledge. Accordingly, County IV against Dr. Figueroa should be dismissed.

## A. Deliberate indifference to serious medical need standard.

The Eighth Amendment protects inmates from "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). But a "prisoner bringing a deliberate-indifference claim has a steep hill to climb." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020). As the Eleventh Circuit explained,

> "[D]eliberate indifference is *not* a constitutionalized version of common-law negligence." "To the contrary, we (echoing the Supreme Court) have been at pains to emphasize that 'the deliberate indifference standard ... is far more onerous than normal tort-based standards of conduct sounding in negligence,' and is in fact akin to 'subjective recklessness as used in the criminal law.'" With respect to prisoners' medical care, in particular, we have held that the Eighth Amendment doesn't require it to be "perfect, the best obtainable, or even very good." Rather, we have emphasized, "[m]edical treatment violates the [E]ighth [A]mendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."

*Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1271 (11th Cir. 2020)[5] (internal citations omitted) (emphasis in original).

Indeed, the Eleventh Circuit has cautioned courts against employing a "'perhaps they could be doing more' standard" when considering claims of deliberate indifference to a serious medical need. *Hammonds v. Theakston*, 833 F. App'x 295, 301 (11th Cir. 2020) (quoting *Hoffer*, 973 F.3d at 1271). Instead, courts should first consider the care provided to an inmate and, if such care satisfies the constitutional minimum, then there is no need to consider whether a defendant could have done more. *Hoffer*, 973 F.3d at 1277 (concluding it did not need to reach the question of whether less

---

[5] In the constitutional context, "[O]nly the most egregious official conduct" shocks the conscience. *Waddell v. Hendry Cty. Sheriff's Off.*, 329 F.3d 1300, 1305 (11th Cir. 2003).

efficacious care was provided pursuant to a cost defense "because we have held that the Eighth Amendment's 'minimally adequate care'" was provided).

A deliberate indifference claim involves both an objective and subjective component. *Keohane*, 952 F.3d at 1266. After a prisoner demonstrates an objectively serious medical need, the inmate must prove prison officials acted with deliberate indifference to that need by showing: "(1) the official was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, (2) the official actually drew that inference, (3) the official disregarded the risk of serious harm, and (4) the official's conduct amounted to more than gross negligence." *Ireland v. Prummell*, 53 F.4th 1274, 1287 (11th Cir. 2022) (quotations omitted).

"With regard to the subjective component of the Eighth Amendment claim, the Court in *Farmer* [*v. Brennan,* 511 U.S. 825, 837 (1994),] held that the prison 'official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference*.'" *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617 (11th Cir. 2007) (emphasis added). "Each individual Defendant must be judged separately and on the basis of what that person knows, because 'imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference.'" *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008).

Because medical care must shock the conscience to constitute deliberate indifference, proof of medical malpractice is not enough. *Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Indeed, "mere evidence of negligence 'in diagnosing or treating

a medical condition' or a showing of medical malpractice does not establish deliberate indifference." *Monteleone v. Corizon*, 686 F. App'x 655, 658 (11th Cir. 2017).

And "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Hoffer*, 973 F.3d at 1272. "[T]he question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) (quoting *Estelle,* 429 U.S. at 10). That's because "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment [fails to] support a claim of cruel and unusual punishment." *Keohane*, 952 F.3d at 1266.

**B. Mr. Williams has not pled Dr. Figueroa was deliberately indifferent.**

Mr. Williams's allegations against Dr. Figueroa fail to establish deliberate indifference. Throughout the TAC Mr. Williams alleges his complaints of pain and mobility impairment were "ignored"; his wound care was neglected; and his urologist referral, PSA level tests, and various medical treatments were "delayed."

But these allegations simply do not state a plausible claim for deliberate indifference. Taken together, the details included in the TAC and in Mr. Williams's records show the care provided to Mr. Williams was nowhere near the sort that would

be so "grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Hoffer*, 973 F.3d at 1271 (11th Cir. 2020).

In fact, the details gleaned from the TAC and Mr. Williams's records demonstrate Dr. Figueroa provided Mr. Williams with constitutional care. Mr. Williams was evaluated each time he interacted with Dr. Figueroa, and numerous tests, treatment plans, and medications were prescribed and implemented for Mr. Williams's medical benefit. Mr. Williams's allegations and records show he was urgently referred to urology in January 2022, ECF No. 96-1 at PLMEDICAL 18–23; he had his PSA levels tested multiple times, *id.* at PLMEDICAL 19; he saw a urologist in March, May, June, and July, *id.* at PLMEDICAL 18–30, 37–38, 45; and he was admitted into the infirmary on January 7, 2022, where he was kept until February 14, 2022 (when he was discharged with a wheelchair). *Id.* at PLMEDICAL 21–23.

Though Mr. Williams may have desired additional treatment or testing, that "isn't grist for a constitutional claim." *Mann v. Sec'y, Dep't of Corr.*, No. 21-11445, 2021 WL 5112647, *4 (11th Cir. Nov. 3, 2021); *accord Hoffer*, 973 F.3d at 1272 (explaining courts are reluctant to second guess medical judgments); *Adams*, 61 F.3d at 1545 (explaining whether to order additional tests is classic question of medical judgment). This is true even if the treatment Mr. Williams received was subpar. *Hoffer*, 973 F.3d at 1273 (citing *Lamb v. Norwood*, 899 F.3d 1159, 1162 (10th Cir. 2018), for the holding: "We have consistently held that prison officials do not act with deliberate indifference when they provide medical treatment even if it is subpar or different from what the inmate wants.")

13

Lastly, Mr. Williams's generalized complaints that Dr. Figueroa did not refer him to a urologist or test his PSA levels sooner also do not state a claim for deliberate indifference. Rather, the records central to Mr. Williams's claims show he was scheduled to have his PSA levels tested within weeks of his transfer to SCI; he had a pending urology referral when he came to SCI that was renewed in January and February; he saw a urologist in March, May, June, and July; and he was provided medication to treat his prostate cancer, which caused his PSA levels to decrease. So Mr. Williams has not plausibly alleged any facts showing Dr. Figueroa was deliberately indifferent to getting Mr. Williams treatment for his prostate cancer.

Instead, as the Eleventh Circuit has explained, Dr. Figueroa would not be liable for deliberate indifference even if he should have done something more to ensure Mr. Williams was seen by a urologist sooner. *Mann*, 2021 WL 5112647 at *3 ("We assume that [the doctor's] failure to refer [Plaintiff] to a specialist or order a colonoscopy violated the applicable standard of care and could support a negligence claim. But … '[m]ere incidents of negligence or malpractice do not rise to the level of constitutional violations.'" (quoting *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991))). Accordingly, none of the allegations against Dr. Figueroa are sufficient to state a claim for deliberate indifference, and the claim should, therefore, be dismissed.

## CONCLUSION

The claim against Dr. Figueroa should be dismissed. Mr. Williams's allegations and the records central to his claim demonstrate Dr. Figueroa did not violate his constitutional rights in providing medical care—either under the First or Eighth

14

Amendments. Because Dr. Figueroa did not violate Mr. Williams's constitutional rights, he should be dismissed from this suit.

### LOCAL RULE 3.01(G) CERTIFICATION

Undersigned counsel certifies that, pursuant to Local Rule 3.01(g), he conferred with counsel for Plaintiff regarding the relief sought in this motion via e-mail on October 24, 2023. Plaintiff opposes the motion in all respects.

Respectfully Submitted,

*/s/ Jacob Hanson*
R. Craig Mayfield (FBN 429643)
Jacob B. Hanson (FBN 91453)
**BRADLEY ARANT BOULT CUMMINGS LLP**
100 North Tampa Street, Suite 2200
Tampa, Florida 33602
Tel: (813) 559-5500
Primary Email:      cmayfield@bradley.com
Primary Email:      jhanson@bradley.com
Secondary Email: tabennett@bradley.com

Brian A. Wahl (FBN 95777)
**BRADLEY ARANT BOULT CUMMINGS LLP**
1819 5th Avenue North
One Federal Place
Birmingham, AL 35203
Tel: (205) 521-8800
Primary Email: bwahl@bradley.com
Secondary Email: tramsay@bradley.com

*Counsel for Defendants Centurion of Florida, LLC; Jason Howell; Alexis Figueroa; Tony Abbott; and Elizabeth Holmes*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 25, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification to counsel of record.

*/s/ Jacob B. Hanson*
Jacob B. Hanson
***Counsel for Defendants Centurion of Florida, LLC; Jason Howell; Alexis Figueroa; Tony Abbott; and Elizabeth Holmes***

16