UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ELMER WILLIAMS,

      Plaintiff,

v.

RICKY DIXON, *et al.*,

      Defendants.

Case No. 3:22-cv-1221-MMH-MCR

**PLAINTIFF'S CONSOLIDATED RESPONSE TO
CENTURION DEFENDANTS' MOTIONS TO DISMISS**

Pursuant to Local Rule 3.01(c), Plaintiff Elmer Williams opposes Centurion Defendants'[1] Motions to Dismiss [D.E. 96–100] his Third Amended Complaint (TAC) [D.E. 88]. As grounds, Mr. Williams states:

**<u>Introduction</u>**

This lawsuit involves the unconstitutional, shocking treatment of Elmer Williams, a former state prisoner, who had a history of managed prostate cancer. While incarcerated in the custody of the Florida Department of Corrections (FDC), Mr. Williams was seen by a urologist, who was able to keep his cancer at remission levels, avoiding its spread. After medication was stopped, Mr. Williams's cancer levels began to increase rapidly, prompting the Centurion Defendants to agree that

---

[1] Centurion Defendants include Centurion of Florida, LLC, Alexis Figueroa, M.D., Jason Howell, Elizabeth Holmes, and Tony Abbott.

he should be seen by his urologist—*urgently*. Despite agreeing that Mr. Williams should see a professional to treat his prostate cancer, Centurion Defendants failed to timely secure the referral. They waited months, "monitoring" his spreading prostate cancer, while it spread throughout his body rendering him terminally ill. They denied him access to accommodations, resulting in horrific wounds on his ankles and buttocks, because he was no longer able to walk due to the spreading cancer. They failed to provide him timely or adequate wound care or send him to a wound care facility in violation of their policies. And in the end, their repeated failures to do what they said they would do or abide by their policies has resulted in Mr. Williams becoming terminally ill—so ill that he was awarded a rare grant of compassionate medical release.

These failures are alleged in the TAC in detail. Centurion Defendants have moved to dismiss the TAC. They argue Mr. Williams cannot state a claim for these horrific constitutional violations. For the reasons detailed below, they are wrong.

### Relevant Factual Allegations

At all times relevant to his claims, Mr. Williams was a state prisoner in the custody of the Florida Department of Corrections (FDC). TAC ¶ 6. Mr. Williams had a history of prostate cancer in FDC custody, which his outside urologist managed to control through medication. *Id*. at ¶¶ 19, 21. According to Centurion's forms, "[a] PSA value of 1.00 ng/ML selects for the upper range of PSA values. Men who have a PSA above the median for their age group are at a higher risk for

prostate cancer and for the aggressive form of the disease. *Id.* at ¶ 24. The higher above the median, the greater the risk." *Id.* In 2020, Mr. Williams's urologist had his PSA level down to 0.02 ng/ML—requiring testing only every two to four years. *Id.* at ¶ 20. His urologist decided to discontinue cancer medication but required that Mr. Williams be seen again in June 2021 to assess his prostate cancer. *Id.* at ¶ 21.

Mr. Williams was not taken back to see his urologist in June 2021 as required. *Id.* at ¶ 22. He would not see his urologist for more than a year. In September 2021, Mr. Williams's PSA level was tested again. *Id.* at ¶ 23. In the several months since discontinuing medication, Mr. Williams's PSA value skyrocketed to 5.21 ng/mL—a threshold that Centurion considers meaning that the cancer is spreading. *Id.* Given the reality that Mr. Williams's cancer was spreading again, medical staff ordered an "urgent" urology referral but allowed the "urgent" referral to languish. *Id.* at ¶ 25.

In November 2021, Mr. Williams was transferred to Suwannee Correctional Institution. *Id.* at ¶ 27. Just prior to arriving at Suwannee C.I., Mr. Williams began experiencing mobility issues and had fallen and broken his teeth. *Id.* at ¶ 26. Shortly after arriving, Mr. Williams fell out of his bunk injuring his hip, neck, and back, and declared a medical emergency. *Id.* at ¶¶ 28–29. Mr. Williams was taken to see Nurse Howell, to whom Mr. Williams explained that he was experiencing numbness and was concerned about paralysis and his rising PSA value. *Id.* at ¶ 31. Mr. Williams received treatment at this interaction, but no action was taken to address his mobility concerns and PSA level. *Id.* at ¶ 32. Upon leaving the encounter, Mr. Williams told

Nurse Howell he couldn't walk and asked for a wheelchair. *Id.* at ¶ 33. Nurse Howell refused to provide one to Mr. Williams, telling him to hold onto a wall. *Id.*

The next day, Nurse Abbott remarked in Mr. Williams's records that Mr. Williams was supposed to be urgently referred to a urologist the month before. *Id.* at ¶ 35. Nurse Abbott questioned whether the referral actually went through the system but took no steps at that time to follow up and ensure that the referral was submitted to Centurion's Utilization Management department. *Id.*

Mr. Williams began experiencing more pain and decreased mobility. *Id.* at ¶ 36. He fell and was punished for his falling and grieving his lack of care and placed in confinement. *Id.* at ¶ 38. Before going into confinement, Mr. Williams filed a grievance against Nurse Howell for his purposeful denial of a wheelchair. *Id.* at ¶ 40. While in confinement in November and December 2021, Mr. Williams continued to grieve that he was not getting medical treatment. *Id.* at ¶ 44. He grieved that he was not getting blood work or laboratory tests and that he needed "to determine where [his] PSA level is at and what's wrong with [him.]" *Id.* While in confinement, Mr. Williams would have trouble getting in and out of his bunk and getting his food; he would crawl on the floor to access food and toilet, which caused severe wounds on his ankles; and he would have to pee in cups and physically place his feces in the toilet because he could not sit on it. *Id.* at ¶¶ 45–48, 58.

Mr. Williams expressed in a contemporaneously kept daily journal that he signed under oath that medical staff were not coming to help him because he grieved

Nurse Howell's refusal to provide a wheelchair. *Id.* at ¶ 52. When the medical staff finally came, he was laughed at and refused emergency care. *Id.* at ¶ 53. That same day, Mr. Williams wrote in his journal that: "If I didn't have God on my side and the strong will to survive, I would have committed suicide, that's just how much pain and anguish I feel inside." *Id.* at ¶ 54. Mr. Williams wondered why Dr. Figueroa and the nursing staff were not sending him to see a cancer specialist. *Id.* at ¶ 55.

When Mr. Williams was released from confinement on December 20, 2021, he was not given a medical pass for a wheelchair, but taken in a borrowed wheelchair to be examined by medical staff (only after Mr. Williams declared another medical emergency). *Id.* at ¶¶ 60–61. Mr. Williams was examined by Dr. Figueroa and Nurse Abbott—who earlier acknowledged urgency given that Mr. Williams's PSA value signified cancer spread and knew that he was supposed to see his urologist urgently—who decided that he would not have his PSA value tested and who failed to check on his urology referral to determine its status. *Id.* at ¶¶ 61–62. According to FDC policy, prior to completing a specialty referral, a prisoner must sign a consent form. *Id.* ¶¶ 81–82. Historically, Mr. Williams would be asked to sign a consent form "a week or so" before going to see a specialist. *Id.* at ¶ 81. Mr. Williams had not signed a consent form to see his urologist by the time of this post-confinement encounter with Dr. Figueroa and Nurse Abbott. *Id.*

Mr. Williams continued to complain about his mobility issues and cancer, as well as the horrific wounds on his ankles and was finally taken to the infirmary in

January 2022. *Id.* at ¶¶ 74–76. In the infirmary, Mr. Williams had his PSA levels tested again, with the result of a 400% increase in antigen levels in his urine—5.21 ng/mL to 21.00 ng/mL. *Id.* at ¶ 77. Dr. Figueroa failed to order a full clinical evaluation to determine whether Mr. Williams's extremity numbness and mobility issues related to the rising PSA value. *Id.* Instead, Dr. Figueroa simply noted that Mr. Williams had an incomplete urology referral from September 2021 and that Dr. Figueroa—who is not a cancer doctor or urologist—would continue to purport to "monitor[]" Mr. Williams's spreading prostate cancer. *Id.* at ¶ 79.

Mr. Williams was not immediately informed that his cancer antigen levels had increased 400% from September 2021 and 10,000% since December 2020. *Id.* at ¶ 80. Weeks later, Mr. Williams had not received any word on his specialty referral. *Id.* at ¶ 81. While in the infirmary, Mr. Williams began to develop foul-smelling wounds on his buttocks—on top of the open wounds on his ankles. *Id.* at ¶¶ 84, 123. Mr. Williams still has these wounds, though they are in various stages of healing now that he is in a hospital. Some wounds necrotized. *Id.* at ¶ 95.

In February 2022, still in the infirmary, Mr. Williams continued to ask about his urology referral. *Id.* at ¶ 97. It turns out, Dr. Figueroa and Nurse Abbott never followed up, and the referral had to be resubmitted to Centurion's Utilization Management department in February 2022. *Id.* Medical staff also categorized Mr. Williams's wounds on his ankles as stage 2 wounds—which require 14 to 45 days of treatment. *Id.* at ¶ 98. Despite that, Mr. Williams was released from the infirmary

without complete wound care. *Id.* at ¶ 100. Mr. Williams's wounds on his ankles and buttocks were allowed to remain open and unhealed for months. When Mr. Williams finally arrived at a specialized wound facility—Reception and Medical Center (RMC)—, his wounds were infected, deep, and horrific:



*Id.* at ¶¶ 114, 123. Staff at RMC told Mr. Williams that Dr. Figueroa and his medical staff should be embarrassed about the condition of these wounds. *Id.* at ¶ 131. The failure to promptly send Mr. Williams to the specialized wound care program at RMC to treat wounds that were not healing violated FDC policy. *Id.* at ¶ 127.

Mr. Williams was also not kept in the infirmary despite these open wounds. In February 2022, he was discharged by Nurse Holmes and Dr. Figueroa because he was "clinically stable," despite not having completed the required course of wound treatment. *Id.* at ¶ 100. Mr. Williams suffered in general population. He did not have

an *assigned*[2] wheelchair or impaired inmate assistant and would miss meals, have trouble showering, and soil himself, and receive inconsistent wound treatment for his open wounds. *Id.* at ¶¶ 104–07. While unable to access the facility's services and with continued numbness, bleeding, and sores, Mr. Williams continued to grieve and make urgent sick call requests to the Centurion Defendants. *Id.* at ¶¶ 109-10.

In May 2022, Dr. Figueroa diagnosed Mr. Williams with osteomyelitis—bone infection—in his wounds. *Id.* at ¶ 120. It had now been months since Mr. Williams developed the wounds on his ankles (caused by dragging himself on the filthy cement floor in confinement) and buttocks, but he remained at Suwannee C.I., which was not the appropriate facility for someone in Mr. Williams's condition according to FDC policy. *Id.* at ¶¶ 123–24, 127. (According to Mr. Williams's medical records, he saw a urologist in March 2022, almost a year after he was scheduled to see a urologist and despite months of worsening condition and shocking test results). *Id.* at ¶ 122. Mr. Williams was seen again by his urologist in June 2022, at which time his PSA value decreased but the delayed treatment proved catastrophic—Mr. Willliams's prostate cancer was metastatic with spinal cord malignancy, spreading through his L-1 through -5 vertebrae, both sides of his prostate, both hips, and his lymph nodes. *Id.* According to Dr. Figueroa, Mr. Williams's condition was now terminal. *Id.* at ¶ 128. Mr. Williams only learned about the June 2022 findings in

---

[2] He alleges that he would have to borrow one and sometimes medical staff would send him back to his dorm in a borrowed or loaner wheelchair. *Id.* at ¶ 104.

August 2022 after he was transferred to RMC. *Id.* at ¶ 132. After residing at RMC for several months, Mr. Williams was granted an award of compassionate medical release and transferred to a hospital. *Id.* at ¶ 141.

### Argument

To survive a 12(b)(6) motion to dismiss, a plaintiff must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action," but she "does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted). Instead, a complaint must contain "enough facts to state a claim to relief that is plausible on its face," *Brooks v. Warden*, 800 F.3d 1295, 1300 (11th Cir. 2015) (quotation omitted), which can allow the court to draw the reasonable inference that the defendant is liable for the alleged misconduct. *Waldman v. Comm'r*, 871 F.3d 1283, 1289 (11th Cir. 2017). This threshold "is not akin to a 'probability requirement'"—the plaintiff must merely allege "'enough fact to raise a reasonable expectation that the discovery will reveal evidence' of the claim." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 556). Factual content must allow the court to draw the reasonable inference that the defendant is liable for the alleged misconduct. *Waldman*, 871 F.3d at 1289.

The Eleventh Circuit thus applies a "two-pronged approach" in evaluating motions to dismiss: "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume

their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Am. Dental Ass'n*, 605 F.3d at 1290 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). This approach applies to all Rule 8(a) pleadings—no heightened pleading standard exists for civil right or municipal liability claims. *See Leatherman v. Tarrant Cnty. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993).

Armed with a fraction of Mr. Williams's medical records, in separate motions Centurion Defendants argue that the TAC should be dismissed for failure to support his claims for First Amendment retaliation, Eighth Amendment deliberate indifference, and liability against Centurion under a *Monell*[3] theory. Each argument is addressed in turn.

## I.     Mr. Williams's excerpted medical records should not be considered.

Centurion Defendants suggest that the Court should consider *excerpts* of Mr. Williams's medical and grievance records[4] when ruling on their motions to dismiss. [D.E. 96 PageID 934]. They rely on *Day v. Taylor*, 400 F.3d 1272 (11th Cir. 2005), *Horsley v. Feldt*, 304 F.3d 1125 (11th Cir. 2002), and several district court cases to support their suggestion. And they emphasize that Mr. Williams amended his complaint after his *de bene esse* deposition, which covered *some* of his grievances and medical records.

In *Horsley*, the Eleventh Circuit held that a court may consider a document

---

[3] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

[4] They do not attach or reference any grievance records, however.

attached to a motion to dismiss without converting it to a motion for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed—"that the authenticity of the document is not challenged." 304 F.3d at 1134. "[I]f the document's contents are alleged in a complaint and no party questions those contents, [courts] may consider such a document provided it meets the centrality requirement imposed in *Horsley*." *Day*, 400 F.3d at 1276.

A document is not "central" to a plaintiff's complaint just because it may or may not contain relevant information or facts. *See Adamson v. Poorter*, 2007 WL 2900576, at *3 (11th Cir. Oct. 4, 2007) (unpublished). In *Adamson*—though not binding[5]—the Eleventh Circuit held the district court erred by dismissing a prisoner's complaint by relying on defendant declarations filed with their motion to dismiss. Finding that defendants' declarations were not "central" to plaintiff's complaint, the court, relying on *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 (11th Cir. 1999)—which is binding precedent—held that the foundation of the ability to introduce documents at the dismissal stage "is that when a plaintiff files a complaint based on a document but fails to attach that document to the complaint, the defendant may so attach the document, and therefore, the document, as one that could have or rather in fairness should have been attached to the complaint, is considered part of the pleadings and thus may be reviewed at the pleading stage without converting the motion into one

---

[5] Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority. *See* Fed. R. App. P. 32.1; 11th Cir. R. 36–2; *McNamara v. GEICO*, 30 F.4th 1055, 1060–61 (11th Cir. 2022).

for summary judgment." *Adamson*, 2007 WL 2900576, at *3 (quoting *Bryant*, 187 F.3d at 1280, n.16.).

In *Cineus v. Fla. Dep't of Corr.*, 2022 WL 4448599 (M.D. Fla. Sept. 23, 2022)—authority which Centurion Defendants fail to cite—, Judge Scriven told Centurion it could not submit medical records in a deliberate indifference case at the dismissal stage without converting the motion to a motion for summary judgment. *Id.* at *4. In that case, the court found that it would be premature to do so when the parties had not undertaken discovery. *Id.* There, the plaintiff had referred to medical records to identify and substantiate treatment but did "not otherwise quote or rely on the medical records *to support the deliberate indifference claim against Centurion*." *Id.* (emphasis supplied). The court found that the medical records were not "central" to the claim, because the plaintiff could present testimony by witnesses, rather than introducing medical records, to prove the deliberate indifference claims. *See id.* (citing *Finan. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284–85 (11th Cir. 2007) ("[T]he First Circuit has held, with respect to a complaint alleging libel and other related claims, that a magazine article referred to in the complaint and attached to the defendant's motion to dismiss was central to the plaintiffs' claim because '[p]laintiffs unquestionably would have had to offer a copy of the article in order to prove their case.'"), quoting *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir. 1988).

There is no question that Mr. Williams references and quotes some of the medical documents in his TAC, but those documents are unnecessary to support his claims of deliberate indifference. For example, the claims that Centurion Defendants deliberately delayed sending Mr. Williams to his treating urologist or failed to place him in a wound-care facility or provide adequate wound care can be introduced by the testimony of Mr. Williams, corrections and medical staff, and his outside treating physicians. *See Cineus*, 2022 WL 4448599, at *4. These medical records are not required to demonstrate the unconstitutional delays.

Even if the medical records are considered central to these claims, Centurion Defendants have laid no foundation for excerpted records to support their authenticity. The attached medical records are heavily excerpted (there are *thousands* of pages of unfiled medical records) and in this case not definitive. *Horsley*, 304 F.3d at 1134 (refusing to consider "excerpts" of a transcript which the plaintiff disputed as different from the transcript referenced in his complaint). Centurion Defendants have not articulated why they can string together excerpts from records—including records referencing other purported records—without considering whether they are able to be rendered admissible and presented to the Court for adjudication of their motions to dismiss. *United States v. Bueno-Sierra*, 99 F.3d 375, 378 (11th Cir. 1996). The Court should not accept Centurion Defendants' invitation to traverse outside the four corners of the TAC. *Roberts v. Carnival Corp.*, 824 F. App'x 825, 826 (11th Cir. 2020) (courts are "ordinarily barred from considering facts not alleged in the

complaint or documents attached to a motion to dismiss").

But even if the Court were to rely on the records, Mr. Williams has sufficiently pleaded claims, which are *not contradicted* by the medical records. For instance, the records simply do not contain all the facts of what Mr. Williams observed, including who was present during his interactions with medical staff. To get around Mr. Williams's allegations, Centurion Defendants argue that Mr. Williams's version of events—some of which he contemporaneously wrote down in a daily journal and signed under oath—cannot defeat their contemporaneous medical records. [*See, e.g.*, D.E. 99 PageID 1041 (citing *Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010)]. But *Whitehead* and the omitted case it cites—*Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990)—are about weighing the credibility of self-serving statements in the face of medical records to determine whether there is a genuine dispute of material facts to preclude summary judgment. *At this stage*, the allegations must be taken as true and viewed in the light most favorable to Mr. Williams. *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003). Beyond the excerpts being incomplete, differences between the records and the allegations are not meaningful. Some differences—like whether Mr. Williams was issued a loaner wheelchair or a medical pass for his own wheelchair after leaving the infirmary [D.E. 97 PageID 1012-13]—are purely semantic and cannot serve the basis for dismissal. Other contradictions are because the records contain outright misrepresentations. TAC ¶ 102. For these reasons, the Court should not consider the 50 excerpted pages of Mr. Williams's medical records

14

at this stage.

## II. Mr. Williams has adequately pleaded claims for denial of constitutionally adequate medical care.

The TAC meets the liberal standard to state a claim for deliberate indifference to serious medical needs in violation of the Eighth Amendment. Mr. Williams has also alleged facts sufficient to establish municipal liability for these constitutional violations under *Monell*. Mr. Williams has alleged facts showing that Centurion's customs and practices of inadequate care, its failure to adequately supervise provision of medical care, and the deficient decisions of its final policymakers directly caused violations of Mr. Williams's constitutional rights. The TAC also sets out sufficient facts to establish the deliberate indifference of each individual defendant in the face of Mr. Williams's urgent, serious medical condition. He has therefore adequately alleged both municipal and individual liability for denial of constitutionally required medical care.

### A. Mr. Williams has adequately pleaded a claim for deliberate indifference against the individual defendants.

Defendants Figueroa, Abbott, Howell, and Holmes (collectively, the "individual defendants") argue that the TAC fails to state a claim for deliberate indifference to a serious medical need. None of the Centurion Defendants dispute Mr. Williams's serious medical need. Instead, largely relying on *Mann v. Sec'y, Dep't of Corr.*, 2021 WL 5112647, at *4 (11th Cir. Nov. 3, 2021) (unpublished), they assert that Mr. Williams cannot seek relief under the Eighth Amendment because he was

monitored for his spreading cancer and was provided *some* treatment for his wounds. As explained below, this case is not like *Mann*.

To establish an Eighth Amendment violation, a prisoner—or former prisoner—must satisfy both an objective and subjective inquiry related to a prison official's conduct. *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004). The Eleventh Circuit has held that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence."[6] *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).  In turn, conduct is "more than mere negligence" when an official "'knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate.'" *Farrow v. West*, 320 F.3d 1235, 1246 (11th Cir. 2003) (quoting *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1425 (11th Cir. 1997)). A prison official also "act[s] with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours," if the condition is sufficiently serious and warrants immediate attention. *Id.*

Indeed, even where *some* care is provided, prison officials are deliberately indifferent if they are "aware of the [serious] medical condition and the need for

---

[6] There is tension within the Eleventh Circuit as to whether mere negligence or something more—like gross negligence—is required to support an Eighth Amendment claim for deliberate indifference. *Webster v. Corizon, LLC*, No. 2023 WL 113602, at *7 (M.D. Fla. 2023) (Howard, J.) (collecting cases). Centurion Defendants have asserted that a recent panel decision "confirm[s]" that the gross negligence standard applies [D.E. 97 PageID 1011 (citing *Ireland*, 53 F.4th 1274 (11th Cir. 2022)], but that panel cannot overrule *McElligott*. *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008).

effective treatment and then callously or recklessly disregard it." *McAdams v. Pelt*, 2018 WL 5850945, at *2 (N.D. Fla. Apr. 27, 2018) (citing *McElligott*, 182 F.3d at 1257–58). It is well-established that "[t]he mere fact that medical care is eventually provided is insufficient to defeat a claim for deliberate indifference" because "[a]n official may still act with deliberate indifference 'by delaying the treatment of serious medical needs.'" *Ireland v. Prummell*, 53 F.4th at 1287–88 (quoting *McElligott*, 182 F.3d at 1255). It is enough to establish deliberate indifference to show that whatever medical care was given was insufficient given the serious medical need. *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000); *Webster*, 2023 WL 113602, at *8 (delay in providing treatment must cause harm to satisfy Eighth Amendment), citing *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989). For a delay to constitute deliberate indifference, it must "seriously exacerbate the medical problem ... [and be] medically unjustified." *Sims v. Figueroa*, 2022 WL 188485, at *5 (11th Cir. Jan. 21, 2022), *cert. denied*, 213 L. Ed. 2d 1102, 142 S. Ct. 2888 (2022) (quoting *Taylor*, 221 F.3d at 1260) (alterations in original).

The TAC alleges that the individual defendants were deliberately indifferent to Mr. Williams' serious and urgent need for cancer treatment, wound care, and mobility devices. The individual defendants assert that this is not enough under *Hoffer v. Sec'y, Fla. Dep't of Corr.,* 973 F.3d 1263, 1271 (11th Cir. 2020). [*See, e.g.*, D.E. 97 PageID 1010]. They claim that they cannot be held deliberately indifference because:

- Dr. Figueroa always evaluated Mr. Williams when they interacted; provided tests and treatment plans; and prescribed medications. [D.E. 100 PageID 1058].

- Nurse Holmes provided Mr. Williams a wheelchair once; and did not authorize his discharge from the infirmary, but even if she did Mr. Williams cannot invoke the Constitution because he was "clinically stable." [D.E. 97 PageID 1013–14].

- Nurse Howell assessed Mr. Williams when they interacted. [D.E. 98 PageID 1029].

- Nurse Abbott was not present at the encounters alleged by Mr. Williams because Dr. Figueroa was identified in the medical records, not Abbott. [D.E. 99 PageID 1040–41].

They also argue that their failure to refer Mr. Williams to a urologist "sooner" cannot form a constitutional claim. They rely on *Mann* and other cases to suggest that they can escape constitutional liability because they were doing the bare minimum for Mr. Williams. But whether they satisfied the Eighth Amendment is a factual inquiry into whether the delays here exacerbated Mr. Williams's condition and were "medically unjustified." *Taylor*, 221 F.3d at 1260.

In *Mann*, the Eleventh Circuit affirmed a *summary judgment* ruling determining that Mr. Mann had failed to show that the prison clinician—Dr. Calderon—violated the Eighth Amendment when he did not refer the plaintiff to a specialist or order other testing for him to rule out colon cancer given the plaintiff's stomach pains and rectal bleeding. 2021 WL 5112647, at *3. The Eleventh Circuit panel reasoned that:

> The evidence shows that Mann saw Calderon only once during the relevant period and that Calderon diagnosed GERD, ordered lab work and x-rays, and prescribed medication for Mann's irritable bowel. While the lab results indicated that Mann had anemia, the other tests were apparently normal, and Mann was relatively young with no reported family history of colon cancer. Even Mann's expert doesn't dispute that GERD may cause at least some of the reported symptoms, and he acknowledges that benign conditions like hemorrhoids or fissures may cause bleeding and anemia, even if they do so only "rarely." In fact, Mann's prison records show that he had been diagnosed with internal hemorrhoids arising out of a bout of diarrhea and colorectal bleeding in May 2014. Those symptoms appear to have resolved largely on their own within a week.

*Id.* (citations omitted). There, the Eleventh Circuit determined that Mr. Mann's claims were a classic example of missed diagnosis or a disagreement in medical judgment, which is not the "grist for a constitutional claim." *Id.* at *4 (citing *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995)).

Similarly, in *Sims v. Figueroa*, the Eleventh Circuit affirmed the grant of summary judgment for Dr. Figueroa regarding another prisoner's complaint that a delay in treating rectal bleeding resulted in advanced prostate cancer. 2022 WL 188485, at *3. There, the Eleventh Circuit found that Dr. Figueroa's failure to follow another Centurion doctor's recommendations to refer the plaintiff to a specialist did not amount to deliberate indifference because it constituted a mere disagreement or matter of medical judgment—Dr. Figueroa had overruled the other clinician's recommendations. *Id.* at *4.

*Mann* and *Sims* explain that clinicians can make judgment calls—even negligent ones, sometimes[7]—without violating the Constitution.  But that is not what happened here.  This is not a matter of whether there was a "genuine, good-faith disagreement between healthcare professionals" concerning the tolerability and responsiveness of Mr. Williams's treatment.  *Smith v. Ward*, 848 F. App'x 853, 857–58 (11th Cir. 2021) (quoting *Harris v. Thigpen*, 941 F.2d 1495, 1507 (11th Cir. 1991)).  Mr. Williams does not complain of missed diagnosis or even assert that Centurion Defendants plotted an alternative course of treatment.  Instead, he claims that the individual defendants and Centurion knew that he had prostate cancer, knew his PSA level was high enough to reveal the spread of cancer, knew that he was suffering from worsening mobility issues, knew that he had an "urgent" referral to a urologist issued by his previous institution, but deliberately delayed acting on the existing specialty referral despite objectively knowing his cancer was worsening and subjectively knowing and observing the obvious risks of delay—such as decreased mobility and increasing PSA levels.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) ("[w]hether a prison official had the requisite [subjective] knowledge of a substantial risk is a question of fact subject to demonstration . . . from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

---

[7] Some courts have held that medical negligence may rise to the level of a constitutional violation where the negligence involves culpable recklessness. *See, e.g.*, *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

While the individual defendants may have placed Mr. Williams in the infirmary and observed or monitored his cancer, that is not a constitutionally sufficient response to the risks Mr. Williams faced. *Smith*, 848 F. App'x at 858 (explaining that in some cases mere monitoring cannot avoid imminent danger of serious injury); *McElligott*, 182 F.3d at 1257 (treatment or medication can be "so cursory as to amount to no care at all"). Instead, where Mr. Williams has alleged that the individual defendants "'knew that the course of treatment was largely ineffective and declined to do anything more to attempt to improve [his] condition' for a prolonged period of time," he has stated a plausible claim about their deliberate indifference to his spreading prostate cancer. *Estrada v. Stewart*, 703 F. App'x 755, 760 (11th Cir. 2017) (quoting *McElligott*, 182 F.3d at 1257–58).

As to the contention that Mr. Williams has only alleged one or two encounters with some of the individual defendants [*see, e.g.*, D.E. 98 PageID 1028–29], Mr. Williams otherwise alleges they were aware of his serious medical needs sufficient to established Eighth Amendment liability. For example, he asserts that Nurse Abbott and Dr. Figueroa were aware of the urgent urology referral and his high PSA level, but deliberately did not act to advance the referral. TAC ¶¶ 35, 79–80, 97. Nurse Howell similarly refused to do anything about Mr. Williams's urology referral. *Id.* at ¶ 31. As for Nurse Holmes, Mr. Williams claims she—along with Nurse Abbott and Dr. Figueroa—was deliberately indifferent to his unhealing wounds. *Id.* at ¶¶ 99–100. He also asserts they failed to treat and accommodate his mobility concerns.

21

As to his horrific wounds, *see id.* at ¶¶ 76, 114, Mr. Williams asserts that Nurses Holmes, Abbott, and Dr. Figueroa were deliberately indifferent to his serious medical condition. *Id.* at ¶¶ 58, 95–96, 98–99, 111, 113–114, 124, 127.  In support of their motions to dismiss, these individual defendants assert that Mr. Williams was "clinically stable" when released from the infirmary, suggesting that his complaints are essentially about medical judgments. [*See, e.g.*, D.E. 96 PageID 937; D.E. 97 PageID 1008]. Not so. The well-pleaded allegations in the TAC support that the perfunctory care for Mr. Williams's worsening wounds—which eventually became necrotic—are claims that the treatment was "so cursory as to amount to no care at all." *McElligott*, 182 F.3d at 1257. Mr. Williams developed the wounds on his ankles in December 2021 while dragging his body along the floor in confinement. TAC ¶ 58. By July 2022 the wounds on his ankles were so bad that bone was visible, and a foul odor emanated from them. *Id.* at ¶¶ 123–24. The wounds on Mr. Williams's buttocks were no different. They developed and were allowed to remain open, necrotic, and deep for months. *Id.* at ¶¶ 84, 110, 114, 120, 123, 125. The individual defendants permitted Mr. Williams to remain in this state despite an FDC policy requiring Mr. Williams to be transferred to a more appropriate facility. *Id.* at ¶ 127; *see Stewart v. Johnson*, 2021 WL 3081882, at *3 (S.D. Ga. July 21, 2021) ("evidence of a policy violation may be evidence of deliberate indifference"); *Hope v. Pelzer*, 536 U.S. 730, 743-44, (2002) (holding that official's disregard of prison regulation "provides equally strong support for the conclusion that they were fully aware of the

wrongful nature of their conduct."). The claims are essentially that the treatment provided for Mr. Williams' wounds violated policy and amounted to no treatment. Those are viable claims under the Eighth Amendment. *Poag*, 61 F.3d at 1543 ("[K]nowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference."); *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989).

Last, Nurses Howell and Holmes argue, presumably pointing fingers at Dr. Figueroa, that they cannot be liable for not taking actions that would contradict a clinician's orders. [*See* D.E. 97 PageID 1012–13; D.E. 98 PageID 1029–30]. They rely on the Eleventh Circuit's recent panel opinion in *Ireland* and a district court order in *Rosario v. Blakely* to suggest that these nurses could not prescribe medication, wheelchairs, tests, or other treatments that contradict clinician orders or exceed their licensed authority. [*See id.*]. In *Ireland*, the court found that the nurses could not be liable for failure to administer potassium chloride to Mr. Ireland because the nurses were not licensed to administer medication without a doctor's order. *Ireland*, 53 F.4th at 1293–94; *Rosario v. Blakely*, 2013 WL 49475, at *9 (M.D. Fla. Jan. 3, 2013) (involving nurse authority to prescribe medication and x-rays). The *Ireland* court similarly found that the nurses were not deliberately indifferent because they had tried to reach clinicians to address Mr. Ireland's condition. *Id.* at 1294. This is not a case about whether these nurses should be held liable for failing to administer drugs they were not authorized to provide. These nurses had objective and subjective

knowledge of the serious medical risks but did not provide constitutionally adequate care for Mr. Williams. The facts here should not be constrained by *Ireland*'s narrow holding.

### B. Mr. Williams has pleaded causation.

Nurses Howell, Holmes, and Abbott also argue that Mr. Williams has not pleaded causation for his deliberate indifference claims. Dr. Figueroa does not assert in his instant motion that Mr. Williams has not pleaded causation for his Eighth Amendment claim against him. [*Compare* D.E. 100 *with* D.E. 60 PageID 525].

To state a claim for deliberate indifference under § 1983, Mr. Williams must allege a causal connection between the constitutional violation and the state actor's conduct. *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) (citation omitted) (requiring "proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation"). Mr. Williams may prove that causal link "by showing that the state actor was personally involved in the acts that resulted in the violation of the constitutional right." *Martinez v. Burns*, 459 F. App'x 849, 851 (11th Cir. 2012).

The individual defendants argue that "there is no plausible allegation" that any of them injured Mr. Williams because he:

- Experienced increased PSA levels *before* he was transferred to Suwannee C.I.;

- Was treated by a host of medical staff when he experienced health issues;

24

- Was placed in the infirmary; and

- Was ultimately seen by specialists and provided cancer treatment.

[D.E. 99 PageID 1043–44; D.E. 97 PageID 1015; D.E. 98 PageID 1029–30]. This argument misses the mark.

In *Martinez*, the Eleventh Circuit found that the plaintiff's deliberate indifference claims failed because the record did not establish a causal connection to show subjective knowledge of the risk or even the personal involvement of the medical staff in any of the alleged acts of deliberate indifference. 459 F. App'x at 851. Here, the TAC offers sound factual allegations that the nurses were personally involved in the alleged unconstitutional delays. They knew about Mr. Williams's increasing PSA levels; they failed to act on the pending *urgent* urology referral; they violated policy on Mr. Williams' languishing wounds; and they failed to treat or accommodate his mobility limitations. Their apparent disagreement on whether that is negligence or deliberate indifference does not affect causation—they were present, and Mr. Williams has adequately pleaded their subjective knowledge.

According to the TAC and Dr. Figueroa's own admissions, the failure rendered Mr. Williams terminally ill—leaving Dr. Figueroa with the conclusion that all he could do was help Mr. Williams "cope." TAC ¶ 128. The nurses rely on *Peterson v. Willie*, 81 F.3d 1033 (11th Cir. 1996) for the proposition that their cursory monitoring and placement of Mr. Williams in the infirmary, among other things, absolves them from liability for deliberate indifference. But that case involved a claim

that doctors failed to provide the plaintiff with medication that made him appear "retarded," and "[a]ppearing retarded" he endured an assault by another prisoner. *Id.* at 1036. The Eleventh Circuit concluded that the record evidence supported that a "joke that got out of hand" causing the injuries, not the failure to provide medication. *Id.* at 1039. That case does not suggest that simply because Mr. Williams was seen by other nurses or providers, he cannot pin down how each of these individual defendants' acts or omissions caused his injuries. Injuries can have multiple proximate causes or come from multiple sources. *Staub v. Proctor Hosp.*, 562 U.S. 411, 420, 131 S. Ct. 1186, 1192 (2011); *Moulds v. Bullard*, 345 F. App'x 387, 391 (11th Cir. 2009) ("A substantial risk to a prisoner's safety . . . may come from single or multiple sources."); *Farmer*, 511 U.S. at 843 ("it does not matter whether the risk comes from a single source or multiple sources").

### C. Mr. Williams adequately pleaded a *Monell* claim.

The TAC also satisfies the requirements to state a claim against Centurion for *Monell* relief. "A municipality can be sued directly under § 1983 when one of its customs, practices, or policies causes a constitutional injury." *Barnett v. MacArthur*, 956 F.3d 1291, 1296 (11th Cir. 2020); *see also Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty.*, Fla., 402 F.3d 1092, 1116 (11th Cir. 2005) (government entity itself must cause the constitutional violation).[8]

---

[8] Centurion takes on the position of a municipality for the purpose of liability here, because "[w]hen a private entity . . . contracts with a [municipality] to provide medical services to inmates, it performs a function traditionally within the exclusive prerogative of the state and

To state a *Monell* claim, a plaintiff must allege facts showing: "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *Marantes v. Miami-Dade Cty.*, 649 F. App'x 665, 672 (11th Cir. 2016) (quoting *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004)). *Monell* liability can also be established based on a failure to adequately train employees where such a failure, "evidences a deliberate indifference to the rights of its inhabitants [that] can be properly thought of as a . . . policy or custom" *City of Canton v. Harris*, 489 U.S. 378, 389, (1989). "[A] municipality's failure to correct the constitutionally offensive actions of its employees can rise to the level of a custom or policy if the municipality tacitly authorizes these actions or displays deliberate indifference towards the misconduct." *Griffin v. City of OpaLocka*, 261 F.3d 1295, 1308 (11th Cir. 2001). Further, municipal "liability on the basis of ratification exists when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority." *Matthews v. Columbia Cty.*, 294 F.3d 1294, 1297 (11th Cir. 2002); *see also Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) (a policy can be adopted by the entity or created by an official of such rank that "he or she could be said to be acting on behalf of the [entity]").

---

'becomes the functional equivalent of the municipality' under section 1983." *Craig v. Floyd Cty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011).

27

Centurion asserts that Mr. Williams's *Monell* claims cannot survive dismissal because: (1) the custom and policy allegations are not factually supported; (2) Mr. Williams only alleges his own individualized experiences; and (3) Mr. Williams has not pleaded that the policies, customs, and practices were the "moving force" behind his alleged constitutional violations. Each argument is addressed in turn.

### 1.  Mr. Williams offers factual support for his *Monell* claims.

Mr. Williams has sufficiently pleaded factual allegations supporting his *Monell* claims. The Supreme Court and the Eleventh Circuit have made clear that there is no heightened pleading standard under Rule 8(a)(2) for *Monell* claims. *See Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) ("[A] federal court may not apply a standard 'more stringent than the usual pleading requirements of Rule 8(a)' in 'civil rights cases alleging municipal liability[.]'") (citation omitted); *Hoefling v. City of Miami*, 811 F.3d 1271, 1275-76 (11th Cir. 2016) (finding no heightened pleading standard for a Monell claim); *Saunders v. Duke*, 766 F.3d 1262, 1266 (11th Cir. 2014) ("After *Ashcroft v. Iqbal*, [] which applied the *Twombly* pleading standard in a civil rights/qualified immunity context, there is no longer a heightened pleading standard in cases governed by Rule 8(a)(2), including civil rights [cases] under § 1983[.]") (quotations omitted)); *Randall v. Scott*, 610 F.3d 701, 710 (11th Cir. 2010) ("After *Iqbal* it is clear that there is no 'heightened pleading standard' as it relates to cases governed by Rule 8(a)(2), including civil rights complaints.").

The TAC satisfies this pleading standard by alleging *Monell* liability against Centurion. Mr. Williams alleges that under Centurion's management of healthcare delivery within FDC, the following widespread policies exist by which prisoners receive unconstitutionally inadequate healthcare: (a) common disregard of reports by patients of objectively serious symptoms; (b) refusal to provide adequate treatment to patients; (c) refusal to timely conduct or obtain diagnostic tests and bloodwork for patients; (d) failure to create sensible treatment plans for patients whose health status requires the same; (e) failure to ensure continuity of care; (f) prioritization of profits at the expense of constitutionally adequate care; (g) failure or refusal to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper; and (h) refusal and/or failure to provide any medical care at all for defined medical problems. TAC ¶¶ 63–64, 125, 133, 142, 152. The TAC further alleges that these policies and practices were allowed to flourish because Centurion, which directed and staffed the provision of healthcare services at FDC facilities and directly encouraged the very type of misconduct here. *Id.* at ¶ 153.

In response, Centurion argues that Mr. Williams has not, among other things,[9]

---

[9] They also argue that Mr. Williams has not explained what the training failures were [D.E. 96 PageID 949], but that is not correct—he identifies at least one area (wound care transfer rules) that satisfies causation. TAC ¶ 127. As for Mr. Williams's claim that there was a policy that Centurion did not permit prisoners to declare medical emergencies when physicians were not available, Mr. Williams's experience bears that out and raises an expectation that discovery will reveal evidence of this policy. *Ferrell v. Fla. Dep't of Corr.*, 2022 WL 329985, at *7 (N.D. Fla. Jan. 13, 2022), report and recommendation adopted, 2022 WL 327203 (N.D. Fla. Feb. 3, 2022).

pleaded sufficient allegations that Centurion had a policy of delaying or not providing treatment to prioritize profits. [D.E. 96 PageID 948]. Relying on this Court's decision in *Scayles v. Inch*, 2022 WL 35991 (M.D. Fla. Jan. 4, 2022) (Howard, J.) and *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1277 (11th Cir. 2020), Centurion asserts that Mr. Williams's allegations are conclusory and fail to explain how such considerations amount to deliberate indifference. In *Scayles*, this Court found that the plaintiff had only rendered legal conclusions as to Centurion's policy to delay diagnosis and treatment for patients with cardiac issues to save money. 2022 WL 35991, at *9. Here, however, Mr. Williams does assert *facts* sufficient under *Hoffer* to state a claim for delayed treatment.[10] For example, the TAC alleges that Mr. Williams's infected wounds were ignored because Centurion believed he would die of his prostate cancer first, meaning that it would not have to expend additional resources on other treatments for Mr. Williams. TAC ¶ 128, 135,

---

[10] Courts have found allegations that the medical provider was withholding treatment for monetary concerns was sufficient to overcome a motion to dismiss. *Hayes v. Corizon Health, Inc.*, 2020 WL 6219833, at *8 (N.D. Fla. Sept. 22, 2020), report and recommendation adopted, 2020 WL 6206012 (N.D. Fla. Oct. 22, 2020) (finding allegation that plaintiff "did not receive necessary treatment sooner due to Centurion's custom and/or policy of cost containment" was sufficient to overcome a motion to dismiss"); *Carmichael v. Jones*, No. 2017 WL 2637410, at *9 (N.D. Fla. Apr. 12, 2017), report and recommendation adopted, 2017 WL 2636492 (N.D. Fla. June 17, 2017) (rejecting argument that allegation Corizon "promulgated a policy or custom to refuse to disclose the criteria for necessary surgery ... and to deny treatment based on prisoner age, and on the basis of cost-savings" was speculative and conclusory).

140.[11]

### 2. Mr. Williams is not required to identify a final policymaker at this stage.

Centurion also argues that the Court should reject Mr. Williams "final policymaker" allegations. [D.E. 96 PageID 950]. An entity "is responsible for any actions taken by the particular official who 'possesses final authority to establish municipal policy with respect to the action ordered[.]'" *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1480 (11th Cir. 1991) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)). "Whether a particular official has final policymaking authority is a question of state law" *Id.* (citing *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701 (1989). Centurion asserts that Mr. Williams's final policymaker allegations are conclusory and subject to scrutiny because "he references no positive law establishing policymaking authority lies with either Dr. Figueroa or UM staff, nor any policy or procedure granting them such authority." [D.E. 96 at PageID 950].

Centurion's argument, if accepted, would impose a burden on Mr. Williams that exceeds the requirements of *Twombly*. The Court should reject the argument because it does not matter who had final decisionmaking authority at this stage, or how such policymaker obtained that authority, because "identifying and proving that a final policymaker acted on behalf of a municipality is 'an evidentiary standard, and

---

[11] Centurion argues that "treatment decisions" regarding individual prisoners cannot constitute customs or policies. [D.E. 96 PageID 950–51]. But the claims here are about decisions to *delay* treatment, not what specific treatments to pursue.

not a pleading requirement.'" *Hoefling*, 811 F.3d at 1280 (quoting *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 510, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). According to the Eleventh Circuit in *Hoefling*, Plaintiff need only to "allege a policy, practice, or custom of [Centurion] which caused the [violation of Mr. Williams's Eighth Amendment rights]." *Id.*; *see also Christmas v. Nabors*, 76 F.4th 1320, 1329–30 (11th Cir. 2023). Because Plaintiff has alleged that utilization managers and/or Dr. Figueroa were the final policymakers for policies he identified in the complaint, he has satisfied his requirement under *Twombly*.

### 3. Mr. Williams does not rely on his own experiences.

Centurion argues that Mr. Williams's *Monell* claims fail because they are premised "exclusively" on his medical treatment. [D.E. 96 PageID 951]. Not so. Mr. Williams alleges that other prisoners were not regularly tested for known cancer despite their medical grades and other prisoners with cancer were not provided routine testing. TAC ¶ 63–64. And there are other prisoners with cancer who claimed that they were not provided adequate testing or timely treatment. *See, e.g.*, *Burge v. Centurion of Florida, LLC*, No. 5:22-cv-525 D.E. 1 (M.D. Fla.) (alleging Centurion and staff failed to test the plaintiff's blood or perform biopsies for over a year despite her cancer diagnosis and otherwise delayed cancer treatment).

### 4. Mr. Williams has alleged that Centurion's policies were the moving force behind the violations.

Last, Centurion argues that Mr. Williams has failed to allege facts that show that their official policies or customs were the "moving force," *Monell*, 436 U.S. at 693-94, behind the constitutional violations. [D.E. 96 PageID 953]. It cites from this Court's decision in *Ratley v. Inch*, 2022 WL 2209897 (M.D. Fla. June 21, 2022) (Howard, J.) to suggest that Mr. Williams has not stated a claim on this basis. In *Ratley*, the plaintiff failed to demonstrate that the customs and policies were the moving force behind the violations because he merely detailed a "factual chronology about how individual medical providers, such as Lee, Colombani, Brenes-Catinchi, and Laubaugh, willfully disregarded 'established medical protocol' for what Ratley describes as injuries that needed urgent attention." *Id.* at *11. As illustrated above, Mr. Williams has identified the policies and demonstrated that they were the moving force behind the violations—Centurion and MHM Health were not violating established protocol; they were employing a practice of delaying treatment to save money, among other things.

### III.   Mr. Williams has adequately pleaded a claim for First Amendment retaliation.

Nurse Howell and Dr. Figueroa argue that Mr. Williams cannot assert a First Amendment retaliation claim against them because (1) he has not shown their awareness of his grievances to satisfy the causation requirement, and (2) he has not alleged any adverse action. [D.E. 98 PageID 1021–23; D.E. 100 PageID 1052–54]. These defendants also assert that they cannot be held liable for continued delays or

issues that were not addressed after the grievances.

Mr. Williams has sufficiently pleaded causation and adverse action. First, he has alleged that these defendants—and FDC staff who work with these defendants and reviewed the grievances—were aware of Mr. Williams's First Amendment activity and his complaints. TAC ¶¶ 41, 51–52, 61, 84–85.  The Eleventh Circuit has held that a plaintiff need not show direct knowledge to support a retaliation claim, instead Mr. Williams must provide allegations that "allow for the reasonable inferences" that FDC and Centurion staff communicated with these defendants about Mr. Williams's grievances. *Bailey v. Wheeler*, 843 F.3d 473, 483 (11th Cir. 2016). In *Bailey*, the Eleventh Circuit held that Mr. Bailey's allegations sufficiently showed that the police department had communicated with the sheriff's department about his complaints prior to adverse action given the temporal relationship between the complaints and adverse action. Similarly, in *Thomas v. Evans*, 880 F.2d 1235 (11th Cir. 1989), the Eleventh Circuit held the temporal relationship between the complaint and retaliatory conduct could satisfy the causation requirement. There, the Eleventh Circuit held that the district court abused its discretion dismissing a prisoner claim as a Rule 11 sanction because the prisoner had established a basis for his retaliation claim based on adverse action—confiscation of his legal documents and reference materials—which occurred only a few days after he was awarded a money judgment against prison officials. 880 F.2d at 1242.

Here, Mr. Williams alleges a plausible inference that the retaliatory adverse action was caused by his grievances. Shortly after he grieved Nurse Howell's conduct, which was reviewed by his colleague Rita Corbin, Mr. Williams was denied any medical attention in confinement. TAC ¶¶ 41, 51–52. Mr. Williams also alleged that other staff would have reviewed the grievance, and it is plausible that Nurse Howell was aware of it given the immediate adverse action. And the evidence shows that Dr. Figueroa read Mr. Williams's grievances concerning him. [D.E. 76-1]. Although Mr. Williams was put in the infirmary and given perfunctory treatment, the fact that his urology referral was delayed for months after grieving Dr. Figueroa's conduct satisfies the causation requirements at this stage in the proceedings.

Second, Mr. Williams has plausibly alleged retaliatory conduct. To satisfy that element, Mr. Williams—as a private citizen—need only show that the adverse action "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Bailey*, 843 F.3d at 481; *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). Mr. Williams has alleged that on account of his grievances about Nurse Howell and Dr Figueroa he was denied medical attention and left in a confinement cell unable to use the toilet or get up and down from his bunk—for thirty days. When he tried to declare an emergency, he was laughed at. TAC ¶ 53. Torture of that level would "deter a person of ordinary firmness" from exercising the right to grieve prison officials' conduct. *Williams v. Radford*, 64 F.4th 1185, 1193 (11th Cir. 2023) ("placing an inmate in disciplinary/segregated confinement

constitutes an adverse action for purposes of a First Amendment retaliation claim"). Mr. Williams was also punished for grieving the failure to take him to his urologist—not a medical judgment as to whether he should see a urologist, but the execution of a referral already made and authorized by staff. Mr. Williams's allegation that Dr. Figueroa purposefully failed to complete the referral process as retaliation for his grievances satisfies the pleading requirement for this element. Mr. Williams alleges that the failures to provide him with an assigned wheelchair or to take him to an appropriate facility for wound care are all a key part of the retaliatory scheme. His First Amendment retaliation claims are sufficiently pleaded.

## Conclusion

For these reasons, the Court should deny Centurion Defendants' motions to dismiss and exclude Mr. Williams's medical records from consideration at this stage.

Dated: November 22, 2023.                    Respectfully submitted,

/s/ James M. Slater
James M. Slater (FBN 111779)
Slater Legal PLLC
113 S. Monroe Street
Tallahassee, Florida 32301
Tel: (305) 523-9023
james@slater.legal

/s/ James V. Cook
James V. Cook (FBN 0966843)
Law Office of James Cook
314 W. Jefferson Street
Tallahassee, Florida 32301
Tel. (850) 222-8080
cookjv@gmail.com

*Attorneys for Plaintiff*