UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| ELMER WILLIAMS,<br><br>       Plaintiff,<br><br>v.<br><br>RICKY DIXON, et al.,<br><br>       Defendants. | Case No. 3:22-cv-01221-MMH-MCR |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT
ADELE JOHNS' MOTION FOR SUMMARY JUDGMENT
AND DECLARATION PURSUANT TO RULE 56(D)**

Plaintiff Elmer Williams responds to Defendant Adele Johns' Motion for Summary Judgment (Doc. 108) and would show as follows:

**I.    INTRODUCTION**

Defendant Adele Johns is a Correctional Services Consultant and designee of the Secretary of the Florida Department of Corrections (FDC) to respond to appeals of inmate grievances and direct grievances of "an emergency nature." Fla. Admin. Code R. 33-103.005(1). For a grievance to be "of an emergency nature," it need not involve only medical issues, but any "matters which, if disposed of according to the regular time frames would subject the inmate to substantial risk of personal injury or cause other serious or irreparable harm to the inmate." Fla. Admin Code R. 33-103.002(4). One purpose of emergency grievance review is to "initiate action to alleviate the conditions giving rise to the emergency." Fla. Admin. Code R. 33-

1

103.006(3)(a)2. Thus, if harm is imminent and all other avenues are blocked, the emergency grievance process may be the only avenue of escape from harm.

In Plaintiff's case, the risk of harm involved encroaching paralysis, difficulty breathing, muscle spasms, and a host of other medical conditions, getting worse every day, that were heralds of terminal illness. But other emergencies might include imminent or continuing sexual assault by a cellmate, persistent impulses toward suicide, or death threats by other inmates or guards, where pleas for help have gone unanswered by corrections officials. But a determination that a grievance involve issues of an "emergency nature" does not mean they must be approved, rather, it means they can be considered and resolved on the merits and not rejected out of hand. A fair investigation may determine that the danger is not imminent or is being handled as effectively as the system permits.

Deliberate indifference is judged by a lay standard. Defendant Johns may have medical staff at hand to judge the symptoms and treatment, but to determine whether a condition is of "an emergency nature" does not necessarily call for medical training. Prison officials must "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "[H]aving stripped [prison inmates] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id*. at 833. Where the risks described in emergency grievances are clearly intrinsically serious (even absent knowledge whether the descriptions are actually accurate) they must be assessed on the merits or returned "without action" forcing

the grievant to start the process again if there is still time.[1] "One does not have to await the consummation of threatened injury to obtain preventive relief." *Pennsylvania v. West Virginia*, 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923). Consistently with this principle, a subjective approach to deliberate indifference does not require a prisoner seeking "a remedy for unsafe conditions [to] await a tragic event [such as an] actua[l] assaul[t] before obtaining relief." *Helling v. McKinney*, 509 U.S. 25, 33-34, 113 S.Ct. 2475, 2481 (1993).

## II. STATEMENT OF FACTS

Plaintiff Elmer Williams arrived at Suwannee Correctional Institution Annex on November 17, 2021. (Exh. 1, Williams DC-14, Overall Inmate Record at 21). He had been in remission from prostate cancer since late 2020. Prior to that time, he had been taking Eligard three times a year to keep his prostate cancer in remission. (Exh. 2, Williams Deposition at 12:3-24). Because of his remission, his cancer chemotherapy medication, Eligard, was discontinued by his primary doctor, George Miquel, MD, on or about December 20, 2020, with medical instructions that he be seen again in June 2021. (Id. 13:3-15). However, June of 2021 came and went and he was never seen. By late 2021, he was concerned. Williams had not been sent back to Miquel and was beginning to have problems with mobility. (Id. at 13:3-23). Arriving

---

[1] Formal grievances not deemed an emergency must be responded to within 20 days, 33-103.011(3)(b). If denied, grievance appeals must be responded to within 30 days of receipt. So the non-emergency route to alleviate the risk of harm may be nearly two months, which is a long time for an inmate fighting impulses to self-harm or a rape victim housed with a sexual predator, or an inmate with encroaching paralysis struggling to breathe.

at Suwannee in November, he desperately sought treatment and accommodations for mobility impairment. (Table 1, Grievance Efforts, *infra*).

### A. An Objectively Serious Medical Condition

Beginning on November 24, 2021, Williams found he was no longer able to walk. (Exh. 2, Williams' Deposition at 15:12-20). On that date, he fell out of bed and was unable to rise unaided. (*Id*. at 18:7-12). His dorm sergeant, Defendant Savonia Richardson refused to call a stretcher. (*Id*. at 18:7-24). Instead, she ordered him to walk and when he failed to do so, she wrote him a Disciplinary Report for "Disobeying an Order," which resulted in his being moved to lockdown Disciplinary Confinement. (Exh. 3, Disciplinary Report at 1). Although he pled not guilty by reason of paralysis, he was convicted and sentenced to 30 days confinement. (Id. at 2). Locked in a cell without a wheelchair, unable to walk, Williams had to drag himself across the filthy concrete floor to drink water, use the toilet, and get food from the food slot on the cell door. (Exh. 2, Williams' Deposition at 42:15-20). In so doing, he sustained bleeding wounds on his ankles that quickly became infected. He began experiencing severe muscle spasms. (*Id*. at 55:21-56:7). He persistently sought help from passing corrections and medical personnel to no avail. (*Id*. at 45:1-9). He wrote a series of grievances which, despite his best efforts, were denied or "returned without action." (*Id*. at 101:20-102:13). Williams remained in confinement until December 20, 2021, when he was moved to J Dorm. (Exh. 1, DC-14).

Williams, in his efforts to obtain treatment against encroaching paralysis and his rising PSA levels, within his limited powers, launched an impressive raft of

4

grievances at all levels. However, he met a solid wall of denied and returned grievances and appeals, as shown in the table below.

**Table 1, Grievances Seeking Accommodations and Care[2]**

| DATE | EVENT | EXHIBIT | RESULT |
|---|---|---|---|
| 2021 1124 | Williams files informal grievance on failure to provide a wheelchair as he becomes unable to walk. It was denied on December 7, 2021 as unfounded. Declined to save video. | 231-2112-0026 | Denied |
| 2021 1207 | Informal grievance filed on November 24, 2021, for refusal to provide wheelchair and refusal to consult video as proof of claim. Denied on the merits. | 231-2112-0026 | Denied |
| 2021 1207 | Informal grievance filed on November 24, 2021, for failure to provide medical care "returned without action" as already raised in 231-2112-0026. Actually different issues. | 231-2112-0028 | Returned |
| 2021 1216 | Informal grievance filed on December 2, 2021, for failure to take him from confinement to medical for scheduled bloodwork relevant to his rising PSA levels indicating a return of his untreated prostate cancer. | 231-2112-0048 | Denied |
| 2021 1221 | Informal grievance filed on December 4, 2021, for denial of medical care and retaliation. Denied on merits as unfounded: "no indication you have been denied medical care" or there being "retaliation from the medical staff." | 231-2112-0089 | Denied |
| 2022 0105 | Williams files direct grievance on failure to treat serious medical conditions. Log 230-22-019 by Suwannee C.I. medical providers. | 230-22-019 | |
| 2022 0112 | Informal grievance filed on January 4, 2022, alleging that Dr. Figueroa denied him a wheelchair and denied marking his medical file as an emergency when he realized he was paralyzed, refusing to provide a pass for diapers and dressing changes when he can't sit on a toilet because of spasms and he soils his pants and severe infection. | 231-2201-0015 | Denied |
| 2022 0113 | Defendant Millette returns grievance without action. No copy of formal grievance. Williams says his responses to formal are being delayed to defeat his appeal. | 22-6-01524 | Returned |
| 2022 0114 | Plaintiff's direct "emergency grievance" complaining of his worsening paralysis, unabated difficulty in breathing, and muscle spasms is "returned without action" by the Secretary's designee, Adele Johns. Johns responds that grievance is not accepted as a grievance of emergency nature. Log 22-6-01487 (mailed to Williams 2022 0119). | 22-6-01487 | Returned |
| 2022 0116 | Williams grieves Dorm Sgt. Richardson for failure to seek medical assistance when he can no longer walk. Log 230-22-042. | 230-22-042 | |
| 2022 0201 | Millette returns Richardson grievance I 22-6-03039 "without action." Appeal not accompanied by copy of formal grievance. | 22-6-03039 | Returned |
| 2022 0210 | Williams grieves Dorm Sgt. Richardson for failure to seek medical assistance when he can no longer walk. Log 230-22-099. | 230-22-099 | |
| 2022 0218 | Appeal of 2112-231-046 filed on December 13, 2021, complaining of failure to respond to medical emergency declarations, failure to treat. Appeal returned without action. Out of time. | 22-6-03639 | Returned |
| 2022 0223 | Appeal of 231-2201-0015 and 2201-231-082, both attached. | 22-6-05262 | Returned |

---

[2] Constituent grievances are attached as Exhibit 4.

|           | Returned without action for failure to attach copies of formal grievances 2112-231-083 and 2112-231-084. Grieves failure to investigate and treat return of prostate cancer. |           |          |
|-----------|---|-----------|----------|
| 2022 0224 | Millette returns Richardson grievance II, 22-6-05340, "without action." | 22-6-05340 | Returned |
| 2022 0224 | Appeal of failure to respond to his grievance dated January 16, 2022, on the refusal by Sgt. Richardson to call a stretcher when he fell out of his bunk and could no longer walk. Returned without action by Millette because "decision already rendered." | 22-6-05340 | Returned |
| 2022 0304 | Appeal of 2112-231-084 (formal) and 231-2112-0089 (informal), both attached. Grieves medical refusing to respond to medical emergency declared while in confinement on December 4, 2021. Suffering severe pain and constant muscle spasms. Appeal denied on merits. | 22-6-04256 | Denied |
| 2022 0316 | Appeal of 2112-231-083 denied. Nurse on duty on December 2, 2021, while he was in confinement, refused to take him for scheduled bloodwork. Last bloodwork indicated rise in PSA from 0.2 to 5.2, indicating a return of prostate cancer. | 22-6-04645 | Denied |
| 2022 0328 | Appeal of error in 22-6-03639 in failure to look at the filing date of formal grievance filing date of January 25, 2022, when it was clear that the grievance had been returned to him by the institution on January 21, 2022, so that it wasn't out of time. Returned without action because "decision already rendered." | 22-6-07452 | Returned |

### B. Failure to Treat a Known Serious Medical Condition

While in confinement, Williams grieved that prison staff failed to take him to his scheduled blood draw on December 2, 2021, which was vital to track his rising PSA levels, signaling a return of his prostate cancer. (Exh. 2, Williams' Deposition at 37:1-14; 47:17-23). While Williams was in medical he tried to talk to medical without success. The only time a nurse talked to him was on December 4, 2021, when he was in "excruciating pain" and who refused to give his name laughed at him when he asked for medical care because it was late evening. (*Id*. at 49:3-50:11). On his release from confinement on December 20, 2021, Williams was moved to J Dorm. (Exh. 1, Overall Inmate Record at 21). Plaintiff continued to be denied a wheelchair. (Exh. 2, Williams Deposition at 63:13-16) He continued to suffer severe pain and growing infections that had started to have a foul smell. (Exh. 2, Williams'

6

Deposition at 60:3-5). His extremities were swollen. (Exh. 2, Williams Deposition at 76:20-21).. Dr. Figueroa upheld the refusal to provide him with a wheelchair, a pass for diapers, or wound care. (Exh. 2, Williams' Deposition at 127: 14-17). By January 12, 2022, the foul smell of his infected wounds[3] was documented in Medical Notes. (Exh. 5, Medical Records 1-12-22). By this time, Williams had filed at least a dozen grievances complaining of failures to treat and to accommodate his disabilities.

On January 5, 2022, Williams filed an "emergency grievance" directly to the Office of the Secretary, to Defendant Johns, complaining of his progressive paralysis, his painful muscle spasms and difficulty in breathing, and the failures of the medical providers to take his condition seriously. (ECF 108-2, Williams Appeal and Johns response). On January 8, 2022, Plaintiff was admitted to the prison infirmary. It was noted that Williams' extremities were swollen but no admission that he was paralyzed. In fact, the medical record was still insisting that he "moves all extremities independently," has a "steady gait," and "ambulates without assistive device," all of which was patently false. (Exh. 6, Medical Records 2-9-22 at 1). The records indicated that there was "no fall risk." (Id. at 4).

Defendant Johns received the January 5, 2022, grievance on January 11, 2022, and on January 12, 2022, at 7:31 a.m., Johns wrote to Government Operations Consultant, Rebecca Yates, as follows:

> Inmate states his legs, knees, feet and ankles are swollen to the point of exploding. He states his stomach is bloated and every time he moves he has a

---

[3] The wounds were subsequently found to be necrotizing fasciitis, a "flesh-eating" bacteria that created holes in his buttocks, heels, and ankles, right down to the naked bone.

7

muscle spasm in his back and his body locks up and he can[']t breathe or his breathing is labored. He states his nerves are damaged and there is little to no oxygen going to his legs. He states he has become completely paralyzed from his stomach to his toes and that area is extremely swollen. He states he needs emergency care.

Is this an emergency?

At 9:47 a.m. the same date, Rebecca Johns responds: "This is not an emergency." (ECF 108-2 at 3). About the same time, FDC's Office of Health Services Chief of Medical Services Dr. Danny Martinez was dealing with an inquiry from one of Plaintiff's family members about the alleged failure to treat. A Centurion employee, Rhonda Bennett reported to him that,

> Inmate Williams has been evaluated and treated by medical multiple times since transferring to Suwannee. He has been noncompliant with taking his medication (Lasix), and his diet. He was seen by the provider and transferred to our infirmary Friday, 1/8/22. From Friday until today, he has lost 30 lbs of fluid. The provider has encouraged the inmate to take his Lasix as prescribed and watch his diet. I have spoken to Ms. Williams several times about how to get an ROI signed. As of this date, there is still not an ROI for her…

(ECF 108-4 at 1, Bennett E-mail). Bennett did not mention that for the prior several weeks Williams had been in confinement, during which time he had received no medical attention or medication although he repeatedly requested it, (Exh. 2, Williams Deposition at 49:3-50:11). However, there is no indication that Defendant Johns saw this misleading report by Bennett or that she was in any way influenced by it in her response.

Whatever investigation was done in the little more than two hours before the Johns e-mail and the response by Rebecca Yates was extremely shallow. In fact, on January 11, 2022, the date Johns received Williams' emergency grievance, and the

8

day before Yates reviewed the electronic medical records, lab reports revealed that Williams PSA count had shot up to 21, 100 times the level he was at in 2020, confirming that his prostate cancer was raging. (Exh. 7, Medical Report, 2-8-22). In fact, a SOAP note was entered as follows:

> S: "I need to go back to urology because my PSA is elevated again"
> O: Patient was previously treated for prostate cancer and reports that he was taking Eligard at one point. He stated that his PSA came down to normal range and everything has been doing well. Labs that were received on 1/11/2022 shows a PSA of 21.00. He was started on Cipro 500mg BID x 21 days and **patient had a urology referral completed by a previous institution but found out that it had never been submitted**.
> A: S/P treatment for prostate Ca. Elevated PSA
> P: Referral to Urology for further evaluation

*Id.*, [emphasis added].

Even when medical providers realized his PSA level was dangerous, he wasn't placed back on his medication for more than three months. In late June 2022, Dr. Figueroa mentioned that he had been seen and placed back on Eligard. (Exh. 8, Medical Record from 5-25-22) (Exh. 9, Eligard Prescription on 5-17-22).

However, the inquiry that was appropriate in making a decision in early January whether to treat the grievance on the merits or to return it "without action" should have been no more than a preliminary determination by Defendant Johns as to whether the allegations of the grievance themselves were "of an emergency nature." And that, they certainly were. By August 4, 2022, Dr. Figueroa admitted that Elmer Williams condition was terminal. (Exh. 10, E-mail 8-4-22).

Defendant Johns handled a lot of emergency grievances. In one set of grievances submitted as "emergency grievances," she returned "without action," two

9

grievances from inmates considering suicide, four complaining of ongoing sexual abuse, two who had recently been stabbed and had active death threats, one under threat of death for refusing to help smuggle in a gun and faced with being sent back to the same prison where the death threats were made, and two, including Williams, who had suffered relapses of prostate cancer after being denied cancer treatments for a prolonged period. (Exh. 11, Table of Grievances Declined as Emergencies).

**Table 2: Summary Exhibit of Other Cases**

| Inmate | Log # | Description | Comment |
|---|---|---|---|
| | | Inmate grieves not being placed on Self-Harm Observation Status (SHOS) despite declaring clearly that he was considering suicide. | |
| | | Inmate grieves that he was placed in cell with inmate who pressures him for sex, asks for help for a week, is ignored, is badly beaten by inmate. | Dorm Sgt. refuses to move him. |
| | | Inmate grieves PREA abuse by sergeant in his housing area and sergeant is still working there after the report and still abusing him. | |
| | | Inmate grieves PREA abuse by sergeant in his housing area and not getting receipts for his grievances and grieves broken audio. | Audio not capturing verbal abuse. |
| | | Inmate grieves beating and sexual assault days earlier and is being denied access to PREA hotline and his family. | |
| | | Inmate grieves he is currently planning to kill himself and that has a long history of self-harm; can't stop thinking about cutting wrists. | |
| | | Inmate grieves that he was stabbed in the head, spine, and chest by gang members and is being denied protective management. | |
| | | Inmate grieves that same day his genitals were twisted by an officer and choked and beaten by others and then left for hours without care. | Bleeding heavily from his nose. |
| | | Inmate grieves denial of protection after severe stabbing by gang members (life- | Officer says he doesn't care. |

| | | flighted) at prior placement with recent second attempt. | |
| --- | --- | --- | --- |
| | | Inmate grieves that his PSA levels have risen to dangerous level and that he is being denied treatment for his prostate cancer relapse. | |
| | | Inmate grieves that he was threatened by gang for refusing to help smuggle in a gun and now pending transfer back to the same prison. | |
| Williams, Elmer, DC# 086916 Suwannee C.I. Annex 5964 U.S. Highway 90 Live Oak, Florida 32060 | 22-7-01487 | Inmate grieves that he is becoming paralyzed, having trouble breathing, severe muscle spasms. | |

## MEMORANDUM OF LAW

Summary judgment is appropriate when pleadings and evidence demonstrate "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment has the initial burden to show the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must view the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences for the nonmoving party. *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Kingsland v. City of Miami*, 832 F.3d 1220, 1226 (11th Cir. 2004).

### A. Defendant Johns Violated the Eighth Amendment

To state a cause of action for failure to protect, Plaintiff must demonstrate three elements: (1) Plaintiff must show that he was "incarcerated under conditions posing a substantial risk of serious harm;" (2) that Defendant "'[had] a sufficiently culpable statement of mind,' amounting to 'deliberate indifference;'" and (3) that the

11

constitutional violation had a causal link to Plaintiff's injuries. *Cox v. Nobles*, 15 F. 4th 1350, 1357-58 (11th Cir. 2021). In this case, there exists abundant record evidence as to all three elements.

"Deliberate indifference exists when a prison official 'knows of and disregards an excessive risk to inmate health or safety.'" *Cox*, 15 F. 4th at 1358 (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). "Deliberate indifference has two components: one subjective and one objective." *Cox*, 15 F. 4th at 1358 (citing *Mosely v. Zachery*, 966 F. 3d 1265, 1270 (11th Cir. 2020)). Plaintiff must establish "both that the [1] the defendant actually (subjectively) knew that [Plaintiff] faced a substantial risk of serious harm and that [2] the defendant disregarded that known risk by failing to respond to it in an (objectively) reasonable manner." *Cox*, 15 F. 4th at 1358.

Defendant Johns takes refuge in the proposition that, under the terms of Florida Administrative Code (FAC) Rule 33-103, she was forced to turn the matter over to Rebecca Yates, in the Office for Health Services, to make the decision as to Plaintiff's grievance. She denies that she had any discretion in an allegation of risk that was clearly unlikely to be abated if the inmate had to go to the end of the line and work through the formal grievance and appeal process. But in fact, the rules only instruct Johns to defer to the Office of the Assistant Secretary for Health Services in the case of a direct grievance "alleging violation of HIPAA." FAC R. 33-103.007(3)(a)3. Otherwise, the rules state:

> (b) Emergency Grievances. An emergency grievance may be filed directly with the Secretary. Upon receipt, staff of the Bureau of Policy Management and Inmate Appeals shall take the following actions as soon as possible, but no

12

later than two calendar days following receipt:

1. Review complaint and contact staff for additional information if necessary;

2. If an emergency is found to exist, initiate action to alleviate the condition giving rise to the emergency;

3. Provide a formal response to the inmate within 15 calendar days; and

4. If an emergency is not found to exist, it will be clearly marked on the grievance "not an emergency," signed and dated by the responding employee, and returned to the inmate within three working days of receipt as his reasons for by-passing the previous level of review will not be valid.

R. 33-103.007(3)(b), Appeals and Direct Grievances to the Office of the Secretary.

So, although FAC Rule 33-103 instructs Johns to contact staff for additional information "if necessary," she is in no way instructed to, or required to, defer to Yates on her decision. As it happened, the condition was not alleviated and as noted by Dr. Figueroa, Williams' condition became terminal. (Exh. 10, Figueroa e-mail).

However, even if FAC Rule 33-103 instructed Johns to defer to Yates' judgment, administrative rules do not control over constitutional duties. *Magluta v. Samples*, 375 F.3d 1269, 1279 n.7 (11th Cir. 2004) ("[P]rocedural requirements set out in the regulation are not themselves constitutional mandates."). The record, taking the facts and inferences in the light most favorable to the non-moving party evinced what *Whitley v. Albers* called "such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." 475 U.S. 312, 321, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986). Only a complete rejection of Plaintiff's evidence and an uncritical acceptance of the movant's version could begin to support Defendant's motion.

**B. The Critical Role Played by the Grievance Process in Medical Cases**

13

The Prison Litigation Reform Act (PLRA) of 1996, 42 U.S.C. § 1997e, requires inmates to exhaust "such administrative remedies as are available" in actions respecting prison conditions under 42 U.S.C. § 1983 or any other federal law. Because Mr. Williams obtained Compassionate Release as a result of his paralysis and terminal cancer diagnosis, he was not required to exhaust his administrative remedies under the PLRA. However, the grievance process is also a gateway to medical treatment when treatment is being wrongly withheld. It is a mechanism for problem solving and internal resolution. Inmates are not able to seek medical help from other providers. They must try to use the tools the system provides to ensure their safety. The failure of the process in his case resulted in acceleration of Mr. Williams' life-threatening, ultimately terminal, medical condition.

The Department of Justice drafted Standards for Inmate Grievance Procedures as 28 CFR Part 40. The Standards required that the procedure provide a grievant with "meaningful remedies" and be accessible to impaired and non-English-speaking inmates. No inmate or employee who appears to be involved in the matter grieved shall participate in the grievance resolution. Responses shall be made within fixed time limits at each level. Expiration of a time limit shall permit the grievant to move to the next level. All grievances must be fully processed within 180 days. A grievant shall be entitled to review by a person or entity not under the institution's supervision or control.

Emergency Procedure (§ 40.8):
The grievance procedure shall contain special provision for responding to

grievances of an emergency nature. Emergency grievances shall be defined, at a minimum, as matters regarding which disposition according to the regular time limits would subject the inmate to a substantial risk of personal injury or cause other serious and irreparable harm to the inmate. Emergency grievances shall be forwarded immediately, without substantive review, to the level at which corrective action can be taken. The procedure for resolving emergency grievances shall provide for expedited responses at every level of decision. The emergency procedure shall also include review by a person or entity not under the supervision or control of the institution.

The Florida Legislature in § 944.331, Fla.Stat. required the Florida Department of Corrections (FDC) to establish "an inmate grievance procedure that must conform to the Minimum Standards for Inmate Grievance Procedures as promulgated by the United States Department of Justice pursuant to 42 U.S.C. s. 1997e." In § 944.09, FDC is given authority to implement rules that "must include" grievance procedures which "shall conform to 42 U.S.C. 1997e." § 944.331(1)(d).

Subsequently, FDC promulgated Rule 33.103, Grievance Rules. In Rule 33.103.001(1), the code provides that:

The purpose of the grievance procedure is to provide an inmate with a channel for the administrative settlement of a grievance. In addition to providing the inmate with the opportunity of having a grievance heard and considered, this procedure will assist the department by providing additional means for internal resolution of problems and improving lines of communication. This procedure will also provide a written record in the event of subsequent judicial or administrative review."

In Rule 33-103.002(4) the code provides, "Emergency Grievance: A grievance of those matters which, *if* disposed *of according to the regular time frames, would subject the inmate to substantial risk of personal injury or cause other serious and irreparable harm to the inmate*." (emphasis supplied). An "emergency grievance" can be submitted directly to the Bureau of Policy Management and Inmate Appeals (BPMIP). *Id.*

15

The code provides 20 days to file an informal grievance, 10 days for a response; another 15 days to file a formal grievance, 10 days for a response (extensions can be requested), and 15 days to file an appeal to the Bureau of Inmate Appeals, review the complaint to determine if it is an emergency within two days of receipt, 15 days to respond if the Appeal is found to constitute an "emergency" and 72 hours to respond if it is not found to be an "emergency" and is "returned without action." In any case, federal guidelines require resolution within 180 days. Although there is no definition of "regular time frames," clearly they can be very long.

For an inmate who files a grievance as an Emergency Grievance directly to the BPMIP, to have a grievance found not to constitute an emergency and "returned without action," this is the end of the road. By this time, the time has generally run (although the BPMIP must determine emergency status and respond within 72 hours, the response must be physically delivered to the inmate at the institution and so will not be aware until receipt).

As noted above, on January 5, 2022, Plaintiff filed a direct grievance appeal to BPMIP alleging that his condition was an emergency. The appeal explained that he had filed the grievance as an emergency because (a) his legs, knees, feet, and ankles are swollen to the point of exploding; (b) that his stomach is bloated and tight and every time he has a muscle spasm from moving his lower back, his body locks up and he can't breathe or his breathing is labored to the point that he panics; (c) that he is confined to a wheel chair and can no longer lay down because he has severe muscle contractions and can't breathe; (d) his nerves are severely damaged; (e) there is little

16

or no oxygen going to his legs; (f) he is paralyzed from his stomach to his toes; (g) every day it gets worse and medical is telling him they can't do anything for him.

The grievance was routed to Defendant Adele Johns, a reviewer in the BPMIP. Johns received the Appeal on January 14, 2022. She responded:

> This grievance is not accepted as a grievance of an emergency nature by Health Services, Central Office, Tallahassee.
>
> Your request for administrative appeal is in non-compliance with the Rules of the Department of Corrections. Chapter 33, Inmate Grievance Procedure. The rule requires that you first submit your grievance at the appropriate level at the institution. You have not done so or you have not provided this office with a copy of that grievance, nor have you provided a valid or acceptable reason for not following the rules.
>
> Upon receipt of this response, you are allowed an additional 15 days from the date this response was mailed (date stamped in upper left corner) to resubmit your grievance at your current location in compliance with Chapter 33-103, Inmate Grievance Procedure. Attach a copy of this response to your re-filed grievance.
>
> Based on the foregoing information, your appeal is returned without action.

(ECF 108-2 at 1).

Plaintiff had already filed multiple grievances at the institutional level and they had not been responded to. Plaintiff explained that in a January 16, 2022 Appeal, which was responded to by Defendant Wendy Millette who simply rejected the Appeal because he had not attached a copy of the institutional response to the grievance that he just explained in detail had not been responded to. So, again, the Appeal was "returned without action." (See Table 1, *supra*).

This scenario played out repeatedly as it has for many FDC inmates over the years. Normally the process of vetting appeals by BPMIP is fairly opaque. However

17

in the case of the January 14, 2022 Johns Appeal Response in Appeal Log No. 22-6-01487, Plaintiff managed to discover a document that shed light on the decision to reject his appeal. Prior to rendering her determination, Johns emailed Defendant Rebecca Yates in Health Services the following at 7:31 am on January 12, 2022:

> Inmate states his legs, knees, feet and ankles are swollen to the point of exploding. He states his stomach is bloated and every time he moves he has a muscle spasm in his back and his body locks up and he cant [sic] breathe or his breathing is labored. He states his nerves are damaged and there is little to no oxygen going to his legs. He states he has become completely paralyzed from his stomach to his toes and that area is extremely swollen. He states he needs emergency care.
>
> Is this an emergency?
>
> Two hours later Yates responded: Good morning. This is not an emergency.

(ECF 108-2 at 3, Appeal and Response)

Johns, Millette, and Yates, after reading Plaintiff's grievance and appeal and presumably reviewing the corresponding medical records, had to know that Plaintiff was at imminent risk of serious harm but chose to ignore the inherent urgency.

### C. Plaintiff Needs Additional Discovery.

The discovery process is still underway in this case. Although still far from transparent, at least from this example, Plaintiff knows that within two hours of her request, Defendant Johns received advice from Defendant Yates that the conditions Williams described were "not an emergency." Plaintiff has reason to believe this is the tip of the iceberg. Additional discovery is needed, and remains ongoing, to show whether the emergency grievance process has been a gateway or a barricade.

Undersigned counsel has become aware of direct grievances by other Florida

prison inmates involving serious risks of imminent harm that were, nonetheless, judged to be "not an emergency." Plaintiff submits that evidence of considerations that went into the "not an emergency" finding in these other cases may be relevant to this case and proportional to the needs of the case. Examples of appeals that were deemed "not an emergency" by Defendants include:

   a. An appellant requested protection against gang members who stabbed him in the back and have an ongoing "hit" on his life.
   b. An appellant is losing vision in his left eye and sought help repeatedly and was supposed to see a specialist on May 18 but the institution did not transport him and he still has not seen a specialist as of June 21.
   c. An appellant was threatened with rape by his cellmate and told dorm officers who did nothing. The cellmate held an edged weapon to his throat and carried out the threat, appellant informed officers and was still ignored.
   d. An appellant with a history of self-harm was considering suicide and cannot stop thinking about cutting his wrists.
   e. An appellant was threatened with death because he refused to smuggle in a firearm and was pending transfer back to the institution where it happened.

(Exh. 11, Summary Exhibit of Other Cases).

Plaintiff would seek production of communications by Defendants that relate to the decisions that the bases of the above appeals were "not an emergency" and to examine Defendants on them in deposition and examine persons designated by FDC on their emergency grievance policies pursuant to Fed.R.Civ.P. 30(b)(6).

Plaintiff is still engaging in written discovery with Defendants, including FDC, on matters that shed light on what really happened when Plaintiff grieved in January 2022. After Johns filed her motion for summary judgment, Plaintiff asked for dates for Johns and Yates depositions. Defense counsel provided dates for early March,

19

which Plaintiff's counsel could not accommodate due to the press of other cases. Plaintiff anticipates fully needing to depose Johns, Rebecca Yates, FDC, and medical staff, as well as complete written discovery on issues related to Plaintiff's treatment but also how Johns, Millette, and Yates handled this type of emergency grievances before he can fully respond to Johns' motion for summary judgment. As set forth in Exhibit 12, Declaration of James Cook Pursuant to Rule 56(d), without that discovery, Plaintiff cannot meaningfully respond to the instant motion.

WHEREFORE, Plaintiff requests that this Court deny Defendants' Motion for Summary Judgment or defer ruling on Summary Judgment, pursuant to Fed.R.Civ.P. 56(d) until further discovery can be completed.

Respectfully submitted,  
s/ James V. Cook  
James V. Cook, Esq.  
Florida Bar Number 0966843  
Law Office of James Cook  
314 West Jefferson Street  
Tallahassee, Florida 32301  
(850) 222-8080; 561-0836 fax  
cookjv@gmail.com  

/s/ James M. Slater  
James M. Slater, Esq.  
Florida Bar Number 111779  
Slater Legal  
113 S. Monroe Street  
Tallahassee, Florida 32302  
Tel: (305) 523-9023  
james@slater.legal  
ATTORNEYS FOR PLAINTIFFS

I CERTIFY the foregoing was filed electronically on 3/18/2024, serving counsel of record registered to be notified by the CM/ECF electronic filing system.

/s/James V. Cook

20