UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ELMER WILLIAMS,

        Plaintiff,

v.                              Case No. 3:22-cv-1221-MMH-MCR

RICKY DIXON, et al.,

        Defendants.

_____

## ORDER

### I. Status

Plaintiff Elmer Williams, an inmate formerly in the custody of the Florida Department of Corrections (FDOC), initiated this action with the assistance of counsel on November 4, 2022. See Complaint (Doc. 1).[1] Williams is proceeding on a Third Amended Complaint (TAC; Doc. 93). In the TAC, he names the following Defendants: (1) Ricky Dixon, Secretary of the FDOC; (2) Centurion of Florida, LLC; (3) Dr. Alexis Figueroa; (4) Dr. Kalem Santiago; (5) Nurse Jason Howell; (6) Nurse Elizabeth Holmes; (7) Nurse Tony Abbott; (8) Adele Johns; (9) Wendy Millette; (10) Rebecca Yates; and (11) Sergeant Savonia Richardson-Graham. TAC at 3–6. Williams contends that Defendants

---

[1] For all pleadings and documents filed in this case, the Court cites to the document and page numbers as assigned by the Court's Electronic Case Filing System.

delayed treatment for prostate cancer and wounds that he developed in confinement. See generally TAC.

This matter is before the Court on the following Motions: (1) Defendant Centurion of Florida, LLC's Motion to Dismiss (Centurion Motion; Doc. 96); (2) Defendant Nurse Elizabeth Holmes's Motion to Dismiss (Holmes Motion; Doc. 97); (3) Defendant Nurse Jason Howell's Motion to Dismiss (Howell Motion; Doc. 98); (4) Defendant Nurse Tony Abbott's Motion to Dismiss (Abbott Motion; Doc. 99); and (5) Defendant Dr. Alexis Figueroa's Motion to Dismiss (Figueroa Motion; Doc. 100). In support of their Motions, Centurion, Nurse Holmes, Nurse Howell, Nurse Abbott, and Dr. Figueroa (collectively Centurion Defendants) have submitted exhibits. See Doc. 96-1. Williams filed a Consolidated Response (Response; Doc. 104). The Motions are ripe for review.

## II. Williams's Allegations[2]

Williams alleges he has a "known, documented" history of prostate cancer. TAC at 6. Following diagnosis and treatment by a urologist, his

---

[2] In considering the Motions, the Court must accept all factual allegations in the TAC as true, consider the allegations in the light most favorable to Williams, and accept all reasonable inferences that can be drawn from such allegations. Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003); Jackson v. Okaloosa Cnty., 21 F.3d 1531, 1534 (11th Cir. 1994). As such, the facts recited here are drawn from the TAC, and may well differ from those that ultimately can be proved. Additionally, because this matter is before the Court on the Centurion Defendants' Motions, this section details the factual allegations pertinent to them.

prostate-specific antigen (PSA) levels, which indicate recurrent prostate cancer, decreased to 0.2 ng/mL in 2020. Id. As a result, Williams's urologist discontinued his medication in late 2020 "with instructions that he be seen again in June 2021 to assess [his] cancer and determine whether to change the course of action or restart medication." Id. Williams asserts he "was never taken by FD[O]C or Centurion staff to see the urologist" in June 2021, id., and on September 30, 2021, a urinalysis showed his PSA levels had increased from 0.2 ng/mL to 5.21 ng/mL, "well over the 4 ng/[m]L threshold used to determine whether prostate cancer is active, spreading, and whether further testing is necessary," id. at 7.

In November 2021, the FDOC transferred Williams to Suwannee Correctional Institution (Suwannee CI). Id. After his arrival at Suwannee CI, on November 18, 2021, Williams fell out of his bunk and injured his hip, neck, and back. Id. at 7–8. He declared a medical emergency. Id. at 8. Sergeant Richardson-Graham refused to call for a stretcher, and instead, she ordered two inmates to pick Williams up and put him in another inmate's wheelchair. Id. Nurse Howell examined Williams in medical. Id. Williams alleges that he informed Nurse Howell that he had hurt his neck and back, he was experiencing numbness in his body and extremities, he was concerned about

paralysis, and his PSA levels had increased from 0.2 ng/mL to 5.2 ng/mL in a "short period of time." Id. Nurse Howell gave Williams a muscle relaxer shot. Id. Williams alleges that during the exam, he asked Nurse Howell if he could approve a wheelchair, to which Nurse Howell responded, "[H]ell no." Id. Williams asserts he questioned Nurse Howell about how he would move around, and Nurse Howell said, "I don't know, hold on to the wall, or you can go to confinement." Id.

The next day, Nurse Abbott noted that Williams's records contained a previous institution's urgent urology referral from October 4, 2021, and "questioned in his notes whether the referral was ever submitted to Utilization Management—the internal Centurion review team, which approved referrals, but which could also overrule clinician recommendations." Id. at 9. Nevertheless, Williams asserts that Nurse Abbott, Dr. Figueroa, and other Centurion staff failed to test his blood and antigen levels. Id.

Williams further alleges that around this time, he began to experience chest pain and breathing problems, while he continued to experience numbness in his legs and difficulty walking. Id. These symptoms prevented Williams from moving around the facility. Id. According to Williams, he again "relayed" his mobility issues to Nurse Howell. Id.

4

On November 24, 2021, Williams had a callout to go to the Institutional Classification Team for a job assignment; however, he had no assigned wheelchair, and could not attend without a wheelchair. Id. Williams alleges Sergeant Richardson-Graham refused to allow him to borrow a wheelchair for the callout. Id. at 9–10. Sergeant Richardson-Graham "later" observed Williams writing an informal grievance about her earlier refusal to call for a stretcher and took Williams to disciplinary confinement. Id. at 10.

During a pre-confinement physical, Nurse Howell "completed a pre-special housing form stating [Williams] complained that his legs were numb." Id. That same day, Williams alleges he wrote an informal grievance about Nurse Howell's refusal to provide a wheelchair. Id. at 10. "In response to the informal grievance about Nurse Howell, his colleague and Centurion staff member, Rita Corbin, wrote that [Williams's] allegations were 'unfounded' and that a wheelchair is ordered 'per a clinician,' not a nurse." Id. at 10–11.

Williams asserts he was taken to confinement in a wheelchair and placed in a cell for disabled prisoners with two beds. Id. at 11. However, he contends staff took the wheelchair from him and did not provide him with an impaired inmate assistant or bunkmate. Id. Williams maintains he "repeatedly" submitted sick call requests about his medical concerns, including his need for

a wheelchair. Id. According to Williams, "sometimes the sick calls were not picked up by staff or processed." Id.

Williams alleges while he was in confinement, he lacked the strength to pull himself up and down from his bunk or to move around to get his food. Id. As a result, he was forced to drag himself across his cell floor to use the toilet or to collect his food tray, id. at 11–12, as well as to urinate in cups or on the floor and defecate on the floor, id. at 12. Williams developed sores on his ankles from dragging himself across the cell floor that ultimately became infected. Id. at 14. Williams further asserts that he could not shower in confinement because he did not have a wheelchair. Id. at 13. "Eventually after more than a week, he was given a wheelchair to shower and then returned to his cell and the wheelchair was taken back." Id.

Williams was released from confinement in a borrowed wheelchair on December 20, 2021. Id. at 15. "He was told that he had to sign a refusal for treatment upon leaving confinement"; he did not sign it "because he was adamant that he was not refusing treatment." Id. (emphasis omitted). Williams asserts medical staff examined him, but refused to treat him despite his complaints that his legs were numb and swollen and that he could not use them. Id. According to Williams, "for more than a month, [he] had continued to

6

voice his complaints but neither FD[O]C nor staff contracted by Centurion were doing anything about those complaints." Id.

On December 24, 2021, Williams was evaluated in the emergency room. Id. at 17. He told Dr. Figueroa, Nurse Abbott, and nursing staff that he could not walk; however, they returned him to his dorm without an assigned wheelchair or other mobility devices. Id. Williams alleges he continued to relay his needs to medical staff during visits and in sick call requests without any sort of relief, such as an assigned wheelchair, an inmate assistant, or other accommodation. Id. at 18.

Nurse Howell evaluated Williams twice in January 2022. Id. at 19. During the first evaluation, Williams complained of shortness of breath, and Nurse Howell found that Williams had diminished lung sounds in his lower left lung and an irregular pulse. Id. Williams was ultimately admitted to the infirmary after the second evaluation on January 7, 2022, when Nurse Howell determined that Williams had a new onset of bilateral ankle edema. Id. In the infirmary, Nurse Wilson noted that Williams's ankle wounds emitted a foul odor, and Williams informed Nurse Wilson and Dr. Figueroa that he had not received any wound care "in several days." Id.

"Around this time," medical staff tested Williams's PSA levels, which had increased from 5.21 ng/mL in September 2021 to 21.00 ng/mL. Id. at 20. "A PSA value of greater than or equal to 4.0 ng/mL is the consensus standard at which further evaluation for prostate cancer should occur." Id. Williams alleges that although Dr. Figueroa noted an October 2021 urologist referral in Williams's records, Dr. Figueroa neither actualized that referral, nor ordered a "full clinical evaluation of [Williams's] prostate cancer to see whether [his] pain and extremity numbness were related to the rising PSA." Id. On February 8, 2022, Williams questioned medical staff about his urology referral. Id. at 26. According to Williams, "no one bothered to ensure that the referral was still in place or was otherwise received or acted on by the urologist. Instead, Centurion staff had to resubmit the referral to urology one month after Dr. Figueroa, his staff, and Centurion knew that [Williams's] PSA levels were alarmingly high, and that [Williams] was having complaints regarding his lower back and legs." Id. (emphasis omitted).

While in the infirmary, Williams asserts he continued to submit grievances about obtaining a wheelchair pass or other accommodation to no avail. Id. at 22–23. Medical staff ultimately determined Williams's foul-smelling wounds "were the result of necrotizing fasciitis, a rare bacterial

8

infection that spread quickly in the body and can cause death." <u>Id.</u> at 25. On February 9, 2022, Williams received wound treatment on his ankles; the wounds "had been categorized as stage 2 wounds," which require 14 to 45 days of treatment. <u>Id.</u> at 26. Nevertheless, Dr. Figueroa and Nurse Holmes began the discharge process on February 14, 2022, "well before the time required to allow [Williams's] wounds to heal and despite the concerning spike in [Williams's] PSA and accompanied back pain and lower extremity numbness." <u>Id.</u> at 26. According to Williams, Dr. Figueroa and Nurse Holmes stated in discharge forms that he was stable, and he would continue his treatment in the dorm. <u>Id.</u> at 27.

"Just two days after his discharge from the infirmary to the dorm, lab reports showed that [Williams's] PSA level doubled to 43.40 ng/mL in just a month's time, now around nine times the level from September 2021 and about 200 times the level in June 2022."[3] <u>Id.</u> Williams still had not visited a urologist or signed a consent form, which authorizes transport to a specialist outside of the FDOC. <u>Id.</u> at 22, 27. He asserts that he did not have a pass for an inmate assistant or an assigned wheelchair. <u>Id.</u> at 27. As a result, Williams would pay other inmates to borrow their wheelchairs and rely on their assistance to get

---

[3] Considered in context, it appears June 2022 is a scrivener's error.

in and out of the wheelchair. Id. at 28. Additionally, he alleges that he soiled himself in bed because he did not have diapers or anyone to assist him with taking the diapers on and off. Id. "Despite open and obvious festering wounds, severe bloating, his inability to move or feel his lower extremities, and his escalating PSA levels, on or about February 23, 2022, Dr. Figueroa told [Williams] that he was doing much better and that his symptoms were resolved." Id. at 29.

According to Williams, on April 1, 2022, he filed an informal grievance "reporting that he still had to sit on the floor when he showered because he could not walk. He requested help because of the unsanitary nature of having to shower this way, particularly because [Williams] had deep open wounds on his buttocks." Id. at 29. Williams asserts his wounds continued to grow, and despite previously noting Williams's increased risk for developing additional pressure sores, medical staff failed to timely treat the wounds or provide consistent treatment. Id. at 30. Dr. Figueroa ultimately diagnosed Williams with osteomyelistis—a bone infection—on May 24, 2022. Id. at 31. "Dr. Figueroa again delayed any treatment for [Williams's] serious and obvious infection," id.; by July 2022, Williams asserts that the sores had increased in size and depth such that bone was visible, id. at 32. Williams alleges that

10

around this time, Dr. Figueroa dug out masses of necrotic tissue from his heel but did not take any other action to treat the sores. Id. at 33.

According to Williams, he did not visit a urologist until "about four months after first complaining of his mobility concerns and medical staff realizing that his PSA levels had risen and that he had an outstanding urology referral [from a previous institution]." Id. at 32. By June 2022, after several visits with an oncologist and administration of Eligard, Williams's PSA levels had decreased to 7.2 ng/mL. Id. Physical findings revealed that his prostate cancer was metastatic with spinal cord malignancy. Id.

In mid-August 2022, the FDOC transferred Williams to the Reception and Medical Center (RMC), where Williams finally learned that his cancer had metastasized and spread throughout his body "even though Dr. Figueroa knew his cancer had metastasized back in June." Id. at 35. Williams asserts his prostate cancer had spread to areas where he complained of pain and numbness. Id. Williams's cancer is terminal, and a state panel has awarded Williams compassionate medical release. Id. at 37.

Williams argues that the deliberate and purposeful failure to have his PSA documented or to have him urgently seen by a urologist "is part and parcel of Centurion's unwritten practice and custom of delaying testing of known

diseases to deny prisoners their adequate medical care." Id. at 16. He notes other FDOC prisoners were not regularly tested for known cancer or had their cancer treatment delayed. Id. According to Williams, Centurion also has failed to provide prisoners with routine bloodwork or urinalyses. Id. Williams maintains Centurion's "final policymakers delayed testing [his] PSA or otherwise referring [him] to a urologist so that by the time he finally received a diagnosis it was too late to provide [him] with expensive, possibly life-saving medication and treatment." Id. at 35.

Based on the above, Williams raises the following claims for relief: (1) retaliation under 42 U.S.C. § 1983 against Dr. Figueroa, Sergeant Richardson-Graham, and Nurse Howell; (2) deliberate indifference under 42 U.S.C. § 1983 against Centurion; (3) violations of the Americans with Disabilities Act and Rehabilitation Act against Secretary Dixon; and (4) failure to treat under 42 U.S.C. § 1983 against Dr. Santiago, Dr. Figueroa, Nurse Howell, Nurse Holmes, Nurse Abbott, Millette, Johns, and Yates. Id. at 37–45. As relief, Williams requests monetary damages and attorney's fees and costs. Id.

### III. Motion to Dismiss Standard

In ruling on a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true. See Ashcroft v. Iqbal, 556 U.S.

662, 678 (2009); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). In addition, all reasonable inferences should be drawn in favor of the plaintiff. See Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010). Nonetheless, the plaintiff must still meet some minimal pleading requirements. Jackson v. BellSouth Telecomm., 372 F.3d 1250, 1262–63 (11th Cir. 2004) (citations omitted). Indeed, while "[s]pecific facts are not necessary[,]" the complaint should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Further, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Twombly, 550 U.S. at 555 (internal quotations omitted); see also Jackson, 372 F.3d at 1262 (explaining that

"conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (internal citation and quotations omitted). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" which simply "are not entitled to [an] assumption of truth." Iqbal, 556 U.S. at 678, 680. Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[.]'" Id. at 678 (quoting Twombly, 550 U.S. at 570).

## IV. Analysis

### A. Consideration of Documents Outside the Four Corners of the TAC

The Centurion Defendants ask the Court to consider documents outside the four corners of Williams's TAC—specifically, 49 pages of medical records—when ruling on their Motions. Centurion Motion at 2; Holmes Motion at 2 n.1; Howell Motion at 2 n.1; Abbott Motion at 2 n.1; Figueroa Motion at 2 n.1; see also Doc. 96-1. They argue Williams drafted the TAC based on discovery responses and his deposition; therefore, it is appropriate to consider the medical and grievance records on which Williams relied. Centurion Motion at

1.[4] The Centurion Defendants further contend that the authenticity of the records is undisputed. <u>Id.</u>

"'Under the doctrine of incorporation by reference, [courts] may also consider documents attached to the motion to dismiss if they are referred to in the complaint, central to the plaintiff's claim, and of undisputed authenticity.'" <u>Luke v. Gulley</u>, 975 F.3d 1140, 1144 (11th Cir. 2020) (quoting <u>Hi-Tech Pharms., Inc. v. HBS Int'l Corp.</u>, 910 F.3d 1186, 1189 (11th Cir. 2018)). As Williams concedes in his Response, he references and quotes some medical documents in the TAC. <u>See, e.g.</u>, TAC at 9 ("Nurse Abbott noted in [Williams's] records that [sic] an <u>urgent</u> urology referral from October 4, 2021 at his previous institution."). Nevertheless, the Court is not persuaded that, at this point in the litigation, it should consider the contents of his medical records. The documents are not central to the claims since Williams may present witness testimony to prove the Centurion Defendants were deliberately indifferent to his serious medical needs. <u>See</u> <u>Cineus v. Fla. Dep't of Corr.</u>, No. 8:21-CV-1659-

---

[4] In their Motions, Holmes, Howell, Abbott, and Figueroa duplicate the argument in the Centurion Motion as to this issue. Therefore, the Court cites only to the Centurion Motion.

MSS-SPF, 2022 WL 4448599, at *4 (M.D. Fla. Sept. 23, 2022)[5] (determining medical records were not central to plaintiff's deliberate indifference claim because at trial, the plaintiff could present testimony by witnesses, instead of introducing the medical records). And, Williams contests the authenticity of the documents. For instance, he alleges that medical staff "deliberately misrepresented" his condition in his medical records. TAC at 27; see also Response at 14. The Centurion Defendants also appear to have only provided excerpts of Williams's medical records. See Horsley v. Feldt, 304 F.3d 1125, 1135 (11th Cir. 2002) (finding that because the plaintiff disputed the authenticity of transcripts attached to the amended answer and because the transcripts were incomplete, they could not be considered in deciding a motion for judgment on the pleadings); see also Legacy Ent. Grp., LLC v. Endemol USA Inc., No. 3:15-CV-0252-HES-PDB, 2015 WL 12838795, at *4 (M.D. Fla. Oct. 1, 2015). Under these circumstances, the Court declines to consider the documents as the Centurion Defendants request.

---

[5] The Court notes that although decisions of other district courts are not binding, they may be cited as persuasive authority. See Stone v. First Union Corp., 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects.").

16

## B. Eighth Amendment Deliberate Indifference

In their Motions, the Centurion Defendants argue that Williams fails to state an Eighth Amendment deliberate indifference claim against them. See Centurion Motion at 9–22; Holmes Motion at 4–10; Howell Motion at 8–13; Abbott Motion at 5–12; Figueroa Motion at 9–14. Pursuant to the Eighth Amendment of the United States Constitution, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526–27 (1984)). To establish an Eighth Amendment violation, a prisoner must satisfy both an objective and subjective inquiry regarding a prison official's conduct. Swain v. Junior, 961 F.3d 1276, 1285 (11th Cir. 2020) (citing Farmer, 511 U.S. at 834); Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004).

As it relates to medical care, "the Supreme Court has held that prison officials violate the bar on cruel and unusual punishments when they display

'deliberate indifference to serious medical needs of prisoners.'" <u>Keohane v. Fla. Dep't of Corr. Sec'y</u>, 952 F.3d 1257, 1265 (11th Cir. 2020) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976)). To prevail on a deliberate indifference claim, a plaintiff must show: "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." <u>Mann v. Taser Int'l, Inc.</u>, 588 F.3d 1291, 1306–07 (11th Cir. 2009).

> "To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry." <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003). To meet the first prong, the plaintiff must demonstrate an "objectively serious medical need"—i.e., "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," and, in either instance, "one that, if left unattended, poses a substantial risk of serious harm." <u>Id.</u> (alteration adopted) (quotations omitted). To satisfy the second, subjective prong, the plaintiff must prove that the prison officials "acted with deliberate indifference to [his serious medical] need." <u>Harper v. Lawrence Cnty.</u>, 592 F.3d 1227, 1234 (11th Cir. 2010) (quotation omitted). "To establish deliberate indifference," a plaintiff must demonstrate that the prison officials "(1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) acted with more than

> gross negligence." Id. (quotation omitted).[6] An
> inmate-plaintiff bears the burden to establish both
> prongs. Goebert v. Lee Cnty., 510 F.3d 1312, 1326
> (11th Cir. 2007).

Hoffer v. Sec'y, Fla. Dep't of Corr., 973 F.3d 1263, 1270 (11th Cir. 2020)

(footnote omitted). Importantly, for allegedly inadequate medical treatment to

rise to the level of a constitutional violation, the care must be "'so grossly

incompetent, inadequate, or excessive as to shock the conscience or to be

intolerable to fundamental fairness.'" Hoffer, 973 F.3d at 1271 (quoting Harris

v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991)); see also Waldrop v. Evans,

871 F.2d 1030, 1033 (11th Cir. 1989) ("Grossly incompetent or inadequate care

can constitute deliberate indifference . . . as can a doctor's decision to take an

easier and less efficacious course of treatment" (internal citation omitted) or

fail to respond to a known medical problem).

  "As applied in the prison context, the deliberate-indifference standard

sets an appropriately high bar." Swain, 961 F.3d at 1285. Indeed, the law is

---

[6] The Eleventh Circuit previously recognized "a tension within [its] precedent regarding the minimum standard for culpability under the deliberate-indifference standard." Hoffer v. Sec'y, Fla. Dep't of Corr., 973 F.3d 1263, 1270 n.2 (11th Cir. 2020). Regardless, the court stated that the "competing articulations—'gross' vs. 'mere' negligence"—may be "a distinction without a difference" because "no matter how serious the negligence, conduct that can't fairly be characterized as reckless won't meet the Supreme Court's standard." Id.; see also Patel v. Lanier Cnty., 969 F.3d 1173, 1188 n.10 (11th Cir. 2020).

19

well settled that the Constitution is not implicated by the negligent acts of corrections officials and medical personnel. <u>Daniels v. Williams</u>, 474 U.S. 327, 330–31 (1986); <u>Davidson v. Cannon</u>, 474 U.S. 344, 348 (1986) ("As we held in <u>Daniels</u>, the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."). A complaint that a physician has been negligent "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." <u>Bingham v. Thomas</u>, 654 F.3d 1171, 1176 (11th Cir. 2011) (quotations and citation omitted). Moreover, the Eleventh Circuit has noted that "[n]othing in our case law would derive a constitutional deprivation from a prison physician's failure to subordinate his own professional judgment to that of another doctor; to the contrary, it is well established that 'a simple difference in medical opinion' does not constitute deliberate indifference." <u>Bismark v. Fisher</u>, 213 F. App'x 892, 897 (11th Cir. 2007)[7] (quoting <u>Waldrop</u>, 871 F.2d at 1033). Similarly, "the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment

---

[7] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. <u>See</u> <u>McNamara v. GEICO</u>, 30 F.4th 1055, 1060–61 (11th Cir. 2022); <u>see generally</u> Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) (citation omitted).

## 1. Centurion

Centurion argues that Williams fails to state an Eighth Amendment deliberate indifference claim. Centurion Motion at 9. According to Centurion, the medical records attached to its Motion show Williams received "continuous care," and therefore, Williams's constitutional rights were not violated. Id. at 12. Centurion contends that even if the Court does not consider the records, Williams fails to plead sufficient facts to suggest Centurion had a custom, policy, or procedure that was the moving force behind a violation. Id. at 15–22.

The FDOC contracted with Centurion to provide medical services to inmates within the State of Florida. Although Centurion is not a governmental entity, "[w]here a function which is traditionally the exclusive prerogative of the state . . . is performed by a private entity, state action is present" for purposes of § 1983. Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 703 (11th Cir. 1985). Indeed,

> "[w]hen a private entity . . . contracts with a county to provide medical services to inmates, it performs a function traditionally within the exclusive prerogative of the state" and "becomes the functional equivalent of

21

the municipality" under section 1983. <u>Buckner v. Toro</u>,
116 F.3d 450, 452 (11th Cir. 1997). "[L]iability under §
1983 may not be based on the doctrine of respondeat
superior." <u>Grech v. Clayton Cnty., Ga.</u>, 335 F.3d 1326,
1329 (11th Cir. 2003) (en banc).

<u>Craig v. Floyd Cnty.</u>, 643 F.3d 1306, 1310 (11th Cir. 2011); <u>see</u> <u>Denham v.</u>

<u>Corizon Health, Inc.</u>, Case No. 6:13-cv-1425-Orl-40KRS, 2015 WL 3509294, at

*3 n.1 (M.D. Fla. June 4, 2015) ("[W]hen a government function is performed

by a private entity like Corizon, the private entity is treated as the functional

equivalent of the government for which it works.") (citation omitted), <u>aff'd</u> 675

F. App'x 935 (11th Cir. 2017).

Where a deliberate indifference claim is brought against an entity, such

as Centurion, based upon its functional equivalence to a government entity,

the assertion of a constitutional violation is merely the first hurdle in a

plaintiff's case. This is so because liability for constitutional deprivations under

§ 1983 cannot be based on the theory of respondeat superior. <u>Craig</u>, 643 F.3d

at 1310 (quoting <u>Grech</u>, 335 F.3d at 1329); <u>see</u> <u>Denno v. Sch. Bd. Of Volusia</u>

<u>Cnty.</u>, 218 F.3d 1267, 1276 (11th Cir. 2000). Instead, a government entity may

be liable in a § 1983 action "only where the [government entity] <u>itself</u> causes

the constitutional violation at issue." <u>Cook ex. rel. Estate of Tessier v. Sheriff</u>

<u>of Monroe Cnty.</u>, 402 F.3d 1092, 1116 (11th Cir. 2005) (citations omitted). Thus,

a plaintiff must establish that an official policy or custom of the government entity was the "moving force" behind the alleged constitutional deprivation. See Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658, 693–94 (1978).

In Monell, the Supreme Court held that local governments can be held liable for constitutional torts caused by official policies. However, such liability is limited to "acts which the [government entity] has officially sanctioned or ordered." Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986). Under the directives of Monell, a plaintiff also must allege that the constitutional deprivation was the result of "an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law." Denno, 218 F.3d at 1276; see Hoefling v. City of Miami, 811 F.3d 1271, 1279 (11th Cir. 2016) (stating Monell "is meant to limit § 1983 liability to 'acts which the municipality has officially sanctioned or ordered'"; adding that "[t]here are, however, several different ways of establishing municipal liability under § 1983").

"A policy is a decision that is officially adopted by the [government entity] or created by an official of such rank that he or she could be said to be acting on behalf of the [government entity]." Sewell v. Town of Lake Hamilton, 117

23

F.3d 488, 489 (11th Cir. 1997) (citation omitted). The policy requirement is designed to "'distinguish acts of the [government entity] from acts of employees of the [government entity], and thereby make clear that [governmental] liability is limited to action for which the [government entity] is actually responsible.'" Grech, 335 F.3d at 1329 n.5 (quotation and citation omitted). Indeed, governmental liability arises under § 1983 only where "'a deliberate choice to follow a course of action is made from among various alternatives'" by governmental policymakers. City of Canton v. Harris, 489 U.S. 378, 389 (1989) (quoting Pembaur, 475 U.S. at 483–84). A government entity rarely will have an officially-adopted policy that permits a particular constitutional violation, therefore, in order to state a cause of action for damages under § 1983, most plaintiffs must demonstrate that the government entity has a custom or practice of permitting the violation. See Grech, 335 F.3d at 1330; McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." Bd. Of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 404 (1997). The Eleventh Circuit has defined "custom" as "a practice that is so settled and permanent that it takes on the force of law," see Sewell, 117 F.3d at 489, or a "persistent and wide-spread practice" of which

the entity is aware, see Denno, 218 F.3d at 1277. Last, "[t]o hold the [government entity] liable, there must be 'a direct causal link between [its] policy or custom and the alleged constitutional deprivation.'" Snow ex rel. Snow v. City of Citronelle, 420 F.3d 1262, 1271 (11th Cir. 2005) (quoting Canton, 489 U.S. at 385). Because Centurion's liability under § 1983 would be based on its functional equivalence to the government entity responsible for providing medical care and services to inmates, Williams must plead that an official policy or a custom or practice of Centurion was the moving force behind the alleged federal constitutional violation.

In the TAC, Williams alleges that Centurion maintains

> policies and practices in which healthcare staff contracted by Centurion: (a) commonly disregard reports by patients of objectively serious symptoms; (b) refuse to provide adequate treatment to patients; (c) refuse to timely conduct or obtain diagnostic tests and bloodwork for patients or comply with referrals to specialists; (d) fail to create sensible treatment plans for patients whose health status requires the same; (e) fail to ensure continuity of care; (f) prioritize profits at the expense of constitutionally adequate care; (g) fail or refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper; and (h) refuse and/or fail to provide any medical care whatsoever for defined medical problems.

TAC at 39. According to Williams, "[t]hese policies and practices were allowed to flourish because Centurion . . . directly encouraged the very type of misconduct at issue here and failed to provide adequate training and supervision of healthcare and correctional employees." Id. at 39–40. Williams maintains that pursuant to these policies, the Centurion Defendants delayed his PSA tests and urology referral "so that by the time he finally received a diagnosis it was too late to provide [him] with expensive, possibly life-saving medication and treatment." Id. at 35. He alleges other inmates at the FDOC and Suwannee CI "were not regularly tested for known cancer despite being required to provide regular testing under the FD[O]C medical grading system or have had their cancer treatment delayed by Centurion and its staff. Centurion also has failed to provide prisoners with cancer like [Williams] routine bloodwork or urinalysis to test their condition as part of its unconstitutional policy, practice, or custom." Id. at 16.

At this stage of the proceeding, the Court is required to accept the factual allegations set forth in the TAC as true. See Iqbal, 556 U.S. at 678. Doing so, the Court finds that Williams has sufficiently stated a claim against Centurion. Williams asserts that Centurion had a cost-saving policy, custom, or practice of delaying and denying appropriate medical care to inmates with cancer, and

that this policy, custom, or practice caused his injuries. The specific factual allegations regarding the progression of Williams's prostate cancer plausibly suggest both the existence of this policy or custom and an underlying constitutional violation.

To the extent Centurion contends that Williams's own experience is insufficient to establish the existence of a policy or custom, the Court is not persuaded. In the TAC, Williams alleges other inmates at the FDOC did not receive treatment or testing as result of Centurion's policies. TAC at 16. Williams is not required to <u>prove</u> at this stage that Centurion had a custom, policy, or practice of delaying or denying appropriate medical care—and whether he will ultimately be able to do so is best left for a determination on summary judgment or at trial.[8] Considering his allegations on the whole, and taken as true, the Court finds that Williams has sufficiently alleged a claim against Centurion. Accordingly, Centurion's Motion is due to be denied.

---

[8] For this same reason, the Court rejects Centurion's argument that Williams has not established policymaking authority lies with Dr. Figueroa or Utilization Management staff. Centurion Motion at 18. Williams alleges in the TAC an unconstitutional policy or custom existed and pleads facts to support its existence. Williams need not positively identify a final policymaker at this stage of the proceedings. See <u>Christmas v. Nabors</u>, 76 F.4th 1320, 1329–30 (11th Cir. 2023).

### 2. Nurse Holmes

Nurse Holmes asks the Court to dismiss the deliberate indifference claim against her. Holmes Motion at 4. She argues that the limited factual allegations regarding her involvement in Williams's medical care do no suggest that she acted with a sufficiently culpable state of mind. Id. at 9. And, to the extent Williams complains that she failed to provide him with a wheelchair upon discharge from the infirmary, Nurse Holmes alleges she does not have the authority to provide a wheelchair. Id. at 7–8. Last, she maintains Williams fails to plead causation. Id. at 10. Williams opposes Nurse Holmes's Motion, arguing that he sufficiently alleges Nurse Holmes acted with deliberate indifference to his "unhealing wounds" and mobility issues. Response at 21.

In the TAC, Williams makes the following allegations about Nurse Holmes. He asserts that on February 14, 2022, "well before the time required to allow [his] wounds to heal and despite the concerning spike in [his] PSA and accompanied back pain and lower extremity numbness . . . Dr. Figueroa and Nurse Holmes started [his] discharge process from the prison infirmary." TAC at 26. According to Williams, Dr. Figueroa and Nurse Holmes stated that he was "clinically stable" in their discharge forms "and that he would be able to continue his wound and other treatment in his dorm." Id. at 27.

28

The Eleventh Circuit has explained "[t]o be deliberately indifferent a prison official must know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, <u>and he must also draw the inference</u>." <u>Franklin v. Curry</u>, 738 F.3d 1246, 1250 (11th Cir. 2013) (quoting <u>Goodman v. Kimbrough</u>, 718 F.3d 1325, 1332 (11th Cir. 2013)) (internal quotation marks omitted). Here, considering only the TAC, the Court finds that the limited factual allegations against Nurse Holmes fail to plausibly suggest she knew Williams faced a substantial risk of serious harm and disregarded that risk. As to his wound treatment, Williams alleges that he failed to receive 14 to 45 days of treatment—the requirement for stage 2 wounds—before Nurse Holmes and Dr. Figueroa discharged him from the infirmary. TAC at 26. However, Nurse Holmes discharged Williams with the expectation that he would be able to continue treatment in his dorm. <u>Id.</u> at 27. Williams fails to set forth any well-pled facts suggesting that Nurse Holmes knew he could not receive treatment in the dorm, and thus, disregarded a risk of serious harm.

Similarly, Williams does not plead sufficient facts to suggest Nurse Holmes knew about his mobility limitations. For instance, he fails to allege that Nurse Holmes personally examined him, or that he notified her that he

required accommodations. While Williams asserts in the TAC that Nurse Homes "failed to provide timely accommodation for [Williams's] loss of motor control," TAC at 35, such an allegation is conclusory and not entitled to an assumption of truth. As such, the Court finds Williams fails to state a plausible claim against Nurse Holmes regarding her alleged failure to provide mobility accommodations. Accordingly, Nurse Holmes's Motion is due to be granted, and the claim against her dismissed.

### 3. Nurse Howell

In his Motion, Nurse Howell argues that Williams has not alleged facts sufficient to state a deliberate indifference claim. Howell Motion at 8. First, to the extent Nurse Howell allegedly failed to provide a wheelchair, he contends the claim fails because he did not have the authority to prescribe a "healthcare appliance." Id. at 7, 11. Next, relying on the medical records attached to his Motion, Nurse Howell asserts that he provided constitutionally adequate care because each time he assessed Williams's medical complaints, he "referred [Williams] to clinicians who could take additional action, like prescribing medication or admitting [Williams]  into the infirmary." Id. at 12. Therefore, he contends that Williams fails to state a claim for relief. Id. at 12–13.

Considering the allegations in the TAC, taken as true, the Court finds Williams has sufficiently stated a deliberate indifference claim against Nurse Howell. Williams alleges in the TAC that Nurse Howell knew Williams had numbness in his legs which led to mobility issues, but Nurse Howell deliberately disregarded these medical concerns. TAC at 8–11, 23, 35. Indeed, Williams asserts that Nurse Howell evaluated him after he fell from his bunk. Id. at 8. Williams allegedly explained his symptoms, including numbness in his legs, to Nurse Howell and asked for a wheelchair, but Nurse Howell denied his request. Id. Several days later, when Nurse Howell conducted William's pre-confinement physical, he noted William's legs were numb but again did not provide him with a wheelchair or any other accommodation. Id. at 10. Without mobility assistance in confinement, Williams was forced to drag himself across the cell floor, from which he developed severe sores that became infected. Id. at 14–15. These factual allegations plausibly suggest Nurse Howell knew of a serious risk of harm and disregarded that risk by conduct that is more than gross negligence.

To the extent Nurse Howell asserts that he did not have the authority to provide a wheelchair, his argument is unavailing. As support, Nurse Howell merely cites to the definition of a "healthcare appliance" in Florida

31

Administrative Code Rule 33-210.201(2)(f), which details ADA provisions for prisoners. A healthcare appliance "refers to devices or medical support equipment including, but not limited to, wheelchairs, canes, walkers, or hearing aids prescribed for an inmate and approved by the Office of Health Services or its designee." Fla. Admin. Code R. 33-210.201(2)(f). The provision does not detail the scope of a registered nurse's prescriptive abilities in an FDOC facility. Nevertheless, even assuming Nurse Howell did not have the authority to prescribe a wheelchair, this does not necessarily foreclose his ability to provide other accommodations, such as an inmate assistant, for Williams's mobility issues. Thus, based on the above, Nurse Howell's Motion is due to be denied to the extent it seeks dismissal of the deliberate indifference claim against him.

### 4. Nurse Abbott

Nurse Abbott argues Williams fails to state a deliberate indifference claim against him. Abbott Motion at 5–6. He asserts that, according to the TAC, he examined Williams on only two occasions: December 20 and 24, 2021. Id. at 8. However, Nurse Abbott argues the medical records demonstrate Dr. Figueroa examined Williams on those dates, and Williams "received

constitutionally adequate medical care." Id. at 9. Finally, Nurse Abbott argues that Williams does not plausibly allege causation. Id. at 11–12.

The Court determines that Williams states a claim for relief against Nurse Abbott. Williams alleges in the TAC that, as early as November 19, 2021, Nurse Abbott knew Williams's previous institution had made an urgent urology referral in October 2021, and Nurse Abbott was uncertain whether the previous institution had submitted the referral to Utilization Management. TAC at 9. Even though Williams had a documented history of prostate cancer and experienced a drastic change in his PSA levels on September 30, 2021, id. at 6–7, Nurse Abbott failed to act on the referral. Indeed, medical staff did not resubmit the referral until February 2022. Id. at 26. Williams asserts that this delay in treatment furthered Centurion's cost-saving policy and ultimately resulted in his prostate cancer metastasizing and becoming untreatable. Id. at 35. Based on these alleged facts, Williams states a plausible deliberate indifference claim at this stage of the proceedings.

Moreover, as to his mobility issues, Williams alleges that Nurse Abbott evaluated him on December 24, 2021, and he notified Nurse Abbott that he could not walk. Id. at 17. By this time, Williams had spent over three weeks in confinement, where he developed sores from dragging himself across the cell

floor because he could not walk. Id. at 11–15. And, Nurse Abbott had received Williams's complaints about numbness, swelling, and lack of use of his extremities. Id. at 15. Nonetheless, Nurse Abbott did not provide Williams with a wheelchair or other mobility accommodations on December 24th. Id. at 17. As a result, Williams's sores worsened and became infected. Because these factual allegations—taken as true with all reasonable inferences drawn in Williams's favor—could plausibly support a finding that Nurse Abbott acted with deliberate indifference to Williams's serious medical needs, Nurse Abbott's Motion is due to be denied.

### 5. Dr. Figueroa

Largely relying on medical records, Dr. Figueroa argues that Williams fails to state a deliberate indifference claim against him because he provided constitutionally adequate medical care to Williams. Figueroa Motion at 12–14.

The Court has declined to consider the medical records that the Centurion Defendants submitted with their Motions. Therefore, considering only the well-pled facts in the TAC, the Court finds Williams sufficiently states a plausible claim under the Eighth Amendment. Williams asserts that Dr. Figueroa denied him timely and proper medical care resulting in terminal prostate cancer and severely infected wounds on his ankles and buttocks. See

Goebert v. Lee Cnty., 510 F.3d 1312, 1330 (11th Cir. 2007) ("[A]n official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay." (internal quotation marks omitted)). The Court declines to find that these allegations if proven would fail to state a plausible claim for a violation of the Eighth Amendment. As such, Dr. Figueroa's Motion is due to be denied as to Williams's deliberate indifference claim.

## C. First Amendment Retaliation

Nurse Howell and Dr. Figueroa also request dismissal of the First Amendment retaliation claim against them. See Howell Motion at 4–8; Figueroa Motion at 7–9. "The core of [a retaliation claim brought pursuant to 42 U.S.C. § 1983] is that the prisoner is being retaliated against for exercising his right to free speech." O'Bryant v. Finch, 637 F.3d 1207, 1212 (11th Cir. 2011) (citation omitted). It is firmly established that "an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement." Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008). An

35

inmate may pursue a cause of action against a prison official who retaliated against him for engaging in that protected speech. Id.

> To establish a retaliation claim, a prisoner must demonstrate "that the prison official's actions were the result of his having filed a grievance concerning the conditions of his imprisonment." Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003) (internal quotation marks and citation omitted). [A plaintiff] can prevail on a retaliation claim if "(1) his speech was constitutionally protected; (2) [he] suffered adverse action such that the administrator's allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech." Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008).

Williams v. Radford, 64 F.4th 1185, 1192 (11th Cir. 2023). As to the third prong, a plaintiff must do more than make "general attacks" upon a defendant's motivations and must articulate "affirmative evidence" of retaliation to prove the requisite motive. Crawford-El v. Britton, 523 U.S. 574, 600 (1998) (citations omitted). "In other words, the prisoner must show that, as a subjective matter, a motivation for the defendant's adverse action was the prisoner's grievance or lawsuit." Jemison v. Wise, 386 F. App'x 961, 965 (11th Cir. 2010) (per curiam) (citation omitted).

### 1. Nurse Howell

As to the specific facts underlying his retaliation claim against Nurse Howell, Williams alleges that he wrote an informal grievance on November 24, 2021, concerning Nurse Howell's refusal to provide him with a wheelchair. TAC at 10. According to Williams, Rita Corbin, Centurion staff member and Nurse Howell's colleague, responded that the allegations "were 'unfounded' and that a wheelchair is ordered 'per a clinician,' not a nurse." Id. at 10–11. Subsequently, while in confinement, Williams asserts:

> [He] was also concerned that medical staff were not helping him, he noted that 'a lot of this neglect is coming from 'retaliation' for me writing Jason Howell up, the nurse." In fact, Nurse Howell's colleague, Rita Corbin, responded to this particular grievance and since then [Williams] has not received any further medical treatment.

Id. at 13.

In his Motion, Nurse Howell contends that the Court should dismiss the retaliation claim against him because: (1) no allegations suggest a causal connection between Williams's grievance against Nurse Howell and any alleged adverse action; (2) Williams fails to allege an adverse action by Nurse Howell; and (3) to the extent Williams asserts Nurse Howell retaliated against

37

him by failing to provide a wheelchair, Nurse Howell did not have the authority to do so. Howell Motion at 4–8.

Williams responds that he has sufficiently alleged a causal connection between the grievance and adverse action. Response at 35. In support of his argument, he points to his allegation that after he wrote a grievance about Nurse Howell, which was reviewed by Nurse Howell's colleague Rita Corbin, he was denied any medical attention in confinement. Id. at 35. Williams also contends that other staff would have reviewed the grievance, and it is plausible that Nurse Howell was aware of it given the "immediate" adverse action. Id.

The Court finds Williams fails to allege the requisite causal connection between his grievance and the alleged adverse action. "The causal connection inquiry asks whether the defendants were subjectively motivated to discipline because [the prisoner] complained of some of the conditions of his confinement." Smith, 532 F.3d at 1278. Here, the alleged facts do not plausibly suggest Nurse Howell knew about the grievance and, thus, was subjectively motivated to deny medical care to Williams in confinement. To the extent Williams argues other staff would have reviewed the grievance and, presumably, informed Nurse Howell, Response at 35, this amounts to mere speculation unsupported by the facts alleged in the TAC. Indeed, Williams does

38

not even allege Corbin, the Centurion staff member who responded to the grievances, interacted with Nurse Howell or other medical staff at Suwannee CI.

Further, Williams provides no well-pled facts, beyond mere supposition, that would suggest the other Defendants or medical staff had a subjective motive to retaliate against Williams for filing a grievance against Nurse Howell. For instance, Williams does not allege Nurse Howell directed other medical staff to deny or delay treatment in confinement. And, based on the allegations in the TAC, Nurse Howell did not substantially engage in Williams's treatment following the grievance beyond admitting him into the infirmary. TAC at 19. Although Williams argues he has pled temporal proximity which suggests a causal connection between the grievance and the adverse action, Response at 35, temporal proximity alone does not save Williams's claim. Without more, Williams's claim is merely conceivable, not plausible. As such, Nurse Howell's Motion is due to be granted as to the First Amendment retaliation claim against him.

### 2. Dr. Figueroa

Last, Dr. Figueroa asks the Court to dismiss the retaliation claim against him. Figueroa Motion at 7. Relying on the medical records attached to his

Motion, Dr. Figueroa argues that Williams cannot demonstrate a causal connection between the grievances and any adverse action. Id. at 8–9. He further contends that even if the Court does not consider the records, Williams's allegations are insufficient because "[a]t most, [] Williams has made only 'general attacks' and has not alleged 'affirmative evidence' of retaliation." Id. at 9 (citation omitted).

Liberally construed, the TAC includes sufficient facts to state a plausible retaliation claim against Dr. Figueroa. Williams asserts he filed grievances regarding his medical care, some of which Dr. Figueroa reviewed and denied. TAC at 15, 23. He alleges Dr. Figueroa delayed treatment for his prostate cancer, denied him a wheelchair, and delayed treatment for his wounds in part because he filed these grievances. Id. at 17, 20–21, 23, 29, 31, 33. As such, Williams alleges facts supporting each element of a retaliation claim. Therefore, Dr. Figueroa's Motion is due to be denied.

Accordingly, it is now

**ORDERED AND ADJUDGED:**

1.     Defendants Centurion, Tony Abbott, and Alexis Figueroa's Motions to Dismiss (Docs. 96, 99, 100) are **DENIED**.

2.      Defendant Jason Howell's Motion to Dismiss (Doc. 98) is **DENIED in part** and **GRANTED in part**. The Motion is **GRANTED** only to the extent that Plaintiff Elmer Williams's retaliation claim against Howell is dismissed for failure to state a claim for relief. In all other respects, the Motion is **DENIED**.

3.      Defendant Elizabeth Holmes's Motion to Dismiss (Doc. 97) is **GRANTED**. Williams's deliberate indifference claim against Holmes is **DISMISSED**. Judgment to that effect will be withheld pending adjudication of the action as a whole. See Fed. R. Civ. P. 54. The Court **directs the Clerk** to terminate Holmes as a Defendant in the case.

4.      Centurion, Howell, Abbott, and Figueroa must file Answers **no later than June 20, 2024**.

**DONE AND ORDERED** at Jacksonville, Florida, this 22nd day of May, 2024.

**MARCIA MORALES HOWARD**
United States District Judge

Jax-9 5/7
c:      Counsel of record

41