## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**ELMER WILLIAMS,**

      **Plaintiff,**

**v.**                          **Case No. 3:22-cv-01221-MMH-MCR**

**RICKY DIXON, et al.,**

      **Defendants.**

_____/

### DEFENDANT DIXON'S MOTION FOR SUMMARY JUDGMENT WITH INCORPORATED MEMORANDUM OF LAW

Defendant Ricky Dixon, Secretary of the Florida Department of Corrections ("FDC"), by and through undersigned counsel and pursuant to Rule 56, Federal Rules of Civil Procedure, hereby moves for summary judgment in his favor as to the claims in Plaintiff's Third Amended Complaint [Doc. 93], and states the following in support thereof:

## I.    INTRODUCTION

Plaintiff is an inmate who was granted a conditional medical release on October 31, 2022, from Suwannee Correctional Institution Annex. However, he remains under active FDC supervision through the Broward East Office of the Fort Lauderdale Circuit 17. In his Third Amended Complaint [Doc. 93], Plaintiff brings a single claim against Dixon: Count III: Violation of ADA/RA.

1

## II.    STATEMENT OF FACTS

### A. Plaintiff consistently failed throughout this litigation to identify any ADA programs to which FDC denied him access or any requested reasonable accommodations which FDC denied him.

In his Third Amended Complaint, Plaintiff continues to commingle and conflate his conclusory allegations regarding his medical care, access to medical care, treatment by medical professionals, and access to medical supplies like a wheelchair.

Plaintiff claims Dixon failed to accommodate Plaintiff's lower extremity numbness, accommodate his incontinence of bladder and bowel ranging from a wheelchair to failure to grant shower passes to access to inmate assistants to his alleged inability to participate in unspecified benefits, programs, activities, and services offered to the entire inmate population of Suwannee CI Annex. Plaintiff insisted that he was denied access to these benefits because he exercised his "First Amendment right to grieve. [Doc. 93, ¶168].

According to Plaintiff, FDC failed to provide him reasonable accommodations for numbness in his lower extremities, incontinence, and allegedly failing to train security staff on the "humane management" of disabled inmates. [Doc. 93, ¶173(a)-(c)]. However, the first two of these examples are not reasonable accommodations designed to grant his access to programs and activities; they are specific medical conditions that may or may not require medical treatment. The issue

of training security staff regarding disabled inmates is outside the purview of the ADA, does not address in any way Plaintiff's allegations regarding access to activities and programs, and is also a function for which sovereign immunity applies.

In Dixon's First Set of Interrogatories to Plaintiff, Dixon asked him to identify each specific ADA benefit, program, activity, and benefit that he did not receive through the institution's staff or in which he was not allowed to participate. Plaintiff's rambling, imprecise, and utterly unresponsive answer to this interrogatory highlights his "shotgun pleading" style approach where he claims that everything he encountered at Suwannee CI Annex until he received his conditional medical release in October 2022 was an action or comment by largely unidentified institutional staff members designed solely to single him out from the rest of the inmate population and retaliate against him for his grievances. This itemization of alleged ADA-related benefits is exhaustive, but very few, if any, would be recognized under ADA:

> There were many benefits, programs, services, and activities I could not participate in or could only participate in on a limited or intermittent basis, including eating, bathing, dressing, housing; access to phones, socialization; exercise; rehabilitative programs; assistive devices; recreation; mobility; access to canteen; access to common dining area; general accessibility to common areas of prison; specialized medical care (including wound care and transportation for lab work); games; integration; socialization; visitation; emotional support; friendship; conversation; mental stimulation; radio and television; other entertainment; reading and study; access to restrooms, showering; mail. *Ex. 1, Plaintiff's Response to First Interrogatories, No. 1.*

3

As Plaintiff gives this exhaustive list of things that are obviously misidentified as ADA accommodations, such as friendship, games, mental stimulation, conversation, and socialization, for example, it is unclear what actually was denied because he stated he "could not participate in *or could only participate in on a limited or intermittent basis*…" *Id*. [Emphasis added.]

Plaintiff was asked similarly to identify every ADA reasonable accommodation that he had requested but was not provided. He did not identify a single accommodation request and instead sidestepped this interrogatory, referring to the prior non-response. The meager and generic information he did provide again concerned medical matters and not any ADA program or benefit:

> See the answer to Interrogatory 1. Also, I was denied a wheelchair; transportation to have blood work done; medical care. It would be impossible to list all the things you miss out on because you are not mobile, because you are locked up or bed-ridden.
> *Ex. 1, Plaintiff's Response to First Interrogatories, No. 5.*

Here, Plaintiff again misidentifies provision of a wheelchair as an ADA accommodation, whereas that is something a physician must provide. Explained below, that would have been something decided by Centurion physician and former Defendant Dr. Alexis Figueroa, who had decided in late 2021 that the wheelchair was not necessary.

Dixon also asked Plaintiff to describe how FDC staff responded to his accommodations requests. Plaintiff could identify only two instances, both involving Centurion and two of its employees, no longer defendants in this suit:

> Flat denial; Sarcasm: "You can try to hold on to the walls" (response to question about how I was going to get back to the Dorm without a wheelchair). Dr. Figueroa once told me if I couldn't get up on the table by myself he wouldn't examine me. I told him I couldn't but there was an inmate who could help me but he wouldn't allow it. So that day I didn't get examined.
> *Ex. 1, Plaintiff's Response to First Interrogatories, No. 2(d).*

The first incident Plaintiff mentions here about 'holding onto the wall' seems to be reference to an alleged comment by former Centurion defendant Nurse Jason Howell, although there are no sources independent of Plaintiff to corroborate this comment. The second refers to former Centurion Defendant Dr. Alexis Figueroa, who made his own determination that Plaintiff was not in need of a wheelchair:

> Q: … So when –
> Mr. Hanson: Objection.
> Q: -- he got out and you refused to give him a wheelchair, wasn't that just to show that you didn't believe that he couldn't walk still?
> Mr. Hanson: Objection.
> A: Again, when I saw Mr. Williams for the first time in 12-20-2021, based on what I have seen, I deemed clinically not necessary for him to have a wheelchair. Again, he was complaining of back pain, lower extremity weakness, I believe, and constipation…
> *Ex. 2, Dr. Figueroa Deposition, 121:18-121:17.*

The fact that Plaintiff lists these complaints here further underscores that he is commingling the medical claims against Centurion with his unspecified claims against FDC.

5

With regard to the issue of reasonable accommodations, those necessary to function in the institution and those necessary to access programs and benefits, here Plaintiff appears to think that these are automatically assigned. That has never been the case. In Dixon's response to Plaintiff's First Interrogatories, he states that:

> Both Chapter 33-210.201, F.A.C., ADA Provisions for Inmates, and Procedure 604.101, ADA Provisions for Inmates, discuss in detail the process used to designate an inmate as being impaired under the provisions of the ADA. However, ***the actual determination of a disability or impairment is made by medical staff*** either at the inmate's initial reception or at the institution where he/she is assigned, based upon his/her record of an existing physical or mental impairment or clinical evaluation of the inmate.
>
> This procedure does not determine the accommodations each designated impaired inmate "must receive." ***Rather, impaired inmates request an accommodation or a modification to access programs, activities, or services in writing on DC2-530A***. If these requests do not involve medical devices or equipment, the requests are received and evaluated by the institutional/regional ADA coordinators.
> *Ex. 3, Dixon's Response to First Interrogatories, No. 2.* [Emphasis added.]

Plaintiff later answered the following as to how he believed ADA requests were made:

> 3.    To the best of your knowledge, identify and explain the application process for applying for an ADA accommodation at Suwannee C.I. Include the following:
> a.    The manner or method in which an inmate applies [for a reasonable accommodation];
>
> Response: …I am told that it is a misconception that an accommodation for a disability has to be formally applied for (like a driver's license). To the best of my knowledge you request accommodation verbally or

6

in writing or obviously be in need of the accommodation to perform
major life functions…
*Ex. 1, Plaintiff's Response to Dixon's First Interrogatories, No. 3(a).*

The critical point here is that any request for an accommodation or access to
any program or activity must be presented in writing on the appropriate form.
Despite the exceptionally voluminous amount of discovery documents exchanged
during this litigation, these simple requests for Plaintiff to identify, with specificity,
exactly which benefits he claims he was denied access to, are responded to with no
clear indication from Plaintiff of what was wrong. As Plaintiff has deposed no FDC
employees or corporate representatives, he only has his self-serving testimony to
support his conclusory allegations.

### B. Plaintiff cannot specifically identify anyone or provide any corroborative evidence that anyone actually denied him reasonable accommodations or access to benefits, programs, activities, or services of any kind.

Because Plaintiff insists that Dixon knew through his "non-delegable duty"
everything imaginable about even the minutia of Plaintiff's medical condition, his
disability discrimination, and subsequent retaliation, which staff members were
responsible for this alleged treatment, and the number and content of every grievance
he submitted about this treatment, one would expect Plaintiff to be easily able to
identify these individuals with no difficulty. In his responses to Dixon's Third Set
of Interrogatories, Plaintiff again waffled:

No. 6 – Identify all subordinates who retaliated against disabled
prisoners, including Plaintiff.

7

Response: I am not aware of "all" subordinates who would retaliate against inmates. **A lot of the retaliation was indirect**. Most of the prison officials I had to deal with knew that I was considered a "writ writer" (someone who writes grievances). I think some of my family members made prison staff angry as well by checking in on me and asking for help. Some (including contract agents) were Tony Abbott, Jason Howell, Savonia Richardson, Jessee Morris, Gerald Knaus, and officers whose names I didn't know [and] who obstructed our requests, like the confinement officers who refused to provide transportation to have my bloodwork done so I and the medical staff would know the status of my PSA level.

*Ex. 1, Plaintiff's Response to Dixon's First Interrogatories, No. 6.*
[Emphasis added.]

Of the five individuals Plaintiff identified, four were Centurion defendants and no longer part of this litigation, and one, Defendant Richardson, was an FDC correctional officer. The rest are nothing more than a collection of John Does who, after three years of litigation and extensive documentation production, should have been easily identified by now. A key point of Plaintiff's above answer is his admission that the retaliation was largely "indirect." Upon close scrutiny, it is clear Plaintiff cannot articulate what his actual claims are against FDC. Again, he admits that the discrimination was done 'through the bureaucracy' rather than being able to identify who discriminated against him:

No. 7 – Identify all subordinates who would deny reasonable accommodations to inmates.

Response: I am not aware of "all" subordinates who would deny reasonable accommodations to inmates. **Most of the denials were done through the bureaucracy**. Some (including contract agents) were Tony Abbott, Jason Howell, Savonia Richardson, Jessee Morris,

8

Gerald Knaus, and officers whose names I didn't know who obstructed our requests, like the confinement officers who refused to provide transportation to have my bloodwork done so I and the medical staff would know the status of my PSA level. There was a committee in charge of ADA accommodations. We never learned who canceled the wound care program for wounds like mine that wouldn't heal in two months.

*Ex. 1, Plaintiff's Response to Dixon's First Interrogatories, No. 7.* [Emphasis added.]

Plaintiff's response here was equally vague and completely unresponsive—a perfect example of the conflation of medical and ADA issues, but none supported by evidence, especially considering no FDC employees or corporate representatives were deposed.

## C. Plaintiff alleges that FDC failed to properly train staff in "humane treatment" of disabled inmates.

In his deposition testimony of January 11, 2023, Plaintiff replied when he was asked if he had ever spoken with FDC defendant Doctor Kalem Santiago, "I have no idea who that is." Then Plaintiff asked, "And where is he at? Is he in Tallahassee?" Finally, after showing Plaintiff the excerpt of the email from Dr. Santiago's office cited in his then-active Amended Complaint [Doc. 35, ¶93], he again admitted, "No, sir. I'm not familiar with her…" *Ex. 4, Plaintiff's 1/11/23 Deposition 165:20-168:11.*

However, in his response to Dixon's First Set of Interrogatories to which he replied in August 2024, Plaintiff somehow continued to blame her among other still unidentified individuals as to who was not trained:

No. 8 – Identify all Florida Department of Corrections ("FDC") employees you interacted with in who FDC failed to train.

Response: I am not aware of or able to remember all examples of persons who failed to train FDC staff to humanely treat disabled inmates but these stand out in my memory: Dr. Kalem Santiago, the Clinical Advisor, stated that she reviewed my records and concluded that I was properly treated. I presume that she, and likely the Health Services Director were involved in training standards. The Warden and the Secretary had to be privy to the lack of training and supervision in Florida prisons. Just a few years earlier, officers at the Reception and Medical Center let a quadriplegic prisoner go without food or water or hygiene or medical care for nearly a week so that he was severely dehydrated and died a few weeks later. The story was published in the Miami Herald as a front-page story. An FDC spokesperson said that prison officials were disciplined but it turned out that most of them received very little consequences and the abuses continue.
*Ex. 1, Plaintiff's Response to First Interrogatories, No.8.*

Again, Plaintiff is unable to remember anyone who failed to do something he believed they should be doing, including Dr. Santiago, who he suddenly recalled as being the "Clinical Advisor" when before he did not even know her gender, much less her position title. Most importantly, there has been no evidence whatsoever as to any inquiry with her alleged training issues. Dr. Santiago was also not deposed in this matter.

## MEMORANDUM OF LAW

## III.   SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted when the moving party shows that "…there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986) (internal quotation marks omitted); *Fed. R. Civ. P. 56(c)*. An otherwise correctly supported motion for summary judgment cannot be defeated simply due to the existence of some factual disputes between the parties. The precise requirement is that there be "no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id*. An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *Tipton v. Bergrohr GMBH—Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A party asserting that a fact is genuinely disputed must support the assertion by citing to specific materials in the record because failure to do so allows the court to consider the facts as undisputed for summary judgment purposes. Fed. R. Civ. P. 56(c)(1)(A), (e)(2)).

The Court is not obligated, however, to deny summary judgment for the moving party when the evidence favoring the nonmoving party is "merely colorable or is not significantly probative." *Anderson*, 477 U.S. at 249-50. "A mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice" to demonstrate a material issue of genuine fact that precludes summary judgment. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990) (quoting *Anderson*, 477 U.S. at 242). "[C]onclusory allegations without specific supporting facts have no

probative value," and are legally insufficient to defeat summary judgment. *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial,'" and a court should grant summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV.    ARGUMENT

### A. Plaintiff failed to meet the legal elements of his ADA/RA Claim.

Title II of the ADA prohibits public entities from discrimination against disabled individuals. To state a claim under Title II of the ADA, a plaintiff must allege: "(1) that he is a 'qualified individual with a disability'; (2) that he was 'excluded from participation in or … denied the benefits of the services, programs, or activities of a public entity' or otherwise 'discriminated [against] by such entity'; (3) 'by reason of such disability.'" *Shots v. Cares*, 256 F.3d 1077, 1079 (11th Cir. 2001) (quoting 42 U.S.C. § 12132). Defendant argues Plaintiff has not met the second or third elements for purposes of this motion.

The Eleventh Circuit has held, "[t]he language of Title II generally tracks that of § 504 of the Rehabilitation Act. See 29 U.S.C. § 794(a)." *Wilson v. Smith*, 567 F. App'x 676, 678-79 (11th Cir. 2014). "In the context of the RA, we have held that 'a plaintiff may demonstrate discriminatory intent through a showing of deliberate

indifference.'" *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012). The Eleventh Circuit emphasized, in the Rehabilitation Act context, deliberate indifference occurs "when the defendant knew that harm to a federally protected right was substantially likely and … failed to act on that likelihood." *Id*. at 344 (quoting *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cnty.*, 610 F.3d 588, 594 (11th Cir. 2010) (emphasis removed).

Plaintiff has been unable to identify how he was allegedly excluded from participation in or denied the benefits of any services, programs, or activities. *Ex. 1, Plaintiff's Response to First Interrogatories, No. 1*. There is also no evidence to indicate Plaintiff was otherwise "discriminated [against] by such entity." *Shots*, 256 F.3d at 1079. When asked directly, Plaintiff has not identified any "service," "program," or "activity" for which he was allegedly excluded because of his disability. *Ex. 1, Plaintiff's Response to First Interrogatories, No. 1*. Plaintiff's Third Amended Complaint does not specify the particular "reasonable accommodation" requested or specify how Plaintiff was allegedly denied access to any service, program, activity, or benefit. Count III only offers generic citations to the ADA (¶¶ 159-160), an admission that Plaintiff is disabled "[a]s a result of the spread of his cancer" (¶ 161) thereby making him a "qualified individual as defined by 42 U.S.C. § 12131(2) (¶ 162), and that FDC is a public entity that receives federal funding (¶¶ 163-164). The remaining Count III allegations are merely conclusory statements

which fail to identify the precise service, activity, or program that he was excluded from by reason of his disability and equally fails to identify the unidentified 'subordinates' Plaintiff claims discriminated against him. *Ex. 1, Plaintiff's Response to Dixon's First Interrogatories, Nos. 6 & 7.*

Each allegation above is conclusory and unsupported by any evidence. Unlike the pleading stage, where bold allegations can be made without factual support, Plaintiff must produce admissible evidence to create a question for the jury that Plaintiff may have been discriminated against by FDC by reason of his disability. Plaintiff has failed to articulate which benefits he was denied access to, who the still unidentified 'subordinates' were that discriminated against him, and how any of it was by reason of his disability (when in fact he blames the conduct due to him writing excessive amounts of grievances, not his disabilities). *Id.*

In his Interrogatory responses, Plaintiff acknowledges that he is both unaware of the reasons behind the allegations he levies at FDC, Dixon, and FDC's agents and who was actually responsible for the alleged retaliation. Plaintiff states that, "[a] lot of the retaliation was indirect," and that "[m]ost of the denials were done through the bureaucracy…". *Ex. 1, Plaintiff's Response to Dixon's First Interrogatories, Nos. 6 & 7.*

He similarly cannot identify the exact ADA benefits which were denied and instead lists, confusingly, items such as friendship, games, mental stimulation,

conversation, and socialization. *Ex. 1, Plaintiff's Response to First Interrogatories, Nos. 1 & 5.* Additionally, Plaintiff states that the wrongs he experienced were "retaliation" through his interrogatory responses, and he appears to theorize that the retaliation occurred because he was considered a "writ writer," or because prison staff was angry that Plaintiff's family would ask for assistance for him. *Ex. 1, Plaintiff's Response to Dixon's First Interrogatories, No.* 6. These distinctions are critical as to Plaintiff's ADA/RA claims as Plaintiff must establish that FDC discriminated against him by reason of his disability, *yet there is no evidence to support that and by Plaintiff's own admission it was allegedly due to his grievances* (which is still equally unsupported). However, here, Plaintiff seems to state that he experienced retaliation for writing grievances and requesting medical treatment, not because of his disability status.

## B. Plaintiff's ADA claim must fail because it cannot be brought on a theory of vicarious liability.

Plaintiff alleges that Defendant violated the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA). Specifically, Plaintiff brings this allegation under the theory of vicarious liability by attempting to show that Defendant was deliberately indifferent to Plaintiff's need for reasonable accommodation through the acts of FDC's employees. Plaintiff's complaint, claims in pertinent part:

> ¶ 170. Dixon and/or his predecessor turned a blind eye to his **subordinates who retaliated** against disabled prisoners, including Plaintiff, for exercising their First Amendment rights, or empowered

15

and rewarded or failed to correct them. Dixon knew that his **subordinates would act unlawfully**, and he failed to stop them from doing so.

¶ 171. Dixon and/or his predecessor also turned a blind eye to his **subordinates who would deny reasonable accommodations** to inmates despite known and obvious need for such accommodations, such as denying wheelchairs, inmate assistants, and diapers to inmates suffering from mobility impairments and incontinence.

…

¶ 174. Dixon acted intentionally and/or with deliberate indifference to Plaintiff's need for reasonable accommodation by, among other things:

    a.  failure to accommodate his lower extremity numbness;

    b.  failure to accommodate his incontinence of bladder and bowel; and

    c.  failing and intentionally refusing to train FDC employees regarding the humane management of physically disabled inmates.

*(Emphasis added.)*

"Discrimination claims under the ADA and the Rehabilitation Act are governed by the same standards, and the two claims are generally discussed together." *J.S. v. Houston Cty. Bd. Of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017). "Given the textual similarities between Title II and section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), the same standards govern claims under both, and we rely on cases construing Title II and section 504 interchangeably." *Ingram v. Kubik*, 30 F.4th 1241, 1256 (11th Cir. 2022). To state a Title II claim, Plaintiff must prove:

1.  That he is a qualified individual with a disability;

2.  That he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and

3. That the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.

*Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001) (citing 42 U.S.C. § 12132);

*Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1083 (11th Cir. 2007).

Here, Plaintiff continues to proceed under a theory of vicarious liability which the Eleventh Circuit Court of Appeals has held is unavailable for claims under Title II of the ADA and the RA. As recently as April 7, 2022, the Eleventh Circuit has held that "vicarious liability is unavailable under Title II" of the ADA and § 504 of the RA. *Ingram v. Kubik*, 30 F.4th 1241, 1257 (11th Cir. 2022).

While Plaintiff alleges that Dixon was aware of the discrimination and acted with deliberate indifference by failing to accommodate Plaintiff and failing to train FDC staff, Plaintiff can provide no evidence to support these allegations. Critically, Plaintiff deposed no FDC employees or corporate representatives and is left to rely on his own conclusory, self-serving allegations, for which it is apparent stem from his allegations against the Centurion medical Defendants (now settled out of this matter). Additionally, Plaintiff does not argue that the unidentified subordinates who acted unlawfully were FDC officials with supervisory authority who intentionally discriminated against or acted with deliberate indifference with respect to Plaintiff's disability. The Eleventh Circuit has held that public entities can be held "liable under the RA for the conduct of an official with supervisory authority if… the official's

17

conduct constituted deliberate indifference." *Walton v. Fla. Dep't of Corr.*, 2020

U.S. Dist. LEXIS 161263 at * 57-58 (M.D. Fla., Sept. 3, 2020)(citing *Liese,* 701

F.3d at 350-351). However, Plaintiff does not allege sufficient facts for this

argument and Plaintiff cannot reasonably plead sufficient facts at this stage of the

litigation as no FDC Defendants or corporate representatives have been deposed in

this matter. As a result, it is entirely unclear how Plaintiff intends to proceed with

this claim without any testimony or even simply being able to identify the programs

he claims to have been denied, as there have been none.

Because Plaintiff's ADA/RA claim proceeds under a theory of vicarious

liability and the precedent in this circuit holds that vicarious liability is unavailable

under Title II of the ADA, Count III in its entirety fails to state any claim upon which

relief can be granted.

### C. Count III must fail as Plaintiff has not alleged facts sufficient to abrogate state sovereign immunity.

Title II of the Americans with Disabilities Act (ADA) validly abrogates state

sovereign immunity insofar as it creates a private cause of action for damages against

the States for conduct that **actually** violates the Fourteenth Amendment. U.S.C.A.

Const. Amend. 14; Americans with Disabilities Act of 1990, § 201 et seq., 42

U.S.C.A. § 12131 et seq. *U.S. v. Georgia*, 546 U.S. 151 (2006). Allegations that may

violate both Title II and the Equal Protection Clause of the Fourteenth Amendment

are those in which a prison official "irrationally preventing disabled persons from

accessing activities and services in prisons" *Black v. Wigington*, 811 F.3d 1259 (11th Cir. 2016)(citing *Georgia*, at 159.)). The Court in *Black* goes on to recommend that the question of whether conduct *actually* violated the petitioner's Fourteenth Amendment rights should take inquiry as to whether or not the Petitioner's Fourteenth Amendment Due Process Claims are "immaterial and made solely for the purpose of obtaining jurisdiction" or are "wholly insubstantial and frivolous." *Id.* at 1270.

Here, Plaintiff has not alleged any Fourteenth Amendment violations in his Complaint and specifically not against Secretary Dixon. For the reasons stated above, Plaintiff has not identified the precise benefits he claims to have been excluded from, who the alleged 'subordinates' were, or how any of this was tied to his disabilities, which contradicts his own sworn interrogatory responses that indicate if anything he believes it was due to his grievances.

Such alleged violations further cannot be vicariously brought because liability for constitutional deprivations under § 1983 cannot be based on the theory of respondeat superior. *Craig v. Floyd Cty*, 643 F.3d 1306, 1310 (11th Cir. 2011); *see Denno v. Sch. Bd. Of Volusia Cnty*., 218 F.3d 1267, 1276 (11th Cir. 2000). Instead, a government entity may be liable in a § 1983 action "only where the [government entity] itself causes the constitutional violation at issue." *Cook ex. rel. Estate of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1116 (11th Cir. 2005) (citations

19

omitted).  Thus, a plaintiff must establish that an official policy or custom of the government entity was the "moving force" behind the alleged constitutional deprivation. See *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 693–94 (1978).

Here, Plaintiff's allegations in Count III do not sufficiently assert an official policy or custom of Ricky Dixon, in his official capacity as the Secretary of the Florida Department of Corrections, that was the moving force behind the alleged constitutional violation.  No corporate representatives for FDC were deposed in this matter, nor were the other FDC Defendants, Savonia Richardson-Graham or Dr. Kalem Santiago. Plaintiff therefore has no record evidence to identify in support of his conclusory allegations regarding any violation. For that reason, any claims against Defendant Ricky Dixon for ADA/RA violations are barred by sovereign immunity and therefore Count III must be dismissed.

### D. FDC is immune from claims of willful or wanton misconduct and negligent training.

Although Florida provides a limited waiver of sovereign immunity through section 768.28, Florida Statutes, it does not waive immunity for allegations arising from discretionary functions. "[E]ven absent an express exception in section 768.28 exempting discretionary functions, certain judgmental decisions of governmental authorities which are inherent in the act of governing cannot be the subject of traditional tort liability." *Commercial Carrier Corp. v. Indian River County*, 371 So.2d 1010, 1020 (Fla. 1979). Discretionary functions are interchangeably referred

to also as planning-level functions. *See Emig v. State, Dept. of Health & Rehab. Services*, 456 So. 2d 1204, 1206 (Fla. 1st DCA 1984).

"A discretionary act is one that involves an exercise of executive or legislative power that, if the court were to intervene, it would 'entangle' itself in questions of policy and planning." *Doe v. Baker Cnty.*, 2025 WL 833231 (M.D. Fla. 2025) (citing *Vaden v. Campbell*, 2009 WL 1919474 at 3* (N.D. Fla. 2009)). Decisions regarding "how to train [law enforcement] officers and what subject matter to include in the training is clearly an exercise of governmental discretion regarding fundamental questions of policy and planning." *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1267 (11th Cir. 2001); *see also Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1117-18 (11th Cir. 2005). The Department's alleged deficiencies in training are therefore discretionary, planning level functions for which FDC is entitled to sovereign immunity. *See, Rice v. Fla. Dept. of Corr.*, 2023 WL 3645606 (M.D. Fla. 2023). *Cf., Slonin v. City of West Palm Beach*, 896 So.2d 882, 884 (Fla. 4th DCA 2005) ("There is no sovereign immunity barrier to making a claim against a governmental agency for negligent retention or supervision.") Plaintiff has not alleged any specific failure in FDC implementing an established policy and the Third Amended Complaint only contains conclusory allegations such as:

> ¶ 173. Dixon acted intentionally and/or with deliberate indifference to Plaintiff's need for reasonable accommodation by, among other things:

…

c) failing and intentionally refusing to train FDC employees regarding
the humane management of physically disabled inmates.

No record evidence in this case supports such an assertion, as Plaintiff has

deposed no FDC employees or corporate representatives and there is no documented

evidence to indicate who Plaintiff claims was not trained, nor which policy they were

not trained on. As argued above, this is a futile argument regardless due to the

protections of sovereign immunity and therefore summary judgment is required.

*Simmons v. Florida Dept. of Corr.*, 2015 WL 3454274 (M.D. Fla. 2015) ("Plaintiff

fails to allege the existence of any training program or policy, let alone how that

training program or policy will or should be implemented.").

## V.    CONCLUSION

There can be no dispute of material fact regarding the Plaintiff's access to care

and ADA programs during his incarceration. As Plaintiff has not deposed any FDC

employees or corporate representatives, he has no record evidence to support his

conclusory allegations which while they may have allowed him to survive the

pleading stage, they cannot defeat summary judgment.

WHEREFORE, Dixon respectfully requests this Court enter final summary

judgment in his favor as to Count III of Plaintiffs' Third Amended Complaint and

grant such other relief as the Court deems proper.

Respectfully submitted,

*/s/ Thomas Buchan*
Thomas Buchan
Florida Bar No. 1010923
Howell, Buchan & Strong
2898-6 Mahan Drive
Tallahassee, Florida 32308
(850) 877-7776
Tom@jsh-pa.com
*Attorney for Defendants Dixon, Santiago, and Richardson-Graham*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing was served to all counsel of record by CM/ECF on April 17, 2025.

*/s/ Thomas Buchan*
Thomas Buchan