UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ELMER WILLIAMS,

    Plaintiff,

v.

RICKY DIXON, et al.,

    Defendants.

Case No. 3:22-CV-997-BJD-LLL

**PLAINTIFFS' NOTICE OF SERVING RESPONSES TO DEFENDANT DIXON'S FIRST INTERROGATORIES**

Plaintiff Elmer Williams, through counsel, pursuant to the Federal Rules of Civil Procedure, has served on the above Defendant(s) Plaintiff's Responses to Defendant Dixon's First Interrogatories, with a copy of this notice.

I CERTIFY a true copy hereof was served on all attorneys of record on 9/9/24.

Respectfully submitted,   s/James V. Cook
    JAMES V. COOK, ESQ.
    Florida Bar Number 0966843
    Law Office of James Cook
    314 West Jefferson Street
    Tallahassee, FL 32301
    (850) 222-8080
    (850) 561-0836 fax
    cookjv@gmail.com

    ATTORNEY FOR PLAINTIFF

## PLAINTIFF'S RESPONSES TO DEFENDANT DIXON'S
## FIRST INTERROGATORIES TO PLAINTIFF

1. Pursuant to Count III of your Third Amended Complaint [Doc. 93], Violation of ADA/RA (against Secretary Dixon), identify every specific Americans with Disabilities Act ("ADA") benefit(s), program(s), service(s), or activity(ies) which you either did not receive or in which you were not allowed to participate.

**Response: There were many benefits, programs, services, and activities I could not participate in or could only participate in on a limited or intermittent basis, including eating, bathing, dressing, housing; access to phones, socialization; exercise; rehabilitative programs; assistive devices; recreation; mobility; access to canteen; access to common dining area; general accessibility to common areas of prison; specialized medical care (including wound care and transportation for lab work); games; integration; socialization; visitation; emotional support; friendship; conversation; mental stimulation; radio and television; other entertainment; reading and study; access to restrooms, showering; mail.**

2. Did you ever apply for any ADA programs while incarcerated at Suwannee Correctional Institution ("Suwannee C.I.")? For every application, include and identify the following:

a. The manner and method by which you applied;

**Response: I made written requests to take an ADA class which was ignored, gave verbal requests and wrote grievances and demonstrating obvious need. I later found out there was a form you could fill out for some kinds of assistive devices but no one told me about it. We didn't have any kind of orientation on this.**

b. The date(s) on which you applied;

**Response: Almost daily. On a regular ongoing basis; I would refer you to my grievances for their dates. Otherwise I did not keep regular notes.**

c. The number of times you applied;

**Response: Almost daily. On a regular ongoing basis. To the extent that my need was obvious, my application was constant. Officers could see me crawling on the floor. I subsequently learned there were forms other than grievance forms by which accommodations could be requested but we were never given any sort of orientation on those processes. I asked to go to an ADA class but my request was ignored.**

d. The response to the application, including whether such application was denied, granted, or otherwise answered; and

**Response: Flat denial; Sarcasm: "You can try to hold onto the walls" [response to question about how I was going to get back to the Dorm without a wheelchair]. Dr.**

**Figueroa once told me if I couldn't get up on the table by myself he wouldn't examine me. I told him I couldn't but there was an inmate who could help me but he wouldn't allow it. So that day I didn't get examined.**

e. Any grievances filed as a result of or pertaining to any program(s), service(s), or activity(ies) you requested to participate in.

**Response: See Grievances that I will provide in place of writing.**

3. To the best of your knowledge, identify and explain the application process for applying for an ADA accommodation at Suwannee C.I. Include the following:

a. The manner or method in which an inmate applies;

**Response: This requires a legal response so I would defer to my lawyer on that but I am told that it is a misconception that an accommodation for a disability has to be formally applied for (like a driver's license). To the best of my knowledge you request accommodation verbally or in writing or obviously be in need of the accommodation to perform major life functions. For instance, when I was having to crawl around on a filthy cell floor to get food or use the toilet. Sometimes prison officials would watch me for a while through the window and then move on without doing anything or (apparently) telling anyone. This was how things worked at Suwannee C.I.**

b. The Department of Corrections personnel or office that handles such applications;

**Response: There is an ADA committee that is supposed to meet quarterly but in the meantime, medical provides many of the accommodations. It was very informal. To use a wheelchair as an example, you can ask for a wheelchair from Dorm officials and sometimes they keep an extra or they will borrow (or take) a wheelchair from an inmate to whom one is assigned. In confinement sometimes they would let a disabled inmate use a wheelchair. Sometimes they wouldn't. I later learned you could file a form to ask for an assistive device but there was no orientation that told you how to do that. I heard later about an ADA class and I asked to attend but was ignored. And we never knew whether the forms we sent, or the letters, or the grievances, would actually get to their destination or end up in the trash or in the back of a file drawer.**

c. Any other pertinent information necessary to describe ADA accommodation applications for prisoners with disabilities.

**Response: As an example, Dorm Supervisors can access wheelchairs and so can medical staff; corrections and medical staff are supposed to assist inmates to secure assistance and help with paperwork.**

4. For all ADA accommodations you requested as stated in paragraph 172 of your Third Amended Complaint [Doc. 93], identify the following:

a. The manner and method by which you applied for each of these accommodations;

3

**Response: I can't provide the manner or method of each request. We couldn't make them directly to Secretary Dixon but I made them to prison officials at various levels and also to medical staff. See my grievances. I made requests by verbal request, by grievance, and by demonstrating an obvious need.**

b. The date(s) on which you applied;

**Response: I expressed my needs daily, except to the extent that corrections or medical staff became angry and threatened to retaliation by word or deed. For instance, I ended up in confinement (and missed my chance to get blood work done in order to find out my PSA level back in 2021) because Sgt. Richardson found out I was writing a grievance against her and she took the grievance away from me (pulled it out of my shirt pocket) and accused me of disobeying an order when I couldn't walk to my ICT meeting because I was paralyzed.**

c. Whether any of these applications were denied, granted, or otherwise answered; and

**Response: After some months, I was allowed to use a wheelchair. I finally got some wound care. When I got out of confinement, I was able to contact my family and eat and drink with less effort. I was unable to sit on the shower bench because of my paralysis so I had to shower sitting on the filthy shower room floor, sometimes in my own feces. I needed full assisted care but didn't get it.**

d. Any grievances you filed as a result of or pertaining to any ADA accommodation(s) you requested and that was denied.

**Response: I will submit the grievances that I have in place of writing.**

5. Pursuant to Count III of your Third Amended Complaint [Doc. 93] Violation of ADA/RA (against Secretary Dixon), identify each ADA accommodation(s) you requested but were not provided.

**Response: See the answer to Interrogatory 1. Also, I was denied a wheelchair; transportation to have blood work done; medical care. It would be impossible to list all the things you miss out on because you are not mobile, because you are locked up or bed-ridden.**

6. As to paragraph 169 of your Third Amended Complaint [Doc. 93], identify all "subordinates who retaliated against disabled prisoners, including Plaintiff…"

**Response: I am not aware of "all" subordinates who would retaliate against inmates. A lot of the retaliation was indirect. Most of the prison officials I had to deal with knew that I was considered a "writ writer" (someone who writes grievances). I think some of my family members made prison staff angry as well by checking on me and asking for help. Some (including contract agents) were Tony Abbott, Jason Howell, Savonia Richardson, Jessee Morris, Gerald Knaus, and officers whose names I didn't know who obstructed our requests, like the confinement officers who refused to**

provide transportation to have my bloodwork done so I and the medical staff would know the status of my PSA level.

7. As to paragraph 170 of your Third Amended Complaint [Doc. 93], identify all "subordinates who would deny reasonable accommodations to inmates…"

**Response: I am not aware of "all" subordinates who would deny reasonable accommodations to inmates. Most of the denials were done through the bureaucracy. Some (including contract agents) were Tony Abbott, Jason Howell, Savonia Richardson, Jessee Morris, Gerald Knaus, and officers whose names I didn't know who obstructed our requests, like the confinement officers who refused to provide transportation to have my bloodwork done so I and the medical staff would know the status of my PSA level. There was a committee in charge of ADA accommodations. We never learned who canceled the wound care program for wounds like mine that wouldn't heal in two months.**

8. Identify all Florida Department of Corrections ("FDC") employees you interacted with in any way who Dixon and/or FDC failed or intentionally refused to train regarding the humane management of physically disabled inmates.

**Response: I am not aware of or able to remember all examples of persons who failed to train FDC staff to humanely treat disabled inmates but these stand out in my memory: Dr. Kalem Santiago, the Clinical Advisor, stated that she reviewed my records and concluded that I was properly treated. I presume that she, and likely the Health Services Director were involved in training standards. The Warden and the Secretary had to be privy to the lack of training and supervision in Florida prisons. Just a few years earlier, officers at the Reception and Medical Center let a quadriplegic prisoner go without food or water or hygiene or medical care for nearly a week so that he was severely dehydrated and died a few weeks later. The story was published in the Miami Herald as a front-page story. An FDC spokesperson said that prison officials were disciplined but it turned out that most of them received very little consequences and the abuses continue.**

9. Identify any FDC policy or procedure of which you are aware that specifically details the manner in which physically disabled inmates are to be "managed."

**Response: I understand there are Health Services Bulletins that guide corrections and medical staff. I don't know all the policies or procedures. To me, the word "managed" refers to the "care and control" of all inmates by all prison staff. Prison officials have told me that all inmates have to obey all officers, even if their orders are conflicting or impossible to perform. For instance, Sgt. Richardson could order me to "walk" when I couldn't walk and then she could charge me with disobeying an order and have me put in confinement where I was managed in the sense that I couldn't communicate with family or go to medical to have my blood work done. I was ordered to stay in my bunk but was unable to get from the bunk to the floor to**

**crawl to the door to get food and drink or to the toilet to urinate or defecate.**

10. With respect to the notes that you snuck out of confinement (referred to in your January 10, 2023, deposition at page 59 lines 8-13):

a. Identify those notes in the manner described in paragraph 10 of the instructions;

**Response: I used the term "snuck out" because messages were often thrown away by prison staff if they discovered them – even legal mail which is supposed to be confidential. I think in my deposition I was just talking about one note. I don't remember who I tried to get that message to but guess it was another inmate, maybe an orderly. I might have asked someone to call my family and tell them I was locked up. I always had to be careful with anything I wrote. I believe that Sgt. Richardson sent me to confinement in the first place because she knew I was writing her up in a grievance. In fact that day she reached over and pulled the grievance I started out of my shirt pocket and I never saw it again. I did take a lot of notes with the intention of filing a lawsuit as soon as I was able and I did manage to get out with some of them – not all. All the inmates I knew had to watch any legal materials they had to try to keep them from being stolen by prison officials during searches. And the guards would make comments to us about them to show they knew what we were writing. The notes I was talking about were notes about what I went through in prison that I would be able to use to preserve my legal rights to hold prison officials accountable for their abuses. They were just notebook pages that I sent to my lawyers although my property was interfered with and I wasn't able to get all of my notes out of the prison. I have to assume they were hidden or destroyed by prison officials like Sgt. Richardson who took my unfinished grievances. I don't know where all the notes ended up but there were a lot of my documents missing when I left prison.**

b. Identify the individuals to whom they were delivered in the manner described in paragraph 8 of the instructions; and

**Response: As I said, in my deposition I was just talking about a single note. However, I sent notes to my attorney, Mr. James Cook, by legal mail. He has been an attorney since I have known him. His address is on these responses.**

c. Identify the act or event of sneaking the notes in the manner described in paragraph 13 of the instructions.

**Response: The act of "sneaking" notes means trying to keep them from being taken away from me or stolen from my property and sending them out as soon as possible so that they would be safe in the hands of my attorneys. I probably sent mail out every week or two for most of the time. As my paralysis became worse it became harder to write and my mailings probably became less frequent. My attorneys asked me to send them all the information I could and I understood that the information would be used to put together a lawsuit for me.**

*Pursuant to § 92.525, Florida Statutes, and 28 U.S.C. § 1746, I hereby declare under penalty of perjury that I have read the foregoing document and that the facts stated in it are true.*

_____
**ELMER WILLIAMS**                                                        **DATE** 9-9-24

*/s/James Cook, Esq.*, 850-222-8080, cookjv@gmail.com