Review of Care for Mr. Elmer Williams in the Florida Department of Corrections

Table of Contents

A.  Background and Qualifications                    p. 1

B.  Role and Information Reviewed                    p. 4

C.  Timeline and Records Review                      p. 5

D.  Findings                                         p. 24

E.  Summary                                          p. 33

**A.  Background and Qualifications**

I am a physician, internist, and epidemiologist with over a decade of experience in
providing, improving, and leading health services for incarcerated people. My clinical training
includes residency training in internal medicine at Albert Einstein/Montefiore Medical Center
(2007) and a fellowship in public health research at the New York University School of
Medicine (2009). My experience in correctional health includes two years visiting immigration
detention centers and conducting analyses of physical and mental health policies and procedures
for persons detained by the U.S. Department of Homeland Security. This work included and
resulted in collaboration with U.S. Immigration and Customs Enforcement ("ICE") on numerous
individual cases of medical release, the formulation of health-related policies, as well as

1

testimony before the U.S. Congress regarding mortality inside ICE detention facilities.

After my fellowship training, I became the Deputy Medical Director of the Correctional
Health Services of New York City. This position included both direct care to persons held in
NYC's 12 jails, as well as oversight of medical policies for their care. This role included
oversight of chronic care, sick call, specialty referral and emergency care. I subsequently was
promoted to the positions of Medical Director, Assistant Commissioner, and Chief Medical
Officer. In the latter two roles, I was responsible for all aspects of health services including
physical and mental health, addiction, quality improvement, re-entry and morbidity and mortality
reviews, as well as all training and oversight of physicians, nursing, and pharmacy staff. In these
roles, I was also responsible for evaluating and making recommendations on the health
implications of numerous security policies and practices, including correctional officer responses
to patients in distress and medical observation. My responsibilities during this time also included
review and approval of all medical and mental health policies, including those relating to intake
health assessments, chronic care and sick call, emergency responses, mental health and substance
abuse care, infirmary care and transfer of patients for higher levels of care. I have also provided
training to correctional staff, reviewed and made contributions to correctional policies regarding
identification and working with incarcerated people with disabilities, whether intellectual,
behavioral health or physical.

In my role as Medical Director and Chief Medical Officer, I reviewed and approved all policies
medical and nursing including those relating to how health staff should respond to injuries and
how to document and injuries stemming from use of force. I also worked closely with

2

correctional leadership to provide training to correctional staff on traumatic brain injuries and other common injuries that occur during use of force. I have also provided input on security policies and provided training for security staff relating to how correctional staff should recognize signs of illness and injury among incarcerated people.

In March 2017, I left Correctional Health Services of New York City to become the Director of Programs for Physicians for Human Rights. In this role, I oversaw all programs of Physicians for Human Rights, including training of physicians, judges, and law enforcement staff on forensic evaluation and documentation, analysis of mass graves and mass atrocities, documentation of torture and sexual violence, and analysis of attacks against healthcare workers. Between December 2018 and April 2020, I served as the Senior Health Fellow and President of Community Oriented Correctional Health Services ("COCHS"), a nonprofit organization that promotes evidence-based improvements to correctional practices across the United States. I have also worked as a medical expert in cases involving correctional health since 2017, and I published a book on the health risks of jail (Life and Death in Rikers Island) that was published in early 2019 by Johns Hopkins University Press.

Since April 2020, I have worked on numerous COVID-19 responses in detention settings. During this time, I have conducted dozens of court-ordered inspections of detention facilities to assess the adequacy of their COVID-19 responses in ICE detention centers, county jails, and state and federal prisons. I was also named as an independent monitor for COVID-19 response for both the Connecticut State Prisons and the Hawaii Department of Corrections, and I was

3

named as COVID-19 inspector by a Federal Court for the Bureau of Prisons facility in Lompoc,

California.

I have also been named as Federal Court-appointed monitor for the health services in the Santa

Barbara, California county jail, the Fluvanna Prison for Women in the Virginia Department

of Corrections and the Criminal Justice Complex in St. Thomas, United States Virgin Islands and

the Cumberland County Jail in New Jersey.  I am currently retained as a correctional health

expert by two State Attorneys' General and the U.S. Department of Justice

A copy of my curriculum vitae is attached to this report as Exhibit A. My fees for this report are

$500 per hour to review documentation and to write a report regarding my findings and expert

opinions. In addition, I charge $500 per hour for deposition and court testimony. Finally, I

charge $250 per hour for travel time and actual expenses for travel costs such as mileage, hotel,

airfare, car rental, and meals. My compensation is not contingent upon my conclusions or

opinions.

### B.  Role and Information Reviewed

I have been retained by Mr. Elmer Williams (Case No. 3:22-cv-955, U.S. District Court, Middle

District of Florida Jacksonville Division) to review the adequacy of care he received while

incarcerated in the Florida Department of Corrections (FDC). In order to formulate my opinions

in this case, I have reviewed the following:

- Medical records for Mr. Williams during FDC incarceration.

4

- Medical records for Mr. Williams after release.

- Classification records for Mr. Williams, including Grievances and Disciplinary Charges
  for refusing to walk to an Institutional Classification Team (ICT) call-out.

- Complaint of Mr. Williams v. Dixon et al, Case No. 3:22-cv-955, U.S. District Court,
  Middle District of Florida Jacksonville Division.

- Deposition transcript of Mr. Williams

- Interrogatory Answers by Mr. Williams

- Interview with Mr. Williams 11/15/23

- Photographs of Mr. Williams

- Email regarding Mr. William Washington, letter from Mr. Washington to FDC

### C.  Timeline and Medical Records Review

Mr. Williams entered FDC custody in 1999 on a 40-year sentence for burglary. At the time he

was 32 years old. In 2017, when he was 50, Mr. Williams was diagnosed with prostate cancer.

Mr. Williams underwent treatment for his prostate cancer, including radiation therapy, and was

told he was in remission in 2018. At the time, Mr. Williams was told that his prostate specific

antigen (PSA) level was 0.2 and that the PSA level would stay low as long as he remained in

remission. Mr. Williams continued to see oncologists and receive hormone treatment three times

per year for several years afterwards.[1] At the end of 2020, Mr. Williams was told by urologist

Dr. George Miquel that he would stop the hormone treatment for six months to see if he

---

[1] Mr. Williams was receiving three times per year treatments with Leuprorelin (Eligard), which
is a hormone treatment that can reduce the symptoms of advanced prostate cancer by inhibiting
testosterone production and growth of prostate cancers that rely on testosterone for growth.
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2697591/

continued to experience remission. That encounter occurred in December 2020, and the follow-up to check back on whether Mr. Williams was still in remission was scheduled for June 2021. This appointment with Dr. Miquel did not occur in June 2021 and Mr. Williams was not seen again to reassess the stoppage of his hormone treatment before his transfer to Suwannee Correctional Institution (Suwannee C.I. or "Suwannee"), a prison in the Florida state prison system, in November 2021. During that time, a repeat check of Mr. Williams PSA was conducted, showing that his level has risen from 0.2 to 5.2, representing 2600 percent increase and represents a dangerous trend out of remission. No action was taken as a result of this result to ensure Mr. Williams was seen for a potential return of his cancer.

Once Mr. Williams was transferred to Suwannee C.I., records indicate that his prostate cancer was noted by health staff, but that he did not receive actual assessment or care based on the alarming PSA result or the prior orders of his oncologist. Mr. Williams medical records include a "New Intake" note written on a progress note dated 11/1/21 by Dr. Almanzar. This note documents "male patient who has hx of prostate ca, who has pending eval with urology and probable Chemotherapy. Patient also reports has pain nerve at the right shoulder level." This note has an extremely brief physical exam and neither the assessment nor plan mention prostate cancer or cancer treatment other than "continue with plan". There is no review of PSA values in this note and no specific information about pending appointment dates, whether they are scheduled or need to be rescheduled. No questions or information is present about basic urologic symptoms including frequency of urination, back or abdominal pain, hematuria, loss of bowel or bladder control or problems standing or walking.

On 11/5/21, a progress note entry is present reporting "I/M seen by telepsych, Dr. Razal." Entered by nurse Milian.

A clinician's order sheet is present dated 11/18/21 with medication orders for Toradol, Flexeril and Solumedrol with nurse practitioner Abbott's signature.

A clinician's order sheet is present dated 11/19/21 with medication orders for Flomax, lisinopril and hydrochlorothiazide for one year nurse practitioner Tony Abbott's signature.

On November 18, 2021, Mr. Williams was at Suwannee and was seen by two nurses, Jason Howell and Abbott, during a nursing sick call for pain and numbness in his legs and back. No referral to higher level of care or assessment was made, and there is no evidence that Mr. Williams recent spike in his PSA level (from 0.2 to 5.2) was reviewed or his history of prostate cancer or missed follow up regarding his treatment having been stopped was reviewed. This encounter was conducted using a back pain protocol. Nurse practitioner Abbott includes a note on the same day in Mr. Williams medical records questioning whether an urgent referral for urology care in October 2021 was ever submitted. No plan is documented in this note about how this question will be addressed and no review of the recently elevated PSA or prior oncology assessments and plans is evident.

On 11/24/21, a 'Pre-Special Housing Health Evaluation'[2] is present in Mr. Williams medical records. This form includes the current medical complaint as "States his legs are numb." This encounter form includes no information from the nurse about how long these symptoms have been present, what other symptoms are present, what makes the symptoms worse or better, and

[2] It should be noted that this "Pre-Special Housing Health Evaluation is a medical evaluation required because Williams was being locked up in solitary confinement on charges of "disobeying an order." Mr. Williams was charged with refusing to go to a call-out for an Institutional Classification Team (ICT) evaluation for a job placement. Mr. Williams contended that he was unable to walk, and two inmate affidavits supported that contention, while Dorm Sergeant Savonia Richardson contended that he could walk and was simply refusing to go. Mr. Williams said he asked for a wheelchair to go to the ICT call-out but was refused by Sgt. Richardson but he was then placed in a wheelchair and taken to confinement.

7

whether he is having any problems with activities of daily living. The vital signs include elevated

heart rate of 105, and the "Infirmities or impairment" question is marked 'no.' No assessment of

how Mr. Williams' symptoms will impact his activities of daily living or plan for

accommodation is present in this note.

Another form is present on the same day and time (09:15 am), a 'Chest Pain Protocol' form in

Mr. Williams medical records. This document records Mr. Williams symptoms as "My chest

hurts and I can't breathe or walk." This form also documents that Mr. Williams pain radiates "all

the way to legs" and under additional symptoms, documents "legs locking up." The pulse

documented in this form is also elevated, 104. The medical history section of the form is left

blank. Two nurses signed this form, nurse practitioner Abbott and Howell, and no referral to a

higher level of assessment or care is documented. There is no documentation of any review of

Mr. Williams' medical history including his prostate cancer, and no review documented that his

outstanding appointments were reviewed or that his laboratory tests were reviewed, including his

recent PSA spike. No assessment of how Mr. Williams symptoms will impact his activities of

daily living or plan for accommodation is present in either of these notes.

Mr. Williams submitted an informal grievance on November 24th regarding his need for a

wheelchair because these symptoms of pain and weakness.

On the same day, Mr. Williams was cited with a disciplinary action for not going to a mandatory

meeting called institutional classification team. He reported to the officers in the housing area

that he was physically unable to walk to this meeting because of pain and weakness, and because

had not been provided a wheelchair. He also wrote to the disciplinary committee that "I can not

walk on my own at all. I'm paralyzed and getting worse. Medical denied me a wheelchair cane

walker so I'm helpless." The FDC did not provide any video review, as requested by Mr.

Williams as proof of his inability to walk. Mr. Williams gave specific location of two cameras
that would support his claim of not being able to walk unrelated to responding to the morning
call-out order that resulted in his being punished. The disciplinary report indicates that the video
was not even reviewed (by checking the box 'not reviewed') but gives no reason for this failure
to review the evidence he attempted to offer except an extremely vague catchall sentence "Based
upon review of the identified tape or the capabilities of the particular taping equipment, the tape
requested does not provide evidence to support the inmate's statement. There is no testimony or
information provided from health staff and no information from a facility ADA coordinator. The
disciplinary report does include the following sworn statements by other incarcerated people who
observed Mr. Williams;

- "He tried to move as fast as he could, but he really can't walk. And the time she called
  call-outs he didn't know he had a call-out."

- "He can't really walk. He didn't no he had a callout."

The FDC staff took this information and decided that Mr. Williams was guilty of the infraction
of "disobeying a direct order." These staff also decided that Mr. Williams should be punished
with 30 days in solitary confinement, referred to as "confinement" in FDC for this rules
infraction. [3]

A sick call request form is present on 11/27/21 that states "I haven't had a bowel movement in 4
days and I've been eating 3 full-course meals daily."

---

[3] Because Williams was not provided with a wheelchair despite his inability to walk, Williams
states he had to drag himself across a filthy prison cell floor to get food or water or try to use the
toilet. Williams says that was the beginning of his necrotizing fasciitis infections in his ankles.

Mr. Williams submitted another informal grievance the following week, on December 2nd, about his inability to get to the medical clinic without a wheelchair for care because of his weakness and pain.

Mr. Williams reports that he attempted to declare a medical emergency while in confinement due to his pain and inability to walk, but that he was told by Nurse Jessee Morris that could not declare a medical emergency because there was no physician in the facility at the time. This denial of responding to a medical emergency report led Mr. Williams to submit a grievance on December 4th, 2021. Mr. Williams reports that he was denied the ability to receive badly needed assessment and care for his pain and inability to walk while in confinement, that he was never provided accommodation via wheelchair, and that when he was set to be released, he was told to sign a refusal of treatment form, which he refused to do.


On 12/20/21, Mr. Williams was seen by Dr. Figueroa for lower extremity swelling, pain and inability to walk. In this encounter, Dr. Figueroa records that Mr. Williams' symptoms have been ongoing for over one month, including swelling and inability to use both legs and makes the assessment that he is unable to bear weight on his legs. This note goes on to document a plan for either infirmary admission or bed rest/lay-in until Mr. Williams is seen again in the next 24 hours. There is no review of the urology plans in Mr. Williams medical records in this encounter, and the PSA level of 5.2 is noted without any mention or review of pending urology appointments, comparison the new PSA level to the prior level of 0.2, and the only mention of the prostate cancer in the plan is "continue monitoring prostate issues". In this note, Dr. Figueroa also acknowledges that Mr. Williams is "unable to walk" but writes "I do not recommend wheelchair at this time'.

It appears from medical records that Mr. Williams was simply told to return to his housing area after this encounter, and that he was not transferred to the infirmary. According to Mr. Williams, he was told to hold on to the walls to get back to his housing area. It also appears that he was not seen by another provider the next day, as was identified as a need by Dr. Figueroa.

On 12/22/21, a telephone encounter is present indicating that Mr. Williams sister called to report his ongoing inability to walk and ongoing pain.


On 12/24/21, Mr. Williams was seen in the Suwannee 'Emergency Room' which is a clinic inside the FDC system, not an actual accredited hospital emergency department. This encounter again documents Mr. Williams' reporting that he cannot function in his housing area and that he has declared a medical emergency. There is no physical examination documented in this note. The note for this encounter indicates that no treatment was given and that again, despite being in a  wheelchair at the time of the encounter, Mr. Williams was told to return to his general population housing area, with the unclear recommendation "IMP will have to do the best he can to complete ADL's." This note, signed by nurse Gerald Knaus, also indicates that Dr. Figueroa has been notified about Mr. Williams encounter.

A sick call encounter is present with nurse Knaus on 12/27/21, regarding Mr. Williams' inability to have a bowel movement and the nurse makes multiple references to Mr. Williams, abusing the medical service, notwithstanding the notation by Dr. Figueroa a week earlier that Mr. Williams couldn't walk. The entire assessment for this sick call encounter is "Pt is abusing the sick call system. He puts in a sick call for 1 item then has several medical complaints." The plan/education parts for this encounter are "refer to provider for possible mental health

11

assessment" and "Use sick call for issue needs not wants." Like other encounters where Mr.
Williams is seeking care, there is a copay indicated for this encounter despite no physical
examination and despite no documentation of review of prior medical records showing lower
extremity weakness, inability to stand or walk.

A sick call form is present dated 12/31/21 that reports "My ankles are badly infected and swollen
and need to be cleaned, sanitized and bandaged up." The fields for time & date that the sick call
form was received, the name of the person who conducted the initial triage and the level of
urgency assigned to the sick call report are all blank. The date of service when Mr. Williams was
seen is recorded as 1/7/21, by nurse Howell. During this month, Mr. Williams skin ulcers were
characterized as foul smelling and identified as necrotizing fasciitis (flesh-eating bacteria).

Another sick call form is present from the same day, which reports paralysis and pain, "I'm
paralyzed and suffering from severe nerve damage and need pain shot for pain because naproxen
not ibuprofen is strong enough to desist pain." The information about when this form was
received is missing, but the date of triage is marked 1/2/22, 48 hours after the sick call form
submission date of 1/21/22.

A sick call encounter with nurse Howell is present on 1/5/22, which indicated a rapid, irregular
heart rate of 125 bpm, elevated blood pressure, new and worsened lower extremity edema,
diminished breath sounds in the left side of the chest, and a plan to notify the clinician. No
clinician encounter is documented on this day.

Two days later it appears that Mr. Williams is admitted to the infirmary based on an infirmary
admission note from the morning of 1/7/22. This note is signed by nurse Holmes and Dr.
Figueroa. This encounter appears to identify Mr. Williams' weakness and pain and possible

neuropathy, with EMG's ordered, but he is also prescribed medications typically utilized for

heart and/or kidney failure. There is a notation to continue the recommendations of the urologist

for Mr. Williams prostate cancer, but no actual review of the latest recommendations or notes

from the urologist is present in this admission, and there is no mention of the dramatic rise in

PSA from 0.2 to 5.2. In fact, the part of the note that documents 'Last PSA' is listed as

"unknown." This admission assessment also identifies the profound lower extremity edema of

Mr. Williams with bilateral pressure ulcers over the malleolar domains with maceration of the

tissue (skin breakdown from moisture exposure) and includes a baseline Braden wound

assessment of 20. Despite prescribing Lasix and spironolactone, which would normally be

utilized when heart or kidney failure led to fluid retention, there is no mention of what the

potential cause of Mr. Williams fluid retention is except for stating that he has been taking a high

sodium and carbohydrate diet. The admission note includes an order for daily nursing evaluation

and daily wound care assessment "To be completed on every day shift".

An infirmary note on 1/11/22 includes a review of Mr. Williams prostate cancer care, his last

PSA and includes "referred to urology urgently". There is no new order or review of the status of

current urology referrals indicated in this note.[4]

An infirmary note on 1/12/22, 5 days after admission, nurse Wilson documents a foul odor

coming from Mr. Williams left foot ulcer.

---

[4] On January 11, 2022, FDC received two grievance appeals from Williams complaining of his
medical condition and the failure to address the condition by medical at Suwannee C.I. The
Secretary of Corrections' designees to respond to grievances on the Secretary's behalf, Adele
Johns and Wendy Millette, rejected the grievances as "not an emergency." Johns had inquired of
Rebecca Yates whether Mr. Williams' complaints constituted a medical emergency and Yates
responded that they did not.

On 2/8/22, an encounter with nurse practitioner Abbott is present which documents Mr. Williams reporting "I need to go back to urology because my PSA is elevated again." This note also documents "Patient was previously treated for prostate cancer and reports that he was taking Eligard at one point. He stated that his PSA came down to normal range and everything has been going well. Labs that were received on 1/11/22 shows a PSA of 21.00. He was started on Cipro BID x 21 days and patient had a urology referral completed by a previous institution but found out that it had never been submitted." A Urology consult request is also present that documents "work reflect elevated PSA (21.0). Urgent urologist evaluation was placed by previous institution but never submitted. Last PSA taken in 9/30/2021 was 5.21. Foley places due to anesthesia and urinary retention." This note was signed by Tony Abbott on 2/8/22.

Infirmary notes in March 2022 (3/22/22, repeatedly document that urgent urology referral is pending, and that recent PSA was 21.

By mid-February, Mr. Williams was discharged from to infirmary back to general population, still with stage 2 ulcers on his ankles, still using a catheter to urinate, still unable to walk and still without a clear reason identified for his fluid retention. He had not yet seen a urologist for his prostate cancer.

The discharge note from Dr. Figueroa includes the information that Mr. Willimas is reporting active discharge at his foley catheter site and that he is being discharged with a wheelchair. His discharge diagnoses include;

- Urinary retention

- Presence of foley catheter

- Decubitus ulcer

14

- Ataxia

- Benign hyperplasia of prostate

- Hypertension

- Elevated PSA

This discharge summary also states "Patient clinically stable and should be able to continue his treatment plan from his dorm."

In the days after his discharge from the infirmary, Mr. Williams would develop a urinary tract infection, which was clear from the pus and blood coming out of his urinary catheter. He reported this issue to nursing, who marked the concern as urgent, but he was not seen the same day (2/18/22), and Mr. Williams submitted additional sick call and grievance forms the following day.

Mr. Williams filed a grievance on 4/1/22 reporting that he had to sit on the floor in the shower because he was unable to walk. His concern focused on the unsanitary nature of being forced to sit on the floor of a shower used by dozens of other people when he had open ulcers on his ankles and buttocks. Mr. Williams reported that FDC staff member Richardson-Graham threatened him with retaliation for filing this grievance, and this included being threatened for not adequately cleaning up after himself after he was forced to sit on the shower floor. Several more grievances were filed in April and May 2022 by Mr. Williams reporting that he was missing meals and was forced to pay other incarcerated people for assistance because of his not being accommodated for mobility impairment and pain. In one grievance, he wrote

"I have no-one to help me change out my clothing. As of to date 4-21-22, I haven't had a shower bath since 4-17-22. And I've missed countless meals because I have no one to put me in my wheelchair so I can eat. I've been subjected to having to pay for assistance because I've been desperate for help to get put in my wheelchair and no-one wants to help me for free."

"I have a catheter in me to urine in, I wear diapers, I cannot sit up on my own. I'm compelled to change my diapers in my bunk in front of the whole dorm on camera because I can't sit up or stand up to do it in the restroom."

I'm missing showers and meals until I can pay someone to help me out."

FDC repeatedly denied these informal and formal grievances of Mr. Williams, including the following;

"You are not being forced by any medical staff member to sit on the floor. You are not supposed to be housed in the infirmary, you were released by the clinician. Your chair is temporary (3 mo.)."

This lack of any accommodation for Mr. Williams continues for several more months, with Mr. Williams repeatedly submitting grievances regarding the inability to shower, eat or maintain his activities of daily living, and FDC replying with denials of his grievances.

Review of utilization management documents from Centurion show that the senior staff who comprise the utilization management committee were being repeatedly informed about the severity of his disease, with requests for the EMG tests to assess the neuropathy issue that was characterized by infirmary staff, as well as requests for urology and CT scan occurring in the months of February to July 2022. These requests and supporting notes make clear that Mr.

16

Williams is unable to walk and that his diagnosis is termed as "terminal." On July 29, 2022, prior to filing this lawsuit, counsel for Mr. Williams wrote to Dr. Figueroa:

> Dear Dr. Figueroa: Last week I visited your patient Mr. Elmer Williams, DC# 086916, and I understood from him that he was going to be sent to RMC for hospital care. I see that as of today, he is still at Suwannee Annex. I did observe the deep wounds to his feet and ankles and I understand that the wounds on his buttocks are similar. I want to very sincerely request that Mr. Williams be sent to an acute care hospital, such as Memorial Hospital in Jacksonville. I am especially concerned about surgical care. I understand you removed a mass of necrotic tissue from his heels and that the infection has gone right down to the bone. I have a medical release which I will attach to this e-mail. Please feel free to contact me if you want to discuss this case.

On August 4, 2022, not having heard back, counsel added:

> Dear Dr. Figueroa, I just wanted to add to my earlier email that Mr. Williams apparently fits into the category of patients with "wounds that fail to heal within two months" so that the CHO must notify the Regional Medical Director for approval to send the patient to a wound specialty facility. I don't believe Suwannee C.I. qualifies. Please feel free to call me on my cell phone at [redacted].

That same day, Dr. Figueroa responded:

> Good afternoon Mr. Cook. I have addressed all your questions to the legal department and they should be contacting you momentarily. I can assure you as I have explained to Mr. Williams, we are doing everything possible to help him cope with this terrible and terminal condition. Unfortunately, this is as far I can help you with your concern. If you

have any further questions or concern please reach out to our administration.  Thank you

and have a great afternoon.

The next day, August 5, 2022, counsel received an e-mail from the Office of FDC's Chief

Clinical Advisor, Dr. Kalem Linette Santiago:

> Dr. Santiago, Chief Clinical Advisor, has reviewed this case and determined he is
>
> receiving adequate care.

Mr. Williams was transferred to another FDC facility, Reception and Medical Center (RMC) in

August 2022.  There, medical staff conducted the assessments (including imaging of his

abdomen and pelvis) to see that his cancer had spread from his prostate outwards to his spine,

from L1-L5 vertebrae, and had also spread to both hips and to numerous lymph nodes. This

extensive spread was identified as "terminal" by Dr. Figueroa. The necrotizing fasciitis of Mr.

Williams had also progressed to a severe stage in his buttocks and heel areas.

In October 2022, counsel for Mr. Williams was able to obtain photographs of his skin

ulcers/infections. The following five photographs show ulcers on his buttocks as well as 2 ulcers

on his right heel/ankle and another 2 ulcers on his left heel/ankle.











As of the time this report is submitted, Mr. Williams is undergoing treatment for prostate cancer
that has spread across his body. When I interviewed him, he was living in a nursing home and
had lost use of his legs and had also developed loss of function in one arm/hand. He reported
having a urinary catheter and using diapers every day but that "I don't even know when I'm
going anymore." He reported that he was receiving wound care every day from a nurse as well as
other nursing care/assessment multiple times per day. He reported that his understanding of his
cancer was that it had spread "all over my body", and that he was in nearly constant pain.

### D. Findings

Finding 1. Failure to provide required cancer care. The most alarming feature of Mr. Williams'

case is a lack of treatment for prostate cancer. I do not offer opinions about which modality of

treatment he should have received, whether radiation, chemotherapy, or even another attempt at

hormone therapy. He received none of those basic treatments when his cancer returned, and the

failure to treat his cancer is the core of FDC's deficiency. FDC health staff repeatedly failed in

their most basic obligation to provide cancer care they themselves had identified as necessary

and even initiated. Not only the medical staff at Suwannee, but the statewide FDC Clinical

Adviser, Dr. Kalem Santiago, the highest-ranking doctor in the FDC health services office,

reviewed and endorsed the way Williams had been treated, as well as the FDC office that

reviewed Williams' health care grievance appeals, acted to effectively quash any criticism of the

acts and omissions of the Suwannee medical staff, allowing them to continue as before.

The plan for Mr. Williams care was clear in late 2020, to temporarily halt his hormone treatment

with Eligard based on his extremely low PSA and then recheck in six months. This is a common

practice that hinges on the rechecking of the PSA, because if some cancer cells survive the initial

treatment, they will reproduce and start producing more PSA into the blood, which is the red flag

for needing a new round of treatment. When his PSA started to rise, and even after Mr. Williams

himself made sure the Suwannee C.I. practitioners were aware of the catastrophic effects of the

failure to treat, and even after the failure to treat was noted in the file. FDC and their private

health care vendor persistently failed to make sure that Mr. Williams was seen again as planned,

and this failure was compounded dozens of times as he was seen over the following 18 months

with a skyrocketing PSA and worsening symptoms of cancer spread in his spine and hips but

never received the potentially life-saving cancer care he desperately needed.

When the PSA level rises after prostate cancer treatment, this signifies a red flag for return of the cancer, because the rise in PSA can signal the existence of cancer cells that are producing PSA. This change requires urgent action to identify the location and spread of cancer cells and initiate treatment of the recurring cancer. It is common for prostate cancer to return or not be completely eliminated after an initial treatment effort, but when physicians become aware of this return, they have multiple options for treatment, including different hormonal treatments, radiation therapy, surgery and chemotherapy.[5]

Table 1, Mr. Williams PSA Levels in FDC

| Date | PSA | Action taken |
|---|---|---|
| December 2020 | 0.2 ng/ml | Stop treatment for 6 months to see if in remission |
| September 2021 | 5.2 ng/ml | No treatment |
| January 2022 | 21.0 ng/ml | No treatment |
| February 2022 | 43.4 ng/ml | No treatment |

Prostate cancer is the most common cancer among men in the United States, and it is a routine part of primary care to work with urologists after initial treatment to recheck PSA levels and make sure a patient is returned to assessment and care. After successful treatment, monitoring of

---

[5] https://www.cancer.org/cancer/types/prostate-cancer/treating/recurrence.html.

PSA levels involves making sure a patient does not have any elevation in their PSA, which is different than when prostate cancer is first being detected, when a PSA level of 4 or 5 may be used as a cutoff. The reason that post-treatment levels should be essentially zero is that the initial treatment for prostate cancer hopefully removes all of the tumor cells, via surgery or radiation and/or hormone treatment. A recurrence can be identified by new physical symptoms of urinary problems, or pain in the area of the prostate (back, hips, pelvis) but detection by blood test of elevated PSA is what most urologists use to find a recurrence, which can happen in up to 40% of cases.[6] This approach is so standard that the professional society for urology has clearly defined that diagnosis is based on two post-treatment PSA values > 0.2 ng/mL.[7]

The failures in providing basic cancer care for Mr. Williams extend beyond the refusal of FDC to return him to see the urologist. Beginning in 2021, Mr. Williams started reporting a steady and worsening set of prostate cancer-related symptoms including pain in his back and hips, inability to walk, and lower extremity swelling. Numerous encounters with FDC health professionals failed to elicit any consideration or assessment for these symptoms as part of worsening cancer, despite them knowing of his recent diagnosis and treatment. When Mr. Williams' symptoms became so acute that he was finally admitted to the infirmary, the physician there again failed to take basic steps to identify the cause of his symptoms. Dr. Figueroa made some vague reference to fluid retention based on a high salt and carbohydrate diet, but he and the infirmary staff failed to do the basic work needed to address a patient presenting with inability to walk, back and hip pain, and severe lower extremity swelling with bilateral ulcers of the ankles. When prostate

---

[6] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7789281/#CR3
[7] From American Urological Association Adjuvant and Salvage Radiotherapy after Prostatectomy:ASTRO/AUA Guideline (2013, amended 2018&2019). Available via https://www.auanet.org/guidelines/prostate-cancer-adjuvant-and-salvage-radiotherapy-guideline Accessed 19 Feb 2020..

cancer returns, the spread often causes symptoms in the pelvis, including pain in the back, hips
and back, problems with urinating, and when the cancer is growing into the areas outside the
prostate, it can cause even more general symptoms;

"If cancer has spread outside of the prostate gland, symptoms and signs may include:

- Pain in the back, hips, thighs, shoulders, or other bones

- Swelling or fluid buildup in the legs or feet

- Unexplained weight loss

- Fatigue

- Change in bowel habits"[8]

The extent of care Mr. Williams received in the infirmary involved some wound care and
laxatives, as well as some medications to force out fluid via diuresis (forcing the kidney to make
more urine and retain less fluid). The infirmary notes for Mr. Williams make some reference to
neuropathy as a potential cause of his lower extremity pain, but this is a condition that involves
pain or weakness relating to how nerves work, not how blood flows and how fluid is retained in
the lower extremities.[9] Also, neuropathy is not among the discharge diagnoses, and it is stunning
that a patient with such profound lower extremity weakness, pain, fluid retention and lower
extremity ulcers leaves with no diagnosis that would explain these symptoms. There is one
diagnosis in this discharge summary, ataxia, which involves brain damage that can cause clumsy

---

[8] https://www.cancer.net/cancer-types/prostate-cancer/symptoms-and-signs
[9] https://my.clevelandclinic.org/health/diseases/14737-peripheral-neuropathy

movements and loss of the ability to walk.[10] As with neuropathy, ataxia is not consistent with the
symptoms Mr. Williams has been exhibiting and is also something that requires urgent or
emergency neurological assessment, which did not occur in his case. Taken together, this
information makes clear that infirmary staff failed to take the most basic steps to assess the
source of Mr. Williams's health problems.

These failures in Mr. Williams' case include but are not limited to the individual nurses and
physicians who provided care to him. It is the responsibility of the correctional agency to ensure
that patients in their custody receive adequate care. In this case, FDC has a contract with the
private company Centurion to provide care, and their obligation is to ensure that Centurion, or
any other vendor, provides adequate care.

I have reviewed an email between FDC staff concerning Mr. William Washington. In this email,
One FDC staff person, Adele Johns, asks another, Rebecca Yates, whether Mr. Washington's
report of having his hormone treatment stopped and subsequently having rising PSA levels
constitutes an emergency. The question is posed as "The question is posed as "Inmate states he
was receiving medication for an enlarged prostate (2007). He then begins taking injections
(2013), he states they were discontinued (2019). He states his PSA levels are high and the
injections were resumed. He states the PSA levels alone mean cancer is present and has spread
due to injections being discontinued. He wants to be seen by a urologist. Written 6/21/2022. Is
this an emergency?" The reply from Rebecca Yates is "This is not an emergency." This email
completely overlooks Mr. Washington's prostate cancer diagnosis and the need for treatment of
recurrence. I have reviewed the original letter sent by Mr. Washington, which mentions that he

---

[10] https://www.mayoclinic.org/diseases-conditions/ataxia/symptoms-causes/syc-20355652

has cancer in the multiple paragraphs, reporting that he was given the hormone treatments to "keep the cancer at bay" and also that he is worried that "the cancer will come back and this time it will inevitably cause my death." He also reports in the letter that his hormone treatment was stopped when a prescription lapsed and that despite the prescription being rewritten, he was still without his injections/treatments.

This email exchange indicates that FDC did not view the return of prostate cancer and interruption of cancer treatment as a condition that met their definition of a medical emergency. I disagree with this assessment. The standard and accepted definition of a emergency medical condition is "An illness, injury, symptom or condition so serious that a reasonable person would seek care right away to avoid severe harm."[11] Having cancer return after treatment clearly meets this criteria. This is especially true when the cancer that has returned is the second leading cause of death among American men.[12] It is not credible that a reasonable person would not view the return of this cancer as so serious as to seek care right away to avoid severe harm.

The relevance of this case to that of Mr. Elmer Williams is that in this case, Mr. Washington is reporting that his cancer treatment was interrupted and FDC was not responding to ensure that his treatment was restarted. This report by Mr. Washington of interrupted cancer treatment, and the clear evidence that this occurred in Mr. Elmer Williams' case, raises the prospect that FDC lacks a basic system to ensure that people with cancer receive treatment without interrupt There are multiple ways that this can occur, none of which is evident in the case of Mr. Williams. One approach is to have a database of all patients with cancer and other potentially life-threatening

---

[11] https://www.healthcare.gov/glossary/emergency-medical-condition/.
[12] https://www.cancer.org/cancer/types/prostate-cancer/about/key-statistics.html#:~:text=for%20Prostate%20Cancer.-,Deaths%20from%20prostate%20cancer,will%20die%20of%20prostate%20cancer..

medical problems that tracks diagnosis, specialty referral/treatment recommendations and whether those appointments and treatments occur as intended. When I led the NYC jail health service, we had such a system that even pre-dated our electronic medical records, but allowed for these critical cases/patients to be tracked centrally by health leadership, as well as by facility leadership, who would review which patients in their care were on this list of patients. Another approach, which is recommended by the NCCHC, is to have a individual treatment plan for patients with special health needs.[13] This approach involves having a clearly written plan for these high needs patients that details clinical status of the disease, the needed laboratory and other testing and the upcoming appointments and treatments. These individualized treatment plans are important because patients may present to sick call or other types of health services with new symptoms that reflect worsening of the serious health problem. They may also move facilities or experience an interruption in care that is not clear to health staff without a single treatment plan to review, since prior specialist notes and recommendations, lab results and other critical information may be spread across thousands of pages of the medical patient's records. The report by Mr. Washington and the substantial evidence provided in this case regarding Mr. Williams indicate that FDC lacks a basic and effective means to track the needs of cancer patients and ensure they receive uninterrupted care.  These deficiencies indicate a lack of effective policy and/or practice in two critical areas, continuity of care for cancer treatment and recognition of medical emergencies. Without mechanisms to detect when life-saving treatment are interrupted, and to recognize when cancer has subsequently returned, many patients with other types of cancers are at risk of preventable death in FDC.

---

[13] NCCHC Standards for Health Services in Prisons. P-F-01, Chronic care, special needs. 2018.

The failure to treat Mr. Williams' cancer when it returned has profoundly reduced his survival chances, and has also inflicted considerable pain, humiliation, and disability. There is a dramatic difference in prostate cancer survival rates when the cancer moves from local (in the prostate) or even regional (in nearby lymph nodes/tissues), to spread in distant sites (bones, liver other structures away from the prostate). When prostate cancer is found in the initial stages, the 5-year survival rate is almost 100%, but when the cancer is allowed to spread to a distant site, the survival is only 28%.[14]

Finding 2. Failure to provide accommodation/punishment with solitary confinement in response to mobility disability/impairment. As Mr. Williams' symptoms worsened in 2021, and FDC staff failed to provide basic assessment and cancer care, his pain and lower extremity swelling become so severe that he could not walk. As he reported these symptoms to staff, they not only failed to provide basic accommodation in the form of a wheelchair, they also took action to punish and retaliate against him for seeking this accommodation. These actions include;

In November/December 2021, Mr. Williams was punished for not coming to a classification meeting, after being denied a wheelchair, by being placed into solitary confinement. This punishment for not being able to walk was compounded by the conditions of the punishment unit, where Mr. Williams struggled to move from his cell bed to the food slot of the locked cell, which he was required to do in order to take and return food trays, as well as to receive medications. Mr. Williams was punished because of his medical illness/impairment, and the punishment meted out to him involved imposition of more pain and further isolation from medical care, and further injury. While he was being punished in solitary confinement, Mr.

---

[14] https://www.hopkinsmedicine.org/health/conditions-and-diseases/prostate-cancer/prostate-cancer-prognosis.

Williams experienced further pain because of the conditions of being locked in a cell all day. He requested assistance eating, and a wheelchair for moving around his cell, but was denied these accommodations. He reported that officers would yell at him to get off the floor, although that was the safest place for him to be. When he would eat, he was forced to get to the food slot midway up the cell door to retrieve his tray. He reported "I would slide on the floor. I would crawl on the floor. I had a -- put -- I made, like, a sliding board thing and I pulled myself to the door, and I would prop myself up by the door, get my tray, eat at the door, put it back up there, then slide back to my bunk." Regarding using the toilet, he reported "When I couldn't get on the toilet anymore, I would use the bathroom on the floor any way I could, just away from my body. I would urinate on the floor. You know, I would defecate, you know, when I did." Dragging his body across the dirty floor, which was covered in urine and feces represents a likely vector for contracting the devastating skin ulcers/infections suffered by Mr. Williams.

Mr. Williams continued to request a wheelchair for accommodation of his progressing pain and inability to walk in, but these requests were either ignored or denied by FDC medical staff throughout December 2021. Even when Mr. Williams was finally permitted a medical emergency on 12/24/21, and to be seen in the Suwannee 'Emergency Room', there was no documentation of a physical examination or any treatment being given. Despite being in a wheelchair at the time of the encounter, Mr. Williams was told to return to his general population housing area, with the unclear recommendation "IMP will have to do the best he can to complete ADL's." This note, signed by nurse Gerald Knaus, also indicates that Dr. Figueroa was been notified about Mr. Williams encounter. Just three days later, nurse Knaus saw Mr. Williams again and made the following characterizations about his symptoms;

- Assessment-"Pt is abusing the sick call system. He puts in a sick call for 1 item then has several medical complaints."

- Plan-"refer to provider for possible mental health assessment" and

- Education-"Use sick call for issue needs not wants."

When I interviewed Mr. Williams by phone, he reported that he was taken to confinement in a wheelchair and that he was "dumped" onto the bed in his cell, and the door was locked. He reported that correctional and nursing staff alike knew he was unable to stand or walk, because he was only taken to the shower a handful of times during his month in confinement, and that this only occurred when correctional staff would take the wheelchair of another person in confinement who had been issued a wheelchair and use it to take Mr. Williams to the shower. He reports that while in confinement, he spent his days sitting on the concrete floor to avoid falls from his bed, and that correctional officers would not allow him to have his mattress on the floor during the day. He reported that he would try to urinate in a Styrofoam cup but that he often ended up urinating all over himself and the floor, which he would try to clean up. He also reported that he had to defecate on the concrete floor and place his own feces in the toilet and clean afterwards because he could not sit on the toilet. He reports that nurses did not enter his locked solitary confinement cell to assess him or provide care but they would pass his cell and see him on the floor in this state on a daily basis. He reports that when he was taken out of his cell, for shower or any other reason, he was only able to leave in a wheelchair, but that when returned to his cell, he was put back on the bed or floor without a wheelchair.

When Mr. Williams was forced back into general population by infirmary staff, he was finally given a wheelchair but in his grievances, he reported numerous impairments of major life

33

activities that remained unaddressed. He was unable not only to walk, but to care for himself, to use a toilet or sit on a shower bench. He was sometimes forced to change a diaper lying on his bunk in full view of other inmates. He was sometimes denied timely access to food. He was prevented from communicating with family. There were myriad elements of daily life that he was unable to access, including meals and call outs, because of his inability to transfer to/from his chair or get assistance in the housing area. The lack of accommodation during these months caused considerable pain and humiliation and further injury for Mr. Williams, based on his grievances, but they also forced him to pay other incarcerated people for the assistance he most urgently needed.

### E.  Summary

FDC failed to treat Mr. Williams' cancer when it returned. I do not offer opinions about what type of treatment he should have received, only that they should have done something to treat his prostate cancer when it returned. Mr. Elmer Williams was identified as having prostate cancer in 2017 and received treatment for that diagnosis that was stopped based on the plans of a urologist in 2020. This plan involved stopping his hormone treatment to see if his PSA level would return in the six months before the next appointment. FDC and its staff failed to provide that follow-up appointment, and as Mr. Williams cancer returned and started to grow outward from his prostate area to the tissues and bones around pelvis and hips. FDC health staff failed to respond to his increasing symptoms of pain, interruption of bowel movements and inability to walk as a potential, even likely result of the return of his cancer. They also failed to take action to respond to his skyrocketing PSA levels so that he would be returned to care for his prostate cancer. From the missed 6-month appointment which should have occurred in June or July 2020, until he was

finally seen by a urologist in March 2022, FDC staff repeatedly failed to recognize and address

the spread of cancer into Mr. Williams tissues and bones. During this time, Mr. Williams was

punished with solitary confinement expressly because of his inability to walk and he was denied

basic accommodation including a wheelchair for much of this time. As a result of these many,

ongoing failures, Mr. Williams has experienced metastatic cancer that will shorten his life and he

has also experienced a tremendous amount of pain and disability, both from the untreated

metastasized cancer and the ulcers that have developed in his buttock and heel areas. The deep

ulcers and tissue infections that Mr. Williams has suffered with for over a year, and for which he

is now receiving daily wound care, represent another threat to his survival.


I declare under the penalty of perjury that the foregoing is true and correct. Executed this

24th day of May 2024, in Port Washington, NY.


_____
    HOMER VENTERS, M.D.