UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ELMER WILLIAMS,

     Plaintiff,

v.                                                      Case No. 3:22-cv-1221-MMH-MCR

RICKY D. DIXON, et al.,

     Defendants.

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## SECRETARY DIXON'S[1] MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 and Local Rule 3.01, Plaintiff Elmer Williams files this

response in opposition to Dixon's motion for summary judgment [ECF No. 189]. As

explained below, Dixon's motion relies on mischaracterizations of the evidence,

misapplications of the law governing ADA/RA claims, and inappropriate attempts

to shift the burden of proof at the summary judgment stage. The record evidence,

viewed in the light most favorable to Plaintiff as the nonmoving party, establishes

genuine issues of material fact that preclude summary judgment on his ADA/RA

claim. Contrary to Dixon's motion, a reasonable jury could conclude that Dixon

violated the ADA/RA with respect to the services and benefits in state prison from

which Plaintiff was excluded due to his disability.

---

[1] The terms "Dixon," the "Secretary," the "Department," and "FDC" are used
interchangeably to refer to Defendant Secretary Ricky Dixon.

## INTRODUCTION[2]

Dixon raises a series of alleged defects with Plaintiff's ADA/RA claims in the
operative Third Amended Complaint ("TAC") [ECF No. 93]. Specifically, he
complains that Plaintiff, who was hospitalized and terminally ill during his
deposition [ECF No. 190-1 at 8:24–10:15], could not answer the legal conclusion of
which "programs" or "services" he missed out on at Suwanee Correction Institution.
But Dixon wholesale ignores or discounts Plaintiff's testimony that he missed meals,
activities, and could not even use the restrooms (all "services" and "benefits" under
the ADA/RA), instead using a latex glove to shove his fecal matter down a shower
drain because of the failures to accommodate his paralysis and incontinence.

Dixon then claims that the TAC is conclusory and about lack of medical care.
But medical issues can and do implicate the ADA/RA, as here. Next, Dixon—
Florida's chief prison official—denies that paralysis, the inability to walk, or
incontinence require reasonable accommodations. That proposition is alarming and
in conflict with federal law and the Department's long-standing settlement agreement
with Disability Rights Florida. Dixon also casts blame on his private health
contractor, Centurion. But allowing him to point the finger would ignore forty years
of this Circuit's jurisprudence on nondelegation. Dixon asserts that the ADA/RA
claims are a vicarious liability claim in disguise, but the record evidence
demonstrates Dixon's actual knowledge of the discrimination and a failure to

---

[2] As a warning, this response and supporting evidence contain graphic images.

adequately respond. And finally, Dixon invokes federal and state immunity, but his arguments are misplaced. The Court should deny Dixon's motion.

## STATEMENT OF DISPUTED AND ADDITIONAL FACTS

### A. Plaintiff begins to experience mobility problems at Suwannee.

Plaintiff—now terminally ill and under medical care on compassionate release from the state prison system—arrived at Suwannee Correctional Institution Annex on November 17, 2021. [ECF No. 114-1 at 21]; [ECF No. 190-1 at 8:24–9:16, 10:1–15]. Prior to his arrival at Suwannee, he had been diagnosed with prostate cancer, but it was in remission; but that changed on September 30 with an elevated PSA level. [ECF No. 190-1 at 10:16–22]. While in remission, Plaintiff did not experience mobility issues. [*Id.* at 12:22–13:2].

Once at Suwannee, Plaintiff began to have trouble walking without assistance. [*Id.* at 15:12-20, 24:7–25:9]. Medical staff at Suwannee saw that Plaintiff's PSA level had increased and noted a previous urgent referral to a urologist. [ECF 192-1 at 1]. On November 24, 2021, Plaintiff fell out of bed and was unable to stand up without assistance. [ECF No. 190-1 at 18:7-12; ECF No. 192-3 at 6]. His dorm sergeant, Defendant Richardson-Graham, observed the distress but refused to call medical staff or provide a wheelchair for Plaintiff. [ECF No. 190-1 at 18:7-24]. Instead, she ordered him to walk. [ECF No. 114-3 at 1]. When Richardson-Graham observed Plaintiff writing a grievance on her about this [ECF No. 192-2 at 3], she snatched the grievance from his shirt pocket and issued a Disciplinary Report against him for disobeying her order to walk, which resulted in his placement in disciplinary

confinement. [ECF No. 114-3; ECF No. 190-1 at 37:12–38:21]. According to Frank Perry, a prisoner in the dorm, who wrote a statement on Plaintiff's behalf in the discipline process, "[Plaintiff] tried to move as fast as he could, but he really can't walk. And at the time he called call-outs he didn't know he had a call-out." [ECF No. 192-3 at 8]. Another prisoner, Leon Johnson, wrote "[Plaintiff] can't really walk, he didn't [k]no[w] he had a callout" [*Id.* at 7]. After being denied a wheelchair to go to his Institutional Classification Team (ICT) meeting, Plaintiff was placed in a wheelchair to go to his pre-confinement physical. [*Id.* at 6].

**B. Plaintiff is left immobile and in squalor despite pleas for help.**

Plaintiff was placed in a single cell without a wheelchair or a cellmate. While in confinement, Plaintiff repeatedly put in sick call requests and grieved about his condition. [*See, e.g.*, ECF No. 114-4 (collecting grievances)]. On one occasion, he was to be taken to medical, but Department staff had no wheelchairs available, so Plaintiff was not given blood work to determine why he was suffering from paralysis. [ECF No. 190-1 at 35:23–36:14]. During his time in confinement, Plaintiff filed grievances and took contemporaneous notes of his treatment. [ECF Nos. 192-2 & 192-4]. For example, he was repeatedly told he was not allowed to be on the floor, but he lacked the strength to pull himself up. [ECF No. 190-1 at 41:4-25]. He would ask for help to have his food brought to him, but that was denied. [*Id.* at 42:1-44:1]. As a result, he scraped his lower body on the floor, causing terrible wounds[3] plagued

---

[3] Medical staff remarked that "room smelled like death." [ECF No. 190-1 at 60:3-5].

4

with necrotizing fasciitis. [ECF No. 192-5 at 1]; [ECF No. 190-1 at 55:16–57:16].

Plaintiff told Cpt. Lindblade that he could not get up and make it to the toilet

in confinement and had to urinate in a cup. [ECF No. 192-2 at 4]. The captain's

response was that Plaintiff needed to get rid of the cups or face discipline for misuse

of property. [*Id.* at 4]. According to an affidavit from January 5, 2022, Plaintiff wrote

that on December 2, 2021: "I'm stink more than ever now because my cell floor is

pissy from me peeing on it all day when I don't have the strength to make it to the

toilet." [*Id.* at 4]. Plaintiff would defecate on the floor and place it in the toilet

because he could not get on the toilet seat. [ECF No. 190-1 at 44:2-21]. Plaintiff

wrote on December 4, 2021: "And I'm dreading the next bowel movement, because I

don't know how I'm going to manage that? Shitting in my bed or in my pants is

going to take me over-the-top in depression… I'll more than likely get to the floor

and go back in the back of the cell next to the toilet and 'try' to pull myself up, but if I

can't, I'll just strip down and lay on my side and let it go and do my best to clean it

up from there." [ECF No. 192-2 at 13].

Plaintiff was unable to shower in confinement because he could not walk and

was not given a wheelchair. [ECF No. 192-2 at 4-5]. It was once in a "blue moon"

that staff would borrow a wheelchair from another prisoner for Plaintiff to use. [ECF

No. 190-1 at 45:1-18]. As a result of the lack of accommodations in confinement,

Plaintiff wrote: "I have cried and cried and cried tear of pain and frustration over the

cruel and inhumane way I've been treated here at Suwannee C.I. Annex by the

nurses and security. If I didn't have God on my side and the strong will to survive, I

would have committed suicide, that's just how much pain and anguish I feel inside."

[ECF No. 192-2 at 10].

Plaintiff grieved and continued to request accommodations. As Plaintiff wrote in a January 16, 2022 appeal to Dixon:

> I filed formal grievance log #2112-231-046 on 12-13-2021. It was received 12-16-21 when I was still in confinement, P dorm, crawling and sleeping on the ice-cold cement floor. And every confinement officer, Sgt., Lieut., and Capt. that walk-through there witness me on the floor. So, I don't know who the investigator in this incident has been talking to. . . . [T]he reason I stopped getting in my bed and lived on the floor, because I keep injuring my hip, back, and neck and retain bruises on my side and every time I fell, I put in a sick call request. Also on me needing a wheelchair to get around. Because I only was taken for a shower in a borrowed wheelchair three times in 27 days. I complained about rupturing my lower hernia crawling around on the floor and being compelled a couple of times to pull my 200+ pounds up into my bunk or get a disciplinary report. . . . And the truth be told my ankle got like this from dragging myself across the floor in confinement to get to and from the food flap on the cell door so I could get my food tray and mail incoming and outgoing. I rubbed both of my ankles to the bone/raw and it's been well over a month and a half, and my ankles are still highly infected in spite of the swelling in my feet going down. . . . And I'm still in the infirmary and I'm still begging for a wheelchair because I'm still paralyzed from my chest down, my spasms are still severe and cutting off my breathing.

[ECF No. 144-4 at 6]. Similarly on January 11, 2022, Plaintiff wrote to Dixon through the grievance process and explained that he was confined to a "borrowed" wheelchair and that he could not breathe; that he needed emergency care. [*Id.* at 2]. Plaintiff also issued other grievances to Dixon around this time, complaining of paralysis and numbness and needing a wheelchair [*See, e.g.*, *id.* at 6, 8–10]. Plaintiff' family and friends also wrote directly to Dixon addressing these complaints. [ECF No. 192-7 at 2]. In response, Dixon's staff explained that it was "not an emergency," and denied his grievance. [ECF No. 88-1].

**C. After confinement, Plaintiff cannot participate in services and benefits.**

The Department was required under a settlement agreement to provide mobility aids and inmate assistants to qualified individuals, like Plaintiff.[4] [ECF No. 192-12 ¶ 5; ECF No. 192-9]. After Plaintiff's release from confinement, Dixon did not provide Plaintiff with an assigned wheelchair or inmate assistant despite Plaintiff's grievances, his family's requests, and the obvious need for one—as Dixon's staff would provide Plaintiff with a wheelchair to get to medical, for example. [ECF No. 114-8 at 1]; [ECF No. 190-1 at 63:13-19]; [ECF No. 192-12 ¶ 4]. Staff at Suwannee knew Plaintiff was immobile, given they allowed him to lay in bed during count when all prisoners are required to stand. [ECF No. 190-1 at 69:4:12].

Without an inmate assistant, Plaintiff would have to expose himself in front of other prisoners to wipe fecal matter off his body, causing the other prisoners to complain. [*Id.* at 69:13-70:19]. Feeling "degraded and humiliated," Plaintiff would grieve and complain about the lack of accommodations. [*Id.* at 70:20–71:9].

Plaintiff would have to beg and pay prisoners to borrow their wheelchairs. [*Id.* at 25:10–16; 66:1-10; 66:23–67:9]; [ECF No. 192-12 ¶ 8].[5] He could not always

---

[4] The settlement agreement provided that Inmates with Mobility Disabilities, an "FDC inmate with a disability that affects the inmate's ability to move, which substantially limits the inmate's major life activities of walking, standing, bending, performing manual tasks, lifting, reaching, or sitting, as defined in the Americans with Disabilities Act, 42 U.S.C. § 12102 and 28 C.F.R. § 35.108," were considered "covered inmates" under the agreement [ECF No. 192-9 at 4, ¶ 12]. Dixon does not dispute that Plaintiff is a qualified individual. Separately, Plaintiff requests that the Court take judicial notice of the agreement.

[5] Donny Phillips, who was in the dorm with Plaintiff at Suwannee, personally observed this and other incidents where Plaintiff could not walk, was threatened, did not have a wheelchair, and was personally carried by other inmates and placed belly-down on the shower to bathe. [*See generally*, ECF No. 192-12].

borrow a wheelchair and would miss meals and showers as a result. [*Id.* at 25:15–23; 66:11-17]. Sometimes, other inmates (not assigned assistants) were able to help Plaintiff get into a borrowed wheelchair to go to the shower, where he would shower sitting on the filthy shower floor (although the other prisoners would try to clean it for him). [*Id.* at 25:24–26:16; 66:18-25]. Sometimes in the shower, because Plaintiff did not have diapers, he would have to defecate there, and push the feces down the drain with his hands. [*Id.* 117:7–118:23]; [ECF No. 192-12 ¶ 8]. Plaintiff described having to take off his soiled prison uniform as "had lost all feeling and all control over [his] bowel movements and urine." [ECF No. 190-1 at 26:10-13]. Other prisoners would help him undress to shower. [*Id.* at 26:13-16].

Plaintiff also described officers seeing him shower this way. [*Id.* at 67:10–68:1; 118:24–119:24]. Guards would tell him he could not shower on the floor. [*Id.* 26:17–27:3]. When he told officers he could not use the shower bench, he was told he would get an assistant—for which, according to Department staff upon request, he was told he was approved. [*Id.* 27:4-15]. As a result of the failure to provide mobility assistance, Plaintiff contracted serious, painful and debilitating infected wounds on



his feet, ankles, and buttocks in addition to his terminal metastatic cancer. [ECF No.
114-8 at 1; ECF No. 192-7 at 4]. These wounds were documented as "necrotizing
fasciitis" or "flesh-eating bacteria." [ECF No. 192-5]. The wounds have not
completely healed. And wound care was not regular or sufficient. [ECF No. 190-1 at
127:3-25]. The Department claimed to have a wound care program so that wounds
that did not heal could be sent to one of six specialized wound care centers around
the Florida prison system. [ECF No. 192-6]; [ECF No. 192-12 ¶ 10]. When Plaintiff
was finally able to inquire about the chances of being sent to this program, which
was described in the FDC literature he and other were told the program was shut
down. [ECF No. 192-12 ¶ 10]. As of the time Plaintiff was given this information his
wounds were still festering. [ECF No. 114-5].

**D. Plaintiff's expert witness opines on Dixon's failures to accommodate.**

Plaintiff's disclosed expert, Homer Venters, M.D., the former Chief Medical
Officer of the NYC Jail System, reviewed Plaintiff's records and spoke with him
about his experience. [ECF No. 192-8]. He opined that "During this time, Plaintiff
was punished with solitary confinement expressly because of his inability to walk
and he was denied basic accommodation including a wheelchair for much of this
time. As a result of these many, ongoing failures, Plaintiff has experienced metastatic
cancer that will shorten his life and he has also experienced a tremendous amount of
pain and disability, both from the untreated metastasized cancer and the ulcers that
have developed in his buttock and heel areas." [*Id.* at 35].

9

## MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment "is appropriate only if 'the movant shows that there is no genuine [dispute] as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton*, 572 U.S. 650, 656–57, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) (per curiam) (quoting Fed. R. Civ. P. 56(a)). A court considering a summary judgment motion must "draw all reasonable inferences in favor of the party opposing summary judgment." *Glasscox v. Argo*, 903 F.3d 1207, 1212 (11th Cir. 2018). Even when the parties agree on a set of facts, a court should deny summary judgment if "reasonable minds might differ on the inferences arising from undisputed facts." *Id.* (quotation omitted). If a factfinder could draw more than one inference from a set of facts, and those multiple inferences create a genuine issue of material fact, summary judgment must be denied. *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1315 (11th Cir. 2007). Credibility determinations, weighing of evidence, and drawing of legitimate inferences are reserved for the jury, and a judge should not appropriate those functions when ruling on a motion for summary judgment. *Id.*

## I.  The Court should disregard Dixon's statement of facts and deny the motion because of his failure to comply with Rule 56.

To begin with, the Court should disregard Dixon's statement of facts where he: (1) fails to specifically cite to record evidence to support his statements; (2) speculates or offers conclusory evidence; and (3) renders legal arguments.

Under Rule 56, a movant is required to provide a statement of material facts

with citations to support each fact. *Deligdish v. Bio-Reference Lab'ys, Inc.*, 2018 WL 6261868, at *1 (M.D. Fla. Oct. 19, 2018) (citing Rule 56(c)(1)). "The Court 'need consider only' the materials cited by the parties." *Id.* (citing Rule 56(c)(3)).

A statement of material facts should not contain legal conclusions or conclusory assertions. *See Farina v. Sushi Takara, Inc.*, 2008 WL 11405985, at *1 (S.D. Fla. Jan. 7, 2008) (citing *McKenzie v. Citation Corp., 2007* WL 1424555, at *6 (S.D. Ala. May 11, 2007)); *see also Barnext Offshore, Ltd. v. Ferretti Grp. U.S.A., Inc.*, No. 10-23869-CIV, 2012 WL 1570057, at *3 n.8 (S.D. Fla. May 2, 2012) ("inappropriate to raise legal argument in a statement of material fact"). Likewise, inadmissible evidence such as speculation and hearsay cannot be considered for summary judgment. *See Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999); Am. Key Corp. v. *Cole Nat'l Corp.*, 762 F.2d 1569, 1579 (11th Cir. 1985); *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

Dixon spends most of his recitation of the "facts" characterizing what is or is not a service, benefit, or program under the ADA. *See* Mot. at 4 ("As Plaintiff gives this exhaustive list of things that are obviously misidentified as ADA accommodations, such as friendship, games, mental stimulation, conversation, and socialization"); *id.* at 3 ("This itemization of alleged ADA-related benefits is exhaustive, but very few, if any, would be recognized under ADA"). Not only that but Dixon also discounts Plaintiff's testimony as "self-serving," which is nonsense because his recital from personal knowledge of the events that occurred is real, tangible evidence.  The Court should disregard Dixon's "facts."

11

## II.    A jury could conclude that Plaintiff has established an ADA/RA
violation against Dixon, for which Dixon had actual knowledge.[6]

Plaintiff seeks damages against Secretary Dixon, in his official capacity, for
violation of Title II of the ADA, 42 U.S.C. § 12101, *et seq.*, for his failure to
adequately respond to discrimination at FDC.[7] *See* FAC ¶¶ 126–41; *see also See Bircoll
v. Miami-Dade Cnty.*, 480 F.3d 1072, 1081 (11th Cir. 2007) (holding that Title II
applies to inmates in state prisons). To state a claim under Title II of the ADA, a
plaintiff must allege "(1) that he is a qualified individual with a disability; (2) that he
was either excluded from participation in or denied the benefits of a public entity's
services, programs, or activities, or was otherwise discriminated against by the public
entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason
of his disability." *Ingram v. Kubik*, 30 F.4th 1241, 1256 (11th Cir. 2022). A plaintiff

---

[6] Although Dixon was appointed Secretary on November 19, 2021—the day after Plaintiff
arrived at Suwannee and 11 days after the designated FDC official signed the settlement
agreement with Disability Rights Florida [ECF No. 192-9 at 39] resolving the state case
litigating FDC's repeated violations of the agreement in the original federal case—Dixon
was aware of it because of its impact on the FDC Budget. Secretary Dixon prominently
mentioned *Disability Rights Florida v. Florida Department of Corrections*, Case No. 219 CA
2825, as "Significant Litigation Impacting Budget, Policy, or Agency Functions. [ECF No.
192-10 at 5]. He would have also received a Report from the Corrections Medical Authority
on their mandated Status of Elderly Offenders in Florida's Prisons [ECF No. 192-11 at 22]
and their special monitoring of Suwannee C.I. Annex and a few other Florida prison
institutions on the issues raised in the Disability Rights Florida litigation. [*Id.* at 11].

[7] "Discrimination claims under the ADA and the [RA] are governed by the same standards,
and the two claims are generally discussed together." *J.S., III by & through J.S. Jr. v. Houston
Cnty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017). Plaintiff requests that the Court take
judicial notice that the ADA applies here because Dixon accepts federal funds, which he
admitted at ECF No. 101 at ¶ 164. *Sims v. Jones*, 2018 WL 3242701, at *5–6 (N.D. Fla. Mar.
1, 2018), R&R adopted in part, 2018 WL 1535483 (N.D. Fla. Mar. 29, 2018), *aff'd*, 75 F.4th
1224 (11th Cir. 2023) (taking judicial notice that the Department accepts federal funds).

may seek damages for a Title II violation upon a showing of deliberate indifference. *Silberman v. Miami-Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019 (citing *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 348 (11th Cir. 2012)).

In *Ingram*, the Eleventh Circuit held that vicarious liability is not available in Title II claims. *Ingram*, 30 F.4th at 1258 (discussing how Title II imports Title VI's remedial regime). Instead, a plaintiff must show the "deliberate indifference of an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the entity's behalf and who has actual knowledge of discrimination in the entity's programs and fails adequately to respond." *Id.* at 1259 (quoting *Liese*, 701 F.3d at 349) (emphasis and brackets removed).

Dixon takes issue with Plaintiff's Title II claim under *Ingram's* approach, but his concerns are unmerited. *See* Mot. at 15–18. Here, Dixon claims there is "no evidence" to support Plaintiff's allegations of discrimination. While Dixon does not offer any, Plaintiff does. To address the contention that this is merely a claim for "vicarious liability," Dixon's threadbare argument is misplaced. To connect the Secretary's failure to act to the discrimination about which he had actual knowledge, Plaintiff alleged that those discriminating employees and agents were authorized to act on his behalf, had knowledge of their actions, and were acting in the scope of their employment.[8] Those allegations do not rest liability on the Secretary "*solely* on

---

[8] Dixon appears to cite a previous iteration of the complaint. The TAC not only asserts Dixon knew and turned a blind eye to the discrimination, *see* TAC ¶¶ 169–74, but that he had actual knowledge of the discrimination through Plaintiff's grievances, emails from family, and the Department's agreement with DRF. *Id.* ¶ 168. Such evidence is undisputed.

vicarious liability or constructive notice" in conflict with the remedial regime of *Ingram*. *See Gebser v. Lago Vista Indep. Sch. District*, 524 U.S. 274, 288 (1998) (emphasis supplied) (referencing the Congressional intent for Title IX, which the *Ingram* court relied on for its pronouncement regarding Title II). Instead, those allegations—about employees' knowledge—merely buttress the Secretary's failures based on his actual knowledge as otherwise described in the TAC. Dixon cannot meet his burden based on citation to an out-of-date complaint without any evidence. *Sprint Sols., Inc. v. Fils-Amie*, 44 F. Supp. 3d 1224, 1228 (S.D. Fla. 2014) (quoting *Mendez-Arriola v. White Wilson Med. Ctr. PA*, 2010 WL 3385356, at *3 (N.D. Fla. Aug. 25, 2010)).

Here, Dixon does not dispute that Plaintiff was a qualified individual. The undisputed evidence also demonstrates that Plaintiff sought accommodations but was denied access to those accommodations—wheelchairs and inmate assistants—all accommodations required by the settlement agreement with Disability Rights Florida. Plaintiff's evidence also demonstrates that he repeatedly requested accommodations—from staff and Dixon—, that staff observed him in obvious and plain need of accommodations, but that his requests were ignored. Such evidence could lead a reasonable jury to determine that Dixon violated the ADA/RA.

## III. Plaintiff's claims are about denial of services and discrimination.

Dixon asserts that Plaintiff's alleged "services" or "benefits" are simply not those contemplated by the ADA/RA. He is wrong. Dixon also tries to cast blame on his private health contractor, Centurion. The Court should reject that effort.

First, Dixon cannot evade liability simply because he has outsourced the

14

provision of health services and ancillary services, such as ADA compliance. Dixon

ignores that FDC owes a nondelegable duty to Plaintiff notwithstanding its contract

with Centurion. *Cineus v. Fla. Dep't of Corr.*, 2022 WL 4448599, at *3 (M.D. Fla. Sept.

23, 2022) (denying a motion to dismiss FDC under the nondelegation doctrine). As

explained in *Ancata v. Prison Health Servs., Inc.*, "federal courts have consistently ruled

that governments, state and local, have an obligation to provide medical care to

incarcerated individuals" and that "duty is not absolved by contracting with an

entity" as the government "itself remains liable for any constitutional deprivations

caused by the policies or customs" of that entity. 769 F.2d 700, 705 (11th Cir. 1985);

*see also Geftos v. Jones*, 2018 WL 1139055, at *3 (M.D. Fla. Mar. 2, 2018); *Hunt v.

Gualtieri*, 2016 WL 1077361, at *3 (M.D. Fla. Mar. 18, 2016). Accordingly, Dixon's

efforts to shield FDC from liability because of its contract with Centurion fails.

Second, Plaintiff's ADA/RA claims are not for "medical decisions," but for

denial of services and discrimination, both of which are cognizable theories under

ADA/RA. Although the Supreme Court has held that the ADA does not govern

medical decisions, it has, however, made clear that "medical services" fall under

Title II. *See Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 210, 118 S.Ct.

1952 (1998). A qualified inmate—and Dixon does not argue that Plaintiff was not

covered by the ADA/RA or that the ADA/RA does not apply to FDC—who was

denied the benefit of medical services because of his disability can state an ADA/RA

claim. *See, e.g., Lonergan v. Fla. Dep't of Corrs.*, 623 F. App'x 990, 994 (11th Cir. 2015)

(holding that prison's failure to give an inmate treatment prescribed by his

dermatologist was "sufficient for the [inmate] to plead a prima facie ADA claim");

*Stafford v. Wexford of Ind.*, LLC, 2017 WL 4517506, at *3 (S.D. Ind. Oct. 10, 2017)

("Plaintiffs do not complain[ ] about the quality of care administered by Wexford;

rather, they assert that Wexford has refused to treat Plaintiffs' disabilities, which is

actionable under the ADA."); *Johnson v. Bryson*, 2017 WL 3951602, at *1 (M.D. Ga.

Sep. 8, 2017) ("[T]he ADA is not wholly inapplicable to claims based on deliberate

indifference to an inmate's medical condition."). Those are not claims of medical

malpractice or medical treatment, but the quality of Plaintiff's "equal opportunity to

*participate* in obtaining and utilizing services at [the jail]." *Silva v. Baptist S. Fla., Inc.*,

856 F.3d 824, 834 (11th Cir. 2017) (emphasis in original).

      Contrary to Dixon's position in the motion, Plaintiff has adequately identified

services from which he was excluded because of his disability. For instance, Plaintiff

explained that Dixon failed to accommodate his paralysis and incontinence, which

impacted his access to safe housing and living conditions. Particularly, he was denied

passes, sanitary supplies to keep from soiling himself, which created sanitary issues.

The failure to provide those supplies and passes, as well as mobility devices,

impacted Plaintiff's ability to make it to the chow hall or otherwise participate in the

services provided at Suwannee. Contrary to Dixon's proclamation that those are not

"services" or "benefits" under the ADA, his failure to provide safe access to showers,

meals, and supplies constitutes a denial of access to services. *See, e.g.*, *Arenas v. Ga.

Dep't of Corr.*, 2018 WL 988099, at *8 (S.D. Ga. Feb. 20, 2018) (stating that access to

safe housing may constitute a "service" or "benefit" under the ADA); *Gorman v.*

*Bartch*, 152 F.3d 907, 912 (8th Cir. 1998) (holding that an arrestee's transportation to the police station constitutes a "service" within the meaning of the ADA because the arrestee has a right to the benefit of transportation that meets his disability needs). Indeed, in *United States v. Georgia*, 546 U.S. 151 (2006), the Supreme Court recognized that "it is quite plausible that the alleged deliberate refusal of prison officials to accommodate [a prisoner's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constituted 'exclu[sion] from participation in or...deni[al of] the benefits of' the prison's 'services, programs, or activities.'" *See also id.* at 157 (quoting 42 U.S.C. § 12132, and citing *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (noting that the phrase "services, programs, or activities" in § 12132 includes recreational, medical, educational, and vocational prison programs).

Dixon comes forth with <u>no</u> record evidence or support for his contention that missing meals, showers, access to wheelchairs and mobility aids are not services, programs, benefits, or activities. And whether Plaintiff could testify as to the legal definition of a "service" or "program" or identify them under the ADA is irrelevant. It is irrelevant to Dixon denying him the ability to live in safe housing or access meals. *See, e.g., Seymour v. Dixon*, 2021 WL 6197967, at *4 (N.D. Fla. Dec. 10, 2021) (finding that the plaintiff stated a plausible ADA claim against the Secretary by alleging that ill-fitting adult diapers caused leakage, which caused him to be excluded from meal time, and that FDC provided reasonable accommodation for the issue in

the past but refused to continue access to accommodation), rep. & recommendation

adopted by, 2021 WL 6197109, at *1 (N.D. Fla. Dec. 30, 2021).

Further, the ADA "does not mandate that a plaintiff be denied access to

services as the sole means of establishing liability." *Walton for Est. of Smith v. Fla.

Dep't of Corr.*, 2019 WL 2103024, at *12 (M.D. Fla. May 14, 2019). A plaintiff may,

alternatively, establish liability "by demonstrating he was 'subjected to

discrimination.'" *Id.* (citing 42 U.S.C. § 12132); *Bircoll v. Miami-Dade Cty.*, 480 F.3d

1072, 1084–85 (11th Cir. 2007) (recognizing the Eleventh Circuit "has explained that

the final clause of § 12132 protects qualified individuals...from being subjected to

discrimination...and is not tied directly" to the provision of or access to services)

(internal quotation marks omitted). Thus, under the discrimination theory, a "refusal

to accommodate the needs of a disabled person amounts to discrimination against that

person because of his disability." *Goldberg v. Fla. Int'l Univ.*, 838 F. App'x 487, 492

(citing *Cmty. Coll. v. Davis*, 442 U.S. 397, 412–13 (1979)).

To recover damages, Plaintiff must show that Dixon engaged in intentional

discrimination, which requires a showing of 'deliberate indifference.'" *Ingram*, 30

F.4th at 1257. "To establish deliberate indifference, a plaintiff must show that the

defendant knew that harm to a federally protected right was substantially likely and

failed to act on that likelihood." *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768

F.3d 1135, 1147 (11th Cir. 2014).

The parties agree that Plaintiff was disabled. Plaintiff has demonstrated that he

was punished because he cannot walk; not assigned a wheelchair even though staff

would put him in one for medical visits but then left to be carried in soiled pants to

shower on the floor; observed showering on the floor and told he would get a

wheelchair but never provided one. That is discrimination because of his disability.

Dixon has failed to show that there are no facts in dispute; he has not come up with

any evidence, only conjecture.

### IV.    Sovereign immunity is not implicated here.

Dixon's sovereign immunity argument also fails. First, he asserts that

Plaintiff's claims fail because he did not allege a Fourteenth Amendment violation.

Second, he asserts again that the claims are simply for vicarious liability. And last, he

asserts that, to prove an ADA/RA claim, Plaintiff must assert *Monell* liability.

Unlike Section 1983, Title II of the ADA abrogates state sovereign immunity

insofar as the Act creates a private cause of action against the States for conduct that

violates both the ADA and the Fourteenth Amendment. *United States v. Georgia*, 546

U.S. 151 (2006); *Black v. Wigington*, 811 F.3d 1259 (11th Cir. 2016). The Due Process

Clause of the Fourteenth Amendment incorporates the Eighth Amendment's

guarantee against cruel and unusual punishment. *Louisiana ex rel. Francis v. Resweber*,

329 U.S. 459, 463 (1947). Dixon is therefore not only not immune from Plaintiff's

ADA claims, but his purported requirement that Plaintiff state a Fourteenth

Amendment violation is simply a misreading of *Georgia* and its progeny. Indeed, a

reasonable jury reviewing the evidence in the light most favorable to Plaintiff could

find that Dixon's conduct—failing to do anything for months in response to requests

and obvious need for mobility devices—rises to the level of a constitutional violation.

19

*See, e.g.*, *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir.1989) (noting that "knowledge of the need for medical care and intentional refusal to provide that care constitute deliberate indifference"); *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).

Finally, Plaintiff can find no authority for Dixon's proposition that he must assert *Monell* liability against Dixon to claim an ADA/RA violation.

## V.    Dixon misunderstands the interplay between state and federal law.

Last, Dixon claims he has not waived immunity under state law. But Florida's sovereign immunity statute does not apply to ADA/RA claims.

## CONCLUSION

Secretary Dixon's motion for summary judgment should be denied.

Dated: May 8, 2025

Respectfully submitted,

*/s/ James M. Slater*
James M. Slater (FBN 111779)
Slater Legal PLLC
2296 Henderson Mill Rd NE #116
Atlanta, Georgia 30345
Tel. (305) 523-9023
james@slater.legal

*/s/ James V. Cook*
James V. Cook (FBN 0966843)
Law Office of James Cook
314 W. Jefferson Street
Tallahassee, Florida 32301
Tel. (850) 222-8080
cookjv@gmail.com

*Attorneys for Plaintiff Elmer Williams*