UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

DONNY PHILLIPS,

     Plaintiff,

v.

RICKY DIXON, in his official capacity as
Secretary of the Florida Department of
Corrections, CENTURION OF FLORIDA,
LLC, MHM HEALTH PROFESSIONALS,
LLC, ALEXIS FIGUEROA, M.D.,
ELIZABETH HOLMES, BRITTNEY
CANNON, CONNIE LYNN ADAMS,
SGT. SAVONIA RICHARDSON-
GRAHAM, SGT. DEBRA ALDRIDGE,
and OFCR. TERESSA FILLMORE
HAWTHORNE,

     Defendants.

Case No. 3:22-cv-997-BJD-LLL

**DEMAND FOR JURY TRIAL**

## AMENDED COMPLAINT

Plaintiff Donny Phillips asserts these claims against Defendants Ricky Dixon, in his official capacity as Secretary of the Florida Department of Corrections (FDC), Centurion of Florida, LLC, MHM Health Professionals, LLC, Dr. Alexis Figueroa, M.D., Elizabeth Holmes, Brittney Cannon, Connie Lynn Adams, Sergeant Savonia Richardson-Graham, Sergeant Debra Aldridge, and Officer Teressa Fillmore Hawthorne.

/

/

## INTRODUCTION

Mr. Phillips, a state prisoner, has a history of serious medical conditions, including paraparesis due to a spinal injury, high blood pressure, high cholesterol, venous insufficiency, and incontinence of bladder and bowel. Because he cannot feel the need for bladder and bowel movements, Mr. Phillips needs frequent diaper changes, sanitation products, and bathroom and shower access. Defendants are denying Mr. Phillips these needs, subjecting him to recurrent attacks of life-threatening cellulitis as punishment for his frequent grievances and insistence on decent and humane treatment. Medical and corrections staff have and continue violate Mr. Phillips' rights, for which he seeks damages. Mr. Phillips also seeks injunctive relief against FDC for its deliberate indifference to his serious medical needs.

## JURISDICTION AND VENUE

1. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

2. Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of civil rights under the Eighth Amendment to the U.S. Constitution.

3. Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, as well as Rule 65 of the Federal Rules of Civil Procedure.

4. Plaintiff's claim is also predicated upon the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131 and 12133, and § 504 of the Rehabilitation Act.

5. Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367, to consider the state law claims alleged herein.

6.     Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391(b), being the district where the claim arose and Defendants conduct business.

7.     All conditions precedent to this lawsuit, including exhaustion of administrative remedies, have occurred, been performed, or been waived.

## PARTIES

8.     At all times material hereto, Plaintiff Donny Phillips was an inmate in the custody and care of FDC at Suwannee Correctional Institution (Suwannee C.I.).

9.     Defendant Ricky Dixon is the Secretary of the Florida Department of Corrections and is sued in his official capacity. References to the FDC herein also refer to Defendant Dixon. Dixon is responsible for the operation of Florida's prison system, including compliance with the Constitution and federal laws. Dixon has statutory authority to implement the injunctive and declaratory relief sought in this Complaint. *See* § 20.315, Fla. Stat.

10.     Defendant Centurion of Florida, LLC is a subsidiary of Centene Corporation, principally located in Missouri and registered as a foreign limited liability company with the State of Florida. Centurion has contracted with FDC to provide medical care to prisoners. When providing medical care for prisoners in FDC custody, Centurion stands in the shoes of FDC. At all relevant times during the events at issue in this case, Centurion was acting under color of law by and through its agents, employees, and contractors identified herein and, on information and belief, other unknown individuals.

3

11.     Defendant MHM Health Professionals, LLC is a wholly owned subsidiary of MHM Services, Inc., which itself is a wholly owned subsidiary of Centene Corporation. MHM Health is responsible for the provision of staffing services related to Centurion's contract with FDC. At all relevant times during the events at issue in this case, MHM Health was acting under color of law by and through its agents, employees, and contractors identified herein and, on information and belief, other unknown individuals.

12.     Alexis Figueroa, M.D. was at all relevant times Centurion's Medical Director/Chief Health Officer and is otherwise *sui juris*. Figueroa is employed by MHM Health to fulfill this role for Centurion.  Dr. Figueroa approved the contours of Plaintiff's medical treatment. Dr. Figueroa is being sued in his individual capacity. At all relevant times during the events at issue in this case, Dr. Figueroa was acting under color of law.

13.     Elizabeth Holmes was at all relevant times a nurse employed by MHM Health to provide nursing care to inmates on behalf of Centurion and is otherwise *sui juris*. Holmes was involved in Plaintiff's medical treatment. Holmes is being sued in her individual capacity. At all relevant times during events at issue in this case, Holmes was acting under color of law.

14.     Brittney Cannon was at all relevant times a nurse employed by MHM Health to provide nursing care to inmates on behalf of Centurion and is otherwise *sui juris*. Cannon was involved in Plaintiff's medical treatment. Cannon is sued in her individual capacity. At all relevant times during events at issue, Cannon was acting

4

under color of law.

15.     Connie Lynn Adams was at all relevant times a licensed practical nurse employed by MHM Health to provide nursing care to inmates on behalf of Centurion and is otherwise *sui juris*. Adams was involved in Plaintiff's medical treatment. Adams is sued in her individual capacity. At all relevant times during events at issue, Adams was acting under color of law.

16.     Sergeant Savonia Richardson-Graham was at all relevant times a corrections officer employed by FDC to work at Suwannee Correctional Institution and is otherwise *sui juris*. Sgt. Richardson-Graham was in charge of Plaintiff's housing at Suwannee. Sgt. Richardson is being sued in her individual capacity. At all relevant times during the events at issue in this case, Sgt. Richardson-Graham was acting under color of law.

17.     Sergeant Debra Aldridge was at all relevant times a corrections officer employed by FDC to work at Suwannee Correctional Institution and is otherwise *sui juris*. Sgt. Aldridge was in charge of Plaintiff's care and custody at Suwannee. Sgt. Aldridge is being sued in her individual capacity. At all relevant times during the events at issue in this case, Sgt. Aldridge was acting under color of law.

18.     Officer Teressa Fillmore Hawthorne was at all relevant times a corrections officer employed by FDC to work at Suwannee Correctional Institution and is otherwise *sui juris*. Ofcr. Fillmore Hawthorne was in charge of Plaintiff's care and custody at Suwannee. Ofcr. Fillmore Hawthorne is being sued in her individual capacity. At all relevant times during the events at issue in this case, Ofcr. Fillmore

Hawthorne was acting under color of law.

19.     At all relevant times, the actions of Dixon, Centurion, MHM Health and their respective agents were state action and were taken under color of state law. Plaintiff has no adequate remedy at law to obtain necessary medical care. Unless enjoined by this Court, FDC and Centurion will continue to subject Plaintiff to violations of his constitutional rights.

## COMMON ALLEGATIONS OF FACT

### A. Phillips' Disability and the FLND Action

20.     Plaintiff is a chronically ill, disabled inmate who is incontinent of bladder and bowel and who has now contracted cellulitis multiple times.

21.     Because of a spinal injury that caused paraparesis, partial lower-body paralysis, Plaintiff cannot feel when his bladder or bowels are full and sometimes has to void his bladder and bowels on short notice.

22.     Plaintiff first contracted cellulitis after being repeatedly exposed to fecal bacteria due to intermittent denial of adult pull-up diapers, sanitation, and bathroom access, causing prolonged direct exposure to urine and feces next to his skin.

23.     Cellulitis is a dangerous tissue infection.

24.     Plaintiff is unusually prone to recurrence of cellulitis, a soft tissue infection, because of conditions of skin breakdown, leg edema, lymphedema, neurological disorder and impairment, chronic extremity edema, venous insufficiency, fungal infections, chronic kidney disease, inmate status, and a history of cellulitis.

25.     Each bout of cellulitis can cause further damage to an already impaired circulatory system, which in turn may lead to further difficulty maintaining skin and limb viability, ultimately with the potential of requiring amputation. In the worst case, the tissue infection (cellulitis) may unpredictably spread to the blood stream (sepsis) and potentially result in death.

26.     Plaintiff also has a history of high blood pressure and venous problems.

27.     Over several years, Plaintiff has been denied changes of diapers, wipes, timely access to bathroom and shower, and antiseptic soap and barrier cream to protect his skin from urine sores from hours in urine-soaked diapers.

28.     The denial of medical care and access to hygiene was part of a campaign of retaliatory actions by both medical and corrections staff as punishment for Plaintiff's frequent grievances and insistence on decent treatment.

29.     The campaign continued as Plaintiff moved from Mayo Correctional Institution to Franklin C.I. to Northwest Florida Reception Center (NWFRC). The retaliatory treatment was of the same kind and prison officials referred to their treatment of Plaintiff as being related to his previous institution.

30.     Eventually, with denial of adequate diapers and other sanitation needs, and timely bathroom and shower access, Plaintiff developed cellulitis in his right leg. Symptoms of cellulitis were first reported in June of 2018.

31.     Cellulitis is a tissue infection that can lead to gangrene, blood poisoning, bone infection (osteomyelitis), septic shock, loss of limbs, and death.

32.     For brief periods of time, Plaintiff would receive antibiotics and better treatment, as well as lessening in the level of harassment by corrections officers.

33.     Eventually, the treatment would deteriorate accompanied by open hostility from medical providers and corrections officers.

34.     Because of this erratic level of care, Plaintiff's cellulitis would return with redness, heat, scaly, weeping skin, and open sores.

35.     Plaintiff sued Mark Inch, then the Secretary of FDC, along with corrections and medical staff and providers concerning, among other things, the lack of constitutionally adequate medical care resulting in his frequent and severe bouts of cellulitis.

36.     In April 2019, Plaintiff was granted preliminary injunctive relief by a court in the Northern District of Florida, which required the provision of "five or more diapers a day (as needed), barrier cream, antiseptic soap, medical wipes, replenishment as they run out, and bathroom and shower passes." *See Phillips v. Inch et al.*, Case No. 4:18-cv-00139-AW-MJF, D.E. 198 at 11 (the "FLND Action").

37.     FDC and Inch were aware of Plaintiff's concerns in the FLND Action and knew or should have known they were serious given the court's entry of a preliminary injunction against the Secretary.

38.     FDC and Inch were on notice of a need to correct the constitutional deprivations Plaintiff alleged in the FLND Action.

39.     After the 90-day injunction expired, FDC argued that a further injunction was unnecessary for Plaintiff at NWFRC because they were continuing to provide

Plaintiff with the items at that facility provided in the then-expired injunction. FDC promised to continue to provide all the needs outlined in the injunction to Plaintiff.

40.　　But, after the expiration of the injunction, and as explained and described below, FDC returned to its earlier campaign of retaliatory denial of hygiene supplies and humiliation.

41.　　And so, despite bringing the FLND Action and obtaining injunctive relief for what was happening at NWFRC, after the resolution of that case—which alleged and centered on claims through December 2019 only—the discrimination and violations followed Plaintiff upon his transfer to Suwannee C.I., which form the basis for this new action.

**B. Defendants' Deprivation of Plaintiff's Rights at Suwannee C.I.**

42.　　On October 15, 2020, Plaintiff was transferred to Suwannee C.I. Annex in Live Oak, Florida—within this District—but abusive treatment of the same kind has continued.

43.　　The following events occurred in Plaintiff's first 30 days at Suwannee C.I.:

    a. 10/15/2020: When he was taken off the bus upon arrival, all of Plaintiff's medications and pack of pull-up diapers were confiscated and he was placed in confinement without even toilet paper.

    b. 10/25/2020: Plaintiff was without diapers and was urinating in his clothes; he was told Suwannee didn't provide adult diapers.

    c. 10/29/2020: CHO Dr. Figueroa told Plaintiff that Suwannee didn't have his hygiene needs; he could receive *only* one diaper at a time.

    d. 10/30/2020: Plaintiff is still deprived of his hygiene needs.

e.  11/02/2020: Plaintiff's tablet—which he uses for his legal work—was locked up by corrections officers when he asked to have it charged.

f.  11/05/2020: Plaintiff asked Defendant Holmes for pull-up diapers. She informed him he would not be getting any and he was told that no one at Suwannee cared about any federal court orders concerning his allotment of diapers. He is refused bathroom or shower passes, medical supplies, and an impaired inmate assistant.

g.  11/09/2020: Plaintiff received one pull-up diaper and a small cup of liquid soap; typically, Plaintiff needs 3-5 diapers per day.

h.  11/10/2020: Plaintiff received a single pull-up diaper. He asked Dr. Figueroa to look at his legs but Figueroa failed to do so.

i.  11/11/2020: Plaintiff is told pull-up diapers are not allowed on the compound but he receives two. He is forced to sit in wet diapers.

j.  11/13/2020: Plaintiff received 12 diapers. He has still not received his other sanitation supplies. Bathroom and shower passes are not renewed.

k.  11/14/2020: As of his 30th day at Suwannee, Plaintiff has not received regular pull-up diaper supplies, hygiene supplies, renewed passes, or an impaired inmate assistant. His cellulitis symptoms have reappeared.

44.  Plaintiff continued to press for normal treatment as an impaired prisoner, and made a formal request on November 24, 2020 for an impaired inmate aide and transfer to an "over-50 camp," an institution like Zephyrhills C.I. for older prisoners.

45.  FDC and his institution instead have left Plaintiff to suffer at Suwannee C.I. in the most inhumane ways.

46.  For example, Plaintiff was able to obtain relief to receive therapeutic boots while at NWFRC. After his transfer to Suwannee C.I., the boots were stolen and staff at the facility and FDC refused to replace them. Those boots were important to Plaintiff's mobility needs—he could wear them to try to push his wheelchair,

improving his circulation, and possibly abating the spread of cellulitis on his body. But FDC and defendants would not let him have new boots.

47.    Dixon and his subordinates were aware that Plaintiff was approved to have these boots but refused to ensure his continued use of them.

48.    When Plaintiff's arthritis flares up, he can't wheel himself to the chow hall and he misses meals. Any time another prisoner attempts to help Plaintiff by pushing his wheelchair, they are threatened with discipline for helping him.

49.    FDC is subject to a monitored settlement agreement in the matter of *Disability Rights Florida, Inc.*, Case No. 2019-CA-2825, Second Judicial Circuit in and for Leon County, Florida, dated November 8, 2021. Pursuant to that agreement, FDC is required to provide certain accommodations to mobility impaired prisoners with respect to ensure that they have reasonable access to medical equipment and accommodations absent any security concerns, access to inmate assistants to help them, among other things. Despite having agreed to provide these accommodations and services to prisoners like Plaintiff, Dixon and defendants have refused to allow Plaintiff to have necessary inmate assistants to help him access his meals and have refused to ensure that he has access to mobility devices, like the boots that were stolen at Suwannee C.I.

50.    Further, when Plaintiff gets regular diapers instead of pull-ups, his lack of muscle control in his lower limbs makes it almost impossible to put them on.

51.    Plaintiff frequently is given diapers that are too big or too small, which allows a mixture of urine and feces to run down his legs into open sores and fecal

11

bacteria to breach his skin. When he is denied wipes, he must try to clean himself with toilet paper or his personal washcloth, which he has no way to decontaminate.

52.     Plaintiff is almost always shorted on sanitation supplies. He receives too few diapers, or the wrong type or size, no wipes or insufficient wipes, no antiseptic soap or barrier creams like A&D ointment, or a tiny supply that lasts a few days.

53.     Despite his representations in the FLND Action concerning Plaintiff's care at NWFRC, the Secretary allowed his subordinates at Plaintiff's new facility—Suwannee C.I.—to deprive Plaintiff of the hygiene supplies and materials that were subject to the expired injunction, resulting in a deliberate indifference to Plaintiff's serious medical needs. The Secretary knew that his staff at Suwannee C.I. were not providing Plaintiff and other disabled prisoners, particularly those who grieve their conditions, with necessary hygiene or medical items.

54.     The Secretary knew that his subordinates would act unlawfully to deprive Plaintiff of necessary hygiene supplies and otherwise retaliate against him and failed to stop them from doing so. Nor did the Secretary implement adequate training to ensure his subordinates would remain vigilant to Plaintiff's constitutional rights.

55.     FDC and its contracted medical providers and staff cover up Plaintiff's serious medical impairments and hide his issues in his medical records to minimize the services he receives and justify failing to provide him with adequate supplies and accommodations, including ones subject to court monitoring.  For example:

a. Plaintiff suffers from peripheral edema, and yet in his infirmary nursing evaluation, "peripheral edema present" is not checked. "Within normal limits" is checked. Plaintiff is incontinent of bowel, but bowel incontinence is not checked. Rather, "normal" is checked. Plaintiff is incontinent of bladder and yet "urinary incontinence" is not checked. Rather, "within normal limits" is checked.

b. The nursing evaluation notes that he uses a wheelchair but does not check that he has partial paralysis (paraparesis).

c. The Braden scale form to gauge risk of pressure sores is almost totally and recklessly false. For instance, Plaintiff's spinal injury leaves him almost totally unable to feel that his bowels or bladder are full, and yet on October 29, 2021, his "sensory perception," is marked "4" for "no impairment."

d. Plaintiff would go through 3-5 diapers a day if they were available and because they are not, he is sometimes forced to remain in wet and soiled diapers for hours and yet on October 29, 2021, he is scored "4" for "rarely moist."

e. Plaintiff is dependent on his wheelchair and, at most, can walk a few steps holding onto his wheelchair—when he has high-topped therapeutic boots, which he has not had for a year. And yet he is scored "4" for "walks frequently."

f. Again, he is wheelchair dependent. And yet he is scored "4" on mobility meaning "no limitations."

56. All in all, on October 29, 2020, a man who is routinely left in wet diapers or clothing and is unable to walk unaided, has a perfect score on the Braden scale.

57. If the Braden scale had been honestly scored, Plaintiff would have received at best a 17. Instead, he received a 23. A score of 17, which shows him at risk for skin breaks, would have flagged him for a skin assessment by a clinician—but Centurion, MHM Health, and their staff did not want that.

58.     To illustrate the absurdity of how these defendants covered up Plaintiff's serious medical issues and needs, replicated below is the scoring system for the Braden scale along with a summary of how defendants scored Plaintiff:

| Sensory Perception | Moisture | Activity | Mobility | Nutrition | Friction/Shear |
|---|---|---|---|---|---|
| 1. Completely limited<br>2. Very limited<br>3. Slightly limited<br>4. No impairment | 1. Constantly moist<br>2. Very moist<br>3. Occasionally moist<br>4. Rarely moist | 1. Bedrest<br>2. Chairfast<br>3. Walks occasionally<br>4. Walks frequently | 1. Completely immobile<br>2. Very limited<br>3. Slightly limited<br>4. No limitations | 1. Very poor<br>2. Probably inadequate<br>3. Adequate<br>4. Excellent | 1. Problem<br>2. Potential problem<br>3. No apparent problem |

59.     On October 30, 2020, from left (sensory perception) to right (friction/shear) Plaintiff was rated: 4, 4, 4, 4, 4, and 3, for a perfect score of 23.

60.     The next day, the same perfect score—23—meaning no impaired sensory perception, rarely moist, frequently walking, no mobility limitations, excellent nutrition, and no apparent friction/sheer problems. Again, an impossible score even without the visible wetness/moisture issues given Plaintiff's wheelchair dependence.

61.     The next day, on November 1, 2020, a perfect score.

62.     November 2nd? A perfect score.

63.     On November 4, 2020, Plaintiff's obvious lack of mobility was finally admitted, and he was scored a 20.

64.     Of all the (apparently incomplete) records provided by FDC to Plaintiff, he apparently never scored below a 19. Most recently, Nurse Cannon scored Plaintiff at 20 on or about May 27, 2022.

65.     Plaintiff's Braden scores should have never been this high. But the object of the false scoring was to avoid requiring a clinician do an actual skin check as would

14

have been necessary with a score of 18 or less. Centurion and its contracted staff through MHM Health had a policy, custom, and practice at FDC institutions like Suwannee C.I. to disregard objectively serious medical symptoms and refuse to provide adequate treatment, among other unconstitutional practices and policies.

66.     For example, on August 7, 2021, Nurse Holmes ordered Plaintiff to leave the medical unit without his necessary medical supplies, forcing him to go the rest of the day and night without any unsoiled diapers.

67.     In response to Plaintiff's complaints and grievances, staff would often tell Plaintiff that they did not care about his lack of medically necessary diapers and wipes. Centurion and MHM Health employee Nurse Adams told Plaintiff that she "did not give a fuck" if he did not have his medically necessary items like diapers and wipes after refusing to provide him with the same. He was also told by medical department staff that they "don't give a fuck about federal judges" at Suwannee C.I. when he was denied access to medical wipes, skin cleanser and A&D ointment upon arrival. Centurion and MHM Health staff and Defendants have told Plaintiff that their job is to fill out paperwork, not to provide him care.

68.     On November 17, 2021, Plaintiff saw Suwannee Chief Health Officer Dr. Alexis Figueroa regarding a bad flareup cellulitis in his right leg. Figueroa told Plaintiff he'd order medications to help Plaintiff, including barrier creams (ointment).

69.     On or about February 3, 2021, Plaintiff had a severe flare-up of cellulitis symptoms. At that time, Plaintiff still had not had bathroom or shower passes renewed and Plaintiff—an ADA (or Americans with Disabilities Act) inmate—was denied

access to the shower during the day.

70.     As of March 5, 2021, Plaintiff had symptoms of severe cellulitis, with extreme swelling and open bleeding sores.

71.     On or about March 9, 2021, Sgt. Aldridge intercepted Plaintiff's legal journal. After removing it from Plaintiff's bunk, she and other corrections staff photographed excerpts of the journal on their phones. Later that day, Aldridge called Plaintiff up to the officer station and asked him "what are you doing writing my name in your book?" In response to Plaintiff explaining that he was being denied access to showers, Aldridge responded "we don't babysit ya'll here."

72.     In April 2021, medical staff employed by MHM Health and contracted by Centurion began distributing smaller sizes of sanitation supplies (4 oz. cleanser instead of 8 oz.) to Plaintiff, causing him to run out of his supply early.

73.     On or about May 5, 2021, Plaintiff was seen by Dr. Figueroa who saw open sores on Plaintiff's right leg and said they would be documented. Figueroa told plaintiff he would order a tub of A&D ointment, which he belatedly received 10 days later along with some Bacitracin ointment. Neither ointment came with any refills.

74.     On May 7, 2021, Plaintiff turned in his tablet to be charged but Sgt. Richardson refused to charge it although she charged other inmates' tablets. Plaintiff's tablet is his lifeline with his sister when he needs assistance. Sgt. Richardson refused to charge Plaintiff's tablet to prevent Plaintiff from communicating with his sister and having her help alert FDC when Plaintiff needed help.

75.     On or about May 9, 2021, Plaintiff's right leg became very swollen and red with open sores. The next day, Plaintiff asked Ofcr. Fillmore Hawthorne to be allowed to use the ADA shower to rinse urine off his body. The officer told him to clean himself with a washcloth. Fillmore Hawthorne routinely allowed selected prisoners to shower throughout the day, but never Plaintiff.

76.     On or about May 11, 2021, Dr. Figueroa saw Plaintiff's open wounds on his right leg and stated he would order wound care and a sonogram. However, in the chart, Dr. Figueroa only noted that everything looked fine, but that Plaintiff's cholesterol was a little high.

77.     On or about May 12 and 13, 2021, Sgt. Richardson-Graham again refused to allow Plaintiff's tablet to be charged while allowing other inmates to charge as punishment for his frequent complaints and grievances about FDC, Centurion, and its contracted-for staff employed by MHM Health. Around that same time Richardson also would not permit Plaintiff or other ADA inmates to shower until after 5 p.m., leaving Plaintiff's skin unclean and prone to infection from being in soiled clothing or diapers all day. Further, given that there are approximately 20 ADA inmates in wheelchairs in Plaintiff's dorm and none are allowed to access the shower until after 5 p.m., there is not always enough time for Plaintiff to clean himself despite his serious medical problems caused by lack of sanitary conditions.

78.     In addition to Richardson-Grahams' attempts to limit Plaintiff's communications with his sister by not permitting his tablet to be charged, Plaintiff's emails through his JPay tablet were also blocked through June and July 2021—an

effort to keep the outside world from knowing the inhumane realities Plaintiff faced.

79.     Because Plaintiff was not given any refills on the A&D ointment, he needed more to treat his skin, but didn't receive any. By early August 2021, Plaintiff was without any ointment and physically unable to put on diapers provided to him—which weren't the pull-up diapers he could have put on without help. He tried to fold those unsatisfactory diapers in his pants because he couldn't otherwise put them on, but urine and feces would still run down his legs.

80.     In the course of receiving his medical supplies, Plaintiff has seen other inmates receiving large pull-up diapers of exactly the kind he had been previously receiving but which were always denied to him with claims they weren't allowed.

81.     At some point in August 2021, Plaintiff—with his severe impairments—was moved to K-dorm, Wing 1, which is an HO-4 dorm—a dorm holding violent inmates.

82.     On August 23, 2021, Plaintiff clearly presented with cellulitis and was prescribed a seven-day course of antibiotic pills. Plaintiff had to skip a day of the antibiotics because medical staff did not know which medication he was prescribed.

83.     By the end of August, Plaintiff had been out of supplies for several days and had to urinate in his clothes. He got diapers in September, but no other supplies.

84.     In October 2021, Plaintiff was again out of diapers and had to urinate in his clothes. He had not received barrier cream (zinc oxide) for over a month to prevent reoccurrence of cellulitis; he had open sores and scabs on his right leg and nothing to treat them and no medical passes to see a provider.

85.     On November 17, 2021, Dr. Figueroa again told Plaintiff he would order A&D ointment and water pills for Plaintiff's swollen right leg—but often Plaintiff would never receive these prescriptions.

86.     Fast forward to the end of the year and Plaintiff had still not received the medication Dr. Figueroa purportedly ordered. He is told by MHM Health employees staffed for Centurion that his sick calls are conveniently "lost." And his right leg is red, very swollen, and open and leaking.

87.     Mere administrative incompetence cannot explain the repeated lapses of medication, sanitary needs, mobility needs and assistance, mis-scoring of medical inventories, and lack of medical attention. If there were any doubt as to the deliberateness of the abuse, regular derisive comments and threats resolved it.

88.     The institutional abuse of elderly, disabled, and chronically ill prisoners was not limited to Phillips but impacted numerous other such inmates—the institutional abuse was known by Dixon, and he failed to stop or curtail the discrimination and abuse.

89.     Under Sgt. Aldridge's watch, preferred prisoners got the run of the showers during the day. ADA inmates, like Plaintiff, had to wait until after 5:00 p.m., when there was no longer time for all of them to get showers.

90.     To prevent Plaintiff from seeking legal redress or otherwise grieving her misconduct, Aldridge told other prisoners in Plaintiff's presence that he was an undercover federal agent, inciting mistrust and anger among some other inmates.

19

91.     This effort to alienate other prisoners from Plaintiff added to the natural aversion of inmates who are forced to live close together, to an inmate who is often incontinent and, when he cannot change diapers, has to move about smelling of a mixture of urine and feces, targeting him for physical abuse by predatory inmates.

92.     Richardson-Graham exhibited a similar desire to stifle Plaintiff's First Amendment rights. At one point on her watch, she called Plaintiff a "snitch" for writing grievances and made sure gang members in the dorm overheard. She made other threats to Plaintiff in the past for not signing documents with false statements.

93.     The actions of Richardson-Graham and Aldridge in connection with Plaintiff's attempts to grieve were tantamount to a death sentence.

94.     Inmates in Plaintiff's dorm were often subjected to group punishment, for which it was made clear by Richardson-Graham and Aldridge that Plaintiff was responsible.

95.     On or about May 13, 2022, Plaintiff was threatened by inmate Carl Johnson with harm if he didn't stop writing grievances against Sgts. Richardson-Graham and Aldridge. Johnson also told him that if there was ever any kind of investigation of Phillips' allegations, he would lie for the corrections staff.

96.     Johnson's threats to Plaintiff were a foreseeable result of the announcements made to inmates by Richardson-Graham and/or Aldridge.

97.     Thus far in 2022, Plaintiff has been issued only three diapers a day (if any), which is insufficient. The diapers are not "pull-up," and he sometimes can't put them on but must fold them inside his boxers to try to catch urine and feces with

limited success. Plaintiff is not issued A&D ointment and only rarely receives zinc oxide and he gets virtually no barrier creams from medical.

98. Plaintiff has been denied adequate diapers from Cannon, Holmes, and Figueroa. He has had his medical wipes confiscated (as recently as July 2022). He lacks passes for the bathroom or shower. And he frequently misses meals because he is unable to wheel himself to the chow hall and has no regular impaired inmate assistant.

99. Specifically, Centurion, MHM Health, and their staff including Figueroa, Cannon, and Holmes, have failed to approve appropriate medical treatment to treat Plaintiff's recurring cellulitis symptoms and have not permitted him to receive necessary treatment nor any treatment at all.

100. Instead, Centurion, MHM Health, and their staff including Figueroa, Cannon, and Holmes, prioritize Centurion's and MHM Health's profits over Plaintiff's care by avoiding provision of necessary medical care and also cooperate in retaliatory denial of access to medical treatment by medical and corrections staff.

101. By ignoring Plaintiff's worsening condition, Centurion, MHM Health, and their staff including Figueroa, Cannon, and Holmes, are making medical decisions for Plaintiff based on cost of treatment, retaliation for speech, and other factors unrelated to sound medical judgment.

102. Plaintiff has exhausted the FDC grievance process repeatedly to obtain immediate and necessary treatment to no avail.

## Causes of Action

I.   **Violation of 42 U.S.C. § 1983 – First Amendment Retaliation (against Richardson-Graham, Aldridge, Holmes, Cannon, and Secretary Dixon)**

Plaintiff repeats and re-alleges the Common Allegations of Fact, as if fully set forth herein and further alleges:

103.   Plaintiff has a right to protected speech and redress of grievances under the First Amendment to the U.S. Constitution.

104.   Plaintiff has written grievances complaining of abusive treatment by Richardson-Graham, Aldridge, Figueroa, Holmes and Cannon and they have responded with retaliatory and life-endangering measures to punish him.

105.   The retaliatory life-threatening measures are such as would deter a person of ordinary firmness from exercising protected speech and seeking redress.

106.   This count as to Secretary Dixon is solely for injunctive relief.

107.   Plaintiff has been required to engage the services of the undersigned counsel. As such, Plaintiff is entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE, Plaintiff demands: (a) judgment for compensatory and punitive damages against the Richardson-Graham, Aldridge, Figueroa, Holmes and Cannon; (b) alternatively, to the extent that any of the above wrongful acts are deemed not to have caused a "more than de minimis" physical injury, nominal and punitive damages against Richardson-Graham, Aldridge, Figueroa, Holmes and Cannon; (c) a preliminary and permanent injunction requiring Richardson-Graham, Aldridge,

Figueroa, Holmes, Cannon and FDC to cease retaliation and provide Plaintiff with necessary and immediate medical treatment to treat his serious medical conditions; (d) an order retaining jurisdiction over this matter to ensure that the terms of an injunction are fully implemented; and (e) an order awarding Plaintiff's reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988 and other applicable law.

## II.   Violation of 42 U.S.C. § 1983 – Eighth Amendment (against Centurion and MHM Health)

Plaintiff repeats and re-alleges the Common Allegations of Fact, as if fully set forth herein and further alleges:

108.   Plaintiff has an Eighth Amendment right to receive timely and adequate medical treatment for a serious medical condition.

109.   Centurion and MHM Health were deliberately indifferent or purposefully ignoring Plaintiff's serious medical needs in violation of the Eighth Amendment right to be free from cruel and unusual punishment.

110.   Plaintiff's injuries were proximately caused by the policies and practices of Centurion and MHM Health.

111.   Prior to and during the events giving rise to Plaintiff's Complaint, Centurion and MHM Health maintained policies and practices pursuant to which prisoners like Plaintiff with serious medical needs were routinely denied medical care and access to medical care.

112.   Specifically, there exist policies and widespread practices at FDC pursuant to which prisoners receive unconstitutionally inadequate healthcare,

23

including policies and practices in which healthcare staff contracted by Centurion and MHM Health: (a) commonly disregard reports by patients of objectively serious symptoms or fabricate reports; (b) refuse to provide adequate treatment to patients; (c) refuse to provide medication, medical devices, and lab work; (d) fail to create sensible treatment plans for patients whose health status requires the same; (e) fail to ensure continuity of care; (f) prioritize profits at the expense of constitutionally adequate care; (g) fail or refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper; and (h) refuse and/or fail to provide any medical care whatsoever for defined medical problems.

113.   These policies and practices were allowed to flourish because Centurion and MHM Health, which respectively direct and staff the provision of healthcare services at Suwannee Correction Institution (and Annex) and FDC, directly encouraged the very type of misconduct at issue here and failed to provide adequate training and supervision of healthcare and correctional employees.

114.   Centurion and MHM Health violated Plaintiff's rights by maintaining practices and policies that were the moving force of these constitutional violations.

115.   These policies and practices were able to exist and thrive within FDC because Centurion (as the contractor to oversee health services at FDC) and MHM Health (as the employer of medical staff under the Centurion contract) were both deliberately indifferent to the problem, thereby effectively ratifying it.

116.   Centurion and MHM Health also acted to violate Plaintiff's constitutional rights through the actions and failures to act by individuals with final

policymaking authority for them.

117.   Plaintiff's injuries were caused by persons who acted pursuant to the foregoing policies and practices in engaging in the misconduct described herein.

118.   Plaintiff has been required to engage the services of the undersigned counsel. As such, Plaintiff is entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE, Plaintiff demands: (a) judgment for compensatory and punitive damages against Centurion and MHM Health; (b) alternatively, to the extent that any of the above wrongful acts are deemed not to have caused a "more than de minimis" physical injury, nominal and punitive damages against Centurion and MHM Health; (c) a preliminary and permanent injunction requiring Centurion to provide Plaintiff with necessary and immediate medical treatment to treat his serious medical conditions; (d) an order retaining jurisdiction over this matter to ensure that the terms of an injunction are fully implemented; and (e) an order awarding Plaintiff's reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988 and any other applicable law.

## III.   Violation of 42 U.S.C. § 1983 – Eighth Amendment (Secretary Dixon)

Plaintiff repeats and re-alleges the Common Allegations of Fact, as if fully set forth herein and further alleges:

119.   Secretary Dixon is aware that Plaintiff suffers from serious medical needs, yet Dixon has intentionally cooperated with actions that delayed and denied the necessary aid and treatment that would alleviate many of those serious medical

needs.

120.    Dixon has disregarded, and continues to disregard, the risks and harms by failing and intentionally refusing to do anything that would remedy Plaintiff's serious medical needs and those of other elderly, disabled, and ill inmates.

121.    Dixon has been deliberately indifferent to the serious medical needs suffered by Plaintiff and others. While FDC contracts with Centurion to provide medical care, Dixon has a non-delegable duty to ensure adequate medical care for all prisoners in FDC custody.

122.    Plaintiff's grievance appeals have been incautiously dismissed without meaningful review, despite the fact that complaints by alert and articulate prisoners who suffer disability, illness, and the infirmities of age with inadequate care in the face of official indifference can be an important line of defense against abusive medical and corrections subcultures.

123.    As a direct and proximate cause of this deliberate indifference, Plaintiff has suffered and will continue to suffer from harm in violation of his Eighth Amendment rights. These harms will continue unless enjoined by the Court.

124.    The institutional indifference to abuse has often been pronounced and explicit, the stakes for its continuation are life and limb, and remedial action would be a public good and benefit to many others in Plaintiff's circumstances.

125.    Plaintiff has been required to engage the services of the undersigned counsel. As such, Plaintiff is entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE, Plaintiff demands: (a) a declaration that Dixon has violated and continues to violate Plaintiff's Eighth Amendment rights; (b) a preliminary and permanent injunction requiring Dixon to provide Plaintiff with necessary and immediate treatment to treat his serious medical conditions; (c) an order retaining jurisdiction over this matter to ensure that injunction terms are fully implemented; and (d) an order awarding Plaintiff reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988 and any other applicable law.

## IV.  Violation of ADA/RA (against Secretary Dixon)

Plaintiff repeats and re-alleges the Common Allegations of Fact, as if fully set forth herein and further alleges:

126.   Plaintiff is entitled to relief for disability discrimination against Ricky Dixon, or his successor, in his official capacity, for violating Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*., ("ADA") which provides in part:

> No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity.

42 U.S.C. § 12132.

127.   Title II of the Act prohibits, among other things:

> limiting a qualified individual's enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service of an agency; and

> subjecting a qualified individual to discrimination under any program or activity conducted by an agency.

28 C.F.R. § 39.130.

27

128. As a result of a spinal injury, Plaintiff became disabled as defined at 42 U.S.C. § 12102(2), as he suffered a physical impairment that substantially limited one or more of his major life activities, including, but not limited to, the ability to walk normally and to perform normal bathroom functions.

129. Plaintiff was a "qualified individual" as defined at 42 U.S.C. § 12131(2): a "Qualified Individual" means a person with a disability who meets the essential eligibility requirements for receipt of services or participation in programs or activities provided by the entity (with or without regard to any auxiliary aids or modifications).

130. FDC is a public entity that has violated Title II of the ADA.

131. FDC is an entity that receives federal funding.

132. Suwannee C.I. and its Annex is a facility and its operation comprises a program and service for purposes of Title II of the ADA.

133. At all times material, Defendant Dixon was an official who at a minimum has authority to address the discrimination and to institute corrective measures on FDC's behalf and had actual knowledge of discrimination in the entity's programs and failed adequately to respond.

134. Specifically, Defendant Ricky Dixon, or his predecessor, in his official capacity, had knowledge of the widespread history of abuse to Plaintiff and other prisoners who suffer from disabilities and are retaliated against for their exercise of the First Amendment right to grieve. Defendant had actual knowledge of Plaintiff's allegations of abuse and understanding of the systemic issues and discrimination from the FLND Action, in which the court entered a preliminary injunction against FDC

requiring it to provide Plaintiff with needed medical supplies, and from its lawsuit with Disability Rights Florida in Leon County, under which Dixon and FDC agreed to court-implemented monitoring and promised better accommodations for disabled prisoners with mobility limitations, like Plaintiff. Defendant further had actual knowledge of the discrimination from Plaintiff's grievances to the Secretary raising these issues at Suwannee C.I.

135.   Dixon and/or his predecessor, turned a blind eye to his subordinates who retaliated against disabled prisoners, including Plaintiff, for exercising their First Amendment rights. Dixon knew that his subordinates would act unlawfully, and he failed to stop them from doing so.

136.   Dixon, or his predecessor, authorized his agents and employees to act for him when they committed the ADA violations alleged herein. Defendant Dixon, or his predecessor, had control over its agents and employees when they committed the ADA violations alleged herein.

137.   His agents and employees accepted the undertaking of acting on behalf of him when they committed the ADA violations alleged herein and had knowledge of the consequences of their ADA violations.

138.   The ADA violations alleged herein and committed by Defendant's agents and employees were done while acting within the course and scope of their employ and/or agency with FDC.

139.   Plaintiff's need for a reasonable accommodation was known and obvious to Defendant and his employees and agents.

140.    Defendant, by failing to adequately respond to the discrimination against Plaintiff, acted intentionally and/or with deliberate indifference to Phillips's need for reasonable accommodation by:

a)  failure to accommodate his paraparesis;

b)  failure to accommodate his incontinence of bladder and bowel;

c)  failure to ensure that he was able to timely access bathroom and shower;

d)  failing and intentionally refusing to train FDC employees regarding the humane management of physically disabled inmates;

e)  permitting sadistic officers to physically abuse Plaintiff; and

f)  fabricating records to hide Plaintiff's disability needs.

141.    As a proximate result of Defendant's failure and intentional refusal to provide Plaintiff with a reasonable accommodation for his disability, he suffered physical harm and severe pain.

WHEREFORE, Plaintiff demands: (a) judgment for compensatory damages against FDC; (b) alternatively, to the extent that any of the above wrongful acts are deemed not to have caused a "more than de minimis" physical injury, nominal and punitive damages against FDC; and (c) an order awarding Plaintiff's reasonable attorneys' fees, litigation expenses, and costs pursuant to applicable law.

## V.    Violation of 42 U.S.C. § 1983 – Eighth Amendment Failure to Treat (against Figueroa, Cannon, Adams, and Holmes)

Plaintiff repeats and re-alleges the Common Allegations of Fact, as if fully set forth herein and further alleges:

142.    Dr. Figueroa and nurses Holmes, Adams, and Cannon know, and have known, that Plaintiff suffers from serious medical needs, yet Figueroa, Holmes, and Cannon have failed and intentionally refused to provide the necessary aid and treatment that would alleviate numerous serious medical needs.

143.    Figueroa, Holmes, Adams, and Cannon have disregarded, and continue to disregard, the risks and harms by failing and intentionally refusing to do anything that would remedy Plaintiff's serious medical needs.

144.    Figueroa, Holmes, and Cannon have been deliberately indifferent to the serious medical needs of Plaintiff.

145.    Specifically, as Chief Health Officer and nurses working for Centurion as staffed employees by MHM Health, Figueroa, Holmes, and Cannon were required to evaluate the appropriate level of care for Plaintiff in his deteriorating condition.

146.    In the face of obvious recurrence of cellulitis, Figueroa, Holmes, Adams, and Cannon have refused to permit Plaintiff to receive care and medical supplies to treat or mitigate his serious medical condition to avoid the risk of serious harm.

147.    As a direct and proximate cause of this deliberate indifference, Plaintiff has suffered and will continue to suffer from harm in violation of his Eighth Amendment rights.

148.    Plaintiff has been required to engage the services of the undersigned counsel. As such, Plaintiff is entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE, Plaintiff demands: (a) judgment for compensatory and punitive damages against Figueroa, Cannon, Adams, and Holmes; (b) alternatively, to the extent that any of the above wrongful acts are deemed not to have caused a "more than de minimis" physical injury, nominal and punitive damages against Figueroa, Cannon, Adams, and Holmes; and (c) an order awarding Plaintiff's reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988 and any other applicable law.

## VI.   Violation of 42 U.S.C. § 1983 – Eighth Amendment Interference with Treatment (against Richardson-Graham, Fillmore Hawthorne, and Aldridge)

Plaintiff repeats and re-alleges the Common Allegations of Fact, as if fully set forth herein and further alleges:

149.   Sergeants Richardson-Graham and Aldridge and Officer Fillmore Hawthorne know, and have known, that Plaintiff suffers from serious medical needs, yet Richardson-Graham, Fillmore Hawthorne, and Aldridge have intentionally interfered with medically necessary sanitation that would alleviate numerous life-threatening medical needs.

150.   Richardson-Graham, Fillmore Hawthorne, and Aldridge have disregarded, and may continue to disregard, the risks and harms by failing and intentionally refusing to do anything to remedy Plaintiff's serious medical needs.

151.   Richardson-Graham, Fillmore Hawthorne, and Aldridge have been deliberately indifferent to the serious medical needs of Plaintiff and to his access to needed care.

152.  In the face of obvious recurrence of cellulitis, Richardson-Graham, Fillmore Hawthorne, and Aldridge have refused to permit Plaintiff to receive care and medical supplies to treat or mitigate his serious medical condition to avoid the risk of serious harm.

153.  The repeated threats against Plaintiff by Richardson-Graham, Filmore Hawthorne, and Aldridge, and their suggestion to other inmates, including inmates with histories of violence, that Plaintiff is a snitch and an enemy that means them harm and their expressions of contempt for Plaintiff's efforts to protect himself through resort to the courts, have contributed materially to his health risks.

154.  As a direct and proximate cause of this deliberate indifference, Plaintiff has suffered and will continue to suffer from harm in violation of his Eighth Amendment rights.

155.  Plaintiff has been required to engage the services of the undersigned counsel. As such, Plaintiff is entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE, Plaintiff demands: (a) judgment for compensatory and punitive damages against Richardson-Graham, Fillmore Hawthorne, and Aldridge; (b) alternatively, to the extent that any of the above wrongful acts are deemed not to have caused a "more than de minimis" physical injury, nominal and punitive damages against Richardson-Graham, Fillmore Hawthorne, and Aldridge; and (c) an order awarding Plaintiff's reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988 and any other applicable law.

## VII. Conspiracy under 42 U.S.C. § 1983 to Violate the Eighth Amendment (against Figueroa, Holmes, Cannon, Adams, Richardson-Graham, Fillmore Hawthorne, and Aldridge)

Plaintiff repeats and re-alleges the Common Allegations of Fact, as if fully set forth herein and further alleges:

156.   Plaintiff is entitled to relief against Defendants Figueroa, Holmes, Cannon, Adams, Richardson-Graham, Fillmore Hawthorne, and Aldridge, for violation of the Eighth Amendment, in creating circumstances that increased the risk of serious harm, including denial of access to bathroom and shower, and also denying care to remedy the risk of harm, such as sufficient adult diapers, sanitation needs, and an impaired inmate assistant.

157.   Defendants acted under color of law to further the conspiracy.

158.   Each of the co-conspirators, employees of FDC, Centurion, and MHM, with the occasional help of other prison inmates who threatened Plaintiff on behalf of prison staff, committed overt acts and was an otherwise a knowing and willing participant in joint criminal activity, working in concert toward an apparent goal of punishing Plaintiff for his insistence on adequate care.

159.   As a direct result of Defendants' conspiracy to deprive Phillips of his constitutional rights, he suffered severe physical injuries and pain, and risk of septic shock, amputation of a limb, or death.

160.   Defendants conspired to do an unlawful act by unlawful means and each Defendant engaged in mutually reinforcing, overt, repeated, consistent, and materially similar acts in furtherance of the conspiracy.

34

161.   As Plaintiff has been obliged to retain counsel for redress, pursuant to 42 U.S.C. § 1988, Plaintiff is entitled to reasonable attorney fees, as well as costs.

WHEREFORE, Plaintiff demands: (a) judgment for compensatory and punitive damages against Figueroa, Holmes, Cannon, Adams, Richardson-Graham, Fillmore Hawthorne, and Aldridge; (b) alternatively, to the extent that any of the above wrongful acts are deemed not to have caused a "more than de minimis" physical injury, nominal and punitive damages against Figueroa, Holmes, Cannon, Adams, Richardson-Graham, Fillmore Hawthorne, and Aldridge; and (c) an order awarding Plaintiff's reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988 and any other applicable law.

## VIII.   Abuse or Neglect of a Vulnerable Adult § 415.1111, Fla. Stat. (Figueroa, Holmes, Cannon, Adams, Richardson-Graham, Filmore Hawthorne, and Aldridge)

Plaintiff repeats and re-alleges the Common Allegations of Fact, as if fully set forth herein and further alleges:

162.   Plaintiff is entitled to relief against Defendants Figueroa, Cannon, Holmes, Adams, Richardson-Graham, Fillmore Hawthorne, and Aldridge, under the Adult Protective Services Act.

163.   Plaintiff met the definition of a "vulnerable adult" in that she was an adult whose ability to perform the normal activities of daily living or to provide for his own care was impaired due to a mental infirmity.

164.   The above Defendants assumed the responsibility for a caregiver relationship, involving the regular and frequent care of Plaintiff.

165.   Defendants had a duty to avoid acts or omissions that caused significant impairment to Plaintiff's mental and physical health.

166.   Defendants had a duty to provide care, supervision and services necessary to Plaintiff.

167.   Defendants breached that duty of care by abusive and neglectful acts that could reasonably be expected to cause serious physical and mental injury.

168.   Defendants breached their duties to Plaintiff as follows:

a) Acting in a way that caused or was likely to cause significant impairment to Plaintiff's physical, mental, and emotional health;

b) Failing to follow normal and accepted humane corrections practices and procedures relating to the safe care of vulnerable inmates; and

c) Failing to provide care, supervision, and services necessary to maintain the physical and mental health of Plaintiff, including necessary treatment, supervision, monitoring and medical services, that a prudent person would consider essential for the well-being of a vulnerable adult.

169.   As a direct and proximate result of Defendants' breach of duty to the Plaintiff, Plaintiff suffered severe physical injuries and emotional distress.

170.   Defendants' acts and omissions as stated above constitute "abuse" as that term is defined in section 415.102(1), Florida Statutes, as well as "neglect" as that term is defined in section 415.102(15), Florida Statutes.

171.   Pursuant to section 415.1111, Florida Statutes, Plaintiff is entitled to actual damages from Defendants, as well as attorneys' fees and costs.

172.   Plaintiff will seek punitive damages under Chapter 415, Florida Statutes.

WHEREFORE, Plaintiff demands: (a) judgment for compensatory and punitive damages against Figueroa, Cannon, Adams, Holmes, Richardson-Graham, Fillmore Hawthorne, and Aldridge; and (b) an order awarding Plaintiffs reasonable attorneys' fees, litigation expenses, and costs pursuant to section 415.1111, Florida Statutes, and other applicable law.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

Dated: November 17, 2022.

Respectfully submitted,

LAW OFFICE OF JAMES COOK

By: */s/ James V. Cook*
James V. Cook (FBN 0966843)
314 W. Jefferson Street
Tallahassee, Florida 32301
Tel. (850) 222-8080
cookjv@gmail.com

-and-

SLATER LEGAL PLLC

By: */s/ James M. Slater*
James M. Slater (FBN 111779)
113 S. Monroe Street
Tallahassee, Florida 32302
Tel: (305) 523-9023
james@slater.legal

*Attorneys for Plaintiff Donny Phillips*

**Certificate of Service**

I hereby certify that on November 17, 2022, I electronically filed the foregoing document with the Clerk by using the CM/ECF system, which will serve a copy on all counsel of record.

By: _/s/ James M. Slater_
        James M. Slater
