UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ELMER WILLIAMS,

       Plaintiff,

v.                                            Case No. 3:22-cv-1221-MMH-MCR

RICKY DIXON,

       Defendant.

_____

**ORDER**

**I. Status**

    Plaintiff Elmer Williams, a former inmate of the Florida Department of Corrections (FDC),[1] initiated this action with the assistance of counsel on November 4, 2022. <u>See</u> Complaint (Doc. 1).[2] Williams is proceeding on a Third Amended Complaint (TAC; Doc. 93). His allegations arise from the alleged mismanagement of treatment for prostate cancer and wounds that he

_____

[1] On October 31, 2022, Williams was awarded a compassionate release.

[2] For all pleadings and documents filed in this case, the Court cites to the document and page numbers as assigned by the Court's Electronic Case Filing System.

developed in confinement. <u>See generally</u> <u>id.</u> FDC Secretary Ricky Dixon is the only remaining Defendant.[3] <u>See</u> <u>id.</u> at 3.

This matter is before the Court on Defendant Dixon's Motion for Summary Judgment (Motion; Doc. 189) with exhibits (Docs. 189-1 through 189-4). The Court advised Williams of the provisions of Rule 56, Federal Rules of Civil Procedure (Rule(s)), notified him that the granting of a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and permitted him an opportunity to respond to the Motion. <u>See</u> Summary Judgment Notice and Courtesy Copies (Doc. 109). Williams filed a response in opposition to the Motion (Response; Doc. 193) with exhibits (Docs. 192-1 through 192-12). Defendant Dixon replied (Reply; Doc. 194). Defendant Dixon's Motion is ripe for review.

## II. Williams's Allegations

In this action, Williams alleges he has a "known, documented" history of prostate cancer. TAC at 6. Following diagnosis and treatment by a urologist, his prostate-specific antigen (PSA) levels, which indicate recurrent prostate

---

[3] The Court granted Defendant Elizabeth Holmes's Motion to Dismiss and dismissed without prejudice the claim against her. <u>See</u> Order (Doc. 118). Pursuant to joint stipulations of dismissal, the Court dismissed with prejudice the claims against Defendants Rebecca Yates; Wendy Millette; Adele Johns; Nurse Jason Howell; Nurse Tony Abbott; Dr. Alexis Figueroa; Centurion of Florida, LLC; Dr. Kalem Santiago; and Sergeant Savonia Richardson-Graham. <u>See</u> Orders (Docs. 121, 176, 185, 199).

cancer, decreased to 0.2 ng/mL in 2020. <u>Id.</u> As a result, Williams's urologist discontinued his medication in late 2020 "with instructions that he be seen again in June 2021 to assess [his] cancer and determine whether to change the course of action or restart medication." <u>Id.</u> Williams asserts he "was never taken by FDC or Centurion staff to see the urologist" in June 2021, <u>id.</u>, and on September 30, 2021, a urinalysis showed his PSA levels had increased from 0.2 ng/mL to 5.21 ng/mL, "well over the 4 ng/[m]L threshold used to determine whether prostate cancer is active, spreading, and whether further testing is necessary," <u>id.</u> at 7.

In November 2021, the FDC transferred Williams to Suwannee Correctional Institution (Suwannee CI). <u>Id.</u> After his arrival at Suwannee CI, on November 18, 2021, Williams fell out of his bunk and injured his hip, neck, and back. <u>Id.</u> at 7–8. He declared a medical emergency. <u>Id.</u> at 8. Sergeant Richardson-Graham refused to call for a stretcher, and instead, she ordered two inmates to pick Williams up and put him in another inmate's wheelchair. <u>Id.</u> Nurse Howell examined Williams in medical. <u>Id.</u> Williams alleges that he informed Nurse Howell that he had hurt his neck and back, he was experiencing numbness in his body and extremities, he was concerned about paralysis, and that his PSA levels had increased from 0.2 ng/mL to 5.2 ng/mL in a "short period of time." <u>Id.</u> Nurse Howell gave Williams a muscle relaxer

3

shot. Id. Williams alleges that during the exam, he asked Nurse Howell if he could approve a wheelchair, to which Nurse Howell responded, "[H]ell no." Id. Williams asserts he questioned Nurse Howell about how he would move around, and Nurse Howell said, "I don't know, hold on to the wall, or you can go to confinement." Id.

The next day, Nurse Abbott noted that Williams's records contained a previous institution's urgent urology referral from October 4, 2021, and "questioned in his notes whether the referral was ever submitted to Utilization Management—the internal Centurion review team, which approved referrals, but which could also overrule clinician recommendations." Id. at 9. Williams asserts that despite this acknowledgement, Centurion staff failed to test his blood and antigen levels. Id.

Williams further alleges that around this time, he began to experience chest pain and breathing problems, and also, he continued to experience numbness in his legs and difficulty walking. Id. These symptoms prevented Williams from moving around the facility. Id. According to Williams, he again "relayed" his mobility issues to Nurse Howell. Id.

According to Williams, on November 24, 2021, he had a callout to go to the Institutional Classification Team for a job assignment; however, he had no assigned wheelchair, and he could not attend without a wheelchair. Id.

4

Williams alleges Sergeant Richardson-Graham refused to allow him to borrow a wheelchair for the callout. Id. at 9–10. And that Sergeant Richardson-Graham "later" observed Williams writing an informal grievance about her earlier refusal to call for a stretcher and that she took Williams to disciplinary confinement. Id. at 10.

Williams further asserts that during a pre-confinement physical, Nurse Howell "completed a pre-special housing form stating [Williams] complained that his legs were numb." Id. That same day, Williams wrote an informal grievance about Nurse Howell's refusal to provide a wheelchair. Id. at 10. "In response to the informal grievance about Nurse Howell, his colleague and Centurion staff member, Rita Corbin, wrote that [Williams's] allegations were 'unfounded' and that a wheelchair is ordered 'per a clinician,' not a nurse." Id. at 10–11.

Williams asserts he was later taken to confinement in a wheelchair and placed in a cell for disabled prisoners with two beds. Id. at 11. However, he contends staff took the wheelchair from him and did not provide him with an impaired inmate assistant or bunkmate. Id. Williams maintains he "repeatedly" submitted sick call requests about his medical concerns, including his need for a wheelchair. Id. According to Williams, "sometimes the sick calls were not picked up by staff or processed." Id.

5

Williams alleges that while he was in confinement, he lacked the strength to pull himself up and down from his bunk or to move around to get his food. Id. As a result, he was forced to drag himself across his cell floor to use the toilet or to collect his food tray. Id. at 11–12. He also had to urinate in cups or on the floor and defecate on the floor. Id. at 12. Williams developed sores on his ankles from dragging himself across the cell floor that ultimately became infected. Id. at 14. Williams further asserts that he could not shower in confinement because he did not have a wheelchair. Id. at 13. "Eventually after more than a week, he was given a wheelchair to shower and then returned to his cell and the wheelchair was taken back." Id. Williams was released from confinement in a borrowed wheelchair on December 20, 2021. Id. at 15.

On December 24, 2021, Williams was evaluated in the emergency room. Id. at 17. He told Dr. Figueroa, Nurse Abbott, and nursing staff that he could not walk; however, they returned him to his dorm without an assigned wheelchair or other mobility devices. Id. Williams alleges he continued to relay his needs to medical staff during visits and in sick call requests without any sort of relief, such as an assigned wheelchair, an inmate assistant, or other accommodation. Id. at 18.

Williams alleges that Nurse Howell evaluated him twice in January 2022. Id. at 19. During the first evaluation, Williams complained of shortness

6

of breath, and Nurse Howell found that Williams had diminished lung sounds in his lower left lung and an irregular pulse. Id. Williams was ultimately admitted to the infirmary after the second evaluation on January 7, 2022, when Nurse Howell determined that Williams had a new onset of bilateral ankle edema. Id. In the infirmary, Nurse Wilson noted that Williams's ankle wounds emitted a foul odor, and Williams informed Nurse Wilson and Dr. Figueroa that he had not received any wound care "in several days." Id.

"Around this time," medical staff tested Williams's PSA levels, which had increased from 5.21 ng/mL in September 2021 to 21.00 ng/mL. Id. at 20. "A PSA value of greater than or equal to 4.0 ng/mL is the consensus standard at which further evaluation for prostate cancer should occur." Id. Williams alleges that although Dr. Figueroa noted an October 2021 urologist referral in Williams's records, Dr. Figueroa neither actualized that referral, nor ordered a "full clinical evaluation of [Williams's] prostate cancer to see whether [his] pain and extremity numbness were related to the rising PSA." Id. On February 8, 2022, Williams questioned medical staff about his urology referral. Id. at 26. According to Williams, "no one bothered to ensure that the referral was still in place or was otherwise received or acted on by the urologist. Instead, Centurion staff had to resubmit the referral to urology one month after Dr. Figueroa, his staff, and Centurion knew that [Williams's] PSA levels were alarmingly high,

7

and that [Williams] was having complaints regarding his lower back and legs." Id. (emphasis omitted).

While Williams was in the infirmary, he asserts that he continued to submit grievances about obtaining a wheelchair pass or other accommodation to no avail. Id. at 22–23. Medical staff ultimately determined Williams's foul-smelling wounds "were the result of necrotizing fasciitis, a rare bacterial infection that spread quickly in the body and can cause death." Id. at 25. On February 9, 2022, Williams received wound treatment on his ankles—wounds that "had been categorized as stage 2 wounds," which would require 14 to 45 days of treatment. Id. at 26. Nevertheless, Dr. Figueroa and Nurse Holmes began the discharge process on February 14, 2022, "well before the time required to allow [Williams's] wounds to heal and despite the concerning spike in [Williams's] PSA and accompanied back pain and lower extremity numbness." Id. at 26. According to Williams, Dr. Figueroa and Nurse Holmes stated in discharge forms that he was stable, and he would continue his treatment in the dorm. Id. at 27.

"Just two days after his discharge from the infirmary to the dorm, lab reports showed that [Williams's] PSA level doubled to 43.40 ng/mL in just a month's time." Id. Williams still had not visited a urologist or signed a consent form, which authorizes transport to a specialist outside of the FDC. Id. at 22,

8

27. He asserts that he did not have a pass for an inmate assistant or an assigned wheelchair. Id. at 27. As a result, Williams would pay other inmates to borrow their wheelchairs and rely on their assistance to get in and out of the wheelchair. Id. at 28. Additionally, he alleges that he soiled himself in bed because he did not have diapers or anyone to assist him with taking the diapers on and off. Id. "Despite open and obvious festering wounds, severe bloating, his inability to move or feel his lower extremities, and his escalating PSA levels, on or about February 23, 2022, Dr. Figueroa told [Williams] that he was doing much better and that his symptoms were resolved." Id. at 29.

According to Williams, on April 1, 2022, he filed an informal grievance "reporting that he still had to sit on the floor when he showered because he could not walk. He requested help because of the unsanitary nature of having to shower this way, particularly because [Williams] had deep open wounds on his buttocks." Id. at 29. Williams asserts his wounds continued to grow, and despite previously noting his increased risk for developing additional pressure sores, medical staff failed to timely treat the wounds or provide consistent treatment. Id. at 30. Williams alleges that ultimately Dr. Figueroa diagnosed Williams with osteomyelistis—a bone infection—on May 24, 2022. Id. at 31. Despite this, "Dr. Figueroa again delayed any treatment for [Williams's] serious and obvious infection," id.; by July 2022, even though according to

Williams, the sores had increased in size and depth such that bone was visible, id. at 32. Williams alleges that around this time, Dr. Figueroa dug out masses of necrotic tissue from his heel but did not take any other action to treat the sores. Id. at 33.

As to his prostate condition, Williams asserts that he did not visit a urologist until "about four months after first complaining of his mobility concerns and medical staff realizing that his PSA levels had risen and that he had an outstanding urology referral [from a previous institution]." Id. at 32. According to Williams, by June 2022, after several visits with an oncologist and administration of Eligard, Williams's PSA levels measured at 7.2 ng/mL. Id. Physical findings at that time revealed that his prostate cancer was metastatic with spinal cord malignancy. Id.

In mid-August 2022, the FDC transferred Williams to the Reception and Medical Center (RMC), where Williams finally learned that his cancer had metastasized and spread throughout his body "even though Dr. Figueroa knew his cancer had metastasized back in June." Id. at 35. Williams asserts his prostate cancer had spread to areas where he complained of pain and numbness. Id. Williams's cancer is terminal, and a state panel has awarded Williams compassionate medical release. Id. at 37.

Based on the above, Williams sues Defendant Dixon in his official
capacity and alleges that he violated the Americans with Disabilities Act
(ADA) and Rehabilitation Act (RA). Id. at 40–44. Williams asserts that he
became disabled from the spread of his prostate cancer, and his physical
impairment substantially limited one or more of his major life activities,
including "the ability to walk normally and to perform normal bathroom
functions." Id. at 41. He alleges that Defendant Dixon actually knew of the
widespread history of discrimination towards Williams and other ADA
prisoners based on prior litigation involving the FDC, grievances that Williams
filed, and emails from Williams's family members. Id. at 42–43. According to
Williams, Defendant Dixon, in his official capacity as FDC Secretary, had the
authority to address this discrimination and institute corrective measures on
behalf of the FDC. Id. at 42. But Defendant Dixon "acted intentionally and/or
with    deliberate    indifference    to    [Williams's]    need    for    reasonable
accommodation[s] by":

> (a) fail[ing] to accommodate his lower extremity
> numbness;
>
> (b) fail[ing] to accommodate his incontinence of
> bladder and bowel; and
>
> (c) failing and intentionally refusing to train
> FDC    employees    regarding    the    humane
> management of physically disabled inmates.

11

Id. at 43. Because of Defendant Dixon's alleged failure and intentional refusal to provide Williams with reasonable accommodations for his disability, Williams has suffered physical harm and severe pain. Id. at 43–44. As relief, Williams requests compensatory damages and attorney's fees and costs. Id. at 44.

### III. Summary Judgment Standard

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[4] An issue is genuine when the evidence is such that a reasonable

---

[4] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d

---

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

  In citing to Campbell, the Court notes that it does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. Gov't Emps. Ins. Co., 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted).

Substantive law determines the materiality of facts, and "[o]nly disputes over

facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

In determining whether summary judgment is appropriate, a court "must view

all evidence and make all reasonable inferences in favor of the party opposing

summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995)

(citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571,

1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the

evidence is such that a reasonable jury could return a verdict for the

nonmoving party." Guevara v. NCL (Bahamas) Ltd., 920 F.3d 710, 720 (11th

Cir. 2019) (quotation marks and citation omitted).

## IV. Applicable Law

Title II of the ADA provides that "no qualified individual with a disability

shall, by reason of such disability, be excluded from participation in or be

denied the benefits of the services, programs, or activities of a public entity, or

be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "To state

a claim under Title II of the ADA, a plaintiff must allege: (1) that he is a

'qualified individual with a disability;' (2) that he was 'excluded from

participation in or . . . denied the benefits of the services, programs, or activities

of a public entity' or otherwise 'discriminated [against] by such entity;' (3) 'by reason of such disability.'" <u>Shotz v. Cates</u>, 256 F.3d 1077, 1079 (11th Cir. 2001) (quoting 42 U.S.C. § 12132).[5]

Typically, proof of a Title II violation entitles a plaintiff to injunctive relief only. <u>Silberman v. Miami Dade Transit</u>, 927 F.3d 1123, 1134 (11th Cir. 2019). To recover monetary damages, a plaintiff "must clear an additional hurdle: he must prove that the entity that he has sued engaged in intentional discrimination, which requires a showing of deliberate indifference." <u>Ingram v. Kubik</u>, 30 F.4th 1241, 1257 (11th Cir. 2022) (quoting <u>Silberman</u>, 927 F.3d at 1134). The "deliberate indifference . . . standard . . . is a high standard." <u>West v. Tillman</u>, 496 F.3d 1321, 1333 (11th Cir. 2007) (per curiam). To establish deliberate indifference, a plaintiff "must demonstrate that the defendant acted with 'subjective recklessness as used in the criminal law,' . . . and to do so he must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff." <u>Wade v.</u>

---

[5] Given the textual similarities between the ADA and the RA, the same standards govern both claims, and courts rely on cases construing the acts interchangeably. <u>Ingram v. Kubik</u>, 30 F.4th 1241, 1256 (11th Cir. 2022). Accordingly, although analyzing both claims, the Court will refer primarily to the ADA for the sake of brevity.

McDade, 106 F.4th 1251, 1262 (11th Cir. 2024) (quoting Farmer v. Brennan, 511 U.S. 825, 839 (1994)).

In addition, a claim under Title II of the ADA cannot be based on vicarious liability. Instead, a plaintiff must allege facts establishing "the deliberate indifference of an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [entity's] behalf and who has actual knowledge of the discrimination in the [entity's] programs and fails adequately to respond." Ingram, 30 F.4th at 1259 (quoting Liese v. Indian River Cnty. Hosp. Dist., 701 F.3d 334, 349 (11th Cir. 2012)). "To qualify, that 'official' must be 'high enough up the chain-of-command that his [or her] acts constitute an official decision by the [entity] not to remedy the misconduct.'" Silberman, 927 F.3d at 1134 (quoting J.S., III by & through J.S. Jr. v. Hou. Cnty. Bd. of Educ., 877 F.3d 979, 987 (11th Cir. 2017)).

### V. Summary of Defendant Dixon's Arguments

Defendant Dixon argues Williams's ADA and RA claims fail because: (1) Williams "has failed to articulate which benefits he was denied access to, who the still unidentified 'subordinates' were that discriminated against him, and how any of it was by reason of his disability"; (2) Williams's claims are impermissibly premised on vicarious liability; (3) Williams fails to allege

16

sufficient facts to abrogate sovereign immunity; and (4) the FDC is immune from claims of willful and wanton misconduct and negligent training. Motion at 12–22.

## VI. Analysis

As relief for his ADA and RA claims, Williams seeks only damages. TAC at 44. And he alleges that Defendant Dixon "was an official who at a minimum has authority to address the discrimination and to institute corrective measures on FDC's behalf."[6] Id. at 42. Therefore, Williams must demonstrate that Defendant Dixon—the only defendant named in the ADA and RA claims— had actual knowledge of discrimination in the FDC's programs and failed to respond adequately.

Williams argues that Defendant Dixon knew his subordinates were engaging in discriminatory acts against Williams and other disabled inmates. Response at 12–14. In support of his contention, Williams relies on the settlement agreement in a state circuit court case—Disability Rights Florida, Inc. v. Florida Department of Corrections, No. 2019-CA-002825. Response at 13 n.8. He alleges that under that settlement agreement, the FDC must provide mobility aids and inmate assistants to qualified prisoners, like

---

[6] Williams has not alleged that any other FDC employee sustained authority to correct the FDC's policies or exercised substantial supervisory authority such that their actions constituted official decisions by Defendant Dixon in his official capacity.

Williams. Id. at 7. According to Williams, this agreement demonstrates
Defendant Dixon knew of the need for accommodations of disabled prisoners,
like Williams, and despite knowing he must provide those accommodations,
the FDC refused Williams's and other qualified prisoners' requests for
necessary assistance. Id. at 13 n.8. Williams notes that Defendant Dixon
"would have also received a Report from the Corrections Medical Authority on
their mandated Status of Elderly Offenders in Florida's Prisons . . . and their
special monitoring of Suwannee C.I. Annex and a few other Florida prison
institutions on the issues raised in the Disability Rights Florida litigation." Id.
at 12 n.6. Lastly, Williams asserts that Defendant Dixon had actual knowledge
of the discrimination through emails from Williams's family members and
relevant medical grievances. Id. at 13 n.8.

Insofar as Williams attempts to argue that the settlement agreement in
Disability Rights Florida, Inc. provided Defendant Dixon with actual
knowledge of discrimination in FDC's programs, the Court is not persuaded.
The settlement agreement, by itself, demonstrates that the FDC implemented
certain procedures to address requests for disability accommodations. See
generally Doc. 192-9. Williams fails to explain how the specific experiences of
those involved in that class action would have alerted Defendant Dixon to the
discrimination that Williams specifically faced: failure to provide a wheelchair,

inmate assistants, or adult diapers. Indeed, the settlement agreement covers inmates with visual impairments and deaf or hard of hearing inmates, in addition to inmates with mobility disabilities. Id. at 17–25. And the Court will not comb the state court record in an effort to construct Williams's argument for him. In short, the settlement agreement does not demonstrate that Defendant Dixon had actual knowledge about the specific discrimination that Williams allegedly faced and that he failed to address it.[7]

Moreover, the various grievances that Williams filed do not demonstrate the actual knowledge required by Eleventh Circuit precedent or a deliberately indifferent response. The Court initially notes that there is no evidence that Defendant Dixon either responded to or reviewed Williams's grievances himself. Also, prison officials considered and addressed Williams's complaints. See generally Doc. 114-4. For instance, Williams filed many of the grievances while he was in the infirmary, and the responses noted that Williams was "being seen and treated for [his] medical issues with medication, wound care and have been placed in the infirmary with 24/7 access to medical." Id. at 32. These responses reflect that prison officials inquired into the matter and did

---

[7] As to the Report from the Corrections Medical Authority (Doc. 192-11), it is dated December 27, 2022, after the events detailed in the TAC. As such, it does little to illuminate the extent of Defendant Dixon's actual knowledge of discrimination during the relevant time period.

not deliberately disregard Williams's complaints without any investigation or inquiry.

As to the email from Williams's family members, the record shows that on January 6, 2022, Stephanie Boudreau—a friend of Williams—emailed Regional Director John Palmer and Defendant Dixon to express her concerns about Williams's condition.[8] Doc. 192-7 at 2–3. In the email, she notes that Williams has not received a wheelchair or a medical pass for adult diapers despite his lack of mobility. Id. In response to the email, Lieutenant Esly Hodge created an incident report and interviewed Williams. Id. at 1. On January 7, 2022, Williams was admitted to the infirmary. Id. at 5–7.

Even assuming that this email shows Defendant Dixon had actual knowledge of Williams's situation, no reasonable jury could find that Defendant Dixon acted with deliberate indifference after he received the email. Indeed, an incident report was generated as a result of Boudreau's email, and Williams was admitted to the infirmary for evaluation. Such evidence does not demonstrate that Defendant Dixon acted with subjective recklessness as used in the criminal law.

On this record, no reasonable jury could find that Defendant Dixon had actual knowledge of the discrimination and, if so, acted with deliberate

---

[8] Williams refers to "emails" throughout his Response; however, he only attaches an example of one—a January 6, 2022 email from Boudreau.

indifference to Williams's ADA or RA rights. Because Williams may not hold Defendant Dixon liable for compensatory damages under the ADA and RA, Dixon is entitled to summary judgment on those claims.

Accordingly, it is now **ORDERED:**

1.      Defendant Dixon's Motion for Summary Judgment (Doc. 189) is **GRANTED**.

2.      Williams and Defendant Dixon's Motions in Limine (Docs. 201, 202) are **DENIED as moot**.

3.      The **Clerk** shall enter judgment in favor of Defendant Dixon and against Williams, terminate any pending motions, and close the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 4th day of November, 2025.

**MARCIA MORALES HOWARD**
United States District Judge

Jax-9 10/23
c:      Counsel of record